**LAW OFFICES OF C. JOE SAYAS, JR.**
C. JOE SAYAS, JR. (Bar No. 122397)
KARL P. EVANGELISTA (Bar No. 250685)
500 N. Brand Boulevard, Suite 980
Glendale, California 91203
Telephone: (818) 291-0088
Facsimile: (818) 240-9955

**KING CHENG MILLER & JIN, LLP**
DAVID P. KING (Bar No. 136765)
3675 Huntington Drive, Suite 200
Pasadena, California 91107
Telephone: (626) 304-9001
Facsimile: (626) 304-9002

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORA PATRICIA AMAYA, an individual; and ANIBAL SILVA, an individual; on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MENZIES AVIATION (USA), INC., a Delaware corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 2:22-cv-05915-MCS-MAR <br> Hon. Mark C. Scarsi <br><br> <u>CLASS ACTION</u> <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date: July 24, 2023 <br> Time: 9:00 a.m. <br> Location: Courtroom 7C |

///
///
///
///
///

a

**TABLE OF CONTENTS**

| | | | **PAGE** |
|---|---|---|---|
| **I.** | **INTRODUCTION** | | 1 |
| **II.** | **STATEMENT OF FACTS** | | 3 |
| | **A.** | **The Parties** | 3 |
| | | 1. *Defendant Menzies Aviation (USA), Inc.'s Operations* | 3 |
| | | 2. *Named Class Representative Dora Patricia Amaya* | 4 |
| | | 3. *Named Class Representative Anibal Silva* | 5 |
| | | 4. *Putative Class Members* | 6 |
| | **B.** | **Menzies' Policy of Authorizing Breaks Contingent on Changing Airline Schedules, and of Foregoing Breaks Until Work is Completed, Led to Meal and Rest Breaks Violations** | 6 |
| | **C.** | **Menzies' Strict Policy to Record Employee Meal-Break Times Created Accurate Record of Meal Break Violations** | 9 |
| | **D.** | **Despite Its Records of Non-Compliant Meal Periods, Menzies Uniformly Withholds Meal Premium Wages Unless Employees Request Payment in Writing and Obtain Manager Approval** | 11 |
| | **E.** | **Despite Existence of Non-Compliant Rest Breaks, Menzies Had No Policy, Procedure or Mechanism by Which Employees Could Request or Otherwise Obtain Rest Premium Wages** | 13 |
| | **F.** | **Employees Required to Move Around the Airport and to Constantly Communicate Were Compelled to Use Personal Cellphones** | 14 |
| **III.** | **THIS CASE SATISFIES ALL CLASS CERTIFICATION REQUIREMENTS UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE** | | 16 |
| | **A.** | **The Requirements of FRCP Rule 23(a) are Satisfied** | 17 |
| | | 1. *The Proposed Class and Subclasses are Sufficiently Numerous and Ascertainable* | 17 |

b

### TABLE OF CONTENTS (CONT'D)

| | | | PAGE |
|---|---|---|---|
| 2. | *The Typicality Requirement is Satisfied* | | 18 |
| 3. | *The Adequacy Requirement is Satisfied* | | 18 |
| 4. | *The Commonality Requirement is Satisfied* | | 19 |
| | (i) | Common Questions as to Meal Break Claims | 19 |
| | (ii) | Common Questions as to Rest Break Claims | 20 |
| | (iii) | Common Questions as to Reimbursement Claims | 21 |
| B. | **The Requirements of FRCP Rule 23(b)(3) are Satisfied** | | 21 |
| 1. | *Common Questions Predominate as to Meal Break Claims* | | 21 |
| 2. | *Common Questions Predominate as to Rest Break Claims* | | 23 |
| 3. | *Common Questions Predominate as to Reimbursement Claims* | | 24 |
| 4. | *Class Treatment is Superior to Multiple Individual Adjudications, and Will Benefit the Court and Parties* | | 25 |
| IV. | **CONCLUSION** | | 25 |

c

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alonzo v. Maximus, Inc.*, 275 F.R.D. 513 (C.D. Cal. 2011)                    17

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013)        17

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)                            17

*Campbell v. Vitran Express, Inc.*, No. CV 11-5029 RGK (SHx),
    2015 U.S. Dist. LEXIS 155512 (C.D. Cal. Nov. 12, 2015)    3, 20, 21, 24

*Chacon v. Express Fashion Ops., LLC*, No. 8:19-cv-00564-JLS-DFM,
    2021 U.S. Dist. LEXIS 195353 (C.D. Cal. Jun. 14, 2021)    23

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012)        18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)                     21

*Jimenez v. Allstate, Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014)               3, 20

*Morgan v. Rohr, Inc.*, No. 20-cv-574-GPC-AHG, 2022 U.S. Dist.
    LEXIS 61046 (S.D. Cal. Mar. 31, 2022)                    2, 20, 22

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010)                          18

*Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018)               17

*Santillan v. Verizon Connect, Inc.*, No. 3:21-cv-1257-H-KSC,
    2022 U.S. Dist. LEXIS 182405 (S.D. Cal. Jun. 13, 2022)    2, 3, 19-20, 21, 22, 24

*Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247 (N.D. Cal. Jul. 5, 2018)       21

*Soto v. Diakon Logistics (Del.), Inc.*, 2013 WL 4500693
    (S.D. Cal. Aug. 21, 2013)                                17

*United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010)    17

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)                     2, 19

*Wang v. Chinese Daily News, Inc.*, 737 F.3d 538 (9th Cir. 2013)             19

**CALIFORNIA CASES**

*Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004 (Cal. 2012)              16 n. 22, 20, 21

*Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal.App.4th 220
    (Cal. Ct. App. Nov. 29. 2006)                            24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**CALIFORNIA CASES (CONT'D)**

*Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58 (Cal. 2021)                    1, 19

*Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094 (Cal. 2007)        1 n. 1, 23

*Naranjo v. Spectrum Security Servs.*, 13 Cal.5th 93 (Cal. 2022)            23

*Safeway, Inc. v. Sup. Ct.*, 238 Cal.App.4th 1138 (Cal. Ct. App. 2015)     23

*Sav-On Drug Stores, Inc. v. Sup. Ct.*, 34 Cal.4th 319 (Cal. 2004)         25

**STATUTES**

*Cal. Lab. Code § 226.7*                                                    16

*Cal. Lab. Code § 512*                                                      16 n. 22

*Fed. R. Civ. P. 23*                                                        *passim*

**REGULATIONS**

*Cal. Code Regs., Tit. 8, § 11090*                                          9 n. 5, 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Defendant Menzies Aviation (USA), Inc. (hereafter, "Menzies") routinely compelled their nonexempt employees (hereafter "Employees") to forego state-mandated meal and rest periods in order to complete work within time limits imposed by Menzies' airline customers. Adhering to its marketing motto of "Excellence from Touchdown to Takeoff," Employees abided by their managers' directive to refrain from taking meal or rest breaks until a specific phase of work is completed: to get aircraft positioned after landing, unloaded, cleaned, re-loaded, boarded, re-fueled and eventually towed out for takeoff.

Consequently, Defendant Menzies' centralized, electronic timekeeping system is replete with records of employee meal periods provided after the 5th hour of work (i.e., late meal breaks), or missed entirely, in violation of the California Labor Code and Wage Order 9 of the California Industrial Welfare Commission.  California law is clear that "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." *Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58, 74 (Cal. 2021).  The California Supreme Court explained: "The presumption derives from an employer's duty to maintain accurate records of meal periods…Because time records are required to be accurate, it makes sense to apply a rebuttable presumption of liability when records show noncompliant meal periods." *Donohue*, 11 Cal. 5th at 76.

Defendant Menzies emphasizes that their electronic timekeeping system strictly complies with the requirement to accurately record all employee meal breaks.  Thus, the non-compliant meal periods reflected in those records, and California law's presumption of liability, warrant immediate payment of Meal Premium wages.[1]  However, Menzies' payroll records

---

[1] Menzies erroneously uses the term "meal penalty" as part of its practice.  However, the California Supreme Court has long established that the extra hour of pay referenced under Labor Code Section 226.7, for missing meal or rest breaks, are properly deemed wages and not penalties.  *See Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1114 (Cal. 2007).  For ease of reference, such premium wages for missed meal and rest breaks will be hereafter referred to, respectively, as a "Meal Premium" or "Rest Premium."

reflect that a substantial amount of Meal Premiums earned for those non-compliant meal breaks remain unpaid to Employees.

By this motion, Plaintiffs Dora Patricia Amaya and Anibal Silva (collectively, "Plaintiffs")—respectively a current and former employee of Menzies— seek to certify a class of "all individuals who worked for Defendant MENZIES in California as non-exempt employees at any time from the 4-year period preceding the filing of this [action] through the present," in order to recover these unpaid Meal Premiums.  As detailed below, the adjudication of liability for such unpaid premium wages—based on common evidence in the form of Defendant Menzies' electronic time and pay records—is appropriate for class certification. *See, e.g., Santillan v. Verizon Connect, Inc.*, No. 3:21-cv-1257-H-KSC, 2022 U.S. Dist. LEXIS 182405, at *38 (S.D. Cal. Jun. 13, 2022) ("[A]bsent an affirmative defense, plaintiff may prove liability on a classwide basis through time record evidence.") (*citing Donohue*); *Morgan v. Rohr, Inc.*, No. 20-cv-574-GPC-AHG, 2022 U.S. Dist. LEXIS 61046, at *49-50 (S.D. Cal. Mar. 31, 2022) ("With a full dataset of payroll data and timekeeping records, meal break premiums owed to putative class members for missed and shortened meal breaks can be assessed on a classwide basis, and will not necessarily require individual inquiry into the circumstances surrounding each and every employee's work shifts and meal break periods."); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("What matters to class certification…[is] the capacity of a classwide proceeding to generate common answers apt to drive resolution of the litigation.").

Plaintiffs also assert rest-break claims on behalf of the class, based on Menzies' wholesale failure to pay any Rest Premiums to non-exempt employees, despite clear common evidence that Menzies' non-exempt employees were routinely compelled to forego state-mandated rest breaks whenever there was work left to do, in furtherance of Menzies' touchdown-to-takeoff obligations to its airline clients.  Glaringly, Menzies has no policy, practice or mechanism at all by which employees could be paid Rest Premiums for missed rest breaks.  Menzies failed to produce a single Rest Premium payment throughout the last 4 ½ years within the class period.  Thus, despite paying lip service in written policies to compliance

with California's rest-break requirements, Menzies maintained an unofficial policy or common practice of foregoing rest breaks and the resulting premium wages for them.  Such theory of liability has long been recognized by the Ninth Circuit to be appropriate for class certification, as "whether such informal or unofficial policies existed will drive the resolution" of the classwide claim.  *See Campbell v. Vitran Express, Inc.*, No. CV 11-5029 RGK (SHx), 2015 U.S. Dist. LEXIS 155512, at *17 (C.D. Cal. Nov. 12, 2015) ("At the heart of Plaintiffs' claim is the so-called 'policy-to-violate-the-policy,' a theory of liability recognized by the Ninth Circuit.") (*citing Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166 (9th Cir. 2014)).

Plaintiffs also seek to certify a subclass for failure to reimburse Employees who were not provided company-issued cell phones or radios, for expenses incurred in using their personal cell phones for work-related tasks, pursuant to California Labor Code Section 2802.  To prove these class claims for failure to reimburse, Plaintiffs must establish that: (1) the employees incurred expenses related to use of their personal cellphones; (2) such expenses were in direct consequence of discharge of duties; and (3) such expenses were "necessary" to do their work.  *See Santillan v. Verizon Connect, Inc.*, *supra*, 2022 U.S. Dist. LEXIS 182405, at *8.[2]

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    Defendant Menzies Aviation (USA), Inc.'s Operations

Menzies is an aviation-services company that provides Ground-handling, Cargo-handling and Fueling services for its airline customers in the aviation industry.  Deposition of Talin Bazerkanian Under FRCP Rule 30(b)(6) ("30b6 Depo."), attached as Exhibit 1 to Declaration of C. Joe Sayas, Jr. in Support of Plaintiffs' Motion for Class Certification ("Sayas

---

[2] Plaintiffs further seek to certify a Labor Code Section 203 Subclass, defined as "all class members who worked during the relevant time period who are no longer employed" by Menzies, for recovery of waiting time penalties, as well as a Labor Code Section 226 Subclass for failure to provide accurate wage statements.  As these claims are derivative of Plaintiffs' claims for failure to pay premium wages and Labor Code Section 2802 reimbursements, certification of those predicate claims will determine the propriety of classwide adjudication of these additional claims.

<u>Decl.</u>"), at pp. 17:7-11, 18:10-13, 32:10-16, 32:25-33:7.   In California, Menzies provides services to airline customers at the following airports: Los Angeles, San Francisco, Santa Ana, San Diego, Burbank, Long Beach and Ontario.  <u>30b6 Depo.</u>, pp. 31:7-13, 31:17-20.

Menzies' Ground-handling operations consist of ramp handling, cabin cleaning, and passenger services.  <u>30b6 Depo.</u>, pp. 17:18-23, 33:8-11.  Ramp handling involves all aspects of the offloading and loading of baggage and cargo, as well as guiding taxiing aircraft when they arrive, securing aircraft with chocks and cones, and towing aircraft out of the gate area for departure.  <u>30b6 Depo.</u>, pp. 33:12-18, 35:3-12; <u>Deposition of Brian Galindo</u> ("<u>Galindo Depo.</u>"), attached as <u>Exhibit 2</u> to <u>Sayas Decl.</u>, at pp. 13:11-23, 15:3-11, 22:17-25:17; <u>Deposition of Jose A. Salcedo Garcia</u> ("<u>Salcedo Depo.</u>"), attached as <u>Exhibit 3</u> to <u>Sayas Decl.</u>, at pp. 10:7-21, 11:23-12:7.   Cabin cleaning involves security checks and cleaning of aircraft after passengers and crew have disembarked, in preparation for new passengers and crew, and the aircraft's departure.  <u>Deposition of Lizette Medina</u> ("<u>Medina Depo.</u>"), attached as <u>Exhibit 4</u> to <u>Sayas Decl.</u>, at pp. 8:21-11:1.  Passenger services consists of checking in passengers for their flights, facilitating their boarding at boarding gates, assisting with flight operations, and assisting arriving passengers with lost luggage, as well as customs and border-protection documents.  <u>30b6 Depo.</u>, pp. 33:19-34:24.

Menzies' Fueling operations consist of fueling aircraft following their arrival in preparation for departure.  <u>30b6 Depo.</u>, pp. 17:24-18:2, 37:12-16.  Its Cargo-handling business runs the warehouses that handle both inbound and outbound cargo for the airline customers. <u>30b6 Depo.</u>, pp. 18:3-9.  These Menzies warehouses are where inbound cargo are received, processed, sorted and then delivered to land-transport agents by Menzies' cargo employees, and where they receive, process, and then build up outbound cargo into pallets and containers in preparation for loading onto aircraft by Menzies' ramp operations.  <u>30b6 Depo.</u>, pp. 36:23-37:11; <u>Salcedo Depo.</u>, pp. 13:2-12; <u>Deposition of Dave Funes</u> ("<u>Funes Depo.</u>"), attached as <u>Exhibit 5</u> to <u>Sayas Decl.</u>, at pp. 8:12-17, 9:1-20, 17:6-18:2, 18:17-19:11, 21:2-22:17, 26:13-28:11, 31:2-32:12.

    **2.**    ***Named Class Representative Dora Patricia Amaya***

Plaintiff Dora Patricia Amaya (hereafter, "Amaya") has been employed as a Passenger Services Agent for Menzies at Los Angeles International Airport ("LAX") since August 2021. Second Amended Complaint ("SAC"), at 3:21-24.  Plaintiff Amaya and her co-workers are routinely unable to go off duty for meal breaks within the first five hours of their shift, as their managers require them to prioritize flight operations over breaks.  Declaration of Dora Patricia Amaya ("Amaya Decl."), ¶ 12.  Amaya and her colleagues were told that Menzies would incur financial penalties for delays attributable to gate operations, so they took late meal breaks to avoid that.  *Ibid.*  Amaya recalls numerous instances of missed, late, and interrupted meal breaks, but only received Meal Premiums on a few occasions.  Amaya Decl., ¶ 15.  It was a rarity for her to receive rest breaks during her shift, as the continuous nature of her work made 10-minute downtimes highly unlikely.  Amaya Decl., ¶ 16.  She does not recall Menzies informing her of the entitlement to extra pay for missed rest breaks, nor does she recall ever receiving any Rest Premiums.  Amaya Decl., ¶ 17.  Amaya's work required her to use her personal cell phone at work to communicate with her co-workers, supervisors and managers, via group chat and calls, regarding the work she performed, as well as to process passenger documents and provide needed information to Customs and Border Protection.  Amaya Decl., ¶¶ 9-10, 18.  She was never offered a company phone nor reimbursed for use of her personal cell phone for work-related tasks.  Amaya Decl., ¶ 18.

### 3.  *Named Class Representative Anibal Silva*

Plaintiff Anibal Silva (hereafter, "Silva") was employed as a Lead Ramp Agent for Menzies at LAX from 2015 to 2020.  SAC, at 3:25-27.  Throughout that time, Plaintiff Silva was routinely unable to take his lunch break within the first 5 hours of his shift, or to take one at all, due to the heavy workloads assigned to him; he could not take his meal breaks unless authorized by a supervisor, who rarely did so within the first 5 hours of a shift, as Menzies' timely completion of service is necessary for it to avoid a penalty.  Declaration of Anibal Silva ("Silva Decl.") ¶¶ 6, 9-11.  He also routinely did not get a second 30-minute meal break for shifts in excess of 10 hours.  Silva Decl., ¶ 6.  Silva's complaints to Menzies management about not being paid Meal Premiums for his non-compliant breaks were largely ignored.  Silva Decl.

¶¶ 11-12.  Silva does not recall taking rest breaks when he worked at Menzies; rather, he worked continuously because time was always of the essence in his work as a Lead Ramp Agent.  Silva Decl. ¶ 15.  Silva's duties required him to use his personal cell phone at work to communicate with co-employees, supervisors and managers, regarding work instructions, cargo information, status of flight arrivals and departures, cancellations, delays, and equipment issues.  Silva Decl. ¶¶ 7, 16.  Silva, however, was never reimbursed for the use of his cell phone on work-related tasks, nor did Menzies ever advise him of any right to reimbursement for such use.  *Ibid.*

### 4.    Putative Class Members

On February 16, 2023, this Court ordered Menzies to disclose contact information of the putative class members, in response to Plaintiffs' interrogatory.  Sayas Decl., ¶ 9.  Plaintiffs are submitting twenty-nine (29) declarations from non-party class members regarding their experiences at Menzies.  Sayas Decl., ¶ 11.  Plaintiffs are also submitting a Declaration from a former exempt Manager of Menzies, Frederic Poag, which corroborates many of the wage-and-hour violations described in the class-member declarations.  Sayas Decl., ¶¶ 10-11.

### B.    Menzies' Policy of Authorizing Breaks Contingent on Changing Airline Schedules, and of Foregoing Breaks Until Work is Completed, Led to Meal and Rest Breaks Violations

Although Menzies recognizes the right to take meal breaks within the 5th hour of a shift, it acknowledges that, due to fluid flight scheduling, the scheduling of employee breaks to comply with California meal-break timing requirements were tentative at best.  Menzies' designee under Federal Rule of Civil Procedure ("FRCP") Rule 30(b)(6) admitted as follows: "Majority of the departments, based on the bare minimum schedule, have the time of when employees can take a break written on the schedule. However, **since we are not a factory** and we don't -- we're not going 8:00 to 9:00, depending on the timeline and depending on the work, **the breaks would change or would switch**."  30b6 Depo., pp. 96:22-97:4 (emphasis supplied).  A natural result of fluid flight schedules were non-compliant meal breaks: "**We try to stick most of the time with what the law says which is, you know, obviously within**

**the five hours. And sometimes we are able to do it, and sometimes we are not**…We're not able to give the breaks on that particular day on that particular time that was on the schedule." 30b6 Depo., pp. 97:20-98:5 (emphasis supplied).

Other Menzies Managers confirmed in depositions that break scheduling was contingent on changing airline schedules, as Menzies' policy and practice was to not authorize breaks whenever work remained to be completed. The Menzies Manager who heads the cabin cleaning department testified that she did not include 30-minute meal breaks when she created employee schedules, "[b]ecause the arrival of the aircraft varies," making it difficult for her to set a schedule for meal breaks. Medina Depo., pp. 35:8-20. She confirmed that because of changes in flight arrivals or flight departures, she is unable to schedule timely meal breaks within employees' fifth hour of work. Medina Depo., pp. 35:25-36:2, 36:13-17, 38:7-39:20. This is especially true since all aircrafts that Menzies typically service are "turn around" flights; these are quick-turn flights that needed to be serviced immediately upon landing, complete the work on it, and prepare the flight immediately for boarding and takeoff. Medina Depo., pp. 12:25-13:1, 45:5-13.

A Menzies Ramp Operations Manager, when asked whether scheduled meal breaks are subject to change "based on a flight being delayed or if some other contingency happens during the course of the shift," replied: "That varies on the day." Galindo Depo., pp. 49:11-20. He further explained: "The time employees would take breaks. We plan based on the schedule and actual times of arrivals and departures. It may vary the day of." Galindo Depo., pp. 49:24-50:2. He confirmed that scheduling of breaks had to stay flexible depending on when planes arrive and depart, and was subject to adjustment based on the work at hand. Galindo Depo., pp. 50:3-10. Ramp Operations employees are sometimes unable to take meal breaks within their first five hours of work "because they need to finish the loading and unloading work." Galindo Depo., pp. 60:5-11. A Freight Department Duty Manager, whose workers performed similar ramp handling work, also confirmed that there were occasions when employees had to take their meal breaks beyond the fifth hour, as the managers in his department would only authorize employee meal breaks once the work process of loading and

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

offloading aircraft have all been completed.  Salcedo Depo., pp. 46:8-17.  When asked about the consequences of failing to meet time deadlines imposed by Menzies' airline customers, he explained: "If we get delays, it's a complaint towards the company."  Salcedo Depo., pp. 24:23-25:23; *see also* Galindo Depo., pp. 94:18-96:2 ("Q: In terms of after the arrival, there's a set time when you guys have to finish, right? **A: Yes. There's a scheduled departure time.** Q: What happens if you aren't finished by their scheduled departure time? **A: Menzies is issued a delay.** Q:  What is a delay? **A: We issue a delay. Depending on the customer contract. They can impose an SLA penalty or advise us not to take any more delays.** Q: Did you say delayed penalty or late penalty? **A:  SLA.** Q: SLA penalty. What is an SLA penalty? **A: SLA is more of a penalty inside of the contract in case we do a delayed flight. It's more of -- how do I say this -- I don't want to say it's a disciplinary action towards the company, but more of, we're going to charge you this percentage of the turnaround rate because you delayed our flight. Make sure you don't do it next time.** Q: They're going to charge you, meaning the airline client is going to withhold a percentage of the fee? **A: Correct.** […] Q: **Are these SLA penalties standard in all of Menzies' contracts with airline clients? A: Yes.**") (emphasis supplied).[3]

A Cargo Operations Manager, when asked whether managers in his department can refuse to give authorization to take a meal break as a matter of practice, and instead re-schedule the break, affirmed that managers in Cargo would delay meal breaks if "handling any freight would require us to move the lunch break."  Funes Depo., pp. 61:20-63:1.  Understandably, this is meant to complete work governed by time requirements imposed under Menzies' service-level agreements, or SLAs, with its airline customers.  Funes Depo., pp. 46:8-47:3.

---

[3] The reference to airline penalties imposed on Menzies as the driving force behind its policy and practice of requiring employees to complete their services before allowing them to stop for breaks is additionally confirmed by Class Member Declarants who were so informed by their Managers and supervisors.  *See*, *e.g.*, Silva Decl., ¶ 10.

That uncertainty in flight arrivals and departures oftentimes led to meal- and rest-break violations are further confirmed in the Employee Declarations.[4]

### C.  Menzies' Strict Policy to Record Employee Meal-Break Times Created Accurate Record of Meal Break Violations

But regardless of flight unpredictabilities, Menzies strictly requires all Employees to accurately punch the actual start and end times of their shifts and their meal breaks on Kronos, Menzies' electronic timekeeping system.[5]  Menzies affirms that it strictly complies with the meal-break recordkeeping requirement.  30b6 Depo., pp. 64:10-21; Medina Depo., pp.  39:21-40:11; Galindo Depo., pp. 59:16-60:4; Funes Depo., pp. 67:14-24.  It protects the accuracy of its time records through a strict Timekeeping Policy, which expressly states that a "missed

---

[4] Declaration of Peter Acosta ("Acosta Decl."), ¶¶ 4, 7-9; Declaration of Manuel Aguilera ("Aguilera Decl."), ¶¶ 7-8; Amaya Decl., ¶¶ 11-12; Declaration of Mynor Joaquin Andrade ("Andrade Decl."), ¶¶ 3, 6-7; Declaration of Daniel Arango ("Arango Decl."), ¶¶ 10, 14; Declaration of Erik Chacon Bojorquez ("Chacon Decl."), ¶¶ 12-14; Declaration of Hajar Chikh ("Chikh Decl."), ¶¶ 5-6; Declaration of Brandon Craig ("Craig Decl."), ¶¶ 4-7; Declaration of Ruben Espinoza ("Espinoza Decl."), ¶¶ 4, 9-11; Declaration of Anthony Fernandez ("Fernandez Decl."), ¶¶ 9-10; Declaration of Jordan Ford ("Ford Decl."), ¶¶ 7-8; Declaration of Jazzmyne Freeman ("Freeman Decl."), ¶¶ 15-17; Declaration of Todd Fucile ("Fucile Decl."), ¶¶ 10-12; Declaration of Andrew Gutierrez ("Gutierrez Decl."), ¶¶ 12-14; Declaration of Clement Hurtado ("Hurtado Decl."), ¶ 5; Declaration of Zoila Lemus ("Lemus Decl."), ¶¶ 8-9; Declaration of Wa Luo ("Luo Decl."), ¶¶ 8-9; Declaration of Jesus Mendoza ("Mendoza Decl."),  ¶¶ 8-9; Declaration of Bryan Morgan ("Morgan Decl."),  ¶¶ 2-5; Declaration of Kevin Orange ("Orange Decl."), ¶¶ 8-11; Declaration of Jonathan G. Otzoy ("Otzoy Decl."), ¶¶ 10-12, 14-15; Declaration of Anthony Penca ("Penca Decl."), ¶¶ 8-9; Declaration of Solvenina Ramirez ("Ramirez Decl."), ¶¶ 5-6; Declaration of Abdel Rifai ("Rifai Decl."), ¶¶ 10-14; Declaration of Brandon Robinson ("Robinson Decl."), ¶¶ 10-14; Declaration of Mario Rocha ("Rocha Decl."), ¶¶ 10-11; Declaration of Frederic Poag ("Poag Decl."), ¶ 10; Declaration of Ryan Sierra ("Sierra Decl."), ¶ 8; Silva Decl., ¶¶ 6, 9-11; Declaration of Abraham Torres ("Torres Decl."), ¶¶ 8-12; Declaration of Steven Vakoc ("Vakoc Decl."), ¶¶ 6-10.

[5] Pursuant to Wage Order 9 of the California Industrial Welfare Commission, which applies to California employers in the transportation industry, Menzies is required to keep accurate "[t]ime records showing when the employee begins and ends each work period," including when meal periods are taken.  See Cal. Code Regs., Tit. 8, § 11090(7)(A)(3).

clock in/out is a violation" of company rules, including any "[f]ailure to clock in/out on their designated time clock for the meal break." *See* <u>Exhibit 6</u> to <u>Sayas Decl.</u>, at Bates-stamp MENZIES_000340. Hence, employees are disciplined if they fail to clock out and back in for meal breaks taken. <u>30b6 Depo.</u>, pp. 74:20-75:12. Strict enforcement of the policy are further ensured by Menzies managers' regular practice of reviewing time cards before payroll to ensure employees have properly punched in and out. <u>30b6 Depo.</u>, pp. 76:19-77:12. Menzies' production of their timekeeping records[6] supports their contention that employees created, and their employer maintained, accurate records of meal breaks taken during work shifts. Plaintiffs' retained economist have reviewed said records, and confirmed that they contain "for each of the Employees,…clock in and clock out times when they start and end their work shifts, as well as clock out and clock in times when they commence and end their meal breaks." <u>Declaration of Kirk Marangi, M.B.A., M.A., C.V.A., ("Marangi Decl.")</u>, at ¶ 6(b).

Specifically, Mr. Marangi has observed the following types of shifts, with regard to whether and what type of meal breaks were taken, reflected in Menzies' electronic time records: (a) Shifts with 4 different time entries, consisting of a clock in and clock at the beginning and end of the shift, and a clock out and clock in within the shift with at least a 30-minute interval, which Mr. Marangi recognizes as an unpaid meal break; (b) Shifts with 4 different time entries similar to (a), but showing that the interval between the clock out and clock in within the shift is less than 30 minutes, which Mr. Marangi recognizes as shortened meal breaks; (c) Shifts with 4 different time entries similar to (a), but showing that the clock out for the 30-minute interval within the shift is recorded beyond the 5th hour of work, which Mr. Marangi recognizes as late meal breaks; (d) Shifts with only 2 different time entries, consisting of a clock in and clock out at the beginning and end of the shift, which Mr. Marangi recognizes to reflect missed meal breaks; and (e) Shifts with 6 different time entries, such as

---

[6] Menzies' FRCP Rule 30(b)(6) designee, Talin Bazerkanian, testified that all putative class members were subject to the same timekeeping system and process, which was centrally overseen by Menzies' corporate office in Dallas, Texas. <u>30b6 Depo.</u>, pp. 41:1-20, 42:9-17, 44:2-45:18.

would indicate a second unpaid meal break.  <u>Marangi Decl.</u>, at ¶ 8.  As such, Mr. Marangi is "able to determine on a Year-by-Year, Employee-by-Employee, and Shift-by-Shift basis, whether any of the following meal break violations had occurred: (i) missed, short, or late first meal breaks for shifts in which an employee had worked at least five (5) hours, and (ii) missed, short, or late second meal breaks for shifts in which an employee had worked at least ten (10) hours." <u>Marangi Decl.</u>, at ¶ 7.

### D. <u>Despite Its Records of Non-Compliant Meal Periods, Menzies Uniformly Withholds Meal Premium Wages Unless Employees Request Payment in Writing and Obtain Manager Approval</u>

Despite Menzies' strict enforcement of their meal-break recordkeeping policy, and the resulting creation of accurate electronic records of non-compliant meal breaks, Menzies does not immediately pay the Meal Premiums owed.  Instead, Menzies withholds payment of the earned Meal Premiums unless and until the following steps are accomplished: (1) Employees must fill in and submit a Missed Punch Form ("MPF") requesting Meal Premiums, *see* <u>Exhibit 7</u> to <u>Sayas Decl.</u> ("LAX MISSED PUNCH FORM (MPF)," Bates-stamped MENZIES_000709); (2) Employees must obtain a signed payment approval from the Manager; and (3) said approval must be entered into the Kronos system.[7]  These requirements constitute Menzies' Meal Premium Payment Policy.  Failing to meet all these conditions, Menzies will not and did not pay the Meal Premiums.[8]  *See* <u>30b6 Depo.</u>, pp. 91:24-92:20;

---

[7] Menzies' FRCP Rule 30(b)(6) designee affirmed this requirement of additionally submitting the MPF signed by a manager and expressly approved by Menzies despite existence of a clear electronic timeclock record of a non-compliant meal break.  <u>30b6 Depo.</u>, pp. 91:4-11. Menzies' Premium Payment Policy unfortunately shifts the onus on Employees to ensure the processing and payment of their wages.

[8] The Menzies requirement to submit a Missed Punch Form to request meal-break premium wages also extended, in modified form, to instances where the electronic timekeeping records reflect a missing second meal break for shifts in excess of 10 hours.  Specifically, Menzies policy is to presume a blanket waiver of all such missing second meal breaks unless an employee submits a Missed Punch Form requesting a meal-break premium wage for the missed second meal break.  <u>30b6 Depo.</u>, pp.214:25-215:18.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Galindo Depo., pp. 99:24-100:7; Medina Depo., pp. 51:14-21, 52:17-53:7.  Menzies' policy applies to all Employees who wish to claim payments of Meal Premiums.  It not only imposed an additional gatekeeping process that unlawfully impedes the immediate payment of Employees' wages; worse, this policy precluded actual payment of wages.  Representative testimony from Employees' Declarations state their common experience of failing to receive their premium wages.[9]  Menzies' policy imposes an obstacle course to payments such that even after submitting the MPFs, Employees were still not paid all their Meal Premiums.[10]

Menzies attempted to explain the non-payment outcomes with a variety of excuses: either requests were denied because Menzies thought, after the fact, that employees could have taken their breaks, or simply denied for no apparent reason, or that MPFs were purportedly lost, or that they will get back to them with answers.  Frequently, there would simply be no action, or simply no payment would appear in the Employees' respective pay statements.[11]  Regardless of claimed reasons for non-payment, Menzies' Meal Premium Payment Policy engenders an outcome where Meal Premiums are conveniently denied and not paid.[12]

---

[9] See Acosta Decl., ¶¶ 9, 11; Aguilera Decl., ¶ 9; Amaya Decl., ¶¶ 15, 17; Andrade Decl., ¶ 8; Arango Decl., ¶¶ 14-18; Chacon Decl., ¶ 20; Chikh Decl., ¶ 7; Craig Decl., ¶ 8; Fernandez Decl., ¶ 5; Ford Decl., ¶ 10; Freeman Decl., ¶ 22; Fucile Decl., ¶ 15; Gutierrez Decl., ¶¶ 18-19; Hurtado Decl., ¶ 7; Lemus Decl., ¶ 10; Luo Decl., ¶ 18; Mendoza Decl., ¶ 10; Morgan Decl., ¶¶ 5-6; Orange Decl., ¶¶ 9-11, 14; Otzoy Decl., ¶ 16; Penca Decl., ¶¶ 10, 12; Ramirez Decl., ¶ 7; Rifai Decl., ¶¶ 14-15, 19; Robinson Decl., ¶ 15; Rocha Decl., ¶¶ 12, 15; Sierra Decl., ¶¶ 9, 11; Torres Decl., ¶¶ 13, 15.

[10] See Arango Decl., ¶¶ 14-16; Chacon Decl., ¶¶ 15-16, 24-25; Espinoza Decl., ¶ 12; Fernandez Decl., ¶¶ 11-12; Ford Decl., ¶ 10; Fucile Decl., ¶¶ 14-15; Gutierrez Decl., ¶¶ 10, 18-19; Orange Decl., ¶¶ 9-11; Poag Decl., ¶¶ 8-9; Rocha Decl., ¶ 12.

[11] Silva Decl., ¶¶ 11-13; Rocha Decl., ¶ 12; Ford Decl., ¶ 10; Fernandez Decl., ¶¶ 11-12; Martinez Decl., ¶ 7; Fucile Decl., ¶¶ 14-15.

[12] The unlawful nature of Menzies' Meal Premium Payment Policy is further evident in those situations where Employees submit the MPFs, and were able to obtain signed approvals from Managers, but were still denied payment of Meal Premiums.  Even in those situations, **Menzies' upper management can still limit or prevent payments of wages**.  A former Operations Control Duty Manager for Menzies, Frederic Poag, states under oath that when he was Manager, he had authorized payments of Meal Premiums by signing the forms.

Menzies' Meal Premium Payment Policy thus resulted in a significant number of earned Meal Premiums left unpaid.  Upon examination and organization of Menzies' voluminous time records for the years 2019-2022, Plaintiffs' economist found 531,939 instances of meal break violations.  When Menzies does pay a Meal Premium, such payments are clearly reflected in the electronic payroll records produced in discovery.[13]  30b6 Depo., pp. 174:16-24, 175:10-25. Mr. Marangi computed the unpaid Meal Premiums (limited to the presently-available data for the years from 2019 to 2022) to be valued at $9,384,820.  *See* Marangi Decl., at ¶ 10-13.

E.    **Despite Existence of Non-Compliant Rest Breaks, Menzies Had No Policy, Procedure or Mechanism by Which Employees Could Request or Otherwise Obtain Rest Premium Wages**

Menzies failed to notify Employees of the right to an extra hour of pay when they miss any of their 10-minute rest breaks.  Galindo Depo., pp. 75:10-20; Salcedo Depo., pp. 59:14-20.  Nowhere in its Handbook or in any of its policies did Menzies inform employees of their rights to extra pay.  It is therefore not surprising that Menzies also failed to have any procedure for Employees to receive their Rest Premium wages.  Medina Depo., pp. 74:17-75:2; Galindo Depo., pp. 75:10-20; Funes Depo., pp. 99:16-100:19.  Menzies' records, therefore, do not show a single Rest Premium payment at any time.  *See* Marangi Decl., at ¶ 16.

However, Defendant Menzies acknowledges that there are instances when employee rest breaks are missed due to uncertainty of flight schedules, coupled with Menzies' practice of foregoing breaks unless and until all work has been completed for its airline customers.

---

However, he would later learn that many of his authorizations were overruled, and the extra wages were not paid to the employees.  Mr. Poag was told by upper management that they believed the employee could have taken a meal break, or that paperwork was missing, or some other excuse.  The concerned employees were not paid despite Mr. Poag's certification that he himself had contemporaneously assessed the work situation and determined that there was not time to take the meal break as it was then necessary to finish the work for Menzies.  Poag Decl., ¶¶ 7-9.

[13] Like with timekeeping, Employees were all subject to the same Menzies payroll system and process centrally overseen by Menzies' corporate office in Dallas, Texas.  30b6 Depo., pp. 41:1-20, 42:9-17, 44:2-45:18.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The Declarations corroborate this practice; indeed, the majority of class members aver that they routinely missed at least one of the state-mandated off-duty rest breaks for each shift they worked for Menzies.[14]   Some class members assert that they did not receive any 10-minute off-duty rest breaks at all due to the continuous nature of their work for Menzies.[15]   Many of them explained that they did not know they were entitled to Rest Premium wages when they were working for Menzies.[16]   Yet, despite the clear evidence of rest-break violations, Menzies' payroll records glaringly reveal that Menzies has not paid any rest-break premium wages; Menzies' list of 375 earnings codes did not even include one for Rest Premiums.  *See* Marangi Decl., at ¶ 16.   This omission reveals Menzies' decision not to provide any procedure for Employees to request or otherwise obtain Rest Premium wages.[17]

    **F.**    **Employees Required to Move Around the Airport and to Constantly Communicate Were Compelled to Use Personal Cellphones**

---

[14] *See* Acosta Decl., ¶ 10; Aguilera Decl., ¶ 10; Amaya Decl., ¶ 16; Andrade Decl., ¶ 9; Arango Decl., ¶ 22; Chacon Decl., ¶¶ 26-28; Craig Decl., ¶ 9; Espinoza Decl., ¶ 13; Lemus Decl., ¶ 11; Orange Decl., ¶ 13; Poag Decl., ¶ 11; Ramirez Decl., ¶ 8; Robinson Decl., ¶ 18; Rocha Decl., ¶ 14; Silva Decl. ¶ 15; Torres Decl., ¶ 14.

[15] Acosta Decl., ¶ 10; Aguilera Decl., ¶ 10; Amaya Decl., ¶ 16; Arango Decl., ¶¶ 22-23; Chacon Decl., ¶ 29; Chikh Decl., ¶ 8; Craig Decl., ¶ 9; Fernandez Decl., ¶ 14; Ford Decl., ¶ 11; Freeman Decl., ¶¶ 23-23; Fucile Decl., ¶ 16; Gutierrez Decl., ¶¶ 23-24; Hurtado Decl., ¶¶ 5, 7; Lemus Decl., ¶ 11; Luo Decl., ¶ 19; Mendoza Decl., ¶¶ 5, 11; Morgan Decl., ¶ 6; Orange Decl., ¶ 13; Otzoy Decl., ¶¶ 14-15; Penca Decl., ¶ 11; Ramirez Decl., ¶ 8; Rifai Decl., ¶¶ 14-15; Robinson Decl., ¶¶ 17-18; Sierra Decl., ¶ 10; Torres Decl., ¶ 14; Vakoc Decl., ¶ 13.

[16] Aguilera Decl., ¶ 11; Amaya Decl., ¶ 17; Andrade Decl., ¶ 9; Arango Decl., ¶ 24; Chacon Decl., ¶ 30; Chikh Decl., ¶ 8; Craig Decl., ¶ 10; Espinoza Decl., ¶ 14; Fernandez Decl., ¶ 15; Ford Decl., ¶ 12; Freeman Decl., ¶ 25; Fucile Decl., ¶ 17; Gutierrez Decl., ¶ 25; Hurtado Decl., ¶ 7; Luo Decl., ¶ 20; Mendoza Decl., ¶ 11; Otzoy Decl., ¶ 16; Rifai Decl., ¶¶ 14, 16; Robinson Decl., ¶ 20; Torres Decl., ¶ 15; Vakoc Decl., ¶ 14.

[17] Tellingly, Menzies acknowledges that it does not conduct any training for any of their employees—managerial and non-managerial alike—regarding the meal- and rest-break requirements applicable to Menzies' non-exempt employees in California.  30b6 Depo., pp. 54:14-55:5, 125:6-16; Galindo Depo., pp. 76:21-77:2.

Defendant Menzies acknowledges that company-issued radios and cell phones are principally limited to supervisory personnel.  <u>30b6 Depo.</u>, pp. 204:4-205:8; <u>Galindo Depo.</u>, pp. 30:12-22.  However, many Employees who were not issued company cell phones or radios assert that, since their work required them to be at different locations but remain in contact with co-workers, they were compelled to use their personal cellphones to discharge their duties.[18]   Specifically, Employees who worked in ramp operations, freight operations, passenger services, and cargo operations proffer similar descriptions of needing to communicate with supervisors and other co-workers for work-related tasks.[19]

Defendant Menzies concedes their knowledge of such use, but insist that this was simply voluntary on the part of employees.  <u>Galindo Depo.</u>, pp. 31:3-14, 32:14-19, 33:15-21; <u>30b6 Depo.</u>, pp. 198:14-199:8, 200:21-201:21.  As noted herein, however, California law does not require that use be made strictly mandatory for reimbursement under Labor Code Section 2802.  Instead, the standard requires only a necessary use, meaning that it was used for core duties in the absence of an employer-provided alternative.  Here, Menzies knew that employees were bringing their personal cell phones to work, and using these devices in group chats, and to exchange texts and calls with co-workers, including supervisors, managers, and even Human Resources, regarding work-related matters.  <u>30b6 Depo.</u>, pp. 204:4-205:8; <u>Galindo Depo.</u>, pp. 30:12-22.[20]

---

[18] <u>Acosta Decl.</u>, ¶ 5; <u>Aguilera Decl.</u>, ¶ 12;  <u>Amaya Decl.</u>,  ¶ 8; <u>Arango Decl.</u>, ¶¶ 7, 21; <u>Chacon Decl.</u>, ¶¶ 10, 33; <u>Craig Decl.</u>, ¶ 11; <u>Espinoza Decl.</u>, ¶¶ 6-7; <u>Fernandez Decl.</u>, ¶¶ 7, 16; <u>Freeman Decl.</u>, ¶ 12; <u>Gutierrez Decl.</u>, ¶ 28; <u>Hurtado Decl.</u>, ¶¶ 6, 8; <u>Lemus Decl.</u>, ¶ 6; <u>Luo Decl.</u>, ¶ 11; <u>Orange Decl.</u>, ¶ 7; <u>Otzoy Decl.</u>, ¶ 6; <u>Penca Decl.</u>, ¶ 6; <u>Rifai Decl.</u>, ¶ 18; <u>Robinson Decl.</u>, ¶ 8; <u>Rocha Decl.</u>, ¶ 9; <u>Sierra Decl.</u>, ¶¶ 6-7; <u>Silva Decl.</u> ¶ 16; <u>Torres Decl.</u>, ¶ 6.

[19] <u>Acosta Decl.</u>, ¶ 5; <u>Aguilera Decl.</u>, ¶ 5; <u>Amaya Decl.</u>, ¶ 9; <u>Arango Decl.</u>, ¶¶ 7, 19-21; <u>Chacon Decl.</u>, ¶¶ 7-11, 31; <u>Craig Decl.</u>, ¶ 11; <u>Espinoza Decl.</u>, ¶ 7; <u>Fernandez Decl.</u>, ¶¶ 7, 16; <u>Freeman Decl.</u>, ¶ 12; <u>Gutierrez Decl.</u>, ¶¶ 21-22, 27-28; <u>Hurtado Decl.</u>, ¶ 6; <u>Lemus Decl.</u>, ¶¶ 5-6; <u>Luo Decl.</u>, ¶¶ 10-15, 21; <u>Orange Decl.</u>, ¶ 6; <u>Otzoy Decl.</u>, ¶ 6; <u>Penca Decl.</u>, ¶ 6; <u>Rifai Decl.</u>, ¶ 19; <u>Robinson Decl.</u>, ¶¶ 7-8; <u>Rocha Decl.</u>, ¶¶ 6-8; <u>Silva Decl.</u> ¶ 16; <u>Torres Decl.</u>, ¶ 6; <u>Vakoc Decl.</u>, ¶ 10.

[20] <u>Acosta Decl.</u>, ¶ 5; <u>Aguilera Decl.</u>, ¶ 5; <u>Amaya Decl.</u>,  ¶¶ 10, 14; <u>Arango Decl.</u>, ¶¶ 20-21, 25; <u>Chacon Decl.</u>, ¶¶ 9-11; <u>Craig Decl.</u>, ¶ 11; <u>Fernandez Decl.</u>, ¶¶ 7, 16; <u>Ford Decl.</u>, ¶ 5; <u>Freeman</u>

Menzies' records similarly reflect that there is no procedure for reimbursing cell phone expenses for Employees. The class members who provided declarations describing their work-related use of personal cell phones uniformly aver that Menzies never informed them of any right to reimbursement or of any way for them to request it.[21] Tellingly, Menzies' payroll records also evinces the wholesale absence of any payments to putative class members coded as employee reimbursements. Marangi Decl., at ¶ 17.

## III. THIS CASE SATISFIES ALL CLASS CERTIFICATION REQUIREMENTS UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiffs allege that Menzies violated California law's requirement that employees be paid premium wages for each day mandated meal- and rest-break provisions are violated.[22] *See Cal. Lab. Code § 226.7*; *Cal. Code Regs., Tit. 8, § 11090*. Plaintiffs also allege that Menzies violated Labor Code Section 2802's requirement to "indemnify" [employees] for all necessary

---

Decl., ¶¶ 10-12; Gutierrez Decl., ¶¶ 21-22; Hurtado Decl., ¶ 6; Lemus Decl., ¶¶ 5-6; Luo Decl., ¶¶ 13-15; Mendoza Decl., ¶ 6; Morgan Decl., ¶ 7; Otzoy Decl., ¶ 6; Penca Decl., ¶ 6; Rifai Decl., ¶ 19; Robinson Decl., ¶¶ 7-8; Rocha Decl., ¶¶ 6-8; Silva Decl. ¶ 16; Torres Decl., ¶ 6; Vakoc Decl., ¶ 10.

[21] Acosta Decl., ¶ 6; Aguilera Decl., ¶ 6; Amaya Decl., ¶ 10; Arango Decl., ¶¶ 27-29; Chacon Decl., ¶ 34; Craig Decl., ¶ 11; Espinoza Decl., ¶ 8; Fernandez Decl., ¶¶ 11, 16; Ford Decl., ¶ 6; Freeman Decl., ¶ 14; Gutierrez Decl., ¶ 30; Hurtado Decl., ¶ 8; Lemus Decl., ¶ 6; Mendoza Decl., ¶ 7; Morgan Decl., ¶ 7; Orange Decl., ¶ 7; Otzoy Decl., ¶ 9; Penca Decl., ¶ 7; Rifai Decl., ¶ 20; Robinson Decl., ¶ 9; Rocha Decl., ¶ 9; Sierra Decl., ¶ 7; Silva Decl. ¶¶ 8, 16; Torres Decl., ¶¶ 7, 16.

[22] California law requires that employees be provided with an off-duty, uninterrupted meal period of at least 30 consecutive minutes for each shift in excess of 5 hours, plus a second such 30-minute meal period for shifts in excess of 10 hours, with the first meal period commencing no later than the end of an employee's fifth hour of work, and the second meal period no later than the end of an employee's tenth hour of work. *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1040-42 (Cal. 2012); *Cal. Lab. Code §§ 226.7 & 512*; *Cal. Code Regs., Tit. 8, § 11090*. California law also requires off-duty rest periods of at least 10 consecutive minutes for each 4 hours of work, or major fraction thereof. *Brinker* at 1028-1029; *Cal. Lab. Code § 226.7*; *Cal. Code Regs., Tit. 8, § 11090*.

expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." As detailed below, said claims are appropriate for class treatment.

### A. The Requirements of FRCP Rule 23(a) are Satisfied

Federal Rule of Civil Procedure ("FRCP") Rule 23(a) provides the following prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See Fed. R. Civ. P. 23(a)*. The proposed class must also be ascertainable. *Soto v. Diakon Logistics (Del.), Inc.*, 2013 WL 4500693, at *2 (S.D. Cal. Aug. 21, 2013). In determining whether to certify a class, the court determines whether the requirements of FRCP Rule 23 are met; it does not evaluate the merits. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013); *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010). As such, on a motion for class certification, the court "is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). Moreover, evidence submitted in support of class certification need not be admissible at trial. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003-04 (9th Cir. 2018); *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011). Here, the proposed class and subclasses meet the requirements of Rule 23(a) and are ascertainable.

### 1. The Proposed Class and Subclasses are Sufficiently Numerous and Ascertainable

The proposed class consists of "all individuals who worked for Defendant MENZIES in California as non-exempt employees at any time from the 4-year period preceding the filing of this [action] through the present." SAC, at ¶ 30. Menzies' production of the class list in discovery shows that such individuals are easily ascertainable, and with more than 5,000 such putative class members, their number is so numerous that joinder of all members is impracticable under FRCP Rule 23(a)(1). The same reasoning applies to the Labor Code 203

subclass of former employees identifiable from the class list already produced by Menzies in discovery.

The subclass of class members for whom the Labor Code Section 2802 claims apply are also ascertainable, as Menzies' job descriptions and representative testimony from managers and Employees can establish which job titles are not limited to a fixed workstation and require constant communications with co-workers in other locations. Numerosity is also satisfied as only a limited number of managers and supervisory personnel are provided company-issued radios and cellphones, *see* <u>30b6 Depo.</u>, pp. 204:4-205:8; <u>Galindo Depo.</u>, pp. 30:12-22; <u>Salcedo Depo.</u>, pp. 37:22-38:9, such that a significant portion of the more than 5,000 putative class members here will necessarily fall within the Labor Code Section 2802 subclass.

### 2. The Typicality Requirement is Satisfied

The typicality requirement of FRCP Rule 23(a)(3) "looks to whether the claims of the class representatives are typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). Here, typicality is satisfied because Plaintiffs have alleged identical injuries, namely, failure to pay meal- and rest-break premium wages, and failure to reimburse for the expense of using personal cell phones in the discharge of work duties.

### 3. The Adequacy Requirement is Satisfied

FRCP Rule 23(a)(4)'s adequacy requirement involves the satisfaction of two factors: (1) do the named plaintiffs and counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and counsel prosecute the action vigorously on behalf of the class? *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012). Both elements of the Rule 23(a)(4) adequacy test are satisfied here. First, there is no evidence that the plaintiffs or their counsel have any interests antagonistic to the interests of the class. <u>Sayas Decl.</u>, ¶ 12. On the contrary, Plaintiffs and the putative class members here share a common interest in challenging Menzies' unlawful employment practices. *Ibid.* Second, Plaintiffs understand the nature of this action and their duties as class representatives, and have ably

- 18 -

assisted their counsel in the prosecution of this litigation.  *Ibid.*  Moreover, Plaintiffs have retained counsel who are qualified, experienced, and knowledgeable in the issues raised in this litigation, and who have adequate class action and litigation experience.  Sayas Decl., ¶¶ 13-17.

### 4.    The Commonality Requirement is Satisfied

FRCP Rule 23(a)(2) requires that there be questions of law or fact common to the class. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart Stores, Inc.*, *supra*, 131 S. Ct. at 2551.  The class claims "must depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  However, Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution.  "So long as there is 'even a single common' question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013), *quoting Wal-Mart*, 131 S. Ct. at 2556.

(i)    Common Questions as to Meal Break Claims

Here, the meal-break claims asserted on behalf of the proposed class reflect the same injuries: Menzies' failure to pay Meal Premium wages despite its records of missed, late and shortened meal periods.  Liability is clearly capable of classwide resolution.  As explained in the California Supreme Court's *Donohue* decision, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided."  *Donohue, supra*, 11 Cal. 5th at 74.  The same presumption of non-compliance applies equally to missed, late and shortened meal breaks reflected in the employer-maintained records.  *Donohue* at 76.

Thus, the common evidence of time and pay records produced by Menzies allows classwide adjudication of the central question of Plaintiffs' theory of liability for meal breaks; namely, whether Menzies properly paid employees all Meal Premiums earned for non-compliant meal periods reflected in Menzies' own time records.  The availability of such common evidence, and the presumption it creates, satisfies commonality.  *See Santillan v.*

*Verizon Connect, Inc.*, No. 3:21-cv-1257-H-KSC, 2022 U.S. Dist. LEXIS 182405, at *41 (S.D. Cal. Jun. 13, 2022) ("time record analysis creates a rebuttable presumption that [employer] is liable for noncompliant meal periods," which satisfies commonality requirement for class certification); *Morgan v. Rohr, Inc.*, No. 20-cv-574-GPC-AHG, 2022 U.S. Dist. LEXIS 61046, at *47-50 (S.D. Cal. Mar. 31, 2022) (common question of whether employer had "common practice of not paying employees meal…premiums when compliant meal…breaks were not provided" satisfied commonality requirement for class certification, as "full dataset of payroll data and timekeeping records" allowed "meal break premiums owed to putative class members for missed and shortened meal breaks" to be assessed on classwide basis).

(ii)    <u>Common Questions as to Rest Break Claims</u>

Commonality is also satisfied as to Plaintiffs' theory of liability for rest break claims: to wit, that: (i) the uncertainty of work scheduling in the aviation industry, coupled with Menzies' practice of foregoing breaks unless and until all work has been completed for airline customers, (ii) its failure to notify Employees of their right to be paid the Rest Premiums, and (iii) a glaring absence of any mechanism by which Rest Premiums may be paid, which understandably resulted in no record of a single Rest Premium payment throughout the class period, comprised an unofficial policy to violate any facially-compliant written rest-break policies of Menzies. "'Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.'" *Campbell v. Vitran Express, Inc.*, No. CV 11-5029 RGK (SHx), 2015 U.S. Dist. LEXIS 155512, at * 16-17 (C.D. Cal. Nov. 12, 2015) (*quoting Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004 (Cal. 2012)). This court noted in *Campbell* that this so-called "policy-to-violate-the-policy" theory of liability is routinely recognized by the Ninth Circuit as appropriate for class treatment, as proof of "whether such informal or unofficial policies existed will drive the resolution" of classwide claims. *See Campbell* at *17 (*citing Jimenez v. Allstate, Ins. Co.*, 765 F.3d 1161, 1166 (9th Cir. 2014)).

Similar to *Campbell*, commonality exists here as to Menzies' above-described unofficial policy that has led to wholesale non-payment of Rest Premiums despite Menzies'

acknowledgement of rest-break violations to ensure completion of work for airline customers. *See Campbell* at *12; *see also Brinker*, *supra*, 53 Cal. 4th at 1040 (employer may not undermine formal policy of providing breaks by pressuring employees to perform duties in way that omits breaks); *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 271-72 (N.D. Cal. Jul. 5, 2018) ("The evidence is sufficient to demonstrate a common question as to whether traveling nurses do not take breaks to which they are entitled because of the pressures imposed by Kaiser's policies and Defendants' failure to adopt policies and procedures to ensure that they receive compliant breaks, which other courts have found to be sufficient to warrant certification under *Brinker*.")

(iii)    <u>Common Questions as to Reimbursement Claims</u>

As described above, the common questions here as to the Labor Code Section 2802 reimbursement claims involve: (i) whether the subclass of employees used their personal cell phones in discharge of core work duties; (ii) whether Menzies knew of such use; and (iii) whether Menzies made available to the employees a viable alternative method for accomplishing same. Such common questions satisfy the commonality requirement under FRCP Rule 23(a)(2). *See Santillan*, *supra*, 2022 U.S. Dist. LEXIS 182405, at *7-12 (questions as to necessity of using personal cell phones to make and receive customer calls while working from home during Covid-19 quarantine, and whether faulty company-provided hardware was viable alternative method, were common contentions capable of classwide resolution).

**B.    <u>The Requirements of FRCP Rule 23(b)(3) are Satisfied</u>**

Certification of a class under FRCP Rule 23(b)(3) is appropriate where, as here, "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and…a class action is superior to other available methods" to resolve the case. *Fed. R. Civ. P. 23(b)(3)*. The predominance requirement is met "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," thus providing "clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal citations omitted).

**1.    *Common Questions Predominate as to Meal Break Claims***

- 21 -

Here, common questions predominate as to the meal-break claims such that class certification is appropriate. Principally among these is the classwide presumption of liability created by Menzies' own common time-record evidence of late, missed or shortened meal periods, and the absence of corresponding Meal Premium payments in its pay records. As succinctly explained by the *Morgan* court in granting class certification: "[T]he law governing meal breaks is clear, and the failure to pay premiums when those regulations are not followed, contravenes the purpose of the statutory scheme. With a full dataset of payroll data and timekeeping records, meal break premiums owed to putative class members for missed and shortened meal breaks can be assessed on a classwide basis, and will not necessarily require individual inquiry into the circumstances surrounding each and every employee's work shifts and meal break periods." *Morgan v. Rohr, Inc.*, *supra*, 2022 U.S. Dist. LEXIS 61046, at *50.

The *Santillan* court likewise ruled that class certification was appropriate because "common questions predominate over individual issues" where, as here, "Plaintiff's time record analysis creates a rebuttable presumption that [the employer] is liable for noncompliant meal periods." *See Santillan* at *41. The *Santillan* court further reasoned that the employer's affirmative defense of "meal period waiver," with supporting evidence consisting of the company's "meal period policies," "timekeeping procedures," class member declarations, and deposition testimony, are also "subject to classwide resolution," because the policies and procedures are common to the class and *Donohue* "specifically enumerated '[r]epresentative testimony, surveys, and statistical analysis,'…as classwide evidence that may be used to rebut the presumption of liability and show compliant meal periods or voluntary waiver." *Santillan* at 38-39, 41. That is also the case here.

Menzies' affirmative defense is that Employees' failure to comply with its Meal Premium Payment Policy excuses non-payment of Meal Premium wages. But Menzies' Meal Premium Payment Policy violates California's mandate of ***immediate*** payment of Meal Premium wages. Under California law, if an employer fails to provide an employee a compliant meal break, that "employee is **'immediately' entitled to the premium wage, without any demand or claim to the employer, in a manner 'akin to an employee's immediate**

entitlement to payment of wages or for overtime." *See Safeway, Inc. v. Sup. Ct.*, 238 Cal.App.4th 1138, 1154 (2015) (*citing Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1108 (2007) (emphasis supplied); *see also Naranjo v. Spectrum Security Servs.*, 13 Cal.5th 93, 109 (Cal. 2022) (affirming *Murphy* holding that "employee entitled to missed-break premium pay 'immediately upon being forced to miss a rest or meal period,' such that "'a payment owed pursuant to section 226.7 is akin to an employee's immediate entitlement to payment for wages or for overtime'"). Menzies' affirmative defense thus presents a common question of law appropriate for classwide adjudication.

The case of *Chacon v. Express Fashion Operations, LLC* is particularly instructive in this regard. There, the plaintiffs similarly argued that a "policy of requiring employees to submit a premium request is unlawful," as "the right to a premium payment, just like the right to overtime pay, is immediate," such that "an employer cannot make such payment contingent upon submission of a premium request." *Chacon v. Express Fashion Ops., LLC*, No. 8:19-cv-00564-JLS-DFM, 2021 U.S. Dist. LEXIS 195353, at *23 (C.D. Cal. Jun. 14, 2021). In granting class certification, the *Chacon* court explained that resolution of the "legality of this 'premium request requirement'…is a common inquiry suitable for class treatment." *Chacon* at *23-24.[23]

### 2.    Common Questions Predominate as to Rest Break Claims

Common questions also predominate as to Plaintiffs' theory of liability on the rest break claims, namely, that Menzies had an unofficial policy to deprive employees of rest breaks and Rest Premium wages. *See § III.A.(4)(ii), supra*. In *Campbell*, the court relied on testimony contained in 13 class-member declarations, and the declaration of a "dispatcher" in a supervisory capacity, collectively averring that the employer constantly intimidated and forced employees to work through supposed rest breaks, to find that common questions

---

[23] As noted above, *see* Footnote 5, *supra*, a related, secondary common question here is the validity of Menzies' presumed blanket waiver of second meal periods absent submission of a Missed Punch Form. This too is appropriate for class treatment. *See Chacon* at *21 (question of invalidity of blanket waiver "allege[s] a company-wide system that created a smooth path to waive a meal period and an obstacle course to obtain premium pay," such that common question of its "facial validity is capable of resolution on a class-wide basis").

predominated as to whether the employer had an unofficial policy to deny rest breaks. *Campbell*, *supra*, 2015 U.S. Dist. LEXIS 155512 at *21. Rejecting competing declarations stating rest-break compliance as merits arguments more appropriately made at the post-certification stage, the court ruled that "common questions predominate as to Plaintiff's claim that Defendant maintained an unofficial policy to deprive employees of their…rest breaks." *Campbell* at 23-24, 26. Like in *Campbell*, determination of whether Menzies had an unofficial policy to violate facially-compliant written rest-break policies is appropriate for class treatment.

### 3.    *Common Questions Predominate as to Reimbursement Claims*

Common questions likewise predominate as to the reimbursement claims. To establish such claims under Labor Code Section 2802, Plaintiffs must establish that: (1) employees incurred expenses; (2) said expenses were incurred in direct consequence of the employees' discharge of their duties; and (3) the expenses were necessary." *See Santillan*, *supra*, at *8 (*citing Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal.App.4th 220 (Cal. Ct. App. Nov. 29. 2006)). Here, the cell phone expenses are indisputable. Menzies acknowledges that some expenses were in direct consequence of Employees discharge of duties, albeit with the caveat that it was not mandatory. But California law is clear that "'[n]ecessary' does not mean 'mandatory' in the sense that the employer ordered the employee to incur the expense." *Santillan* at *8. Rather, the central questions with regard to necessity are: (i) whether the relevant subclass of employees performed core duties on their personal cell phones; and (ii) if Menzies provided a reasonable alternative to use for those core duties. *Santillan* at *8-10. The main question here is thus whether the use was "necessary" within the meaning of Labor Code Section 2802, which will be established by common evidence of Employees' job descriptions and representative testimony. Such common evidence predominates and would drive classwide resolution, making class certification appropriate. *See Santillan* at *7-12 (common questions predominated as to necessity of using personal cell phones for customer calls due to faulty company-provided hardware not being a viable alternative).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

### 4. Class Treatment is Superior to Multiple Individual Adjudications, and Will Benefit the Court and Parties

Class treatment in this case is superior to any other method of adjudicating the claims made on behalf of the more than 5,000 class members in this case. Absent class adjudication, handling this high number of repetitive individual claims would unjustifiably strain limited judicial resources. On the other hand, judicial economy would be achieved through classwide adjudication. Where, as here, common questions of law and fact predominate in the determination of failure to pay earned premium wages reimbursements, and Rest Premiums, making that determination in a single class action is superior to making that same determination repeatedly in numerous individual adjudications.

Given the predominant common issues of facts and law in this case, the class action proceeding will fairly and efficiently adjudicate the controversy. Evidence consisting of centralized time and pay records, common company policies and practices, representative testimony, and statistical analyses can be used as classwide proof to determine liability, and ultimately damages. *See Sav-On Drug Stores, Inc. v. Sup. Ct.*, 34 Cal.4th 319, 333 (Cal. 2004) ("California courts and others have in a wide variety of contexts considered pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.")

## IV.    CONCLUSION

The Court and all parties will benefit from fairly and efficiently adjudicating the common controversies in this case using the class action mechanism. Accordingly, Plaintiffs respectfully request that this Court grant their Motion for Class Certification.

Dated: May 22, 2023

**LAW OFFICES OF C. JOE SAYAS, JR. and KING CHENG MILLER & JIN, LLP**

By:    /s/ C. Joe Sayas, Jr.
C. JOE SAYAS, JR.
KARL P. EVANGELISTA
Attorneys for Plaintiffs

- 25 -