1  CHRISTOPHER WARD, CA Bar No. 238777
   cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3300
3  LOS ANGELES, CA 90071-2418
   TELEPHONE: 213.972.4500
4  FACSIMILE:   213.486.0065

5  KEVIN JACKSON, CA Bar No. 278169
   kjackson@foley.com
6  **FOLEY & LARDNER LLP**
   11988 EL CAMINO REAL, SUITE 400
7  SAN DIEGO, CA 92130-2594
   TELEPHONE: 858.847.6700
8  FACSIMILE:   858.792.6773

9  Attorneys for Defendant
   MENZIES AVIATION (USA), INC.
10

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14  DORA PATRICIA AMAYA, an                Case No. 2:22-cv-05915-MCS-MARx
    individual; and ANIBAL SILVA, an
15  individual; on behalf of themselves and  **DECLARATION OF KEVIN**
    others similarly situated,              **JACKSON IN SUPPORT OF**
16                                          **DEFENDANT MENZIES AVIATION**
                            Plaintiffs,     **(USA), INC.'S OPPOSITION TO**
17                                          **PLAINTIFFS' MOTION FOR CLASS**
           vs.                              **CERTIFICATION**
18
    MENZIES AVIATION (USA), INC., a         Date:    July 24, 2023
19  Delaware corporation; and DOES 1        Time:    9:00 a.m.
    through 10, inclusive,                  Ctrm.:   7C, 7th Floor
20                                          Judge:   Hon. Mark C. Scarsi
                            Defendants.
21
                                            Complaint Filed:  August 19, 2022
22                                          FAC Filed:        August 30, 2022
                                            SAC Filed:        May 9, 2023
23

24

25

26

27

28

JACKSON DECL ISO OPPOSITION TO MOTION FOR CLASS CERTIFICATION
Case No. 2:22-cv-05915-MCS-MARx

### DECLARATION OF KEVIN JACKSON

I, Kevin Jackson, declare as follows:

1.      I am an attorney and duly licensed to practice law in the State of California and I am senior counsel at the law firm of Foley & Lardner, LLP, attorneys for Defendant Menzies Aviation (USA), Inc. ("Defendant") in the above-captioned action.  I have firsthand personal knowledge of the facts contained in this declaration and if called upon to testify, I would and could do so as set forth herein.

2.      I make this Declaration in support of Defendant Menzies Aviation (USA), Inc.'s ("Defendant") Opposition to Plaintiffs' Motion for Class Certification ("Motion").

3.      On April 26, 2023, Christopher Ward took the deposition of Plaintiff Dora Patricia Amaya.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Ms. Amaya's deposition is attached hereto as **Exhibit 1**.

4.      On May 19, 2023, I took the deposition of Anibal A. Silva.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Mr. Silva's deposition is attached hereto as **Exhibit 2**.

5.      On April 13, 2023, Plaintiffs' counsel deposed Menzies' Western Region Human Resources Director, Talin Bazerkanian.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Ms. Bazerkanian's deposition is attached hereto as **Exhibit 3**.

6.      On May 3, 2023, Plaintiffs' counsel deposed witness Brian Galindo.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this

matter.  A true and correct copy of excerpts from the transcript of Mr. Galindo's deposition is attached hereto as **Exhibit 4**.

7.    On May 5, 2023, Plaintiffs' counsel deposed witness Jose A. Salcedo Garcia.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Mr. Salcedo Garcia's deposition is attached hereto as **Exhibit 5**.

8.    On May 3, 2023, Plaintiffs' counsel deposed witness Lizette Medina. Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Ms. Medina's deposition is attached hereto as **Exhibit 6**.

9.    On May 5, 2023, Plaintiffs' counsel deposed witness David Funes. Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Mr. Funes' deposition is attached hereto as **Exhibit 7**.

10.    Attached as **Exhibit** 8 is a true and correct copy of Menzies Aviation Employee Handbook California, authenticated at the Deposition of Dora Patricia Villagra ("Amaya Depo."), 105:14 – 106:2; Deposition of Plaintiff Anibal Silva ("Silva Depo."), 126:24 – 127:9; and the Deposition of Menzies' Person Most Knowledgeable ("PMK Depo."), 111:13 – 112:4.

11.    Attached as **Exhibit 9** is a true and correct copy of the Meal and Rest Period Policy, California, authenticated at Silva Depo., 103:11 - 21.

12.    Attached as **Exhibit 10** is a true and correct copy of the Kronos Adoption, E-Self Service and Notice of Informational Messaging to Mobile Phones, authenticated at Amaya Depo., 152:14 – 153:9; and Silva Depo., 105:24 – 107:5.

13.    Attached as **Exhibit 11** is a true and correct copy of the Personal Electronic

Device & Cellular Phones Policy, authenticated at Amaya Depo., 162:9 – 25; Silva Depo., 90:5 – 9; and PMK 196:10 – 196:23.

14.     Attached as **Exhibit 12** is a true and correct copy of the Kronos Meal Period Clocking Policy and Reminder of Meal and Rest Period Policies and Requirements, authenticated at Amaya 130:21 – 131:16; and PMK 87:11 – 87:24.

15.     Attached as **Exhibit 13** is a true and correct copy of the Menzies Aviation Alternative Dispute Resolution Policy, authenticated at Amaya Depo., 32:11 - 15.

16.     Attached as **Exhibit 14** is a true and correct copy of the Agreement to be Bound by Alternative Dispute Resolution Policy, authenticated at Silva Depo., 20:6 – 22:16.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on June 12, 2023 at San Diego, California.

Kevin Jackson

4864-9884-4006.1

# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   DORA PATRICIA AMAYA, an          )
     individual, et al.,              )
 5                                    )
              Plaintiffs,             )
 6                                    )
       vs.                            ) CASE NO. 2:22-Ccv-
 7                                    ) 05915-MCS-MARx
     MENZIES AVIATION (USA), INC.,    )
 8   et. al.,                         )
                                      )
 9            Defendants.             )
     _____)

10

11

12

13              REMOTE PROCEEDINGS OF THE

14        VIDEOTAPED DEPOSITION OF PATRICIA VILLAGRA

15                       VOLUME I

16               WEDNESDAY, APRIL 26, 2023

17

18

19

20

21   Stenographically Reported by:
     LISA RICHARDSON, RMR, CRR, RPR, CSR No. 5883
22

23   Job No. 10118763

24

25   PAGES 1 - 185
```

EXHIBIT 1 - 5

1          THE VIDEOGRAPHER:   The court reporter today is

2    Lisa Richardson, and she may now swear in or affirm the

3    deponent.

4                    PATRICIA VILLAGRA,

5    having been administered an oath, was examined and

6    testified as follows:

7          THE STENOGRAPHER:   Proceed, Counsel.

8          MR. WARD:   Thank you.

9                    EXAMINATION

10   BY MR. WARD:

11     **Q    So good morning, Ms. Amaya.   I know I**

12   **introduced myself just before we started today, but I'm**

13   **Christopher Ward, I represent Menzies Aviation.   And I'm**

14   **going to be asking you some questions today.**

15           **Ideally we'll have an orderly, smooth process.**

16   **I'm not going to make this any more difficult than it**

17   **has to be, I hope.**

18           **But before we kind of jump into some things,**

19   **can I ask you to state and spell your complete legal**

20   **name for the record?**

21     A    My legal name is Dora Patricia Amaya Serna.

22   And my current legal name is Patricia Villagra, is

23   because due to my marriage, so I changed my last name.

24     **Q    Okay.   And just, just so that we are clear, can**

25   **you spell both the full legal name and your current**

1       Q     Okay.  And you are seeing you've got a

2    seven-page document there in front of you?

3       A     Give me one second.  Seven-page.  The one that

4    I have signed?  Not signed.  Agreement.  Dispute

5    resolution.

6          What is the page that you want me to review?

7       Q     I just want to make sure you are seeing all

8    seven pages that I sent over first before we get too

9    deep into it.

10      A     Yes.  I see it.

11      Q     Okay.  So let me just ask you this:  Do you

12    recognize this Exhibit 1 that I've sent to you?

13      A     I do.

14      Q     What do you recognize it to be?

15      A     The arbitration.  Yes.

16      Q     Okay.  Is this an alternative dispute

17    resolution policy and agreement that you executed at the

18    beginning of your employment with Menzies Aviation?

19      A     I want to understand that question.

20      Q     Sure.  So I'll -- let's, let's scroll down.

21    Let me ask a different question.

22          You went through an orientation process at the

23    beginning of your employment with Menzies, correct?

24      A     Correct.

25      Q     And through that orientation, I imagine you

Volume I                                                      Amaya vs.
Patricia Villagra                          Menzies Aviation (USA), Inc.

1    reviewed a number of policies and procedure documents,

2    right?

3         A    Correct.

4         Q    Okay.  And is this alternative dispute

5    resolution policy one of the documents that you reviewed

6    during that orientation?

7         A    No.  During the orientation, no.

8         Q    At some point at the beginning of your

9    employment did you review this material?

10        A    We have to do it from our computers and sign

11   up, yes.

12        Q    Okay.  And so you -- well, it looks like there

13   are two different times where there's an execution form,

14   but they are both dated August 28th, 2021.

15             Do you see what I'm looking at there?

16        A    Yeah -- give me one second.

17             My -- okay.  So this -- so this is -- my

18   computer is acting up.  I'm sorry.

19        Q    No worries.  Take your time.

20        A    Thank you.

21             Okay.  I can see this August 28.  August 28.  I

22   see August 28.

23        Q    Okay.  And so just to make sure I'm clear here,

24   you reviewed this on your computer in connection --

25        A    Yes.

**Volume I**                                                      **Amaya vs.**
**Patricia Villagra**                                  **Menzies Aviation (USA), Inc.**

1        Q     -- with your employment with Menzies on

2    August 28, 2021?

3        A     Yes.

4        Q     Okay.  And in that process, you placed your

5    acknowledgement that the policy -- that you had read it;

6    is that correct?

7        A     Correct.

8        Q     Okay.  And then if we go down to the very last

9    page of this Exhibit 1 --

10       A     Yes.

11       Q     -- it looks like there's an electronic

12   signature there.

13             Is that your electronic signature?

14       A     Yes.

15       Q     And you placed that there on August 28th, 2021?

16       A     Yes.

17       Q     Prior to placing those two electronic

18   signatures, did you read these pages?

19       A     Yes.

20       Q     Okay.  And did you have an understanding of

21   what they meant?

22       A     Yes.

23       Q     What was that understanding?

24       A     My understanding is that if I did not sign

25   this, I was not able to perform -- I mean to be hired

Volume I                                                    Amaya vs.
Patricia Villagra                          Menzies Aviation (USA), Inc.

1    for Menzies.  And then this is the understandings that

2    some kind of -- if I have any dispute.

3         Q    Okay.  Do you understand what arbitration is?

4         A    No.

5         Q    Okay.  Prior to indicating your electronic

6    signature on this document, did you ask any questions of

7    Menzies of what it meant?

8         A    No, because I was doing it by myself at home.

9    So I was not able to ask any questions about this,

10   regarding to this form.

11        Q    Okay.  Do you have any understanding as to

12   whether other Menzies employees in the state of

13   California are also required to execute this type of

14   agreement?

15        A    Yes.

16        Q    What is your understanding?

17        A    That all of us we need to sign this to be able

18   to get the job.

19        Q    Okay.  So as you sit here --

20        A    If you are not signing, you are not going to be

21   able to get hired.

22        Q    Okay.  And as you sit here today, then, is it

23   far to say your understanding that all or most all

24   Menzies employees in California are subject to similar

25   agreements?

EXHIBIT 1 - 10

 1      A      Yes.

 2             MR. KING:  I'm just going to object; it calls

 3   for speculation.

 4             You can answer.

 5             MR. WARD:  Did you get her answer, Lisa?  Good.

 6   Thank you.

 7   BY MR. WARD:

 8      Q      Okay.  So when you applied to Menzies, did you

 9   have an understanding of what kind of job you were

10   applying for?

11      A      Kind of.  Because it was the first time that I

12   was going to work at the airport.

13      Q      Okay.  What -- at the time -- let's just focus

14   for the moment at the time you applied.

15             Did you have an understanding of what kind of

16   business Menzies did?

17      A      Not completely.

18      Q      What was your understanding at that time?

19      A      That I was going to work at passenger service

20   agent, just front desk -- I mean the counters receiving

21   passengers, checking the passengers, and departures or

22   arrivals.  But not the entire operation.  I was not

23   familiar with that.  I thought that it was an easy job,

24   like receiving passengers, greeting, very good customer

25   service, and then a new learning for me.

1      A    Yes.

2      Q    And what did you understand that paragraph to

3   be communicating to you at that time?

4      A    Honestly, I have no idea what it was collective

5   bargaining agreement.  I just sign up the position,

6   passenger service agent.  And because I was new with the

7   company and the union, so I just took the job.

8      Q    Okay.  At some point after you received this

9   letter, did you form an understanding of what it meant

10  to be part of a bargaining unit covered by a collective

11  bargaining agreement?

12     A    I do not understand that part.

13     Q    Sure.  So you did understand when you started

14  the job that you would have a union representing you,

15  correct?

16     A    Correct.

17     Q    Okay.  And as you continued working at Menzies,

18  did you ever ask what it meant to have union

19  representation or what rights you had because of the

20  union?

21     A    Yes.

22     Q    When did you do that?

23     A    I -- when I start working I ask my manager

24  what does it mean having union and why I was paying for

25  union.  And they said, like, you have to reach out HR so

```
 1        Q     How many times would you say you did that?
 2        A     How many times did you refer the each passenger
 3   or the each shift or flight?
 4        Q     Well, let me ask a different question.
 5              So you are down --
 6        A     Yes.
 7        Q     Let's take a situation where you are down on
 8   the ramp --
 9        A     Yes.
10        Q     -- right?
11              And there are ramp agents there who are loading
12   and unloading the aircraft, correct?
13        A     Yes.  Correct.
14        Q     Okay.  Did you also, when you were down on the
15   ramp, participate in putting passenger baggage into the
16   baggage holds like the ramp agents do or anything like
17   that?
18        A     Not directly to the airplane, but we have -- I
19   have to bring luggages to the passengers -- to the ramp
20   agents, agents.  If their flight was to -- if the flight
21   was full so we have to get luggages from the cabin to,
22   to the, to the ramp agents so they can place it, upload
23   it to, to the plane.
24        Q     Let me see if I understand you.  So if, you
25   know, the overheads in an airplane are full and the
```

Page 56

1  maintenance personnel.  You know, passenger service

2  agents.  Fueling personnel as well.

3      Q    Any other types of services or job categories

4  that you can identify?

5      A    Not that I can recall, unless are you talking

6  about the management.

7      Q    Sure.  Got it.

8          What about -- does Menzies perform all of these

9  services at LAX, to your knowledge?

10     A    I, I know the company is a big company, so I

11 know that they have different locations.  And I believe

12 in Canada as well.

13     Q    Okay.  What about within California, do you

14 have any knowledge of what kind of operations they offer

15 at, let's say, San Diego?

16     A    They might have an Ontario.  I don't know.

17     Q    Well, that's what I'm asking.  If you are just

18 going to speculate, that's fine.  I don't want you to

19 guess.  I'm just asking what knowledge.

20         Do you have any knowledge whether Menzies has

21 operations at San Diego?

22     A    No.

23     Q    Do you have any knowledge whether Menzies has

24 operations at Ontario?

25     A    No.

**Volume I**                                                           **Amaya vs.**
Patricia Villagra                              Menzies Aviation (USA), Inc.

```
 1        Q     Do you have any knowledge of any Menzies
 2    operation at any California location other than LAX?
 3        A     No.
 4        Q     Okay.  What do you know about their operations
 5    at LAX beyond Tom Bradley?
 6        A     I don't.
 7        Q     Okay.  But you do know that they have quite a
 8    bit of different types of business, right?
 9        A     Yes.
10        Q     And is it fair to say that, you know, the, the
11    job experience of a ramp agent is going to be very
12    different from that of a passenger service agent, right?
13        A     Yes.
14        Q     Would you agree that it's possible that, you
15    know, a passenger service agent's job at San Francisco,
16    if they have that job, would be different than
17    somebody's at LAX?
18        A     Can you repeat that?  I'm sorry.
19        Q     Sure.  So let's say Menzies has passenger
20    service agents at San Francisco.  Would you imagine that
21    there would still be some differences between the job at
22    San Francisco versus the job at LAX?
23        A     I don't know.
24        Q     You don't know one way or another?
25        A     No.
```

EXHIBIT 1 - 15

Volume I                                              Amaya vs.
Patricia Villagra                    Menzies Aviation (USA), Inc.

1        Q    And cargo agents at Menzies at LAX are

2    represented by a union, correct?

3        A    Yes.

4        Q    Okay.  What about fuelers, do you have any

5    knowledge about what their requirements might be for

6    using cell phones?

7        A    No.

8        Q    Okay.  Do you know if fuelers at Menzies are

9    represented by a union?

10       A    No.

11       Q    Okay.

12       A    I don't know that.

13       Q    Okay.  What about the maintenance folks that

14   you talked about, do you have any knowledge about their

15   cell phone requirements?

16       A    No.

17       Q    Do you have any knowledge as to whether

18   maintenance employees by Menzies are represented by a

19   union?

20       A    No.

21       Q    Okay.  And you talked about cabin cleaning

22   employees as well.  They are represented by a union at

23   LAX as well, aren't they?

24       A    I don't know.

25       Q    Okay.  Do you have any knowledge about whether

1    they have to use their cell phones to work?

2         A    I don't know.

3         Q    Okay.  Let's switch over to uniforms now.

4              I think you had said earlier that everybody

5    looked different on the passenger service team at Tom

6    Bradley?

7         A    The entire teams.  So we all looked different.

8    We supposed to have a coat -- Menzies Aviation uniform,

9    which is a vest, Navy blue vest, Navy blue jacket, Navy

10   blue pants, or a skirt for females, and white shirt.

11   And also we have kind of like a scarf that identified us

12   and also a tag.  But I never receive any uniform, so I

13   have to buy my own uniforms: black skirt and white shirt

14   and a Navy blue jacket.

15        Q    Okay.  So it's your assertion that Menzies was

16   supposed to provide you a specific uniform, correct?

17        A    Correct.

18        Q    And they never provided you that uniform?

19        A    Correct.

20        Q    And that would be the same for all the other

21   passenger service agents that you know of as well,

22   right?

23        A    Yes.

24        Q    Okay.  And did Menzies ever tell you:  Since we

25   are not providing you a uniform, you need to go buy

1        A      Yes.

2        Q      Explain to me what your basis for that

3    contention is.

4        A      When I start my shift, we -- I agree that we

5    have to be at the front desk, at the counters standing

6    up for long periods of time.  But also I'm aware that

7    I'm entitled to get my ten-minutes break and also my

8    meal break.  Those meal breaks and ten-minutes break

9    were not provided to me in a long shift.

10       Q      Let me ask you a couple questions.

11              So you say you are aware that you are entitled

12   to get a ten-minute break.

13              What's your basis for that awareness?

14       A      The California law.

15       Q      Okay.  Was that something that Menzies also

16   communicated to you itself?

17       A      Yes.

18       Q      Okay.  And how about with respect to the meal

19   break, what's your basis for that awareness?

20       A      I'm aware that I'm entitled to get my meal

21   break before the sixth hour.  Between the fifth and the

22   sixth hour I need to get my meal break --

23       Q      Okay.

24       A      -- noninterrupted meal break.

25       Q      And that was something Menzies also

Volume I                                                    Amaya vs.
Patricia Villagra                      Menzies Aviation (USA), Inc.

 1   communicated to you?

 2        A    Yes.

 3        Q    And you are aware that Menzies had policies and

 4   procedures regarding meal breaks?

 5        A    Yes.

 6        Q    And you are aware that Menzies had policies and

 7   procedures regarding rest periods?

 8        A    Yes.

 9        Q    Okay.  And Menzies also communicated to you

10   that if you did not receive a meal break you were

11   entitled to compensation for that, correct?

12        A    No.

13        Q    Okay.  How about did Menzies ever communicate

14   to you that if you did not receive a rest break you were

15   entitled to compensation for that?

16        A    We had no communication about that.  We never

17   receive any communication about that.

18        Q    Okay.  Did anybody ever instruct you that you

19   are required to skip rest periods at Menzies?

20        A    No.

21        Q    Did anybody ever instruct you that you are

22   required to skip meal breaks at Menzies?

23        A    I'm sorry, I'm going to return to the first

24   question, because I, I think I misunderstood your

25   question.

1  coworkers with the same concerns.  And I feel that I'm

2  able to represent the entire group.

3      Q    Have you taken any efforts to investigate these

4  allegations with respect to Menzies employees in

5  San Francisco?

6      A    No.

7      Q    Okay.  Do you know anything about -- do you

8  have any personal knowledge about the circumstances of

9  any Menzies employee at San Francisco?

10     A    No.

11     Q    Okay.  How about at any airport in California

12 other than Los Angeles, have you taken any efforts to

13 investigate these various theories for those employees?

14     A    No.

15     Q    Okay.  And do you have any personal knowledge

16 of the circumstances of any particular employee at any

17 location other than LAX?

18     A    No.

19     Q    Okay.  Is it fair to say that your knowledge is

20 generally confined to either passenger service agents or

21 what you know from your son as a cargo agent?

22     A    And -- yes, coworkers.

23     Q    Since you filed this case, have you taken any

24 efforts to speak to fuelers, for example, to investigate

25 their circumstances at LAX?

1       A    I have not.

2       Q    Okay.  As far as you know, at this point do you

3    intend to assert any additional claims or theories

4    against Menzies other than what we've discussed today?

5       A    No.

6       Q    Okay.  All right.  You understood while working

7    at Menzies that you were represented by a union, right?

8       A    Yes.

9            MR. WARD:  You know, I'm going to do this, just

10   to keep my sequencing correct.

11           So I am going to mark this as Exhibit 4, and

12   ask you to take a look at it, as soon as I actually get

13   it in there.

14                   (Exhibit 4 was marked.)

15   BY MR. WARD:

16      Q    All right.  Let me know when you've had a

17   chance to look at that document.

18      A    It's loading.  It's loading.

19           Okay.  I got it.

20      Q    Okay.  This is Exhibit 4.

21           Do you recognize this?

22      A    Give me one second.

23           Yes.

24      Q    And what do you recognize this to be?

25      A    This is the, the lawsuit.

1    of Menzies in California? some?  What's your

2    understanding of that?

3         A    I kind of lost in that.

4         Q    Sure.  So is, is it your belief that all

5    nonexempt employees of Menzies, other than maybe

6    administrative personnel in the state of California, are

7    represented by unions?

8              MR. KING:  Let me just object; it calls for

9    speculation.

10             You can answer, Patricia.

11             THE WITNESS:  Okay.

12             I don't know.

13   BY MR. WARD:

14        Q    Okay.  But just -- and I'm just trying to

15   understand how far your knowledge goes on this.  I'm not

16   trying to give you a hard time.  So I apologize if it

17   sounds that way.

18             But, for example, you know there are other

19   groups of employees at LAX that are also represented by

20   unions; is that true?

21        A    I don't know.

22        Q    Okay.  So you know the passenger service agents

23   are represented by unions at LAX, we know that, right?

24        A    Right.

25        Q    Okay.  Beyond that, do you have knowledge of

1   which particular groups of employees are represented by

2   unions or would you only be speculating?

3       A    I would only be speculating.

4       Q    Okay.  That's fine.

5            You mentioned earlier, if I recall, that you

6   received an employee handbook in connection with your

7   employment with Menzies, right?

8       A    Yes.

9            MR. WARD:  Okay.  So let's put this in first.

10  Oops, sorry, hold on.

11           Mark that as Exhibit 7.

12               (Exhibit 7 was marked.)

13           MR. WARD:  And if I neglected to do it earlier,

14  I marked the collective bargaining agreement as 6.  But

15  everything's labeled in the Chat.

16           So this will be Exhibit 7.

17  BY MR. WARD:

18      Q    Let me know when you've had a chance to take a

19  look at it.

20      A    I'm opening the file right now.

21           Okay.  I got it.

22      Q    And you recognize this Exhibit 7?

23      A    Yes.

24      Q    What do you recognize this to be?

25      A    I recognize my signature, dated, and then, yes,

Volume I                                                                    Amaya vs.
Patricia Villagra                                    Menzies Aviation (USA), Inc.

1    I picked up this.

Volume I                                                                    Amaya vs.
Patricia Villagra                                    Menzies Aviation (USA), Inc.

2         Q    Okay.  And you recognize this to be an

3    acknowledgment of the fact that you had received the

4    Menzies Aviation handbook?

5         A    Yes.

6         Q    Did you read this document before you placed

7    your electronic signature on it?

8         A    Yes.

9         Q    And did you understand that the employee

10   handbook contained certain information in terms of

11   conditions of employment that applied to you?

12        A    Yes.

13        Q    Okay.  We can close that one.

14             MR. WARD:  This is going to be a slightly

15   larger one, so it may be taking a minute here.

16             All right.  This is Exhibit 8.

17                  (Exhibit 8 was marked.)

18             THE WITNESS:  Opening the file.  Folder.

19             Yes.  I can see the employee handbook.

20   BY MR. WARD:

21        Q    And you'll recognize this as the employee

22   handbook that you received in connection with your

23   employment with Menzies?

24        A    Yes.  This is electronically, we have access.

25        Q    Okay.  And so this was made available to you in

1    connection with your employment?

2        A    It was -- yes.

3        Q    Okay.  And you understood that this handbook

4    contains terms and conditions that applied to your

5    employment?

6        A    Yes.

7        Q    Did you read it at any point during your

8    employment with Menzies?

9        A    Yes.  But not everything.  But, yes.

10       Q    Why did you choose to read some of it but not

11   all of it?

12       A    I read the important part, like security

13   policies, and also I was reading the electronic devices.

14   When I was having the concern about my job performance,

15   so I went through the handbook.  Because I trusted

16   Menzies Aviation, so if I sign up something for a

17   company, I trust in their good faith that I'm not going

18   to have any issues regarding to, to the, the low

19   statements in them.  So it's like I'm confident that the

20   company is going to work in a good faith with -- along

21   with us, with me, in this case.  So that's why I

22   didn't -- I read important parts.  But I trusted the

23   company.

24       Q    Okay.  Let me ask a different question.

25            At the beginning of your employment, did you

EXHIBIT 1 - 25

1              Do you see that?

2        A    Yes.

3        Q    Okay.  And on any occasion where you felt that

4   you did not receive a proper meal period, did you notify

5   your manager or supervisor?

6        A    Yes.

7        Q    Okay.  And did you get essentially the same

8   response as what you just described?

9        A    Yes.

10       Q    And that response would be inconsistent with

11  company policy, correct?

12       A    Correct.

13       Q    And so if other supervisors were also operating

14  inconsistently with company policy, would you agree we'd

15  need to go look into the circumstances of each and every

16  one of those supervisors?

17       A    Yes.

18       Q    Because the policy is that you are supposed to

19  get the meal period under California law, right?

20       A    Correct.

21       Q    So if there's some reason why employees are not

22  getting meal periods as required by company policy, we'd

23  need to go investigate each and every one of those

24  circumstances to find out why, wouldn't we?

25       A    Yes.

Volume I                                                                    Amaya vs.
Patricia Villagra                                          Menzies Aviation (USA), Inc.

1      Volume I                                           Amaya vs.
       Patricia Villagra                       Menzies Aviation (USA), Inc.    it online.  My bad.

2                  THE WITNESS:  That's okay.

3                  MR. WARD:  All right.  This will be Exhibit 11.

4                      (Exhibit 11 was marked.)

5                  THE WITNESS:  Okay.  Now I was able to open it.

6      BY MR. WARD:

7         Q    Okay.  Do you recognize this Exhibit 11?

8         A    Yes.

9         Q    And this is one of the documents that you

10     provided to your counsel in this case?

11        A    Yes.

12        Q    Okay.  And is this something you received

13     from Menzies during your, you know, onboarding

14     process?

15        A    Yes.

16        Q    Okay.  And did you read it at the time that you

17     received this?

18        A    Yes.

19                 MR. WARD:  Okay.  All right.  Close that one

20     out.

21                 This will be Exhibit 12.

22                     (Exhibit 12 was marked.)

23                 THE WITNESS:  Okay.  I got it.  "Kronos Meal

24     Period."

25     BY MR. WARD:

1    Volume I
Patricia Villagra                          Amaya vs.
Menzies Aviation (USA), Inc.   And, you recognize this document?

2         A    Yes.

3         Q    What do you recognize this to be?

4         A    This was when I was onboarding.  And this is

5    for the time attendant -- punching in/out.

6         Q    And we looked at some other documents that you

7    electronically signed on August 28th, 2021.

8              Is this your electronic signature placed that

9    date?

10        A    It is.

11        Q    Okay.  And, so, that you reviewed this document

12   on that date?

13        A    Yes.

14        Q    Did you read the entire document before you

15   placed your electronic signature?

16        A    Yes.

17        Q    Okay.  So at this point did you understand that

18   Menzies's policy was that it was mandatory to take meal

19   breaks and to clock in and out for them?

20        A    Yes.

21        Q    Okay.  And did you understand that it was

22   mandatory for employees to take rest periods?

23        A    Yes.

24        Q    Okay.  How about at the second page here on

25   this, did you see a heading that says "Missed Punch

```
 1       A    Yes.
 2       Q    Okay.  And you read that at the beginning
 3   during your onboarding?
 4       A    Yes.
 5       Q    So do you agree that Menzies notified you that
 6   if you missed a meal break or a rest break, the action
 7   to take was to complete a missed punch form?
 8       A    Yes.
 9       Q    And that you understood that if you did so,
10   corrective action could be taken?
11       A    Yes.
12       Q    And that corrective action could include
13   providing meal period premiums?
14       A    Yes.
15       Q    So the missed punch form was the mechanism to
16   report any missed breaks, right?
17       A    Yes.
18       Q    And if you reported such a break, that's how
19   you would get the meal period premium?
20       A    Yes.
21       Q    And you, in fact, completed one -- well, let's
22   skip that for a second.
23            MR. WARD:  I made it all the way to 12 before I
24   lost track of my own exhibits.  That's kind of a record
25   for me.
```

```
 1              All right.  So this will be 13.
 2                   (Exhibit 13 was marked.)
 3              THE WITNESS:  Okay.  I can see the missed punch
 4   form.
 5   BY MR. WARD:
 6      Q    Okay.  And this is something that you recognize
 7   was available to you in connection with your employment
 8   with Menzies?
 9      A    I recognize the form, but it was not available
10   to us.  It's only by request that your manager can
11   handle it for you.
12      Q    Okay.  So if you had requested one of these
13   forms, your understanding is you should have received
14   it?
15      A    Yes.
16      Q    And this would be the mechanism to report to
17   Menzies that you had either missed a meal break or a
18   rest period?
19      A    Yes.
20      Q    And if you submitted it, that's how you would
21   receive the premium for any missed breaks?
22      A    Yes.
23      Q    Okay.  Did you ever look to see whether this
24   form was available online to you anywhere?
25      A    I did.
```

1          Okay.  So you were aware that Menzies had a

2    mechanism for reporting missed breaks, correct?

3          A     Correct.

4          Q     And you were aware that Menzies had a mechanism

5    for seeking premium for those missed breaks, correct?

6          A     Correct.

7          Q     So the reason why you didn't get these premiums

8    is because, as you are seeing it, you had a supervisory

9    chain that was violating company policy; is that true?

10         A     Correct.

11         Q     Okay.  And whether other supervisors similarly

12    violated company policy would be something we could only

13    figure out by going supervisor by supervisor at Menzies,

14    correct?

15         A     Correct.

16         Q     Now, you did complete one of these missed punch

17    forms during your employment, right?

18         A     Yes.

19               MR. WARD:  So this will be Exhibit 14.

20               (Exhibit 14 was marked.)

21    BY MR. WARD:

22         Q     Let me know when you've had a chance to look at

23    this.

24         A     It's still loading.

25               Okay.  I got it.  "Missed Punch Form."

1   July of 2022, Menzies discontinued the use of this

2   mobile app?

3       A    Yes.  They discontinue it.

4       Q    Okay.  Got it.

5            And so at that point, the only way that you

6   could punch in and out would be using the Kronos finger

7   scanner?

8       A    Yes.

9       Q    Okay.  So in other words, as of June or

10  July 2022, you were no longer even allowed to use your

11  phone for timekeeping purposes; is that correct?

12      A    We are not allowed to use the phone for a

13  timekeeping purposes.

14           MR. WARD:  All right.  This one will be 17.

15               (Exhibit 17 was marked.)

16  BY MR. WARD:

17      Q    Let me know when you've had a chance to look at

18  that.

19      A    It's downloading.

20           Okay.  "Kronos Adoption E-Self Service."

21      Q    You recognize this document?

22      A    Yes, I do.

23      Q    What do you recognize it to be?

24      A    I recognize that I was able -- Kronos was

25  sending me notifications, and then -- it was about the

Volume I                                                               Amaya vs.
Patricia Villagra                                    Menzies Aviation (USA), Inc.

 1    clock in and clock out.

 2        Q     Okay.  And on the second page here there's

 3    another electronic signature.

 4              Do you acknowledge --

 5        A     Yes.

 6        Q     -- that you placed that electronic signature

 7    there on August 28, 2021?

 8        A     Yes.

 9        Q     Did you read this document before placing your

10    electronic signature on it?

11        A     Yes.

12        Q     And did you understand from reading it that

13    this document communicated to you that using your phone

14    for timekeeping purposes was voluntary?

15        A     Yes.

16        Q     And that if you wanted to you could opt out?

17        A     But in -- yes.  But in the practice, it was

18    different.  I was, I was aware of all of this, and then

19    I sign up.  But in the practice, for all of us it was

20    different.  We were using the phone 100 percent.  It was

21    not opt out.  Because when I tried to opt out to not use

22    my cell phone, the answer from Menzies Aviation was --

23    the manager was:  For you to be able to be part of the

24    team, you need to have constant communication, that

25    means you need to use your phone.  If you do not want to

Page 153

1    use your phone, so you are not allowed to work, and --

2    but I'm going to say the specific airline, Copa

3    Airlines -- you are not allowed to work for Copa

4    Airlines, because that's a manager requirement.

5              So opting out to not use our cell phone, it was

6    not an option.  It is in writing and the policies are in

7    writing and they are really good, but in practice, we

8    never -- we do not receive the written policies.  So

9    it's the opposite.

10    **Q    Okay.  And so your experience with respect to**

11    **your specific manager is that the manager failed to**

12    **follow the policy, correct?**

13    A    It's -- yeah.  It's correct.

14    **Q    And --**

15    A    It's not only for me, it's for all of us.

16    **Q    Well, everybody under your particular manager,**

17    **in other words, right?**

18    A    We have that, and all of us we have the same

19    manager.  And then all of us, we have the same problem.

20    So it's, it's a collective problem.  It's not only

21    Patricia Amaya's collective.

22    **Q    Sure.  Collective all working under the same**

23    **manager, in other words?**

24    A    Yes.

25    **Q    Because that manager is essentially failing to**

1      Q    Okay.  So it's true you have no personal

2    knowledge of what any manager on the ramp working at

3    Terminal 2 might or might not be doing with respect to

4    the policies stated in Exhibit 17, correct?

5      A    Correct.

6      Q    Okay.  And so if we were to try and find out

7    whether that manager was, in fact, following the

8    policies or not, the only way for us to do that would be

9    to go find out from those manager's employees, right?

10            MR. KING:  Let me just object, it calls for

11   speculation.

12            You can answer.

13            THE WITNESS:  Do I need to answer that

14   question?

15            MR. KING:  Yes.  You can answer.

16            I just objected on speculation grounds, but you

17   can answer.

18            THE WITNESS:  Okay.  So, yes, I have only my

19   statements from the managers that I work with.

20            MR. WARD:  Okay.  All right.  This will be 18.

21                (Exhibit 18 was marked.)

22            THE WITNESS:  Working on it.  Opening the file.

23            Okay.  I opened the "Hand Held Electronic

24   Devices Policies -- Policy."

25   BY MR. WARD:

1        Q     Okay.  And is this a policy that you received

2    in connection with your employment with Menzies?

3        A     Yes.

4        Q     And are you -- at the end there, there's

5    another electronic signature of August 28th, 2021.

6              Are you the one who placed that electronic

7    signature on this document?

8        A     Yes.

9        Q     Okay.  And did you read this document before

10   executing it electronically?

11       A     Yes -- yes.

12       Q     And did you -- do you see the "Policy

13   Statement" on the first page where it says:

14             {As Read} The Company has a zero tolerance

15             policy applicable to the use of personal mobile

16             phones during working hours as set forth --

17       A     Yes.

18       Q     {As Read} -- in the Company's Personal

19             Electronic Device and Cellular Phones Policy?

20       A     Yes.

21       Q     Okay.  And you understand that that is the

22   written policy of the company?

23       A     Yes.  I understand that's the policy.  And it

24   sounds good, but in the practice it's totally different.

25       Q     And that's going to be a practice that could

1  vary manager to manager, right?

2     A    No.  It's for the entire company -- I mean, for

3  all of us.

4     Q    You don't have personal knowledge of what

5  happens outside of Los Angeles, right?

6     A    No, no, no.  I'm -- I'm sorry if I misstate

7  that.  For Los Angeles.

8     Q    Okay.  And you don't have personal knowledge

9  what happens outside of either -- well, not even your

10  son.  I'm talking about your personal knowledge.

11          Other than your specific working environment,

12  you don't have personal knowledge of what any other

13  manager of Menzies at LAX does or does not do, true?

14     A    I have contact with all the managers through my

15  personal cell phone.

16     Q    Your managers, correct?

17     A    In the Menzies Aviation managers, that means

18  Brayan Galindo manager, which is the operational

19  manager.  Gisella Laverde, which is the general manager

20  for passenger service agents.  For Gabriella Marta,

21  which is another supervisor.  And then the rest of the

22  supervisors.  So it's actually with the entire crew,

23  even though with Aurea Quinonez.  So the personal cell

24  phone, we use it for the entire company.

25     Q    Sure.  Slightly different question though.

```
 1              Whether the manager is following the policy
 2     with respect to the employees he or she manages, your
 3     knowledge is limited to the managers you worked with,
 4     correct?
 5         A    I don't understand the question.
 6         Q    Okay.  I'll just leave it at that then.
 7              MR. WARD:  This will be 19.  Sorry, wrong
 8     document.
 9                   (Exhibit 19 was marked.)
10     BY MR. WARD:
11         Q    Let me know when you've had a chance to look at
12     that.
13         A    Working on it.
14              Okay.  I open "Personal Electronic Device &
15     Cellular Phones Policy."
16         Q    And you recognize this document?
17         A    Let me -- "Company" -- yes.
18         Q    And there's an electronic signature on the
19     second page there, looks like another one dated
20     August 28, 2021.
21              Are you the one who caused that electronic
22     signature to be placed there?
23         A    Si.
24         Q    That was a yes?
25         A    Yes.
```

**Volume I**                                                          **Amaya vs.**
**Patricia Villagra**                              **Menzies Aviation (USA), Inc.**

1   period?

2      A    I cannot recall exactly what happened, but meal

3   premiums form -- if we signed a meal premium, it's

4   because the manager handed those missed punch forms to

5   us directly, and it's because it was a problem with the

6   flight.

7           So if I'm not mistaken, this date it was a

8   flight that it was cancelled, because certainly things

9   that can happen, and then we couldn't take any break,

10  neither ten-minutes break, no meal break -- breaks.

11          So manager handled the meal break missed punch

12  form.  We filed that, manager approve, and then if

13  the -- I'm going to be clear in the missed punch form.

14  Only if -- this is, this is the process.  Only manager

15  can give you the form, because it's not available for

16  us, for none of us.  It's not that we have a box that

17  you can grab it, sign it, and submit it.  So it has to

18  be provided for your -- from your manager.

19          The second step, we have to clock in --

20  document the time that we miss the meal break.

21          And then the third step for us as employees to

22  be able to get the meal break penalty is until it is

23  approved from the upper management.  So it's not that we

24  as employees are allow to just claim the meal break.  We

25  are not.  It's only if it is approved.

1          So have three steps for us to be able to get

2    the meal break penalties paid.  That's the process.

3        Q    Okay.  So looking at this Exhibit 21, is it

4    your belief that there is a missed punch form that

5    corresponds to the meal break penalty for this day?

6        A    Yes.

7        Q    Okay.  But you just said earlier that you are

8    not sure, but you think what happened was -- let me know

9    if I've got this wrong, I'm not trying to put words in

10   your mouth -- but what I heard was you think that there

11   was a flight that was cancelled or delayed and so that's

12   why the supervisor brought the missed punch form for

13   that day?

14       A    Yeah.  It could be for many reasons.  But --

15       Q    Well, let me, let me stop you right there.

16   Because that's the important -- that -- you just said

17   "it could be for many reasons."

18            And what I'm trying to understand is, are you

19   testifying from memory with respect to this in per- --

20   this meal break premium in April or May 2022, or are you

21   speculating based on what might have happened?

22       A    I'm speculating.

23       Q    Okay.  So if we wanted to find out for sure the

24   reasons why you got a meal break premium that day, we'd

25   have to go back to that specific day and see what

1    **happened, right?**

2        **A    Yes.**

3        Q    Okay.

4            MR. WARD:  This is Exhibit 22.  It's trying to

5    be Exhibit 22 anyway.

6                    (Exhibit 22 was marked.)

7    BY MR. WARD:

8        **Q    All right.  Have a look at that once it loads**

9    **up for me.**

10       A    Okay.  Working on it.  Opening the folder, the

11   PDF form.

12           Okay.  I see a form.

13       **Q    Okay.  So I'm going to be very specific about**

14   **the time frame here.**

15           **So before you started this lawsuit, had you**

16   **ever seen this set of records before?**

17       A    This kind of record?

18       **Q    Yes.**

19       A    Exactly this record?

20       **Q    Have you -- have you ever seen this document**

21   **prior to the commencement of this lawsuit?**

22       A    I haven't seen this record.

23       **Q    Until today?  This is the first time you've**

24   **seen it?**

25       A    Yes.

1          STENOGRAPHIC COURT REPORTER'S CERTIFICATE

2              I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby certify:

4              That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were duly sworn; that a record of the

8    proceedings was made by me using stenographic machine

9    shorthand, which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12             Further, that if the foregoing pertains to the

13   original transcript of a deposition in a federal case,

14   before completion of the proceedings, review of the

15   transcript was requested.

16             I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19             IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   Dated: 5/10/2023

22

23

             LISA RICHARDSON, RMR, CRR, RPR
24           CSR No. 5883

25

# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4     DORA PATRICIA AMAYA, an
       individual, et al.,
 5
                    Plaintiffs,
 6                                    CASE NO. 2:22-cv-
          vs.                         05915-MCS-MAR
 7
       MENZIES AVIATION (USA),
 8     INC., et al.,

 9                  Defendants.
       _____
10

11

12

13

14        REMOTE VIDEO DEPOSITION OF ANIBAL A. SILVA

15                  Friday, May 19, 2023

16

17

18

19

20

21

22

23     Reported by:
       Layli Phillips
24     RPR, CRR, CSR No. 14402

25     Job No. 10120116
```

Page 1

```
 1                         ANIBAL A. SILVA
 2            the deponent herein, called as a witness, after
 3    having been first remotely duly sworn, was examined and
 4    testified as follows:
 5                         EXAMINATION
 6    BY MR. JACKSON:
 7         Q. Good morning, Mr. Silva.  I know I just
 8    introduced myself before we started, but my name is
 9    Kevin Jackson.  I'm the attorney for Menzies and will be
10    taking the deposition today.
11            Before we get into things, just as a matter of
12    formality, could you please state and spell your full
13    name for the record.
14         A. Yes.  My name is Anibal, A-n-i-b-a-l, Alexis,
15    A-l-e-x-i-s, Silva, S-i-l-v-a.
16         Q. Have you ever had your deposition taken before?
17         A. No.
18         Q. So before we get started, I just want to go
19    over a few basic ground rules about a deposition, so,
20    you know, the process here, especially now that we're
21    doing these remotely, feels a little more informal;
22    however, the testimony you give today is under oath and
23    under the penalty of perjury.  It has the same force and
24    effect as if you were in a court of law; do you
25    understand that?
```

```
 1   BY MR. JACKSON:
 2        Q. All right.  Mr. Silva, please go ahead and let
 3   me know when you've had a chance to look over the
 4   document.
 5        A. Okay.
 6        Q. Do you recognize Exhibit 1?
 7        A. I don't.
 8        Q. I'd like to direct your attention to the second
 9   page of Exhibit 1, which is Bates labeled
10   MENZIES_001307.  Do you see that in the lower right-hand
11   corner?
12        A. Yes.
13        Q. Do you see the section that says Employee
14   Signature digitally signed by Anibal Alexis Silva on
15   May 2nd, 2015?
16        A. Yes.
17        Q. Do you have any reason to believe that that is
18   not a digital signature that you affixed to this
19   document in approximately May 2015?
20        A. Could you repeat that question?
21        Q. Well, let me ask this a little bit differently.
22        A. Okay.
23        Q. When you started your employment with Menzies,
24   you went through an orientation process, correct?
25        A. That's correct.
```

EXHIBIT 2 - 46

1          Q. And during that orientation process, did you

2     review a number of written policies and procedure

3     documents?

4          A. Yes.

5          Q. And I'll represent to you this document is

6     titled Agreement to Be Bound By Alternative Dispute

7     Resolution Policy.  It's my understanding that this is

8     one of the documents that was in your orientation; do

9     you recall that?

10          A. I don't recall it.

11          Q. But you do recall receiving a number of

12     documents to review during your orientation, correct?

13          A. That is correct.

14          Q. And that would have been in early May 2015; is

15     that correct?

16          A. Yes.

17          Q. So sitting here, is it correct that you just

18     simply don't recall this specific document?

19          A. I wouldn't say that.  I would say various

20     amounts of documents were presented during the

21     orientation, and a lot of them weren't -- we were just

22     given Cliff Notes of what each document was referring to

23     and we signed.

24          Q. What do you mean when you say you were given

25     Cliff Notes?

Anibal A. Silva

1          A. Our safety instructor was there basically

2    letting us know what these documents entailed without us

3    really reading any of the documents.  A lot of these

4    documents were signed towards the end of the two-week

5    orientation, and a lot of them weren't really read.

6          Q. Did you have an opportunity to read them if you

7    wanted to?

8          A. I would say yes.

9          Q. Okay.  And during that process, do you recall

10   either -- strike that.

11          During the orientation process, do you recall

12   physically signing documents?

13          A. I do.

14          Q. Do you also recall electronically signing

15   documents?

16          A. I do.

17          Q. So looking at Exhibit 1, Page 2, which is Bates

18   labeled MENZIES_001307, which purports to contain a

19   digital signature with your name and date on it, sitting

20   here today, do you have any reason to believe that you

21   did not, in fact, digitally sign this document?

22          A. No.

23          Q. Okay.  Thank you.

24          Looking at this document entitled Agreement to

25   Be Bound By Alternative Dispute Resolution Policy, do

 1          Q. During your employment with Menzies, did you

 2    ever work at any other airport other than LAX?

 3          A. No.

 4          Q. Did you ever work in any other part of the

 5    terminal other than the international side?

 6          A. I have.

 7          Q. Okay.  We'll come back to that.

 8             What do you mean when you say wide body?

 9          A. Type of aircraft, they were considered bigger

10    aircrafts, anything over a triple seven, wide body

11    aircraft.

12          Q. And you understood that you would be working as

13    a ramp agent loading and unloading cargo?

14          A. And baggage, yes.

15          Q. Baggage?  Is there a difference between the

16    two?

17          A. Yes.

18          Q. What's your understanding of the difference?

19          A. The baggage, well, comes from an individual on

20    the aircraft.  Any of the cargo was supplies, equipment,

21    anything of that sort for another company, and it came

22    wrapped and packaged different.

23          Q. Okay.  Just so I understand, when you're

24    referring to baggage, this would be unloading and

25    loading baggage that will be on passenger flights, and

 1  reassured that the job is getting done accordingly.

 2       Q. You mentioned -- and correct me if I'm

 3  misstating your testimony, but I think you just referred

 4  to something along the lines of the crazy parts of the

 5  job that were unpredictable; is that right?

 6       A. That is correct.

 7       Q. What were the crazy parts of the job that were

 8  unpredictable, what types of things?

 9       A. We had passengers come down to the tarmac when

10  they were not supposed to, so that puts a security risk

11  on the whole aircraft, the whole flight.  Police is

12  called.  Either we -- or the passengers can come in

13  drunk or in a state of mind where they are not able to

14  fly and their baggage will be removed.  The weight

15  capacities on some of the cargo would be off, and if

16  they weren't able to calculate or allow that specific

17  cargo to be sent out, they would bump it and reorganize

18  the whole aircraft in the way they want it to leave to

19  meet weight requirements and distribution for takeoff,

20  or we can just be shorthanded as a company.  We have

21  also had incidents where members of Menzies and

22  employees have hit the aircraft.  Accidents do occur,

23  which puts the whole process on standby.

24       Q. Would flight delays also be one of those

25  unpredictable things?

Anibal A. Silva

```
 1          A. Yes.

 2          Q. And am I correct that you said that the

 3   different coordinators from the different airlines had

 4   different ways of adapting to all of these unpredictable

 5   occurrences?

 6          A. Correct.

 7          Q. And were some better than others?

 8          A. That's not my place to judge.

 9          Q. Well, I'm asking you, I mean, in your own

10   personal opinion, were some better than others?

11          A. I mean, I equally enjoyed working with

12   everybody, so in my experience, they were very cordial.

13          Q. That's not quite an answer to my question.  So

14   let me ask it a little bit differently.  You agree that

15   different coordinators in different airlines responded

16   to these myriad unpredictabilities differently, correct?

17          A. Correct.

18          Q. Maybe without making a qualitative judgment on

19   whether some are good or some are bad, would some be

20   more rapid and efficient in how they responded to some

21   of these occurrences than others were?

22          A. Yes.

23          Q. And would that ultimately result in potentially

24   your duties taking longer or shorter depending on how

25   they responded to these unpredictable occurrences?
```

 1          A. Yes.

 2          Q. And these occurrences, they're unpredictable,

 3   but they're fairly routine, meaning you deal with them

 4   all the time as part of the job; is that right?

 5          A. Yes.

 6          Q. I know you testified earlier that when you

 7   first applied to Menzies, you weren't entirely clear on

 8   the services that it provided as a company; is that an

 9   accurate recollection of your testimony?

10          A. Yes, yes.

11          Q. As you worked there, during the course of your

12   employment, did you come to understand what exactly

13   Menzies did as a company?

14          A. Yes.

15          Q. And what's your understanding sitting here

16   today?

17          A. They were a third-party company providing

18   services of other airlines that couldn't have their own

19   maintenance or their own employees in every station, so

20   Menzies would take care of their needs upon landing in

21   LAX.

22          Q. So ramp ground handling operations were one of

23   the services that Menzies provided, correct?

24          A. Correct.

25          Q. And that's where you worked exclusively

1  certifications for certain aircrafts, certain airplanes.

2      Q. Let's come back to that in a second. I just

3  want to wrap this up.

4      Would you agree that based on your personal

5  experience, whether somebody was experiencing late or

6  interrupted meal periods really depended on the manager

7  and that particular employee?

8      A. No.

9      Q. Help me understand because it -- you made it

10  sound -- a second ago you told me that, you know, in

11  your observation, some people were getting compliant

12  breaks and some weren't because the managers were

13  picking and choosing who to give, you know, additional

14  work to or needed somebody to do a quick turn. Did I

15  misunderstand that?

16      A. No, that is correct. But that came with

17  certifications; depending on the certifications, on the

18  turnaround rate on employment, there was very vast, very

19  quick, unexperienced new leads that weren't able to

20  complete the tasks or be certified for the certain

21  tasks, and we would be pulled, the people with more

22  experience, more seniority and certifications for

23  their -- for the airlines would take a bigger punch when

24  it came down to lunches being missed.

25      Q. Okay. So if you were a more experienced

EXHIBIT 2 - 53

Anibal A. Silva

Amaya vs.
Menzies Aviation (USA), Inc.

1    employee who had more certifications, you might be
2    called upon to, you know, wrap up a service instead of
3    somebody more experienced or less experienced such that
4    they would get to go take their break and the more
5    experienced person wouldn't; is that right?
6            A. Correct.
7            Q. Okay.  So the -- the different treatment really
8    depended on the manager and the different employees who
9    were doing the work itself; is that right?
10           A. Correct.
11           Q. Okay.  You obviously understand that yourself
12    and other ramp agents were covered by the collective
13    bargaining agreement when you -- you know, the group
14    voted in favor of union membership; is that right?
15           A. Could you rephrase that.
16           Q. Yeah.
17               At the time you became represented by a union
18    in 2016, did you understand that the terms of your
19    employment would then be covered by a collective
20    bargaining agreement?
21           A. I wasn't aware of that.
22           Q. Okay.  But you understood that your -- you were
23    being represented by a union at that time, right?
24           A. Correct.
25           Q. And you understood that other ramp agents at

www.aptusCR.com

Page 59

www.aptusCR.com

EXHIBIT 2 - 54

Anibal A. Silva

1   LAX were also covered by the union?

2        A. Yes.

3        Q. And represented by the union, I mean?

4        A. Yes.

5        Q. Did you have any knowledge as to whether other

6   groups of employees were also represented by the union

7   at LAX?

8        A. We did work alongside other third-party

9   contractors, WFS and Swissport.  Through speaking to

10  them in passing, that was a subject that was never

11  really brought up, so I'm unaware whether other

12  companies had union representation as well.

13       Q. Yeah.  My -- I apologize because I didn't ask a

14  very clear question.  My question is a little bit

15  different.

16          Do you have any knowledge as to whether other

17  groups of workers in different departments at Menzies

18  were represented by the union at LAX?

19       A. I did know that Menzies as a whole in that

20  location was being represented by the union.

21       Q. Is it your understanding that every employee

22  who works for Menzies at LAX is covered -- strike that.

23          Is it your understanding that every employee

24  that works at Menzies at LAX is represented by a union?

25       A. Yes.

Anibal A. Silva

1        Q. Did you ever -- well, strike that.

2            Are you familiar with the concept of a

3   collective bargaining agreement?

4        A. No.

5        Q. Did you ever review the collective bargaining

6   agreement that specified the terms and conditions of

7   your employment at Menzies once you were represented by

8   the union?

9        A. Might have asked questions in regards, but I

10  don't recall.

11       Q. Do you ever remember after the group

12  collectively voted in favor of union representation, do

13  you remember getting a copy of a document that

14  identified the terms and conditions of your employment,

15  for instance, your hourly wage rate and things like

16  that?

17       A. I do -- I do believe seeing that document

18  because --

19       Q. You have seen that --

20       A. -- there would -- I believe I did see that

21  document, yes.

22           MR. JACKSON:  Okay.  Let's go ahead and take --

23  let's go off the record.

24           THE VIDEOGRAPHER:  Okay.  Off the record at

25  11:36 a.m.

```
 1              (Whereupon, a short break was taken.)
 2              THE VIDEOGRAPHER:  This is Media 4.  We're back
 3      on the record at 11:48 a.m.
 4      BY MR. JACKSON:
 5          Q. All right.  Welcome back.  Go ahead and share
 6      my screen with you again.
 7              Do you recall before the break, we were talking
 8      about the union representation and collective bargaining
 9      agreement; do you recall that?
10          A. Yes.
11              (Whereupon Deposition Exhibit No. 5 was marked
12              for identification.)
13      BY MR. JACKSON:
14          Q. All right.  What I have introduced here as
15      Exhibit 5 is the LAX Ground Services Agreement between
16      SEIU United Service Workers West and Menzies Aviation,
17      which is Bates stamped MENZIES_471 through 520.
18              I'm going to go ahead and put it into the chat
19      here as well.
20              I know this is a lengthy document, but have you
21      ever seen this document or something like it before?
22          A. I might have seen a booklet on the break room
23      table maybe once or twice but never really read through
24      it.
25          Q. Is it correct that the collective bargaining
```

Page 62

Anibal A. Silva

1   agreement was available for you to review if you desired

2   to do so?

3          A. Yes.

4          Q. And do you have a general understanding of what

5   the collective bargaining agreement contains within it?

6          A. Not really, no.

7          Q. As a general matter, do you understand that it

8   sets forth generally the terms and conditions of your

9   employment with Menzies as negotiated by the union on

10  your behalf?

11         A. Yes.

12         Q. We can set this aside for now.

13            I think I asked you earlier whether you had

14  knowledge about Menzies's operations at other airports

15  in California, and you said no; is that right?

16         A. Yes.

17         Q. Do you know which other airports Menzies

18  operates at in California?

19         A. Not really.  I mean, if I recall, we might have

20  had transfer flights that would go to

21  San Francisco, to LAX.  I believe Qantas would fly from

22  there over here, and it would be one of our -- like one

23  of our stops or one of the Qantas Airline stops, and it

24  would pick up passengers.

25            But other than that, I'm not really familiar

Page 63

1    what other airports Menzies works along with or in.

2           Q. And similarly, do you have any knowledge of the

3    types of operations and services Menzies provides at any

4    other airport in California other than LAX?

5           A. No.

6           Q. But you do agree, we've discussed it already,

7    that Menzies does provide a number of different services

8    and operations, correct?

9           A. Correct.

10          Q. Aside from the ramp service operations at LAX,

11   you have little to no knowledge of the other operations

12   or departments at LAX or other airports, correct?

13          A. Correct.

14          Q. And, you know, I understand that you're aware

15   of some of the positions that exist, but is it fair to

16   say that the day-to-day job experience, for instance, of

17   a ramp agent like yourself is going to be very different

18   from that of a passenger service agent?

19          A. Yes.

20          Q. And would you agree that it's possible that,

21   you know, even within your own job classification, a

22   ramp service agent position could be different at LAX

23   than it is at a different airport that Menzies services?

24          A. I don't know.

25          Q. And you don't know one way or another, right,

Anibal A. Silva

Amaya vs.<br>Menzies Aviation (USA), Inc.

```
 1   because --
 2        A. Correct.
 3        Q. -- because you've never worked at another
 4   airport other than LAX?
 5        A. Correct.
 6        Q. Okay.  We'll come to this a little bit more
 7   later, but my understanding is your last day worked at
 8   Menzies was around March 15th, 2020, and that you
 9   formally resigned later that year in September of 2020;
10   is that roughly correct?
11        A. Yes.
12        Q. At what point after you left Menzies did you
13   make the decision to initiate legal action against the
14   company?
15        A. This year.
16        Q. Okay.  And why did you decide to do that,
17   without disclosing any attorney-client communications?
18        A. The fear of not speaking out was no longer
19   there.  I was no longer in the state, and someone had
20   started the process, and I felt it was time to find
21   basically justice for myself, and as I was presented
22   with the notification that it had began already, I felt
23   the need to come forth with my side.
24        Q. Did you say you're living out of state now?
25        A. Yes.  I'm living in Arizona.
```

Page 65

Anibal A. Silva

1      Q. And can you provide your current mailing

2  address in Arizona, just so we have it for the record,

3  please?

4      A. Absolutely.  It's PO Box 1199, Paulden,

5  P-a-u-l-d-e-n, Arizona, 86334.

6      Q. What city is that in in Arizona?

7      A. Paulden.

8      Q. Paulden.

9         And where is that relative to, like, Phoenix?

10     A. I'm about an hour and a half away.

11     Q. Okay.  I'm going to introduce as Exhibit 6 the

12  second amended complaint filed in this matter.

13        (Whereupon Deposition Exhibit No. 6 was marked

14        for identification.)

15  BY MR. JACKSON:

16     Q. This is the Second Amended Complaint and Demand

17  For Jury Trial filed in this action on May 9th, 2023.

18        Do you recognize this document?

19     A. Yes.

20     Q. Have you seen this document before?

21     A. Yes.

22     Q. What is it?

23     A. It is a declaration, correct?

24     Q. Well, I'm asking what your understanding of it

25  is.  I can scroll more just so you can look, kind of

Anibal A. Silva

 1    briefly flip through it so you can see it.

 2         A. My statement and my claims in regards of

 3    Menzies.

 4         Q. Got it.

 5            And I'll represent this is the second amended

 6    complaint filed in this action.  It's a 44-page

 7    document, and have you seen this document before today?

 8         A. If it's not my declaration, no.  I've only seen

 9    my own.

10         Q. When you say your own declaration, what are you

11    referring to?

12         A. My statement.

13         Q. How long of a document is that?

14         A. I don't know.  I'm unaware.

15         Q. Well, you've seen it, correct?

16         A. I don't count pages.  I mean, yes, I've seen

17    it.

18         Q. Is it more than one page?

19         A. Yes.

20         Q. Is it more than 20 pages?

21         A. Not that I remember.

22         Q. Is that a document that you personally signed?

23         A. Yes.

24         Q. Okay.  This is the complaint that was filed in

25    this action.  This would not have been signed by you.

 1  This is filed by your attorneys.  Is it correct that you

 2  have not seen this document before?

 3       A. Yeah.  Like I said, other than my own

 4  declaration, that's all that I have seen.  I don't know

 5  that document.

 6       Q. Okay.  Do you understand that you're asserting

 7  claims against Menzies for alleged wage and hour

 8  violations?

 9       A. Yes.

10       Q. Do you understand that you're asserting these

11  claims on behalf of yourself and all other nonexempt

12  Menzies's employees in California?

13       A. Yes.

14       Q. And you're willing to take on the

15  responsibilities of that representation whatever they

16  might be?

17       A. Yes.

18       Q. Do you understand what it means to be a class

19  representative?

20       A. Yes.

21       Q. And what's your understanding?

22       A. To represent my fellow peers who have gone

23  through similar scenarios while working with Menzies.

24       Q. Do you understand that in this case, you're

25  alleging that Menzies violated California law regarding

Anibal A. Silva

1    the provision of meal periods to nonexempt employees in

2    California?

3         A. Yes.

4         Q. Specifically what's your understanding and

5    personal experience as to how Menzies did not satisfy

6    the obligation to provide meal periods to you during

7    your employment?

8         A. Lunch periods were made felt like we were

9    supposed to ask permission, and upon asking permission,

10   it really fell on managers' hands to designate that

11   meal.  Unless spoken to previously in regards, they

12   would let us know, "Hey, you have another flight coming

13   right behind it.  I'll give you a meal premium, and, you

14   know, it's just a quick offload.  You're going to go

15   over an hour."

16        It started that way with them using that as a

17   way to get someone to work, but that wasn't the case for

18   everyone.  Once the number of meal premiums have -- were

19   increasing and upon them increasing, they were being

20   denied to the point where employees were scared to speak

21   up and ask for a meal premium even though they deserved

22   it, and they were doing their job but were afraid from

23   managers because they were the ones who approved or

24   denied, and if they felt it was unjust or, like, if we

25   should have hurried and made it on time, then they would

1      A. Yes.

2      Q. Was there anything in the job description that

3  indicated that ramp agents are responsible for

4  monitoring the real-time in-air flight status of the

5  aircraft, or was that actually somebody else's job at

6  Menzies or at the airlines to monitor that and

7  communicate it to you?

8      A. I would say it was someone else's job, that is

9  correct.

10      Q. Did any manager at Menzies specifically

11  instruct you to use your cell phone for work?

12      A. The moment that they call your cell phone is

13  the moment that they're instructing you to pick up your

14  phone and receive further instructions from them.

15      Q. Yeah.

16      But other than what you just testified, did any

17  manager ever say to you personally that you were

18  required to use your cell phone for work?

19      A. Orientation, we signed documentation saying

20  phones are not provided on the tarmac.  Safety was

21  always patrolling to make sure that no one was on their

22  cell phone.  Cell phones were not supposed to be on the

23  tarmac.

24      Q. Okay.  So then I'm just trying to follow what

25  you're saying.  Are you saying that Menzies had a policy

1    that expressly prohibited employees from using cell

2    phones on the tarmac, right?

3          A. Correct.

4          Q. And so you would agree that using the cell

5    phone on the tarmac in the manner that you've described

6    would be a violation of Menzies's policies?

7          A. That is correct.  But that was not their

8    practice.

9          Q. Well, when you say it was not their practice,

10   are you referring to the company as a whole or are you

11   referring to the managers that you personally

12   experienced working with?

13         A. I'm referring to my department, the actions

14   that -- that actions that my managers took.

15         Q. And so you would agree that these actions as

16   you described it would constitute managers violating or

17   deviating from Menzies's actual written policies,

18   correct?

19         A. That is correct, and we have had scenarios

20   where we've had employees be written up by safety and

21   given a writeup for using their cell phones even though

22   they're answering some manager's call, the timekeeper's

23   call.  I mean, the break room, the timekeepers, they

24   communicated with every employee through their cell

25   phones.

1    operating equipment, correct?

2        A. That is correct.

3        Q. Did you operate equipment as part of your job

4    as a ramp agent?

5        A. Very frequently, yes.

6        Q. Okay.  And did you ever use your cell phone

7    while you were operating machinery or equipment?

8        A. I have.  I'm not a hundred percent sure.  I'm

9    sure I've been -- yeah, I've been probably at fault for

10   that.

11       Q. And you -- you would agree that instruction

12   from the managers like that which you've described

13   already to use your cell phone while you're on the

14   tarmac would be an explicit violation of Menzies's

15   policy, correct?

16       A. Correct.

17       Q. And your experience in that regard was limited

18   to the ramp and the managers in that department, right?

19       A. Yes.

20       Q. And you have no personal knowledge one way or

21   another whether other managers in other departments at

22   LAX also engaged in conduct that you believe violates

23   this policy of Menzies's, correct?

24       A. Correct.

25       Q. And similarly with respect to other airports in

1    California that Menzies services, regardless of which

2    department, you would not know one way or another

3    whether there were managers there who were instructing

4    employees in a manner that would violate this policy,

5    correct?

6         A. That is correct.

7         MR. JACKSON:  Okay.  I think this is a -- we

8    can go off the record.

9         THE VIDEOGRAPHER:  Okay.  Off the record at

10   12:33 p.m.

11        (Whereupon, a lunch break was taken.)

12        THE VIDEOGRAPHER:  This is Media 5.  We're back

13   on the record at 1:11 p.m.

14   BY MR. JACKSON:

15        Q. Welcome back.  I hope you had a nice lunch.

16        Mr. Silva, you understand that you are still

17   under oath, correct?  I think you're on mute, sir.

18   Sorry.

19        A. There you go.  Yes.

20        Q. Any reason why your deposition can't proceed

21   here this afternoon?

22        A. No.

23        MR. JACKSON:  Okay.  I'd like to screen share

24   again.  Are we up to Exhibit 8 now?  The last one was 7?

25        THE REPORTER:  Correct.

Anibal A. Silva

```
 1              THE VIDEOGRAPHER:  Yes.
 2              (Whereupon Deposition Exhibit No. 8 was marked
 3              for identification.)
 4    BY MR. JACKSON:
 5              Q. I would like to introduce as Exhibit Number 8 a
 6    document entitled Personal Electronic Device Policy,
 7    slash, Cellular Phones, Bates stamped MENZIES_914.
 8              Have you seen this document before, Mr. Silva?
 9              A. I believe so.
10         Q. And it appears that is your digital electronic
11    signature dated May 2nd, 2015, as with other documents
12    we've seen today; is that right?
13         A. That is correct.
14         Q. And what is your understanding of this policy?
15         A. Same as the last one.  No phones would be
16    permitted.
17         Q. I think this one's a little bit different.
18         A. All right.  Let's see.
19         Q. Go ahead and read through it to refresh your
20    recollection if that helps.
21         A. Okay.
22         Q. And so would you agree this policy provides
23    Menzies's rules regarding company provided electronic
24    devices as well as personal cell phones?
25         A. Regarding the rules, yes, on paper.
```

1          Q.  Okay.  And you see under personal cell

2    phones -- well, strike that.

3              Starting at the top, it states:

4              "The company may provide a business cell phone

5    or electronic device to an employee for local and long

6    distance work-related communications."

7              Do you see that?

8          A.  Yes.

9          Q.  And you mentioned before radio.  That would be

10   a type of electronic device that Menzies provided to

11   employees at times, correct?

12         A.  That is correct.

13         Q.  And then with respect to personal cell phones,

14   this policy reads:

15             "An employee with a personal cellular phone

16   that is not approved by company management for

17   work-related use should not make calls nor accept

18   incoming calls to their personal cell phones during

19   working hours."

20             Do you see that?

21         A.  Yes.

22         Q.  And you would agree that was your understanding

23   of Menzies's written policy?

24         A.  Yes.

25         Q.  And just like with Exhibit 7 we reviewed before

1   lunch, you would agree that the conduct that you

2   described whereby managers would allegedly contact you

3   and others on your personal devices, that would also be

4   a violation of this policy; do you agree?

5        A. I agree.

6        Q. And, again, you don't have personal knowledge

7   of whether managers at other departments at LAX were

8   engaging in conduct that you believe violates this

9   policy, right?

10       A. Correct.

11       Q. And the same is true with respect to other

12   airports?

13       A. Yes.

14       Q. Okay.  All right.  We can stop sharing this for

15   now.

16            Have we covered all of the ways in which you

17   recall needing to use your cell phone for work-related

18   purposes, that is, one, communication with coworkers and

19   management during your shift and, two, the use of the

20   flight tracker app?

21       A. Yes.  The phone was used for those two

22   instances, and there wasn't just during work hours.

23   Managers would also contact us regarding work after work

24   hours.

25       Q. And when did that occur?

```
 1  managers regarding a situation on a flight.
 2       Q. Who do you recall specifically by name being on
 3  the group chat or chats that you're describing?
 4       A. I remember -- I remember Eduardo Padilla,
 5  Anthony Hernandez, Caleb Ross.  From what I remember
 6  name wise, those are probably the only names I really
 7  recall.  It's been some time.
 8       Q. Sorry.  Were any of those three people you
 9  identified just now managers?
10       A. No.
11       Q. Can you identify any managers who were sending
12  messages to the group chat or to you personally outside
13  of working hours when you were not on the clock?
14       A. Yes, Carlos Vargas and Victorino Ramirez.
15       Q. And do you still have copies of these text
16  messages?
17       A. I've gone through various amounts of phones.  I
18  mean, I can always go back in the log of Verizon, see if
19  it's in the cloud, but on hand, no.
20       Q. Have you made any efforts in connection with
21  this case to go through your personal cell phone's
22  communication devices or records to obtain copies of
23  text messages or other communications that you think are
24  relevant to this case?
25       A. I have not.
```

1      Q. Okay.  Do you recall approximately how much

2  time you believe you spent attending to work duties,

3  including responding to communications that were not on

4  the clock for which you were not paid?  Can you

5  approximate how much time you think you spent on that

6  over the course of your employment?

7      A. I cannot recall, to be honest.

8      Q. Is it accurate to say it was no more than a

9  couple of minutes here and there?

10     A. After work regarding, yes, I would say five,

11  ten-minute stretches, whenever it took for that

12  conversation to end or whenever the specifics and

13  details were established that they needed.

14     Q. Okay.  But sitting here today, you're unable to

15  actually identify specific days or times or duration of

16  time you believe you worked off the clock; is that

17  correct?

18     A. That is correct.

19     Q. And do you have personal knowledge one way or

20  another of whether employees outside of the ramp agent

21  position experienced something similar to what you just

22  described?

23     A. I'm unaware.

24     Q. And same question with respect to other

25  airports.

1        A. Same answer, I'm unaware.

2        Q. Have we now covered all of the ways that you

3   believe or recall that you utilized your personal cell

4   phone for work purposes during your employment at

5   Menzies?

6        A. Yes.

7        Q. Moving on now to your second reimbursement

8   expense that you identified, which was boots, did I hear

9   correctly that you said Menzies provided boots but that

10  you found them to be uncomfortable so you bought your

11  own?

12       A. That is correct.  Up until the fourth year did

13  they begin to provide different shoes for leads that

14  were more comfortable.

15       Q. Did you ever lodge a complaint or even speak to

16  anybody at the union about the boots that Menzies

17  provided being uncomfortable?

18       A. Yes.

19       Q. You spoke to a union rep about that?

20       A. I brought it up.

21       Q. When was that?

22       A. I would say after I turned into a lead towards

23  2016.

24       Q. And what do you recall the union's response

25  being?

1        Q. And sitting here today, you have no reason to

2    think that Menzies was responsible for setting the

3    monthly parking pass rates at the airport, do you?

4        A. No.

5        Q. Okay.  Have we covered now all of the expenses

6    that you claim that you should have been reimbursed for?

7        A. Yes.

8        Q. Okay.  All right.  I'm going to jump back a

9    little bit, and we're going to go through a few of the

10   policies and things like that that you described that

11   you received during the onboarding process.  Go ahead

12   and share my screen again.

13            (Whereupon Deposition Exhibit No. 9 was marked

14            for identification.)

15   BY MR. JACKSON:

16        Q. I'd like to introduce as Exhibit 9 a document

17   entitled Employee Acknowledgment of Handbook, is Bates

18   stamped MENZIES_894.

19            Do you recognize this document, Mr. Silva?

20        A. I don't remember it.

21        Q. Well, sitting here looking at it now, do you

22   have an understanding of what it is?

23        A. Yes.

24        Q. And what is it?

25        A. It's accepting and acknowledging the rules and

Anibal A. Silva

 1   expectations from Menzies.

 2        Q. Right.

 3            So you recall during orientation, you said you

 4   received a lot of written policies and procedure

 5   documents and things like that, right?

 6        A. Correct.

 7        Q. And do you recall you received an employee

 8   handbook?

 9        A. I would -- I would assume so, yes.  I think so.

10        Q. Okay.  And this document appears to state that

11   you acknowledge that you received a copy of the employee

12   handbook that provides guidelines on the policies,

13   procedures, and programs affecting your employment,

14   right?

15        A. Correct.

16        Q. And the handwriting on this document and the

17   signature, is that yours?

18        A. It is.

19            (Whereupon Deposition Exhibit No. 10 was marked

20            for identification.)

21   BY MR. JACKSON:

22        Q. Okay.  I'd like to introduce as Exhibit 9 (sic)

23   a document entitled Meal and Rest Period Policy,

24   California, Bates stamped MENZIES_ --

25            MR. KING:  Is that 9 or 10?

Anibal A. Silva

1               MR. JACKSON:  I think it's --

2               THE REPORTER:  It's 10.

3               THE VIDEOGRAPHER:  10.

4               MR. JACKSON:  Oh, it is 10.  I'm sorry.  The

5    last one was 9.

6               I'm not doing a good job of pulling this into

7    the chat, too.  Apologies.  You need 8 and 9.

8               THE VIDEOGRAPHER:  And 10.

9               MR. JACKSON:  Right.

10   BY MR. JACKSON:

11          Q. Okay.  Back to Exhibit 10, which is shared on

12   the screen here and also in the chat, Mr. Silva, do you

13   recognize this document?

14          A. Yes.

15          Q. And just like with the others, we see a name

16   and signature that appears to be yours dated May 4th,

17   2015.  Do you agree that is your signature?

18          A. Yes.

19          Q. Do you recall reviewing and signing this

20   document?

21          A. I remember signing.

22          Q. Okay.  And what's your understanding of what is

23   contained in this document?

24          A. The legality in regards of meal periods and the

25   actions to be taken if not given the meal break on time.

Page 103

1    Q. And it provides that:

2        "All nonexempt employees who work more than 5

3    hours in a workday are entitled to an unpaid, duty-free

4    meal period of at least 30 minutes that begins by the

5    conclusion of your fifth hour of work."

6        Do you see that?

7    A. Yes.

8    Q. And you agree that's been the policy at Menzies

9    from the time that you began employment there?

10   A. Yes.

11   Q. Similarly, the next sentence:

12       "If you work more than 10 hours in a workday,

13   you're entitled to a second, unpaid meal period of at

14   least 30 minutes that begins by the conclusion of your

15   tenth hour of work."

16       Do you see that?

17   A. Yes.

18   Q. And do you agree that was the policy that was

19   in effect at the time that you began your employment at

20   Menzies?

21   A. Yes.

22   Q. The next section of this describes the

23   circumstances in which you can waive your meal period.

24   Did you have an understanding of how meal period waivers

25   worked at Menzies?

1        A. Not a full understanding.  I was aware if

2   this -- I mean, I was aware that this was, like, the

3   written policy.  I wasn't aware that it was something

4   that I was, like, willing to do, you know.  It always

5   was in the hands of manage -- management and operational

6   needs.

7        Q. Let me ask this:  Did you have an understanding

8   while you worked at Menzies that if you worked more than

9   five hours but less than six hours, you could agree to

10  waive your right to a meal period?

11       A. I was aware if you worked under six hours, you

12  didn't need to take a lunch break.

13       Q. And did you also understand that while you were

14  employed at Menzies, if you worked more than 10 hours

15  but less than 12 hours, you could waive your second meal

16  break so long as you took your first meal break?  Did

17  you understand that?

18       A. I -- like I said, I understood it because I

19  read it, but that wasn't always the case, but from the

20  writing, yes, it's -- I understood.

21          (Whereupon Deposition Exhibit No. 11 was marked

22          for identification.)

23  BY MR. JACKSON:

24       Q. Okay.  And if I can put up, I'd like to

25  introduce as Exhibit 11 the document entitled Kronos

1   Meal Period Clocking Policy and Reminder of Meal and

2   Rest Period Policies and Requirements.  This is Bates

3   labeled MENZIES_1336 to 1337.  It appears the document

4   went into effect in 2019.

5           Do you recognize this document?

6           A. No.

7           Q. Do you recall during your employment -- strike

8   that.

9           You received a lot of written policies to

10  review and acknowledge and sign at the time of your

11  orientation, correct?

12          A. That is correct.

13          Q. Do you recall that periodically during your

14  employment, Menzies issued updates to their policies or

15  new policies?

16          A. I was aware, yes.

17          Q. And how would you have accessed those policies?

18          A. Those policies will actually be given to our

19  safety department.  Safety department will -- will

20  locate each individual and have them sign any

21  documentation that has -- that needs updating or a new

22  signature.  A lot of the times they weren't really

23  explained or read, especially since they came either

24  during a break, on lunch, or during a flight.

25          Q. Okay.  I am looking at a document that you

1   would have never seen before but we -- we discussed

2   earlier, there were a lot of policies that were provided

3   electronically that you reviewed electronically and

4   provided an electronic signature to, correct?

5        A. Yes.

6        Q. And we just saw on Exhibit 11, it's dated

7   sometime in 2019, correct?

8        A. Yes.

9        Q. I'm looking at an electronic signature

10  acknowledgment that tracks when employees signed

11  policies.

12       A. Mm-hmm.

13       Q. And according to this, you signed this policy

14  on June 20th, 2019.  Do you have any reason to think

15  that that's not accurate?

16       A. I have no reason.

17       Q. You just don't recall one way or another,

18  correct?

19       A. I do not.

20       Q. Okay.  So looking at this policy, it reiterates

21  the same general meal period policy that existed at the

22  time that you first started working at Menzies, right?

23       A. I can't see.  If you don't mind zooming in,

24  then I could --

25       Q. Yeah.  Yeah.  This still provides that if you

1    work more than 5 hours, you're entitled to a first meal

2    period of 30 minutes; if you work more than 10 hours,

3    you're provided -- entitled to a second meal period of

4    at least 30 minutes; that you can waive the first one if

5    you worked fewer than 6; that you can waive the second

6    one if you work fewer than 12 and took your first meal

7    period.  That was all the same as the policy that we

8    just looked at before this, right?

9        A. I would say so, yes.

10       Q. And this policy specifically instructs

11   employees if a nonexempt employee -- well, strike that.

12       It states:

13       "Meal periods are mandatory, and nonexempt

14   employees may not skip a meal period for any reason or

15   take a meal period at a time other than when scheduled,

16   without permission from their manager or supervisor."

17       You would agree that that was Menzies's policy,

18   correct?

19       A. Their written policy, yes.

20       Q. It further provides that:

21       "If a nonexempt employee misses a meal period

22   for any reason, takes less than a 30-minute duty-free

23   meal period, or does not take the meal period at the

24   scheduled time, the employee must immediately notify his

25   or her manager or supervisor."

1          You would agree that that was Menzies's

2    instruction to employees that you were supposed to

3    report to your manager or supervisor the times --

4          A. Yeah.

5          Q. -- you wouldn't take a meal period?

6          A. Yes.

7          Q. And the same was true for rest periods,

8    correct?

9          A. Up until this documentation, I've never seen or

10   recall rest periods becoming a stated situation or a

11   stated mandatory break.  Rest periods were not part of

12   the practice at that job or spoken of.  They considered

13   being on standby on a flight your rest period.

14         Q. Well, let's go back to the prior exhibit really

15   quick.  This exhibit, which is the policy that you

16   signed at the time of your orientation when you first

17   started working, this policy provides for rest periods,

18   right?

19         A. Yes.

20         Q. Actually one ten-minute rest break for every

21   four hours work, correct?

22         A. Correct.

23         Q. So this was communicated to you at the time you

24   started working at Menzies, right?

25         A. Yes.  It was never told that it was a mandatory

EXHIBIT 2 - 83

1       Q. But did you ever personally witness employees

2   in departments outside of your own being instructed to

3   skip meal breaks?

4       A. I've never been in that conversation --

5       Q. Okay.

6       A. -- between a manager and another fellow

7   employee.

8       Q. And same question for rest breaks.

9       A. I was not in that conversation.  I was just

10  told thirdhand.

11      Q. Okay.  And how many times would you estimate

12  that one of your supervisors instructed you to skip a

13  meal break?

14      A. It happened very often, and I don't think I

15  will be able to put an accurate number or even a

16  ballpark number, but it happened very often, even to the

17  point where denying that became an issue.

18      Q. Did a manager or supervisor ever instruct you

19  to skip a rest break, one of those ten-minute,

20  on-the-clock breaks?

21      A. Rest breaks were never a terminology that was

22  used or that was practiced or even acknowledged in our

23  department.

24      Q. So just so I'm clear, is it your testimony that

25  you never received a single ten-minute unpaid rest break

1          A. We were always near an aircraft, and we were

2     always on call ready to continue work.  I would not

3     consider that a ten-minute un -- uninterrupted break.

4     Work was always related and involved.

5          Q. And but sitting here, you don't have personal

6     knowledge one way or another of whether that was the

7     same situation in other departments, right?

8          A. In other departments, no.

9          Q. That's correct, you don't have personal

10    knowledge about the rest break practices in other

11    departments?

12         A. That is correct.

13         Q. And similarly, you don't have personal

14    knowledge about the rest break practices at other

15    airports?

16         A. That is correct.

17         MR. JACKSON:  All right.  We've been going for

18    about an hour.  Let's go off the record and take a

19    ten-minute break.

20         THE VIDEOGRAPHER:  Okay.  Off the record -- off

21    the record at 2:11 p.m.

22         (Whereupon, a short break was taken.)

23         THE VIDEOGRAPHER:  This is Media 6.  We're back

24    on the record at 2:23 p.m.

25

EXHIBIT 2 - 85

1   BY MR. JACKSON:

Anibal A. Silva                                Amaya vs.
                                      Menzies Aviation (USA), Inc.

2        Q. All right.  Mr. Silva, I'm going to go ahead

3   and share another document with you here.

4           (Whereupon Deposition Exhibit No. 15 was marked

5           for identification.)

6   BY MR. JACKSON:

7        Q. Does document entitled Employee Handbook

8   California Bates stamped MENZIES_295 down to 327,

9   generally speaking, do you recognize this document?  Are

10  you there?

11          THE VIDEOGRAPHER:  You're muted.  It's probably

12  the same issue as last time.

13          MR. JACKSON:  Go off the record while he gets

14  it sorted out.

15          THE VIDEOGRAPHER:  Yeah.  Off the --

16          THE WITNESS:  Is that better?

17          THE VIDEOGRAPHER:  There we go.  Yeah.

18          MR. JACKSON:  Okay.  You can go back.

19          THE VIDEOGRAPHER:  Okay.  Go ahead.

20          MR. JACKSON:  Are we on?

21          THE VIDEOGRAPHER:  Yes.

22          THE WITNESS:  Yes.

23  BY MR. JACKSON:

24       Q. Oh, okay.  Mr. Silva, do you recognize this as

25  the employee handbook?

EXHIBIT 2 - 86

Anibal A. Silva

Amaya vs.
Menzies Aviation (USA), Inc.

1       A.  Yes, I recall.

2          Q. And at the time of your employment with

3    Menzies, do you recall familiarizing yourself with the

4    policies in the handbook?

5          A. During our orientation, we were given the Cliff

6    Notes and -- of what it consisted of, yes.

7          Q. You were provided with an actual copy of it,

8    though, right?

9          A. I might have, yes.

10          Q. And so you would agree that you would have had

11   ample opportunity to review and familiarize yourself at

12   some point, not necessarily during orientation, but at

13   any time?

14          A. Yes.

15          Q. Do you recall ever actually going through the

16   handbook to familiarize yourself with its contents?

17          A. No.

18          Q. Okay.  But you would agree that the policies

19   set forth in the handbook applied to your employment at

20   Menzies, right?

21          A. Yes.

22          Q. During your employment at Menzies, did you

23   utilize a mechanism for recording your time to punch in

24   and out?

25          A. Yes.

1  BY MR. JACKSON:

2      Q. I will represent to you, but you can verify,

3  that these pay statements correspond with the same pay

4  periods for which we reviewed time records just now in

5  Exhibit 16.

6          So this is Exhibit 17, Bates labeled

7  MENZIES_1142, 1145, and 1146.

8          Do you recognize these documents as the pay

9  statements you received during your employment at

10  Menzies?

11      A. They do look like my every week pay stubs,

12  correct.

13      Q. And here under pay details, that's your name

14  and address at the time?

15      A. I can't visually see your document, but I would

16  assume so, yes.  That is my physical address and my

17  name.

18      Q. And you recall on the time records we just

19  reviewed for those three pay periods, there was one meal

20  break premium in the first pay period, one meal break

21  premium in the second pay period, and two meal break

22  premiums in the third pay period, correct?

23      A. That is correct, that were approved, yes.

24      Q. That were approved.

25          And then here on the pay records, you would

1  agree that these reflect that Menzies did, in fact, pay

2  you a meal break premium for one hour for the pay period

3  of February 24th to March 1st, 2020, correct?

4        A. That there were approved, correct.

5        Q. And the same is true for the next pay statement

6  for the period of February 3rd to February 9th, 2020, we

7  see here again another meal break premium that was paid,

8  correct?

9        A. Yes.

10        Q. And finally on the third page, we see here for

11  the pay period of January 27th, 2020, to February 2nd,

12  2020, another two meal premiums paid for that pay

13  period, correct?

14        A. Correct.

15        Q. And so I think you pointed out, we can even go

16  back to it, on Exhibit 16, I think you were pointing out

17  that you believe there were other instances that showed

18  late meals, but there wasn't a meal break premium,

19  right?

20        A. That is correct.

21        Q. Is there any way, sitting here looking at this

22  document, for you to know why a meal break premium was

23  provided, let's say here for Saturday -- we're looking

24  at the first page of Exhibit 16 -- why you would have

25  received a meal break premium for that Saturday that was

1  late but not for the Friday where it appears that it was

2  possibly late as well?

3        A. Absolutely.  That can easily be answered by

4  depending on the shift of the manager that was on duty.

5        Q. Can you explain that, please?  What do you --

6        A. They would determine whether your -- your

7  reasoning was even adequate in their eyes, and if it

8  was, they still got to send in for one last approval,

9  and it could have been denied from that individual or

10 the fact that that manager has had too many meal

11 premiums and they've restricted his ability to even fill

12 those forms out or approve those forms, so those forms

13 no longer became an option for that operational manager

14 or manager, and we would be denied that meal premium,

15 but then the following day, it really depends on the

16 manager on duty and how many have -- how many meal

17 premiums they have approved.

18        Q. Okay.  So I don't want to put words in your

19 mouth, but I want to make sure I'm understanding your

20 testimony.  It sounds like you would agree, first,

21 there's no way that we can simply look at the time

22 record to understand why a meal break premium was

23 approved or not approved; you would agree with that?

24        A. Yes.

25        Q. Second, it's your belief that the determining

1    factor as to whether a meal break premium was approved

2    would depend on which specific manager was approving it;

3    is that right?

4         A. Yes.

5         Q. And so in order -- well, strike that.

6              So is it fair to say that in your experience,

7    some managers would approve the meal premiums consistent

8    with Menzies's written policies and other managers would

9    deny the meal period premiums, which would be a

10   violation of Menzies's policy; do you agree with that

11   statement?

12        A. Can you repeat that one more time for me?

13        Q. Yeah.  That wasn't the best question.  I'm

14   sorry.

15             So you would agree as a broad statement, some

16   managers would approve the meal break premiums and some

17   would not, correct?

18        A. Yes.

19        Q. And so you would agree that a manager who

20   receives a missed punch form from you and approves your

21   meal break premium and then you're paid that premium,

22   that manager is acting in a manner that is consistent

23   and complies with Menzies's written policies that we've

24   looked at, right?

25        A. In that moment, yes.

1          Q. Okay.  And similarly, if in your belief you

2     submit a proper meal -- missed punch form requesting a

3     meal break premium for what you believe is a valid

4     reason and a manager denies that and you're not paid a

5     premium, in your view, that would be a violation of

6     Menzies's written policies, right?

7          A. That is correct.

8          Q. And so then do you agree that to determine

9     whether a violation of Menzies's policy is taking place,

10     we would really have to look at it on a case-by-case and

11     manager-by-manager situation?

12          A. I would say so.

13          MR. JACKSON:  Okay.  Go off the record.

14          THE VIDEOGRAPHER:  Okay.  Off the record at

15     2:48 p.m.

16          (Whereupon, a short break was taken.)

17          THE VIDEOGRAPHER:  This is Media 7.  We're back

18     on the record at 3:01 p.m.

19     BY MR. JACKSON:

20          Q. Okay.  Mr. Silva, we are at the home stretch

21     here.  I appreciate your attention and cooperation

22     today.  I just want to go through a couple of quick

23     documents.

24          (Whereupon Deposition Exhibit No. 18 was marked

25          for identification.)

Anibal A. Silva

1   company provided you a uniform to wear during your

2   shifts, right?

3      A. Correct.

4      Q. And they covered the expenses of that uniform?

5      A. Yes.

6      Q. I know you've testified at length today that

7   your personal knowledge is really limited to the ramp

8   agent or ramp agent lead position at LAX, right?

9      A. Could you rephrase that?

10      Q. It sounds like -- I mean, you would agree that

11   the -- your personal knowledge and experience is really

12   largely limited to the ramp area and the ramp agent

13   position at LAX because that's where you actually

14   worked, right?

15      A. Correct.

16      Q. And we talked a little bit earlier about your

17   understanding that in this case, you're seeking to be a

18   representative of other people, right?

19      A. Yes.

20      Q. So your -- that -- that -- that position that

21   you're seeking to be is referred to as a class

22   representative; do you understand that?

23      A. Yes.

24      Q. In your role as a class representative, have

25   you taken any steps to investigate the allegations

**Page 145**

1    you're making as they relate to positions other than

2    ramp agent?

3         A. I'm sorry.  Could you repeat that?

4         Q. Yeah.

5         Have you -- so your -- the allegations -- you

6    would agree that the allegations that you're making in

7    this action are based on the experiences that you had as

8    a ramp agent at LAX, right, because that's the only

9    time --

10        A. And for -- yes, what I witnessed around my work

11   area, yes.

12        Q. Right.

13        But that work area was largely just other ramp

14   agents, right?

15        A. Yes.

16        Q. And so my question is have you done anything to

17   investigate or figure out if employees in other

18   departments at LAX had the same experiences that you

19   had?

20        A. No.

21        Q. And have you done anything to investigate

22   whether employees at other locations, other airports,

23   had the same experience that you had at LAX?

24        A. No.

25        Q. And I know you said that you felt that you had

1  worked on most of the airlines that Menzies serviced,

2  but have you done anything to investigate whether your

3  experience -- strike that.

4          Other than the airlines that you provided

5  services to at Menzies, have you taken any steps to

6  investigate or figure out if employees who provided

7  services for other airlines at Menzies experienced the

8  same issues that you claim to have experienced?

9      A. You lost me.  I'm sorry.  It's -- yeah.  Can

10  you repeat that one more time?

11      Q. Yeah.

12          So you -- you testified today about the

13  experience that you had in your position at LAX with

14  that list of 10 or 12 airlines that you recall working

15  for, right?

16      A. Correct.

17      Q. And you know that there are other airlines that

18  Menzies provides services to in addition to just the

19  ones that you provided services to, correct?

20      A. I am aware.

21      Q. And in your role as a class representative,

22  have you taken any steps to investigate the experiences

23  of employees who provided services to airlines other

24  than the ones that you provided services to?

25      A. I have not.

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand,

8  which was thereafter transcribed by me; that the

9  foregoing is a true record of the testimony given.

10    Further, that if the foregoing pertains to

11  the original transcript of a deposition in a federal

12  case, before completion of the proceedings, review of

13  the transcript [ X ] was [  ] was not requested.

14    I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17    IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20

21  Dated:  May 19, 2023

22

23

24  _____

    Layli Phillips

25  RPR, CRR, CSR No. 14402

```
 1              DECLARATION UNDER PENALTY OF PERJURY
 2    Case Name: Amaya vs. Menzies Aviation (USA), Inc.
 3    Date of Deposition: 05/19/2023
 4    Job No.: 10120116
 5
 6              I, ANIBAL A. SILVA, hereby certify
 7    under penalty of perjury under the laws of the State of
 8    _____ that the foregoing is true and correct.
 9              Executed this _____ day of
10    _____, 2023, at _____.
11
12
13              _____
14                        ANIBAL A. SILVA
15
16    NOTARIZATION (If Required)
17    State of _____
18    County of _____
19    Subscribed and sworn to (or affirmed) before me on
20    this _____ day of _____, 20__,
21    by_____,    proved to me on the
22    basis of satisfactory evidence to be the person
23    who appeared before me.
24    Signature: _____ (Seal)
25
```

# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                       -  -  -
       DORA PATRICIA AMAYA, an   ) CIVIL DIVISION
 4     individual; and BRAYAN    )
       LOZANO GONZALEZ, an       ) Case No.:
 5     individual; on behalf     ) 2:22-cv-05915-MCS-MAR
       of themselves and         )
 6     others similarly          )
       situated,                 )
 7                               )
               Plaintiffs,       )
 8                               )
          -vs-                   )
 9                               )
       MENZIES AVIATION (USA),   )
10     INC., a Delaware
       corporation; and DOES 1
11     through 10, inclusive,

12             Defendants.

13                       -  -  -

14          CONTAINS HIGHLY CONFIDENTIAL PORTIONS

15

16             REMOTE VIDEOTAPED DEPOSITION OF TALIN

17     BAZERKANIAN, 30(b)(6), located in California,

18     commencing at 9:47 A.M. PDT, on Thursday, April

19     13, 2023, before ALYSSA A. REPSIK, Court Reporter

20     and Notary Public in and for the Commonwealth of

21     Pennsylvania.

22

23

24

25
```

EXHIBIT 3 - 99

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1   reporter.
 2                    THE REPORTER:  The attorneys
 3   participating in this deposition acknowledge
 4   that I am not physically present in the
 5   deposition room and that I will be reporting
 6   this deposition remotely.
 7            They further acknowledge that, in
 8   lieu of an oath administered in person, the
 9   witness will verbally declare her testimony in
10   this matter under penalty of perjury.
11            The parties and their counsel
12   consent to this arrangement and waive any
13   objections to this manner of reporting.  Please
14   indicate your agreement by stating your name
15   and your agreement on the record.
16                    MR. SAYAS:  Joe Sayas, I do
17   agree.
18                    MR. JACKSON:  Kevin Jackson, I
19   agree as well.
20                    TALIN BAZERKANIAN, a witness
21   herein, having been first duly sworn, was
22   examined and testified as follows:
23                    EXAMINATION
24   BY MR. SAYAS:
25        Q.    Good morning, ma'am.
```

EXHIBIT 3 - 100

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1   directly supervise, do they hold office in Los

 2   Angeles?

 3        A.    No, they don't.

 4        Q.    Okay.  Are they spread out across

 5   the country?

 6        A.    Yes, they are.

 7        Q.    And what is the type of business

 8   that your employees engage in?

 9        A.    Aviation ground handling.  Aviation

10   ground handling and fueling and cargo handling

11   business.

12        Q.    What is ground hold -- holding

13   business?

14        A.    Ground-handling business.

15        Q.    Yeah.  Yes.  I'm sorry.  Ground

16   handling business.

17              What is that?

18        A.    Ground-handling business is we're

19   the middle -- we would be -- we would be

20   contracted by the airlines to handle all of

21   their ground-handling aspect at the airports,

22   meaning off-loading and loading planes and also

23   checking in passengers.

24        Q.    What about fueling?  What does that

25   consist of?
```

EXHIBIT 3 - 101

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1          A.    Fueling consists of fueling
2    aircrafts.
3          Q.    And you mentioned a third one.    I
4    believe that's cargo handling, is it?
5          A.    Yes, cargo handling.
6          Q.    And what does that consist of?
7          A.    Maintaining the warehouses that
8    handle inbound and outbound cargo for the
9    airlines.
10          Q.    So primarily, or principally, the
11    type of customers that Menzies has would be
12    airline customers; is that correct?
13          A.    Yes.
14          Q.    And how many airline customers does
15    Menzies service in California?
16          A.    I can't tell you that number,
17    offhand.
18          Q.    Are you able to give us an estimate
19    of like, 7 to 10, or 10 to 20?
20          A.    It would probably be 10 to 20.
21          Q.    And all these 10 to 20 airline
22    customers are engaged in both interstate and
23    international travel?
24          A.    It just depends on the airlines.
25    They're not all the same.    Some of them are

EXHIBIT 3 - 102

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    domestic, some of them are international.

2        Q.    Okay.  When you say "domestic,"

3    would that be interstate travel, like, from

4    California to Texas?  Anything going out of

5    cargo handling would be interstate.  That's

6    what I meant.

7              So let me repeat the question.

8              The 10 to 20 airline customers that

9    you have, are those airlines engaged in both

10   intrastate and international travel?

11       A.    I would say both.

12       Q.    Okay.  Is there any airline that --

13   that is exclusively engaged in travel within

14   California alone?

15              MR. JACKSON:  Objection.

16   Calls for speculation.  The question exceeds

17   the scope of the 30(b)(6) designation.

18              You're asking her to testify about

19   another business's practices, which is not one

20   of the topics, nor is she qualified to testify

21   about it.

22              But, Talin, you can answer, if you

23   know.

24   BY MR. SAYAS:

25       Q.    Right.

EXHIBIT 3 - 103

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1      A.    Can you repeat the question again?

2      Q.    Can I -- is there any airline

3   customer that's exclusively engaged in simply

4   interstate travel or just within California?

5      A.    I would not know the answer.  I

6   don't know what businesses they do, where they

7   go.

8      Q.    Okay.  Now, Menzies has -- I would

9   ask the question -- do you know if Menzies has

10   written agreements with its airline customers?

11      A.    To the best of my knowledge, yes, we

12   do have.

13      Q.    Okay.  And what do you call these

14   agreements?  Are they service contracts or just

15   contracts for services?

16          What do you call those?

17      A.    It just depends on the contract.  It

18   depends on the customer.  But it would be

19   somewhere around service contract or contracts.

20      Q.    Okay.  And generally speaking, do

21   those service contracts or contracts require

22   Menzies to provide any of these three major

23   services that you mentioned within a certain

24   time limit?

25      A.    Can you repeat that question?

EXHIBIT 3 - 104

1    read, is that still applicable at Menzies in

2    California?

3        A.    Yes, it is.

4        Q.    Okay.  Now, tell me the policy of

5    Menzies with respect to meal breaks starting in

6    2018.

7        A.    The policy that we have for meal

8    breaks has been on way before 2018, but it

9    continues from 2018 until today.  And I think

10   it's one of your exhibits.

11           It's very clearly covering

12   employees, based on the labor law, when and how

13   long of meal breaks and rest periods they will

14   need to take based on their shift.

15       Q.    So for an employee who works more

16   than five hours is that -- a nonexempt employee

17   entitled to a meal break that's uninterrupted

18   for at least 30 minutes, is that a policy?

19       A.    Yeah, it's the policy.  I think you

20   have it.  If you want to put it on the screen

21   we can go over it together.

22       Q.    Sure.  Let me -- let me show you

23   Exhibit 5.  It's a document entitled "Kronos

24   Meal Period Clock in Policy and Reminder of

25   Meal and Rest Period Policies and

EXHIBIT 3 - 105

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    Requirements," and it's Bates-stamped Menzies

2    440 up to Menzies 441.

3                    (Bazerkanian Exhibit No. 5 was

4    marked for identification.)

5                    MR. JACKSON:  Sorry, Joe --

6    BY MR. SAYAS:

7        Q.    Do you recognize Exhibit 5?

8                    MR. JACKSON:  Sorry, Joe.  Is

9    there a question pending?

10   BY MR. SAYAS:

11       Q.    Do you recognize Exhibit 5?

12       A.    Yes, I do.

13       Q.    Okay.  Yes.  Okay.  And on the

14   bottom portion of the document there is a date

15   of 2019.

16                    Do you see that?

17       A.    Yes.

18       Q.    Okay.  Was this created -- was this

19   document created in 2019?

20       A.    This document was created in 20 --

21   it was re-created in 2019 due to the fact that

22   we started rolling out Kronos for all of our

23   employees because, previous to that, we used to

24   use another clock in system.

25       Q.    And what's the other clock in

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    that you said they can be posted, it can be

2    conveyed to the nonexempt employees, okay.

3            Are you saying that all meal breaks

4    are in the form of written schedules conveyed

5    to nonexempt employees?

6        A.    That is -- that is exactly what I

7    said that it's not.  It's not written

8    conveying.  I said it depends on the

9    department.  It depends on the unit.  It

10   depends on how big the department is.  It

11   depends on the managers and depending on the

12   function that you do.  Some of them are in

13   writing, some of them are not in writing.

14           Some of them has to do with the

15   group taking a break at a certain time

16   altogether.  Some of them are scheduled.

17           So it depends on where you work and

18   what function you do.

19       Q.    Okay.  So give me the departments or

20   units that do not have written schedules of

21   meal breaks.

22       A.    Majority of the departments, based

23   on the bare minimum schedule, have the time of

24   when employees can take a break written on the

25   schedule.

EXHIBIT 3 - 107

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1               However, since we are not a factory

2       and we don't -- we're not going 8:00 to 9:00,

3       depending on the timeline and depending on the

4       work, the breaks would change or would switch.

5               Some departments are able to switch

6       the break and put it in writing and put it on

7       the TV so everybody can see it.  But some

8       departments, for example, such as cabin

9       cleaners, if they cannot take it from 10:00 to

10      12:00, then the manager will go and tell them,

11      "Okay.  Today you cannot take it, as

12      designated, from 10:00 to 12:00, but you will

13      take it from 9:30 to 10:30."

14          Q.    For -- in the case of cabin

15      cleaners, do they change every day?

16          A.    It depends on.  Do they clean cabins

17      every day at the same time?  No.  Sometimes

18      there's -- if there's a cancellation or there's

19      a delay on the plane, then we move it around.

20              We try to stick most of the time

21      with what the law says which is, you know,

22      obviously within the five hours.  And sometimes

23      we are able to do it, and sometimes we are not.

24      And that's what the meal breaks are there for.

25          Q.    When you say you're not able to do

EXHIBIT 3 - 108

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1    it, are you saying you're not able to set
 2    schedules?
 3         A.    No.  We're not able to give the
 4    breaks on that particular day on that
 5    particular time that was on the schedule.
 6         Q.    Okay.  And when you say the
 7    schedules for cabin cleaners, you're saying
 8    that this would be in writing; is that correct?
 9         Did I understand you correctly?
10         A.    When we publish a schedule we
11    publish the breaks as well.  But since our
12    business -- the way our business is if the time
13    changes, then we'd communicate that to the
14    employees.
15              In the case of employees that are
16    maybe 20 or 30, then we do it manually.  We do
17    verbal communication.
18              In the case of employees if it's
19    going to affect 40, 50 people, then there's
20    different ways of communications, such as
21    verbals, such as we put it on the TV, or we
22    announce it on the radios.
23         Q.    So other than cabin cleaners, okay,
24    let's talk about other units or departments.
25              Which departments or units provide
```

EXHIBIT 3 - 109

```
 1          A.     No.

 2          Q.     -- any policy?

 3          A.     Yeah.  No, I understand.

 4          Q.     And I will, perhaps for the sake of

 5     completeness, show you a copy of the handbook,

 6     the Menzies' handbook.

 7               And at this time I'll request --

 8               MR. SAYAS:  Cielo, can you put

 9     in Exhibit 6, the employee handbook?

10               (Bazerkanian Exhibit No. 6 was

11     marked for identification.)

12     BY MR. SAYAS:

13          Q.     Employee handbook, Exhibit 6, it's

14     Bates-stamped Menzies 440 [sic] to 33 --

15     Menzies 337.  Okay.

16               I think it is on -- beginning --

17     beginning on Page 12 of Exhibit 6 where it

18     talks about meal periods under 3.4, proceeding

19     up to Page 13 of Exhibit 6 of the handbook

20     where it talks about meal periods and rest

21     periods.  There you go.  3.4.  That's Page 12

22     of Exhibit 6.

23               Are you familiar with the provisions

24     of the handbook on meal periods and rest

25     periods?
```

EXHIBIT 3 - 110

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1        A.    Yes.

 2        Q.    Okay.

 3        A.    They're exactly the same as the

 4   policy.

 5        Q.    Okay.  And the provisions on meal

 6   periods and rest periods mirror the policy

 7   provisions in Exhibit 5; is that correct?

 8        A.    Correct.

 9        Q.    And I don't see, again, a provision

10   which says that the meal breaks should be

11   provided within the first five hours.

12             Did you see anything there in the

13   handbook --

14        A.    No.

15        Q.    -- where --

16        A.    We don't have to say -- we don't

17   have to say that because it is the California

18   law.  We follow the law.  It doesn't matter

19   whether it's in the handbook or not.

20        Q.    The question, ma'am --

21        A.    As long as -- no, I don't see it.

22        Q.    Thank you.

23        A.    You're welcome.

24        Q.    Are you aware -- other than the CBAs

25   that you mentioned, are you aware of any other
```

EXHIBIT 3 - 111

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1      Q.    Now, other than the three

2   descriptions and three earnings codes that we

3   discussed on meals or lunch, is there any other

4   earnings code that you know that would pertain

5   to the payment of meal penalties?

6      A.    I've provided the description of the

7   earnings code to the legal, which this is what

8   you have, so if --

9      Q.    Okay.

10      A.    -- you haven't found any, then

11   there's not any.

12      Q.    Okay.

13      A.    I don't know if there's any other

14   code.

15      Q.    All right.  Thank you.  Is there any

16   earnings code for a rest break penalty -- I'm

17   sorry.

18          Is that what you refer to it in

19   Menzies?  You also refer to it as a rest

20   penalty or a rest break penalty?

21      A.    No.  We just call it a meal penalty.

22      Q.    Okay.  For -- in cases -- we're

23   going to be discussing rest breaks, but is it

24   the policy of Menzies to pay an extra hour of

25   penalty whenever an employee misses the

EXHIBIT 3 - 112

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    required rest break?

2         A.    Yes.  If they flag it out, of

3    course.

4         Q.    Okay.  Is there any earnings code

5    for rest break penalty?

6         A.    No.  They use the same meal code as

7    one hour-based on the employee's pay rate.

8         Q.    Is there a reason why they use the

9    same codes as the meal break?

10         A.    No specific reason.  It has the

11    same -- same functionality as the meal break

12    and the same amount, so I'm not sure why

13    another code was not created.

14         Q.    Is there any reason why there's no

15    distinction between the payment of a meal

16    penalty from a rest penalty?

17         A.    No.  I think I just answered that.

18    I'm not sure why.

19         Q.    Okay.

20         A.    The value is the same, so it could

21    just be because of that.

22         Q.    As far as you know, has Menzies ever

23    paid a rest penalty?

24         A.    I'm not sure.  If an employee has

25    requested it, then I'm certain we paid.

EXHIBIT 3 - 113

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1   what is the deduction benefit code?  What does

 2   that mean?

 3        A.   It's a code of the deductions of

 4   some of the benefits that employee has.

 5        Q.   Okay.  Okay.  And the amount

 6   corresponding to that in blue, that is the

 7   amount for each benefit code that the employee

 8   receives; correct?

 9        A.   Which blue?  The dark blue or the

10   light blue?  The light blue is the employer,

11   the dark blue the employee.

12        Q.   The dark blue?

13        A.   Yeah.  That's what the employee gets

14   deducted, yes.

15        Q.   I see.  Okay.  All right.  Okay.  So

16   let's go back to Exhibit 5, and if we go

17   through the issue of rest breaks.

18             I may have touched on this partly,

19   ma'am, but what's your understanding of the

20   Menzies' policy on rest breaks?

21        A.   On what?

22        Q.   What is Menzies' policy on rest

23   breaks?

24        A.   Clearly stated right there what the

25   policy is.  The policy is to follow the
```

EXHIBIT 3 - 114

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    California Labor Code.  The policy is, and it

2    says, "Nonexempt employees are authorized and

3    permitted to take one ten-minute paid rest

4    break for every four hours work or major

5    portion therefore."

6        Q.    Okay.  And under Menzies' policies,

7    rest breaks are, like meal breaks, mandatory?

8        A.    Yes, they are.

9        Q.    And employees are also subject to

10   disciplinary action if they do not take rest

11   breaks?

12       A.    If they frequently, yes.  If they

13   don't do it and we're aware of it, then they

14   are subject to disciplinary.

15       Q.    Okay.  Has any employee been

16   terminated as a result of not getting a rest

17   break?

18       A.    Not getting a rest break or not

19   taking a rest break?  That's a -- that's

20   different.  There's a big difference right

21   there.

22       Q.    Okay.  Why don't we start with --

23   let me rephrase the question.

24            Has any employee been terminated as

25   a result of not taking a rest break?

EXHIBIT 3 - 115

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1   addresses it, and you also get shop stewards
 2   and union organizers that are supporting you in
 3   case if you have any grievances in regards to
 4   the meal break and rest periods.
 5        Q.    Let me show you another document
 6   which we'll mark as Exhibit 18.
 7             (Bazerkanian Exhibit No. 18 was
 8   marked for identification.)
 9   BY MR. SAYAS:
10        Q.    This is the "Kronos Adoption E-self
11   Service and Notice of Informational Messaging
12   to Mobile Phones."  Exhibit 18 is Menzies
13   Bates-stamped 425 out of 426.
14             Are you familiar with this document?
15        A.    Yeah, I am.
16        Q.    Yes.  What is this document?
17        A.    "Kronos Adoption E-self Service and
18   Notice of Informational Messaging to Mobile
19   Phones."
20        Q.    This was generated in -- what?
21   2019?  There's a date in the lower -- in bottom
22   portion?
23        A.    Yes.  That's what it shows.
24        Q.    Okay.  What is -- in a nutshell,
25   what is Menzies' policy with regard to the use
```

EXHIBIT 3 - 116

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1    COMMONWEALTH OF PENNSYLVANIA            )
                                             ) SS
 2    COUNTY OF ALLEGHENY                     )

 3                    CERTIFICATE

 4     I, Alyssa A. Repsik, a notary public in and
      for the Commonwealth of Pennsylvania, do hereby
 5    certify that the witness, TALIN BAZERKANIAN,
      was by me first duly sworn to testify the
 6    truth, the whole truth, and nothing but the
      truth; that the foregoing deposition was taken
 7    at the time and place stated herein; and that
      the said deposition was recorded
 8    stenographically by me and then reduced to
      typewriting under my direction, and constitutes
 9    a true record of the testimony given by said
      witness.
10
       I further certify that I am not a relative,
11    employee or attorney of any of the parties, or
      a relative or employee of either counsel, and
12    that I am in no way interested directly or
      indirectly in this action.
13
       IN WITNESS WHEREOF, I have hereunto set my
14    hand and affixed my seal of office this 19th
      day of April 2023.
15

16

17        Alyssa A. Repsik
          _____
          Alyssa A.  Repsik, Notary Public
18        Court Reporter
          Notary Public
19        Allegheny County
          My Commission Expires March 3, 2024
20        Commission Number 129614

21

22

23

24

25
```

EXHIBIT 3 - 117

# EXHIBIT 4

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                            -   -   -
     DORA PATRICIA AMAYA, an        )Case No.:
4    individual; and BRAYAN        )2:22-cv-05915-MCS-MAR
     LOZANO GONZALEZ, an           )
5    individual; on behalf of      )
     themselves and others         )REMOTE VIDEOTAPED
6    similarly situated,           )DEPOSITION OF BRIAN
                                   )GALINDO
7                    Plaintiffs,   )
                                   )
8    Vs.                           )
                                   )
9    MENZIES AVIATION (USA),       )
     INC., a Delaware              )
10   Corporation; and DOES 1       )
     through 10, inclusive,        )
11                                 )
                     Defendants.

12

13

14                           -   -   -

15

16

17                      STENO.COM
                      (310) 573-8380
18

19

20    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
      WITHOUT AUTHORIZATION FROM THE CERTIFYING
21    AGENCY

22

23

24

25

EXHIBIT 4 - 119

```
 1   that I am not physically present in the

 2   deposition room and that I will be reporting

 3   this deposition remotely.

 4          They further acknowledge that, in

 5   lieu of an oath administered in person, the

 6   witness will verbally declare his testimony in

 7   this matter is under penalty of perjury.

 8          The parties and their counsel

 9   consent to this arrangement and waive any

10   objections to this manner of reporting.  Please

11   indicate your agreement by stating your name

12   and your agreement on the record.

13                MR. EVANGELISTA:  Karl

14   Evangelista.  I agree.

15                MR. JACKSON:  Kevin Jackson.

16   I agree.

17                BRIAN GOLINDA, a Witness

18   herein, having been first duly sworn, was

19   examined and testified as follows:

20                  EXAMINATION

21   BY MR. EVANGELISTA:

22       Q.   Good afternoon, sir.

23       A.   Good afternoon.

24       Q.   Can you state your and spell your

25   full name for the record?
```

EXHIBIT 4 - 120

BRIAN GALINDO                                                    JOB NO. 591518
MAY 03, 2023

1          A.     Correct.

2          Q.     Can someone else clock out and in

3     for an employee?

4          A.     No.

5          Q.     Are there occasions where ramp

6     agents or ramp department employees can't take

7     meal breaks during the first five hours of the

8     shift because they need to finish the loading

9     and unloading work?

10         A.     On occasions.   It depends on the

11    operation.

12         Q.     You mentioned when that happens, you

13    submit a meal penalty.

14                Is that what you said?

15         A.     Correct.

16         Q.     What is a meal penalty?   Is that a

17    form?

18         A.     Yes.   A document accessible to the

19    employees.

20         Q.     Is that what's been called a Missed

21    Punch Form?

22         A.     Correct.

23         Q.     Let's do it this way.   I want to

24    show you what's previously been identified and

25    marked as Exhibit 7 in a prior deposition.

EXHIBIT 4 - 121

1    is that right?

2          A.    Correct.

3          Q.    In a regular eight-hour shift, they

4    would get two rest breaks; is that right?

5          A.    Correct.

6          Q.    Do you have an understanding of what

7    Menzies' policy is for when an employee is not

8    allowed to take all of the 10-minute rest

9    breaks they're entitled to during their shift?

10         A.    yes.

11         Q.    What is that policy?

12         A.    The policy is made available to the

13   employees so they understand that we're

14   supposed to give an employee their two

15   ten-minutes, depending on what shift they work.

16              We're supposed to give them their

17   10-minute rest break regardless if there's a

18   flight on the ground or regardless if they're

19   working.

20              An employee is subject to their

21   10-minute rest breaks.

22         Q.    I understand what the written policy

23   is.  Is there ever an occasion that because of

24   the type of work that employees are not able to

25   take the 10-minute rest break they're entitled

EXHIBIT 4 - 122

BRIAN GALINDO                                        JOB NO. 591518
MAY 03, 2023

1    to?  They have to continue working?

2         A.   No.  Like I mentioned, employees --

3    no matter if a flight is on the ground or if

4    they're doing something, employees are subject

5    to their rest breaks.

6         Q.   If they're out in the ramp area and

7    it's time for their rest break, they can drop

8    what they're doing and take their rest break?

9         A.   Yes.

10        Q.   We talked about meal penalties.  Is

11   there such a thing as a rest-break penalty at

12   Menzies?

13        A.   Not that I'm aware of.

14        Q.   Has any employee approached you

15   requesting a rest-break penalty?

16        A.   No.

17        Q.   Are you aware of any procedure that

18   an employee can request a rest-break penalty

19   from Menzies?

20        A.   Not that I am aware of.

21        Q.   Have you provided training to the

22   employees in the ramp department with regard to

23   the rights as to meal breaks and rest breaks?

24        A.   Employees all acknowledge the policy

25   for their breaks.

EXHIBIT 4 - 123

```
 1   COMMONWEALTH OF PENNSYLVANIA        )
                                         ) SS
 2   COUNTY OF ALLEGHENY                 )

 3                   CERTIFICATE

 4        I, Katie Wilkerson, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, BRIAN GALINDO, was by
     me first duly sworn to testify the truth, the
 6   whole truth, and nothing but the truth; that
     the foregoing deposition was taken at the time
 7   and place stated herein; and that the said
     deposition was recorded stenographically by me
 8   and then reduced to typewriting under my
     direction, and constitutes a true record of the
 9   testimony given by said witness.

10        I further certify that the inspection,
     reading and signing of said deposition were
11   waived by counsel for the respective parties
     and by the witness.

12
          I further certify that I am not a
13   relative, employee or attorney of any of the
     parties, or a relative or employee of either
14   counsel, and that I am in no way interested
     directly or indirectly in this action.

15
          IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my seal of office this 10th
     day of May, 2023.

17

18
               Katie Wilkerson, Notary Public
19                  Professional Reporter

20        My Commission Expires February 14, 2026

21

22

23

24

25
```

EXHIBIT 4 - 124

# EXHIBIT 5

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                    -   -   -
    DORA PATRICIA AMADOR, an    )  CIVIL DIVISION
 4  individual; and BRAYAN      )
    LOZANO GONZALEZ, an         )  Case No.:
 5  individual; on behalf       )  2:22-cv-05915-MCS-MAR
    of themselves and           )
 6  others similarly            )
    situated,                   )
 7                              )
            Plaintiffs,         )
 8                              )
      -vs-                      )
 9                              )
    MENZIES AVIATION (USA),     )
10  INC., a Delaware            )
    corporation; and DOES 1     )
11  through 10, inclusive,      )
                                )
12          Defendants.         )

13                    -   -   -

14            REMOTE VIDEOTAPED DEPOSITION OF

15    JOSE A. SALCEDO GARCIA, located in California,

16    commencing at 1:01 P.M. PDT, on Friday, May 5,

17    2023, before ALYSSA A. REPSIK, Court Reporter

18    and Notary Public in and for the Commonwealth

19    of Pennsylvania.

20

21

22

23

24

25
```

EXHIBIT 5 - 126

JOSE A. SALCEDO GARCIA                                                    JOB NO. 591520
MAY 05, 2023

Page 2

```
 1   APPEARANCES VIA STENO CONNECT:
 2   FOR THE PLAINTIFFS:
 3   LAW OFFICES OF C. JOE SAYAS, JR.
 4   BY:  C. JOE SAYAS, JR., ESQ.
 5   500 N. BRAND BOULEVARD, SUITE 980
 6   GLENDALE, CA 91203
 7   (818) 291-0088
 8   Cjs@joesayaslaw.com
 9   KING CHENG MILLER & JIN, LLP
10   BY:  DAVID P. KING, ESQ.
11   3675 HUNTINGTON DRIVE, SUITE 200
12   PASADENA, CA 91107
13   (626) 304-9001
14
15   FOR THE DEFENDANTS:
16   FOLEY & LARDNER, LLP
17   BY:  KEVIN JACKSON, ESQ.
18   11988 EL CAMINO REAL, SUITE 400
19   SAN DIEGO, CA 92130
20   (858) 792-6773
21   Kjackson@foley.com
22
23   OTHER APPEARANCES:
24   LEGAL VIDEOGRAPHER - ISH RESTO
25
```

Page 3

```
 1                  INDEX
 2              ---o0o---
                                    PAGE
 3   DIRECT EXAMINATION:  ATTORNEY SAYAS     5
 4              ---o0o---
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  Good
 3   afternoon.  We are on the record at 1:01 p.m.
 4   Pacific time on May 5, 2023 to begin the
 5   deposition of Jose Salcedo in the matter of
 6   Amaya, et al., versus Menzies Aviation, USA,
 7   Inc., et al.
 8          This case is venued in the United
 9   States District Court, Central District of
10   California.  The case number is
11   2:22-CV-05915-MCS-MAR.
12          This deposition is taking place via
13   Steno's Steno Connect platform.  The legal
14   videographer is me, Ish Resto, here on behalf
15   of Steno, and our court reporter is Alyssa
16   Repsik, also here on behalf of Steno.
17          Would counsel please identify
18   yourselves and state whom you represent.
19          MR. SAYAS:  Good afternoon.
20   Joe Sayas appearing for the Plaintiffs.
21          MR. JACKSON:  Kevin Jackson
22   for Defendants.
23          THE VIDEOGRAPHER:  Thank you,
24   counsel.  Will the reporter please swear in the
25   witness?
```

Page 5

```
 1          THE REPORTER:  The attorneys
 2   participating in this deposition acknowledge
 3   that I am not physically present in the
 4   deposition room and that I will be reporting
 5   this deposition remotely.
 6          They further acknowledge that, in
 7   lieu of an oath administered in person, the
 8   witness will verbally declare their testimony
 9   in this matter under penalty of perjury.
10          The parties and their counsel
11   consent to this arrangement and waive any
12   objections to this manner of reporting.  Please
13   indicate your agreement by stating your name
14   and your agreement on the record.
15          MR. SAYAS:  Joe Sayas here.  I
16   agree.
17          MR. JACKSON:  Kevin Jackson,
18   agreed.
19          JOSE A. SALCEDO GARCIA, a
20   witness herein, having been first duly sworn,
21   was examined and testified as follows:
22                  EXAMINATION
23   BY MR. SAYAS:
24      Q.   Good afternoon, Mr. Salcedo.
25      A.   Good afternoon.
```

EXHIBIT 5 - 127

JOSE A. SALCEDO GARCIA                                              JOB NO. 591520
MAY 05, 2023

Page 42

1      A.    Yes.
2      Q.    Okay.  And the freight team that you
3 have, are your employees involved in building
4 up freight or breaking down freight?
5      A.    No.
6      Q.    That's entirely for the cargo people
7 to handle?
8      A.    Yes.
9      Q.    What you handle is merely movement
10 of already built-up cargo?
11     A.    Yes.
12     Q.    All right.  Now, do you have an
13 understanding of Menzies' policy on meal
14 breaks?
15     A.    Yes.
16     Q.    Okay.  And what's your understanding
17 of that policy?
18     A.    We have to take a break before the
19 fifth hour.  Any break after the sixth it's a
20 penalty, so the employee gets paid an
21 additional hour.
22     Q.    Did you say after the sixth or after
23 the fifth?
24     A.    After the sixth.
25     Q.    And let's call that the late meal

Page 43

1 break.
2      A.    Yes.  Meal break.
3      Q.    And you're saying an employee is
4 entitled to an extra hour of pay if there's a
5 late meal break?
6      A.    Yes.
7      Q.    Do you consider that in preparing
8 your schedules?
9      A.    The breaks?
10     Q.    Yes.
11     A.    Yeah.  So, like I said, depending on
12 how our flights come in, wherever we have a
13 bigger gap to allow them to go on break, we try
14 to send them on break.
15     Q.    Okay.  Now, the schedules that you
16 make here, I suppose that would contain
17 schedule on when the employee should start his
18 shift; correct?
19     A.    Yes.
20     Q.    And does that schedule also contain
21 the time within which the employee should
22 commence his or her break, meal break?
23     A.    We don't send it on to the
24 scheduling.  Like, we will just send the start
25 time.

Page 44

1      Q.    Okay.
2      A.    And then once we're at work, we'll
3 let them know the break will be here between
4 these flights, and then that's -- we're a
5 working operation.  Wherever we see the gap or
6 if we -- like I said, a lot of the times I have
7 one flight with 16 agents.
8      Q.    Yes.
9      A.    If I don't need all 16 agents on
10 that flight, I'll use that number to work the
11 flight and send a portion on break.  And then
12 when that portion on break returns, we'll
13 substitute with the guys there and then we'll
14 send the other portion on break.
15     Q.    And who lets the employees know of
16 their break times?
17     A.    Me.
18     Q.    And you communicate that to the
19 supervisor or the lead or you send a group
20 message?
21     A.    Yes.  No.  No.  No, we're there.
22 Like I said, I'm always there with them --
23     Q.    Right.
24     A.    -- in operation.
25     Q.    Mm-hmm.

Page 45

1      A.    So if we see the time available to
2 start sending them on break, we'll just
3 individually, for example, "Jose, go on break.
4 David, go on break.  Eric, go on break 30
5 minutes," stuff like that.
6      Q.    This cargo aircraft that you serve,
7 do they usually land in the same location?
8      A.    Yes.
9      Q.    What do you call that location?
10     A.    ICC.
11     Q.    Okay.  And any -- in the area where
12 all this cargo aircraft lands or is parked,
13 they're within walking distance from your
14 office; is that correct?
15     A.    Yes.
16     Q.    So you're saying that, you know, you
17 can -- you know, you can walk from one aircraft
18 to another cargo aircraft to at least oversee
19 your employees?
20     A.    Yes.
21     Q.    And were there occasions when
22 because of work demands that you may have to
23 schedule the meal breaks beyond the fifth hour?
24     A.    It might happen sometimes, but it
25 would be more so -- being that they're cargo

EXHIBIT 5 - 128

JOSE A. SALCEDO GARCIA                                                JOB NO. 591520
MAY 05, 2023

Page 54

1    Q.    Right.  Right.  Were there instances
2  where you see late meal breaks on the time
3  records where you did not make modifications to
4  the time records of your employees?
5    A.    No, because I'm always a -- like,
6  I'm always accountable of what the guys -- so I
7  know -- I'm already aware if an employee wasn't
8  able to take a break.
9         So at the end of the shift I know I
10 have to go in there and adjust this employee
11 because he didn't take a break or he went on
12 break late, stuff like that.
13        So, I mean, I've never -- we have
14 always kept them up to par.  So we check them
15 daily.
16   Q.    All right.  As far as you know,
17 whenever you see a late meal break in the time
18 records you would always make modifications to
19 the time records so that the employee could be
20 paid his meal penalty?
21   A.    No.  We don't modify.  We just add
22 the penalty --
23   Q.    Okay.
24   A.    -- to their card.
25   Q.    Okay.  I see.  Okay.  No changes on

Page 55

1  the time record --
2    A.    No, no, no.  We don't touch those.
3    Q.    -- you just put an entry --
4    A.    Yeah.  We don't touch anything,
5  we'll just add -- it's a pay code.
6    Q.    Yes.
7    A.    So we'll add the pay code to the
8  card which states "meal penalty," and then we
9  just add that it's an additional hour.
10   Q.    Okay.  Is the code MLB?
11   A.    It should be.
12   Q.    Okay.  Okay.  And when -- has an
13 employee ever come to you and said,
14 "Mr. Salcedo, I -- you know, I had a late meal
15 break, but look at my pay stub, and there's no
16 payment of a meal break penalty"?
17        Have you come across any concern
18 like that?
19   A.    No, sir.
20   Q.    Are you aware of anyone in your unit
21 who has not been paid a meal penalty?
22   A.    No, sir.
23   Q.    Have you been informed by anyone at
24 Menzies that no -- payment of meal penalty
25 should be reduced or limited?

Page 56

1    A.    No, sir.
2    Q.    Have you been informed by anyone at
3  Menzies that labor costs should be reduced and,
4  therefore, meal penalties should be strictly
5  evaluated?
6    A.    No.
7    Q.    Okay.  Do you receive any type of
8  discretionary or profit-sharing bonus from
9  Menzies?
10   A.    No.
11   Q.    Okay.  And do you have an
12 understanding of Menzies rest break policy?
13   A.    Yes.
14   Q.    And what is that understanding?
15   A.    The rest break, it's the break
16 before the fifth hour.  And then there's a --
17 I'm not exactly sure, but I know there's
18 15-minute breaks that they're supposed to have
19 throughout the shift.
20   Q.    Yes.  And how -- how do you provide
21 rest breaks to your employees?
22   A.    The 15-minute breaks?
23   Q.    The rest breaks, yes.
24   A.    Those are normally given, again,
25 within -- like, in between flights.  So say if

Page 57

1  we finish a flight and our next flight is in 45
2  minutes, they use that time to go to the
3  vending machines or restroom breaks, or
4  whatever they go to do in between them.  And
5  then once they come back, then we're waiting
6  again for the flight.
7    Q.    You said 15 minutes.  Is that the 15
8  minutes or 10-minute rest break?
9    A.    Most times it's 15.  A lot of times
10 they take more.  But it's somewhat downtime
11 between the flights.
12   Q.    Is -- okay.  Is the employer
13 required to ask your permission before taking a
14 rest break?
15   A.    Yes.
16   Q.    Other than you, is there anyone who
17 is authorized to give permission to the
18 employee for a rest break?
19   A.    The supervisor releases them.
20   Q.    Okay.  Is it your understanding that
21 if there's a failure to provide a rest break,
22 that Menzies' policy is to compensate that
23 employee for a payment of at least an hour of
24 compensation?
25   A.    For the 15-minute breaks?

EXHIBIT 5 - 129

JOSE A. SALCEDO GARCIA
MAY 05, 2023

JOB NO. 591520

Page 58

1    Q.    Is it your understanding that if
2  there is -- if the employee is not provided the
3  rest break, then Menzies' policy is to pay that
4  employee an extra hour of penalty?
5    A.    Yeah.
6    Q.    And have you authorized employees to
7  clock a one-hour penalty for missing a rest
8  break?
9    A.    Yeah.  We just went over that.
10  Yeah.
11    Q.    No, no.  We're talking about the
12  meal break, but this is -- I'm now asking about
13  the rest break.
14    A.    For the most part, they always take
15  their rest breaks.
16    Q.    Okay.  My question is -- I mean, you
17  know that meal breaks are different from rest
18  breaks; correct?
19    A.    Yeah.  Rest breaks are on the clock.
20    Q.    Yes.  Rest breaks --
21       MR. JACKSON:  Real quick.
22  Sorry to interrupt.  We've been going a little
23  over an hour now and I could use a restroom
24  break.  Whenever it's good for you I'd
25  appreciate a five-, ten-minute break.

Page 59

1       MR. SAYAS:  Sure.  Sure.  I'll
2  just have him -- I'll just have Mr. Salcedo
3  answer the question.  Okay.  Then we'll have a
4  break.
5  BY MR. SAYAS:
6    Q.    Do you have the question in mind,
7  Mr. Salcedo?
8    A.    Yeah.  Honestly, I wasn't aware of
9  that.
10    Q.    You were not aware of rest breaks?
11    A.    That the rest break has to pay them
12  an hour?  We always find a way to make their
13  rest breaks available.
14    Q.    Let me make sure before you take a
15  break.
16       You're not aware that if they missed
17  a rest break, the employee should be
18  compensated at Menzies for an extra hour of
19  penalty?
20    A.    Yeah.  I didn't know that.
21       MR. SAYAS:  Let's take a
22  ten-minute break.  We'll be -- let's be back at
23  2:35.
24       MR. JACKSON:  Sure.
25       MR. SAYAS:  Okay.  All right.

Page 60

1  Let's go off the record.
2       THE VIDEOGRAPHER:  The time is
3  2:17 p.m. Pacific time.  We're now off the
4  record.
5       (A recess was taken.)
6       THE VIDEOGRAPHER:  The time is
7  2:44 p.m. Pacific time.  We're now back on the
8  record.
9       MR. SAYAS:  Yeah.  Let's make
10  sure Kevin is in.
11       Kevin, are you here?
12       MR. JACKSON:  I'm in.  Thank
13  you.
14       MR. SAYAS:  Okay.  All right.
15  Okay.
16  BY MR. SAYAS:
17    Q.    Okay.  We're back on the record,
18  Mr. Salcedo.  Okay.  Sir, I remind you you're
19  still under oath.
20       But I'm going to follow up on your
21  testimony regarding your entry into Kronos to
22  allow payment of the meal penalty.
23       Do you remember that?
24    A.    Yes.
25    Q.    Okay.  And you made reference to the

Page 61

1  use of a code for the meal penalty?
2    A.    Yes.
3    Q.    And then you said yes to my
4  suggested code of MLB, which is what I found in
5  the records.  Okay.  Yes.
6       Other than inputting an MLB code, do
7  you do any -- do you make any annotations to
8  the Kronos' records?
9       So something like an explanation to
10  say why the employee is entitled to a meal
11  penalty?
12    A.    No, because on the Kronos it's
13  showing that they took their break after --
14  after the time they were supposed to take it.
15    Q.    Okay.  And are you saying that the
16  only input you have on that Kronos' system is
17  to put in that MLB code?
18    A.    The meal penalty code, yes.
19    Q.    Okay.  Have you ever received any
20  communication from anyone at Menzies saying
21  that the -- you should not have authorized a
22  meal penalty on any instance?
23    A.    No.
24    Q.    Okay.  Now, when you made the entry
25  of an MLB and you're making -- you didn't make

EXHIBIT 5 - 130

JOSE A. SALCEDO GARCIA                                    JOB NO. 591520
MAY 05, 2023



Page 66

```
1              - - -
2              (Thereupon, the deposition was
3    concluded at 2:51 p.m. PDT.  Signature was
4    waived.)
5              - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JOSE A. SALCEDO GARCIA
MAY 05, 2023

JOB NO. 591520

Page 67

```
1    COMMONWEALTH OF PENNSYLVANIA       )
                                        ) SS
2    COUNTY OF ALLEGHENY                )
3              CERTIFICATE
4      I, Alyssa A. Repsik, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
5    certify that the witness, JOSE A. SALCEDO
     GARCIA, was by me first duly sworn to testify
6    the truth, the whole truth, and nothing but the
     truth; that the foregoing deposition was taken
7    at the time and place stated herein; and that
     the said deposition was recorded
8    stenographically by me and then reduced to
     typewriting under my direction, and constitutes
9    a true record of the testimony given by said
     witness.
10
       I further certify that I am not a relative,
11   employee or attorney of any of the parties, or
     a relative or employee of either counsel, and
12   that I am in no way interested directly or
     indirectly in this action.
13
       IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office this 11th
     day of May 2023.
15
16
17
18   Alyssa A.  Repsik, Notary Public
     Court Reporter
19   Notary Public
     Allegheny County
20   My Commission Expires March 3, 2024
     Commission Number 129614
21
22
23
24
25
```

STENO.COM
(310) 573-8380

STENO.COM
(310) 573-8380

Pages  66..67

EXHIBIT 5 - 131

# EXHIBIT 6

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                        -   -   -
   DORA PATRICIA AMAYA, an         )Case No.:
4  individual; and BRAYAN         )2:22-cv-05915-MCS-MAR
   LOZANO GONZALEZ, an            )
5  individual; on behalf of       )
   themselves and others          )REMOTE VIDEOTAPED
6  similarly situated,            )DEPOSITION OF LIZETTE
                                  )MEDINA
7               Plaintiffs,        )
                                  )
8  Vs.                            )
                                  )
9  MENZIES AVIATION (USA),        )
   INC., a Delaware               )
10 Corporation; and DOES 1        )
   through 10, inclusive,         )
11                                )
                Defendants.
12

13

14                       -   -   -

15

16

17

18
       REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
19  WITHOUT AUTHORIZATION FROM THE CERTIFYING
    AGENCY
20

21

22

23

24

25

EXHIBIT 6 - 133

1    that I am not physically present in the

2    deposition room and that I will be reporting

3    this deposition remotely.

4          They further acknowledge that, in

5    lieu of an oath administered in person, the

6    witness will verbally declare her testimony in

7    this matter under penalty of perjury.

8          The parties and their counsel

9    consent to this arrangement and waive any

10   objections to this manner of reporting.  Please

11   indicate your agreement by stating your name

12   and your agreement on the record.

13          MR. SAYAS:  Joe Sayas, Jr.  I

14   agree.

15          MR. JACKSON:  Kevin Jackson.

16   I agree.

17          LIZETTE MEDINA, a Witness herein,

18   having been first duly sworn, was examined and

19   testified as follows:

20                   EXAMINATION

21   BY MR. SAYAS:

22       Q.    Good morning, Ms. Medina.

23       A.    Good morning.

24       Q.    Can you state your full name for the

25   record?

EXHIBIT 6 - 134

LIZETTE MEDINA                                                    JOB NO. 591517
MAY 03, 2023

```
 1        Q.    You mean to say that you let the
 2   team clean whatever number of airplanes they
 3   can clean on a cleaning shift?
 4        A.    It varies on the arrivals of the
 5   aircrafts.
 6        Q.    If there is a delayed arrival, that
 7   will reduce the number of airplanes they can
 8   clean on a given shift?
 9        A.    Yes.
10        Q.    If the airline is prompt, that will
11   maximize the number of airplanes that the team
12   can clean?
13        A.    Yes.
14        Q.    Do you have an understanding of
15   Menzies' no-break policy?
16        A.    Yes.
17        Q.    What's your understanding of
18   Menzies' no-break policy?
19        A.    They have to take their lunch break
20   before the five-hour mark.
21        Q.    Is it your understanding that meal
22   breaks should be at last 30 minutes?
23        A.    Yes.
24        Q.    It should be work-free or
25   uninterrupted by any work?
```

EXHIBIT 6 - 135

LIZETTE MEDINA                                                    JOB NO. 591517
MAY 03, 2023

1          A.     Yes.

2          Q.     How does your department provide

3     meal breaks to employees?

4          A.     The supervisor notifies the team.

5          Q.     When does the supervisor notify the

6     team?

7          A.     It varies.

8          Q.     The schedule that you mentioned

9     earlier, do those contain the schedule of the

10    meal breaks?

11         A.     Of the 30-minute meal breaks?

12         Q.     Yes.

13         A.     No.

14         Q.     Why is that?

15         A.     Because the arrival of the aircraft

16    varies.

17         Q.     It would be difficult for you to set

18    a schedule for meal breaks, given that

19    condition?

20         A.     Yes.

21         Q.     The manner of determining when meal

22    breaks will be taken, is that something that's

23    up to the supervisor?

24         A.     And myself when I'm on shift.

25         Q.     How do you determine when meal

EXHIBIT 6 - 136

LIZETTE MEDINA                                                    JOB NO. 591517
MAY 03, 2023

1     breaks should be taken?

2          A.     The arrival of the aircraft.

3          Q.     Let's give an example.  Say a shift

4     starts at 1 p.m. and they're assigned on a

5     particular airline, how do you determine when

6     the meal break of each team should be taken?

7          A.     We make sure it's met before the

8     five-hour mark.

9          Q.     You would schedule a meal break, in

10    my example, before 6 p.m.

11                Is that your practice?

12         A.     That is correct.

13         Q.     Have there been occasions when,

14    because of either changes in flight arrivals or

15    flight departures, that you're not able to set

16    a meal break schedule within the fifth hour?

17         A.     It varies.

18         Q.     Have there been occasions that you

19    have not been able to schedule a meal break

20    within the first five hours?

21         A.     Not that I can recall.

22         Q.     You're saying you don't recall you

23    giving a schedule beyond the fifth hour of any

24    time?

25         A.     No.  We typically make it a goal for

EXHIBIT 6 - 137

LIZETTE MEDINA                                              JOB NO. 591517
MAY 03, 2023

1    them to take it before the five hours.

2        Q.    At no time did you ever schedule a

3    meal break beyond the fifth hour?

4        A.    Not that I recall.

5        Q.    Other than you, it's your

6    supervisors that can set a meal break schedule,

7    correct?

8        A.    Correct.

9        Q.    Have there been occasions when any

10   of your supervisors failed to set a meal break

11   schedule within the first five hours?

12              MR. JACKSON:   Objection.

13   Calls for speculation.

14              THE WITNESS:   It varies on the

15   operation.   It always varies on the flight

16   arrival.

17   BY MR. SAYAS:

18       Q.    I understand it varies.

19              Have there been occasions, that you

20   know of, when, supervisors scheduled meal

21   breaks beyond the fifth hour?

22       A.    No.

23       Q.    In my example, the shift starts at

24   1 p.m.  You're not aware of any scheduling by

25   you or any of your supervisors beyond the fifth

EXHIBIT 6 - 138

 1        Q.    Exhibit 7 that we're looking at,

 2   other than the uses you've already said, it's

 3   been used to allow a request by employees for

 4   payment of penalty or when the employees forget

 5   to punch in their times.

 6             Is there any other use for this

 7   Missed Punch form?

 8        A.    No.

 9        Q.    Are you aware of the policy at

10   Menzies with respect to rest breaks?

11        A.    Yes.

12        Q.    What's your understanding of that

13   rest-break policy at Menzies?

14        A.    Employees are required two

15   ten-minute rest breaks besides their 30-minute

16   meal break.

17        Q.    That's two ten-minute work-free rest

18   break for an ordinary eight-hour shift,

19   correct?

20        A.    Correct.

21        Q.    Is it your understanding that if

22   Menzies failed to provide the two rest breaks,

23   that the employee is entitled to the payment of

24   an extra hour of penalty; is that correct?

25        A.    Correct.   I've never encountered

EXHIBIT 6 - 139

LIZETTE MEDINA                                              JOB NO. 591517
MAY 03, 2023

1    where they didn't take rest breaks.  I've never

2    had to deal with that personally.

3         Q.    Has anybody informed you that he or

4    she had not taken their rest breaks?

5         A.    No.

6         Q.    Have you used a Missed Punch Form

7    for the purposes of paying a rest break

8    penalty?

9         A.    No.

10        Q.    Have you, yourself, gathered your

11   employees in a meeting and informed them that

12   they have the right to a rest break?

13        A.    No, because they're aware.

14              MR. SAYAS:  Move to strike.

15   Calls for speculation.

16   BY MR. SAYAS:

17        Q.    Have you or anyone at your

18   department met with the cabin-cleaning

19   employees and informed them of the their right

20   to be paid an extra hour of penalty if they did

21   not take their required rest break?

22        A.    No.

23        Q.    Have you or anyone from your

24   department met with the cabin-cleaning

25   employees to tell them that the Missed Punch

EXHIBIT 6 - 140

1    COMMONWEALTH OF PENNSYLVANIA        )
                                        ) SS
2    COUNTY OF ALLEGHENY                 )

3                    CERTIFICATE

4        I, Katie Wilkerson, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
5    certify that the witness, LIZETTE MEDINA, was
     by me first duly sworn to testify the truth,
6    the whole truth, and nothing but the truth;
     that the foregoing deposition was taken at the
7    time and place stated herein; and that the said
     deposition was recorded stenographically by me
8    and then reduced to typewriting under my
     direction, and constitutes a true record of the
9    testimony given by said witness.

10       I further certify that the inspection,
     reading and signing of said deposition were
11   waived by counsel for the respective parties
     and by the witness.

12
         I further certify that I am not a
13   relative, employee or attorney of any of the
     parties, or a relative or employee of either
14   counsel, and that I am in no way interested
     directly or indirectly in this action.

15
         IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my seal of office this 9th day
     of May, 2023.

17

18           Katie Wilkerson, Notary Public
19                Professional Reporter
                    STENO.COM
                  (310) 573-8380
20       My Commission Expires February 14, 2026

21

22

23

24

25

EXHIBIT 6 - 141

# EXHIBIT 7

DAVID FUNES                                                    JOB NO. 591519
MAY 05, 2023

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                       -  -  -
       DORA PATRICIA AMAYA, an    ) CIVIL DIVISION
 4     individual; and BRAYAN     )
       LOZANO GONZALEZ, an        ) Case No.:
 5     individual; on behalf      ) 2:22-cv-05915-MCS-MAR
       of themselves and          )
 6     others similarly           )
       situated,                  )
 7                                )
 8              Plaintiffs,        )
                                  )
 9        -vs-                     )
                                  )
10     MENZIES AVIATION (USA),    )
       INC., a Delaware           )
11     corporation; and DOES 1    )
       through 10, inclusive,     )
12                                )
                Defendants.        )
13
                       -  -  -
14           REMOTE VIDEOTAPED DEPOSITION OF

15     DAVID FUNES, located in California, commencing

16     at 9:02 A.M. PDT, on Friday, May 5, 2023,

17     before ALYSSA A. REPSIK, Court Reporter and

18     Notary Public in and for the Commonwealth of

19     Pennsylvania.

20                        STENO.COM
                          (310) 573-8380
21

22

23

24

25
```

EXHIBIT 7 - 143

Page 6

1  agree.
2              DAVID FUNES, a witness herein,
3  having been first duly sworn, was examined and
4  testified as follows:
5              THE REPORTER:  Counsel, you
6  may begin.
7              MR. SAYAS:  Thank you.
8                  EXAMINATION
9  BY MR. SAYAS:
10     Q.    Can you state your full name for the
11  record, sir?
12     A.    It's Dave F-U-N-E-S.
13     Q.    Okay.  And are you currently
14  employed, Mr. Funes?
15     A.    Yes.
16     Q.    Okay.  And who's your employer?
17     A.    It's -- employed by Menzies
18  Aviation.
19     Q.    Is that Menzies Aviation, USA, Inc.?
20     A.    It's Menzies Aviation, USA, Inc.,
21  yeah.
22     Q.    And for purposes of my questioning,
23  I will simply refer to your employer as
24  "Menzies" for efficiency purposes.
25              Is that okay?

Page 7

1     A.    Yes.
2     Q.    And have you been deposed before?
3     A.    No.
4     Q.    This is -- this is -- you're
5  represented by counsel today?
6     A.    Yes.
7     Q.    Okay.  I'm sure you may have had an
8  opportunity to discuss it with counsel, but the
9  only instruction that I will give you is that
10  this deposition has the same solemnity and
11  effect as if it were taken in a court of law,
12  and all your answers to my questions are taken
13  under penalty of perjury.  That oath you've
14  taken before our court reporter, that's the
15  same oath you take in a court of law.
16              So my request is to give your best
17  testimony today.  And is there any reason why
18  we cannot proceed with the deposition this
19  morning?
20     A.    No reason.
21     Q.    And what's your position with
22  Menzies at the present time?
23     A.    Present time I am the cargo
24  operation manager of Menzies LAX.
25     Q.    I'm not sure whether you're close

Page 8

1  enough to your computer.  I'm hearing kind of
2  like a muffled sound here a little bit.  I want
3  to see and hear you clearly.
4     A.    Is that better?
5     Q.    That's better.  Thank you.  Thank
6  you.
7              And what are your duties as cargo
8  operations manager?
9     A.    As a cargo operation manager, I
10  handle the business side of Menzies related to
11  cargo operations.
12     Q.    And what does cargo operations
13  consist of?
14     A.    Consist of a -- handling the
15  operation for two customers that we have in
16  LAX, and that is the whole side of import and
17  export of cargo to the LAX airport.
18     Q.    Okay.  You mentioned two customers.
19  I want to make sure I'm -- I get it correctly.
20              You say the import and export of
21  cargo.  Is that --
22     A.    Correct.
23     Q.    And the other one is -- the second
24  one is LAX?
25     A.    Correct.

Page 9

1     Q.    Okay.  What is -- can you describe
2  for me what import/export cargo entails?
3     A.    So what import cargo is, it's
4  related to the cargo that arrives to the U.S.
5  and you will have to break it down, right.
6              And when it comes -- the opposite
7  will be the import would be export it, which is
8  build up and send the cargo off overseas.
9              So when it comes in we determine
10  what would be import, and when it leaves it's
11  export.
12     Q.    Okay.  Okay.  And when you say
13  "customer," are you talking about airline
14  customers?
15     A.    Correct.  We are currently handling
16  two airline customers, and recently we acquired
17  one more airline customers that we're going to
18  start providing services to.
19              So to answer the question, yes, I'm
20  referring to our airline customers.
21     Q.    Okay.  And what are these airline
22  customers?
23     A.    So the airline customers are Qatar
24  and Air China, and very recently it's Amerijet.
25     Q.    So there's a total of three

EXHIBIT 7 - 144

DAVID FUNES                                        JOB NO. 591519
MAY 05, 2023

Page 46

1  requirement associated with it, but you also
2  mentioned another phase, which is delivering
3  cargo.
4           Is there a separate time requirement
5  for that?
6       A.    Absolutely.  The answer to your
7  question is yes.
8       Q.    And what is the time requirement for
9  that?
10      A.    When -- when cargo arrive to LAX we
11 have a number of hours given to us to have it
12 ready for the customer.  Every customer will
13 require to receive that cargo within eight
14 hours.  When the flight landed and park, after
15 offloading you have eight hours.
16          Eight hours to break down the
17 pallet, and the customer will send the drivers
18 to pick up the goods that you broke down.
19      Q.    Okay.  And who -- who determined
20 that eight-hour requirement?
21      A.    It's determined by the SLA, the
22 service-level agreement that we have with the
23 airlines.  And the two airlines we have
24 agreed -- with Amerijet we don't do any of
25 that, but with Air China and with Qatar we had

Page 47

1  agreed, our commercial manager have agreed to
2  an SLA, the SLA to break down cargo is eight
3  hours.
4       Q.    Is there any consequence to Menzies
5  if, for any reason, irrespective of the fault
6  of Menzies, the eight-hour time requirement is
7  not met?
8       A.    I am not fully aware of the
9  consequences financially, but I know that we --
10 this is how we -- we review our KPIs how long
11 it takes us to break down a pallet.
12          The consequences of not meeting the
13 SLA will be, obviously, documented and will
14 affect our SLA KPIs.
15      Q.    What are KPIs?
16      A.    It's how you rate your performance.
17 Performance factors that affect your KPI will
18 be not made in the SLA, and that will be one of
19 the reasons not meeting the -- not breaking
20 down a pallet within eight hours.
21      Q.    Are those -- are KPIs some sort of a
22 standard or metrics for a performance?
23      A.    Metrics for performance.  That's
24 what they are.
25      Q.    Does KPI stand for anything?

Page 48

1       A.    We call it KPIs, but I'm not fully
2  aware of what it stands for.  But that -- what
3  I know of that we need to ensure that the SLAs
4  are met.
5       Q.    Okay.  I'll just guess that the "I"
6  there will be index, but I'm just guessing,
7  Mr. Funes?
8       A.    Okay.
9       Q.    Yes.  Okay.  So other than the
10 delivery of cargo, the buildup of cargo, and
11 the time to accept cargo, is there any other
12 time requirement that you're -- you follow
13 within the cargo operations unit?
14      A.    No.
15      Q.    If -- are you familiar with Menzies'
16 policy on meal breaks for nonexempt employees?
17      A.    Yes.
18      Q.    By the way, when I say "employees,"
19 I'm -- I would refer to employees as nonexempt
20 employees, and those employees, at least --
21 exclusively under your supervision or within
22 the cargo operations department.
23          Is that okay?
24      A.    Yes.
25      Q.    Okay.

Page 49

1       A.    Yeah.
2       Q.    Yes.  And what's your understanding
3  of Menzies' policy with respect to providing
4  meal breaks to employees?
5       A.    So just to correct the record, I do
6  have the managers who are coordinating the
7  operations assigning rest breaks and lunch
8  breaks.
9           That's something that's not --
10 though I'm familiar with the policy, you asked
11 me --
12      Q.    Yeah?
13      A.    -- if I'm familiar.  It's not -- I'm
14 not assigning that on a daily basis.  That's
15 not really the scope of my duties.
16          But I'm fully aware of the policy
17 which is for hourly employees that a certain
18 number of hour that you work, you're entitled
19 to have a rest break or a lunch break.
20      Q.    Okay.  And that meal -- meal period
21 or meal break should be provided within the
22 first five hours of work; correct?
23      A.    Right.  Any -- any -- if you work
24 more than five hours, you're entitled to a
25 30-minute unpaid break.  And we call it lunch

EXHIBIT 7 - 145

DAVID FUNES                                                      JOB NO. 591519
MAY 05, 2023

Page 50

1  breaks, yes.
2      Q.   Okay.  And that meal break should be
3  duty-free and uninterrupted; right?
4      A.   Absolutely.  Yes.
5      Q.   Okay.  Now, is -- I understand the
6  scope of your actual responsibilities, but is
7  it the responsibility of duty managers to see
8  if meal breaks are provided to employees?
9      A.   Yes, duty managers are.
10     Q.   And -- okay.  Do your duty managers
11 set schedules?  Let's begin with work
12 schedules, the beginning of the shifts of the
13 employees and the end of their shifts?
14     A.   Yes.  The -- all the schedules are
15 posted in the warehouse for cargo agents and
16 for cargo handlers.  The managers have that
17 access as well.  Yeah.
18     Q.   Okay.  And aside from posting the
19 schedules on the -- you said on the walls or
20 bulletin boards?
21     A.   We have, yes, but we have a system
22 called Kronos where all the schedules are
23 posted.
24     Q.   Okay.  And the schedules, do they
25 also contain the schedules for employee meal

Page 51

1  breaks?
2      A.   In every shift I'm fully aware that
3  the managers assign the lunch break based on
4  the number of hours they work.
5          Our employees work eight hours, so
6  employees are aware of what time to take their
7  lunch breaks, yes.
8      Q.   Okay.  The time that they're
9  supposed to take the meal breaks, that's part
10 of the schedules given to employees; is that
11 correct?
12     A.   Yes.
13     Q.   Okay.  And how often are they
14 noticed or notified of their meal break
15 schedules?
16         Are they notified of it on a weekly
17 basis or on a daily basis?
18     A.   All depends, but our hours, at least
19 an employee is working eight hours.  We don't
20 have part-timers, and they know exactly the
21 time to take the lunch break.
22         If it varies, their managers have
23 full control to move that -- that lunch break
24 probably five minutes later or five minutes.
25 But everybody just follow the lunch break

Page 52

1  that's given from the manager.
2      Q.   What I'm asking, Mr. Funes, is --
3      A.   Yeah.
4      Q.   -- basically, if the -- these meal
5  break schedules, were they given daily in
6  advance or weekly in advance or --
7      A.   They given -- the schedule that you
8  work is given to you and also your lunch break.
9  So it's given -- it's posted so they know every
10 shift what time they need to go to lunch
11 breaks, yeah.
12     Q.   Okay.  And are those schedules
13 weekly schedules or daily schedules?
14     A.   For us, in the current basis that
15 we're in, we put in the schedules.  It hasn't
16 changed for -- same schedule for six months.
17 Has not changed at all.
18     Q.   Okay.
19     A.   So --
20     Q.   Okay.  And the meal break schedules
21 have not changed also?
22     A.   Have not changed.  And if it changes
23 on the daily basis, they communicate -- the
24 duty manager who has full control of this lunch
25 break assign them to this employee.

Page 53

1      Q.   Okay.  And whatever the meal period
2  schedules are provided in those schedules we're
3  talking about, do you know whether employees
4  were aptly able to take their meal breaks at
5  the scheduled times?
6          MR. JACKSON:  Objection.
7          THE WITNESS:  I wouldn't be
8  able to answer that.  Yeah.
9  BY MR. SAYAS:
10     Q.   Okay.  And who would be able to
11 answer that question?
12     A.   The shift managers who overseeing
13 the meal -- the meal, in this case, schedule
14 for that given day.
15     Q.   And those would be one of the five
16 duty managers?
17     A.   That they report to, correct.
18     Q.   Okay.  And by the way, do you have
19 authority to hire employees as an operations
20 manager?
21     A.   Do I have authority?  Yes, I do have
22 authority.
23     Q.   Okay.  And in addition to having the
24 authority to hire employees, do you also have
25 the authority to fire or terminate employees?

EXHIBIT 7 - 146

DAVID FUNES                                                    JOB NO. 591519
MAY 05, 2023

Page 82

1    Q.    Only the -- one of the five duty
2  managers?
3    A.    Only the five duty managers.  Yes.
4  Correct.
5    Q.    What are the standards used by your
6  duty managers in the handling of these requests
7  for meal penalties?
8    A.    The standards as to LOP, out --
9    Q.    Whether they accept it or deny it?
10   A.    Oh.  The manager who is fully in
11  control of the schedules, because they get
12  posted, they will determine whether or not you
13  missed a meal, which rarely happens for in the
14  cargo business.  They will have to meet with
15  the employee and fill this out.
16         If the -- if the employee would miss
17  a meal, we have to complete that with the
18  manager on duty.  That is -- and this is what
19  is -- and once you sign it, you will have to
20  send it to HR to finish out the process, yeah.
21   Q.    Who sends it the HR to finish out
22  the process?
23   A.    Either manager will have to scan it
24  or bring the original hard copy to Emma.
25   Q.    Okay.

Page 83

1    A.    Our timekeeper.
2    Q.    Yes.  Okay.  And the -- okay.
3         So once the manager gives the form
4  to Emma, scans it, does the manager also send
5  it to -- send a scanned copy to payroll?
6    A.    For us -- sorry.  For us, Emma, our
7  timekeeper that's in payroll, payroll
8  timekeeping, that would be Emma's scope of
9  duties, I believe.
10   Q.    Okay.  Okay.  Other than sending it
11  to Emma, does the manager -- is the manager
12  required to send it to anybody else?
13   A.    No.
14   Q.    Have you been informed of instances
15  when request for meal penalties are denied?
16   A.    No, I have not been informed, not
17  that I'm aware of.
18   Q.    Are you aware of complaints from
19  employees of not being paid on their request
20  for meal penalties?
21   A.    Not that I'm aware of since being
22  with cargo.
23   Q.    Are you aware of instances when
24  employees took their meal breaks beyond the
25  fifth hour and were not paid meal penalties?

Page 84

1    A.    No, not that I'm -- not that I'm
2  aware of.
3    Q.    And have you been aware of instances
4  when employees missed their meal breaks in
5  the -- during the entire shift and were not
6  paid meal penalties?
7    A.    Not that I'm aware of.
8    Q.    Have you been made aware of
9  instances when employees have been interrupted
10  in their meal breaks?
11   A.    Not that I'm aware of.  I -- no.
12  The answer -- the short answer is no.
13   Q.    The reports, the Kronos' reports
14  that you said you have received, are those
15  reports similarly received by your duty
16  managers?
17   A.    The managers receive this report and
18  I'm a CC on those E-mails for those reports
19  that they send to the DMs, yes.
20   Q.    I see.  I see.  Okay.  Have you,
21  yourself, reviewed those reports?
22   A.    I will be a point of escalation for
23  the timekeepers or Emma.  The managers are
24  trained to sort it out at their discrepancy.
25  In this instance, a missed punch, the employee

Page 85

1  have to do it.
2         And I will be serving as an
3  escalation point in case their manager is not
4  following up with employees.  I will get with
5  the manager to ensure the missed punch get
6  sorted out before payroll ends.
7    Q.    I see.  And have you -- have you
8  been informed by any employee about any -- any
9  missed or late meal break that --
10   A.    No.
11   Q.    -- he or --
12   A.    No.
13   Q.    Okay.  Now, in looking at Exhibit 7,
14  are you aware of any other use or uses for this
15  Missed Punch Form?
16   A.    No.  No.
17   Q.    Okay.  Does your department keep a
18  copy of missed punch forms that have been
19  signed by both the employee and the manager?
20   A.    All the managers, they have folders
21  where they keep briefings, statements, forms.
22  Other managers keep a file that is located in
23  the office where they can sort one of these
24  forms.
25         But in order to -- that would be a

EXHIBIT 7 - 147

DAVID FUNES                                                JOB NO. 591519
MAY 05, 2023

---

Page 94

1      Q.    What about 2021?
2      A.    It was one of the best years for
3  cargo.
4      Q.    Okay.  I see.
5      A.    That means more volumes.  That means
6  more employees.  Yes.
7      Q.    And relatively more cargo handler
8  employees you had?
9      A.    More cargo handlers, correct.
10  That's correct.
11      Q.    Do you have an estimate of how many,
12  approximately, in 2021?
13      A.    All together, office, warehouse
14  managers, more managers I have under my scope
15  of duties, 236 employees.
16      Q.    Okay.  And what about the year 2020?
17  Are those relatively the same?
18      A.    Relatively the same, yes.
19      Q.    Same as 2021; right?
20      A.    Yes, roughly the same.  After 2022
21  they've been declining dramatically, as I
22  mentioned to you.  80, 89.  I believe, 84.
23      Q.    Okay.  What about the year 2019?
24      A.    I wasn't -- my role with Menzies was
25  a key account manager for passenger service --

---

Page 95

1      Q.    Yeah.  I see.
2      A.    -- for Norwegian airline.  Yep.  I
3  wouldn't be able to give you an exact number at
4  that time.
5      Q.    Okay.  Okay.  Now, looking again at
6  the Exhibit 7, okay, I already talked about
7  filling these forms from whenever an employee
8  requests a meal penalty or whenever an employee
9  misses punching in for a clock-in or a
10  clock-out procedure.
11      Having discussed that, do you know
12  of any other reason for using Exhibit 7?
13      A.    No.
14      Q.    Okay.  Are you familiar with rest
15  periods?
16      A.    If I'm -- am I familiar?  Yes, I am.
17      Q.    Okay.  Tell me what your
18  understanding is of Menzies' policy on rest
19  periods.
20      A.    When it comes to rest periods you --
21  when the employee worked four hours you
22  entitled to a ten-minute rest period every four
23  hours.
24      Q.    So in an eight-hour shift the
25  employee would be entitled to two ten-minute

---

Page 96

1  rest periods?
2      A.    Yeah.  So in the cargo world, I
3  mean, you work eight hours.  You entitled to
4  two ten rest periods, ten-minute breaks, and
5  one 30-minute lunch break.
6      Q.    And unlike meal periods, rest
7  periods are paid; correct?
8      A.    Correct.  They're ten minutes paid
9  rest periods; correct.
10      Q.    Okay.  And if there's a -- 12-hour
11  shift and that employee would be entitled to
12  three rest breaks; correct?
13      A.    Yeah.  Correct.  At least that's my
14  understanding of the policy, but with cargo we
15  work eight hours.  That's what we deal with.
16  Yes.
17      Q.    I see.  And have you used -- have
18  you or any of your managers used Exhibit 7, the
19  Missed Punch Form, to -- well, let me strike
20  that for a second.  Let me ask you this.
21      If the employee is not provided with
22  the required rest breaks, is it the policy of
23  Menzies to pay an extra hour of penalty or
24  compensation?
25      A.    Yeah.  I wouldn't be able to answer

---

Page 97

1  your question because, with Menzies, all these
2  rest periods are given during briefings.  They
3  know exactly when to take it, so...
4      Q.    Okay.  Yeah.  And --
5      A.    There's never a time that they miss
6  it because it doesn't happen with cargo.
7      Q.    Right.  I'm just going to ask you.
8  As a manager --
9      A.    Yeah.
10      Q.    -- your understanding of the
11  payments not -- as part of the policy, whether
12  is -- is it your understanding that it is
13  Menzies' policy to pay whenever there's a
14  missed rest break?
15      MR. JACKSON:  Objection.
16  Calls for speculation.  Calls for a legal
17  conclusion.
18      You can answer.
19      THE WITNESS:  I just -- the
20  thing that I know about the policies is you
21  work four hours.  You can take a ten.  It's a
22  rest period.
23  BY MR. SAYAS:
24      Q.    Right.
25      A.    Not sure when you miss it because we

---

EXHIBIT 7 - 148

DAVID FUNES                                                JOB NO. 591519
MAY 05, 2023

Page 98

1    don't have any instances when they miss it.
2         Q.   Yes.  I'm not asking you about the
3    break.  I'm just asking you for your
4    understanding of the policy --
5         A.   You have to take it.
6         Q.   -- whether --
7         A.   It's not negotiable.  You work four
8    hours, you take a ten.
9         Q.   Okay.  Are you saying that all
10   employees at -- all the employees have been
11   provided the required ten-minute rest breaks at
12   Menzies?
13        A.   At Menzies or at cargo?
14        Q.   Cargo.  More specifically, cargo.
15   Yes.  Thank you.
16        A.   Yes.
17        Q.   Okay.
18        A.   The shift briefing has the
19   ten-minute break, and they sign it off.
20        Q.   Okay.  Are you aware of any
21   compensation that is paid to any employee at
22   Menzies if they are not provided the rest
23   breaks?
24        A.   Yes.
25             MR. JACKSON:  Objection.

Page 99

1    Calls for speculation.  Calls for legal
2    conclusion.
3              You can answer.
4              THE WITNESS:  I won't be able
5    to answer that.
6    BY MR. SAYAS:
7         Q.   Okay.  Has anyone requested the
8    payment of compensation for missing a rest
9    break?
10             MR. JACKSON:  Objection.
11   Calls for speculation.
12   BY MR. SAYAS:
13        Q.   I'm talking about cargo.
14        A.   For cargo?  No.  Not that I'm aware
15   of.
16        Q.   Okay.  And do you know if any of
17   your duty managers has used Exhibit 7 or a
18   Missed Punch Form in determining whether an
19   employee at cargo is entitled to one hour of
20   compensation for missing a rest period?
21             MR. JACKSON:  Objection --
22             THE WITNESS:  Not that I know
23   of.
24             MR. JACKSON:  Dave, just give
25   me a second to get my objections in.  Okay?

Page 100

1    You're doing great, but just give me a beat so
2    we can have a clean record for Alyssa.
3              So that was objection.  Calls for
4    speculation.  And you can answer.
5              THE WITNESS:  No.
6    BY MR. SAYAS:
7         Q.   Okay.  Is that no, you don't know?
8         A.   I just don't know.
9         Q.   Okay.  All right.  Just to -- just
10   to leave this issue, Mr. Funes, are you aware
11   of any employee who has received compensation
12   at Menzies for any missed rest break?
13        A.   No.
14             MR. JACKSON:  Objection.
15   Calls for speculation.
16   BY MR. SAYAS:
17        Q.   You can answer, subject to counsel's
18   objection.
19             You can answer, Mr. Funes.
20        A.   Yeah.  I'm not aware of.
21        Q.   Okay.  And just a little
22   clarification on the work performed by your
23   cargo handlers.
24             For the entire duration of their
25   shift they work simply inside the warehouse?

Page 101

1         A.   Yes.  Inside the warehouse.  Yes.
2         Q.   And is that true also for your cargo
3    agents?
4         A.   They work in the office.  Yes.
5         Q.   Do any of your cargo employees, do
6    they participate in a group chat, telephone
7    chat?
8         A.   Not that I'm aware of.
9         Q.   Has any employee in your cargo
10   department ever informed you that he or she had
11   received instructions utilizing -- I say
12   instructions, I'm talking about work
13   instructions received through participation in
14   that group chat?
15        A.   No.
16        Q.   Do you know if the employees,
17   meaning cargo handlers, cargo agents, your
18   supervisors and lead, do they communicate with
19   each other using text messages?
20             MR. JACKSON:  Objection.
21   Calls for speculation.
22             You can answer, Dave.
23             THE WITNESS:  Okay.  The
24   employees are given a two-way radio in cargo,
25   and also the -- any electronic devices they

EXHIBIT 7 - 149

DAVID FUNES                                                                    JOB NO. 591519
MAY 05, 2023



```
                                                         Page 110
 1    COMMONWEALTH OF PENNSYLVANIA        )
                                          ) SS
 2    COUNTY OF ALLEGHENY                 )
 3                   CERTIFICATE
 4      I, Alyssa A. Repsik, a notary public in and
      for the Commonwealth of Pennsylvania, do hereby
 5    certify that the witness, DAVID FUNES, was by
      me first duly sworn to testify the truth, the
 6    whole truth, and nothing but the truth; that
      the foregoing deposition was taken at the time
 7    and place stated herein; and that the said
      deposition was recorded stenographically by me
 8    and then reduced to typewriting under my
      direction, and constitutes a true record of the
 9    testimony given by said witness.
10      I further certify that I am not a relative,
      employee or attorney of any of the parties, or
11    a relative or employee of counsel, and
      that I am in no way interested directly or
12    indirectly in this action.
13      IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office this 11th
14    day of May 2023.
15
16
17           Alyssa A.  Repsik, Notary Public
             Court Reporter
18           Notary Public
             Allegheny County
19           My Commission Expires March 3, 2024
             Commission Number 129614
20
21
22
23
24
25
```

JOB NO. 591519

STENO.COM
(310) 573-8380

EXHIBIT 7 - 150

# EXHIBIT 8



# EMPLOYEE HANDBOOK

## California

Employee Handbook (California) | v1/Rev 1 |   © Menzies Aviation 2018

EXHIBIT 8  - 152

MENZIES_000295

## TABLE OF CONTENTS

1.1 Purposes Of This Handbook ........................................................................................................ 4

1.2 Company Values ......................................................................................................................... 4

2.1 Employment-At-Will ..................................................................................................................... 5

2.2 Introductory Period ...................................................................................................................... 5

2.3 Employment Eligibility Verification ............................................................................................... 5

2.4 Equal Employment Opportunity ................................................................................................... 5

2.5 Zero Tolerance For Discrimination And Harassment .................................................................. 6

2.6 Reasonable Accommodation ....................................................................................................... 8

2.7 Open Door Policy ......................................................................................................................... 8

2.8 Safety Policy ................................................................................................................................ 8

2.9 Security Policy ............................................................................................................................. 9

2.10 Use Of Electronic Devices ....................................................................................................... 10

2.11 Training .................................................................................................................................... 10

2.12 Railway Labor Act Notice ........................................................................................................ 11

3.1 Part-Time and Full-Time Employees ......................................................................................... 12

3.2 Exempt And Non-Exempt Employees ....................................................................................... 12

3.3 Working Hours and Days ........................................................................................................... 12

3.4 Meal Periods ............................................................................................................................. 12

3.5 Rest Periods .............................................................................................................................. 13

3.6 Employee Rest .......................................................................................................................... 13

3.7 Overtime .................................................................................................................................... 14

3.8 Transfers and Promotions ......................................................................................................... 14

3.9 Payroll Schedules ..................................................................................................................... 15

3.10 Employee Pay .......................................................................................................................... 15

3.11 Personnel Records .................................................................................................................. 15

4.1 Code of Conduct ....................................................................................................................... 16

4.2 Progressive Discipline ............................................................................................................... 17

4.3 Attendance ................................................................................................................................ 18

4.4 Alcohol and Drug Abuse ........................................................................................................... 18

4.5 Uniform Attire & Appearance .................................................................................................... 20

4.6 Conflict of Interest ..................................................................................................................... 21

5.1 Health And Welfare Benefit Plan .............................................................................................. 22



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

5.2 Eligibility ........................................................................................................ 22

5.3 Benefit Election Period ...................................................................................... 22

5.4 COBRA ............................................................................................................ 23

5.5 Vacation, Sick Leave And Paid Time Off ............................................................. 23

5.6 Family and Medical Leave Act ............................................................................ 23

5.7 Pregnancy Disability Leave ................................................................................. 25

5.8 Bereavement Leave ........................................................................................... 26

5.9 Military Leave .................................................................................................... 26

5.10 Voting Time Off ............................................................................................... 26

5.11 Time Off For School Activities .......................................................................... 26

5.12 Workers' Compensation ................................................................................... 27

6.1 Internet Use ...................................................................................................... 28

6.2 E-Mail Use ........................................................................................................ 29

6.3 Voice Mail ......................................................................................................... 29

6.4 Monitoring Of Email And Internet Usage ............................................................ 29

6.5 Use Of Company Property .................................................................................. 29

6.6 Confidential Information Security ........................................................................ 30

6.7 Non-Solicitation/Disclosure ............................................................................... 31

6.8 Bulletin Board ................................................................................................... 31

6.9 Travel ............................................................................................................... 31

6.10 Claiming Business Expenses ............................................................................. 31

6.11 Personal Belongings ........................................................................................ 31

6.12 Media Communications .................................................................................... 32

7.1 Resignation, Termination and Layoff .................................................................. 32

7.2 Exit Interview .................................................................................................... 32

7.3 Terminations ..................................................................................................... 32

7.4 Layoff ............................................................................................................... 32

7.5 Final Paycheck .................................................................................................. 32

7.6 Employment References ..................................................................................... 33



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

## SECTION 1 - INTRODUCTION

### 1.1 Purposes Of This Handbook

This Employee Handbook is intended to explain some of the key terms and conditions of employment on a non-exempt basis with the Menzies Aviation family of companies, which includes Menzies Aviation, Aeroground, ASIG and Simplicity (USA).  This version of the Employee Handbook supersedes all previously issued handbooks.

Every employee is expected to read this Employee Handbook carefully as it is a valuable reference for understanding your employment.  The Company reserves the right to revise, modify, delete, and/or add to any and all policies, procedures, work rules, or benefits stated in this Employee Handbook or in any other document.  No oral statements or representations can in any way alter the provisions of this Employee Handbook.  This Employee Handbook is not a contract of employment.

Not all Company policies and procedures are set out in this Employee Handbook.  We have summarized only some of the more important ones.  Additionally, if your employment is subject to a different contract setting forth terms and conditions of employment, in the event of a conflict between that contract and the provisions of this Employee Handbook, the contract will govern.  If you have any questions or concerns about this Employee Handbook or any other policy or procedure please ask your local Human Resources representative.

### 1.2 Company Values

**Spirit** is our way of doing business. It represents the core values that our employees must adhere to in doing their job. These values are:

**S**afety and Security
We take responsibility for the safety and security of ourselves, our customers, and our co-workers.

**P**assion
We work hard and enjoy our job, we do it to the best of our ability, and we put the customer at the heart of everything we do.

**I**nnovation
We encourage and reward ability and creativity, look for better ways to do our job, and have a "can do" attitude open to new ideas.

**R**eliability
We take pride in our work, we do it well, and we follow through on commitments to consistently deliver the best to our customers.

**I**ntegrity
We treat others with dignity and respect, we are trustworthy, and we act with high professional, moral, and ethical standards in supporting Company goals, values, and decision-making.

**T**eamwork
We participate and involve others in team efforts, we cooperate with others and share resources, we see things from the "other point" of view, and we take responsibility to fix mistakes so that they don't happen again.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

# SECTION 2 – GENERAL EMPLOYMENT POLICIES

## 2.1 Employment-At-Will

Employment with the Company is at-will, meaning that either you or the Company can terminate your employment at any time, with or without cause or notice. This policy of at-will employment is the sole and entire agreement between you and Company as to the duration of employment and the circumstances under which employment can be terminated.

Nothing in this Employee Handbook or any other Company policy alters or modifies the at-will nature of your employment.  This policy of at-will employment may not be modified orally or in writing by any individual or document other than by a written employment agreement signed by the Senior Vice President, Americas.  The Company's policy of at-will employment further allows it in its sole discretion to modify or change any terms or conditions of employment, including, but not limited to, assigning duties to employees outside their customary assignments.

## 2.2 Introductory Period

The first 90 days of employment are considered an Introductory Period. During this period, your supervisor will work with you to help you perform your job successfully. This period provides you with the opportunity to evaluate your job satisfaction and provides the Company with the opportunity to evaluate your performance. Employees who complete the Introductory Period are not automatically entitled to a salary increase, transfer, promotion, job reclassification, or continued employment.

## 2.3 Employment Eligibility Verification

U.S. immigration law prohibits employers from recruiting, hiring, or continuing to employ undocumented immigrants who are not eligible to work in the United States. The Immigration Reform and Control Act (IRCA) establishes employment eligibility verification procedures that all employers must follow when filling a job vacancy. IRCA also prohibits employers from discriminating in recruitment, hiring, or discharge on the basis of national origin or citizenship status.

The U.S. Citizenship and Immigration Services within the Department of Homeland Security administers and enforces regulations implementing IRCA's requirement that employers verify employees' legal authorization to work. Under the regulations, employers must obtain from each new employee certification of identity and authorization to work in the United States. If you are not legally authorized to work in the United States or become unauthorized, you must inform Human Resources immediately.

## 2.4 Equal Employment Opportunity

The Company is an equal opportunity employer and makes employment decisions exclusively on the basis of merit.  The Company prohibits unlawful discrimination based on race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, military or veteran status, marital status, medical condition, genetic information, sexual orientation, gender, gender expression or identity, or any other category protected by federal, state, or local law.  All such discrimination is unlawful and all individuals employed by Menzies Aviation are prohibited

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

from engaging in this type of conduct. The Company further will make all employment decisions, including but not limited to, recruitment, hiring, promotion, retention, compensation, training, discipline and termination of employment decisions without regard to any characteristic protected by federal, state or local law.

## 2.5 Zero Tolerance For Discrimination And Harassment

Pursuant to its policy of equal employment opportunity, the Company is committed to compliance with all applicable laws providing equal employment opportunities and has therefore adopted a policy of zero tolerance with respect to workplace discrimination and harassment. This policy of zero tolerance for discrimination and harassment applies to all individuals at every level of the Company's operations and prohibits harassment or discrimination against any employee whether or not the incidents occur on Company premises and whether or not the incidents occur during working hours. Supervisors, co-workers and third-parties with whom Company employees encounter through their job duties are prohibited from engaging in unlawful behavior under both federal law and the California Fair Employment and Housing Act ("FEHA").

**Sexual Harassment**
The Company's policy of zero tolerance for discrimination and harassment includes a zero tolerance policy with respect to unlawful sexual harassment. Sexual harassment is a form of unlawful sex discrimination that occurs when an employee is subject to unwelcome sexual attention or conduct affecting the terms or conditions of employment. Sexual harassment includes sexually oriented conduct which is sufficiently pervasive or severe and that unreasonably interferes with an employee's job performance or creates an intimidating, hostile, or offensive working environment. Examples of unlawful sexual harassment include unwanted sexual attention from co-workers of a persistent or offensive nature, promises to an employee to reward an employee if he or she complies with a sexually-oriented request or a threat of adverse treatment for refusing a sexually-oriented request, engaging in sexually suggestive and unwelcome behavior in the workplace, such as touching another employee, making sexually explicit commentary, leering or ogling at another employee, commenting inappropriately on a co-worker's physical appearance, displaying, storing, or transmitting pornographic or sexually oriented messages or materials in the workplace or using Company equipment or facilities to do so, making sexual or romantic advances toward an employee who has previously rejected such advances, and/or retaliating against an employee for reporting or threatening to report sexual harassment, or for participating in a Company investigation into an allegation of sexual harassment.

**Other Types Of Unlawful Harassment**
The Company's policy of zero tolerance for discrimination and harassment also includes a zero tolerance policy with respect to unlawful harassment on the basis of race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, veteran status, marital status, medical condition including genetic characteristics, sexual orientation, gender expression or identity, or any other category protected by federal, state, or local law. Such harassment may include behavior similar to unlawful sexual harassment, such as making threats or racially motivated slurs, epithets, derogatory jokes or commentary, displaying derogatory or offensive posters, photographs, cartoons or drawings, making offensive or racially-motivated gestures, and/or retaliation for reporting harassment or threatening to report harassment.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

**Employee Responsibilities**
You **must** immediately report, preferably in writing, every instance of perceived discrimination or harassment to your supervisor or Human Resources, regardless of whether you or someone else is the subject of the discrimination or harassment. If you are not comfortable making such a report or complaint to anyone at your location, you **must** report your concerns to the Regional HR Director in the first instance. You should provide as much detail as possible in your complaint or report and include names, dates, descriptions, documents and actual events or statements made so that the Company can perform as thorough an investigation as possible and take appropriate remedial measures where inappropriate conduct has been found to have occurred. The Company will make reasonable efforts to protect the privacy of any employee who makes a complaint or report of discrimination or harassment or who supplies any information pertaining to an allegation of discrimination or harassment, but, due to the Company's obligation to thoroughly investigate all allegations of discrimination or harassment, it cannot guarantee complete confidentiality with respect to any allegation or report of discrimination or harassment.

Employees may also direct any complaints of harassment or discrimination to the California Department of Fair Employment and Housing ("DFEH") or to the Equal Employment Opportunity Commission ("EEOC").  Contact information for the DFEH and the EEOC field office nearest an employee's work location can be found in the telephone directory.

**Supervisor/Manager Responsibilities**
Supervisors and managers must deal quickly and fairly with all allegations of discrimination or harassment, whether or not there has been a written or formal complaint. This responsibility requires that a supervisor or manager receiving a complaint or report of discrimination or harassment, or witnessing conduct that may constitute unlawful harassment, to immediately report the fact of the complaint and any supporting information to Human Resources, ensure that an investigation is immediately commenced, and take appropriate corrective action pursuant to guidance provided by Human Resources. Supervisors and managers who tolerate discrimination or harassment and/or who fail to comply with any the responsibilities listed above will be subject to disciplinary action, up to and including termination of employment.

**Investigation**
Every good faith complaint of discrimination and harassment will be followed by a fair, complete and timely investigation.  The investigation will be as thorough as possible based on the information provided to the Company. Menzies Aviation will attempt to keep the investigation as confidential as is reasonably possible and will disclose information pertaining to a complaint or report of discrimination or harassment on a strict "need to know" basis, but cannot guarantee complete confidentiality due to its obligation to thoroughly investigate every allegation of discrimination and harassment.  Interference with an investigation into a complaint of alleged harassment or discrimination is prohibited, and will result in disciplinary action up to and including termination of employment.  Likewise, a complaint of harassment or discrimination that is found to have been made in bad faith will subject the complainer to disciplinary action, up to and including termination of employment.  However, where the investigation into a complaint of alleged harassment or discrimination does not reveal a violations of this policy, that does not necessarily mean the complaint was made in bad faith.



E X C E L L E N C E **FROM TOUCHDOWN TO TAKEOFF**

**Discipline**

Employees found to have violated the Company's policy of zero tolerance with respect to discrimination and harassment are subject to disciplinary action, up to and including immediate termination of employment.

**Prohibition On Retaliation**

The Company will not tolerate retaliation toward any individual who submits a complaint of discrimination or harassment, who provides any information pertaining to an alleged incident of discrimination or harassment or who participates in an investigation into an alleged incident of discrimination or harassment.  Any individual found to have retaliated against anyone for making a complaint or providing information relating to an alleged incident of harassment or discrimination will be disciplined, up to and including discharge from employment.

## 2.6 Reasonable Accommodation

The Company will not discriminate against qualified individuals with disabilities in any aspect of the employment relationship, and will attempt to reasonably accommodate a qualified individual with a known physical or mental disability to enable the employee to perform the essential functions of his or her job, unless doing so would create an undue hardship or pose a direct threat to the employee or others. The Company further will not discriminate against any individual based on his or her sincerely held religious beliefs and practices, and will attempt to reasonably accommodate an individual's sincerely held religious beliefs and practices.

Employees who believe they require or who are requesting an accommodation related to their disability in order to perform the essential functions of the job or an accommodation for their sincerely held religious beliefs and practices should contact both their supervisors and the Human Resources Department and describe the specific accommodation requested or required. The Company will communicate directly with the employee to explore possible accommodations and attempt to work out a mutually agreeable resolution.

## 2.7 Open Door Policy

The Company strives to maintain a positive work environment for all of its employees, and therefore maintains an open door policy and encourages employees to feel free to bring forward and discuss openly any work related concerns. No employee will be retaliated against for bringing forward any work-related concerns pursuant to this open door policy.

## 2.8 Safety Policy

Employee safety is the Company's top priority. Employees must comply with all safety regulations, whether established by the Company or by federal, state, or local law. Employees must report any/all safety hazards to their direct supervisors or the safety department.

The Company maintains a comprehensive Safety Manual that is regularly updated to ensure employees are aware of the most up-to-date safety standards.  Employees are responsible for being familiar with the standards and protocols contained in that Safety Manual.  However, due to the critical importance of safety in all that the Company does, highlights of the Safety Program are also repeated in this Handbook.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

**Safety Guidelines**

Employees must adhere to the following safety guidelines:

- Employees in job classifications requiring heavy lifting must use safe lifting techniques
- Employees must follow all equipment operating instructions as outlined by the manufacturer, as well as training received from the Company
- Employees must never use equipment or perform a job they are not trained to do
- Employees must use, and shall not deactivate, safety devices provided by the Company or an equipment manufacturer
- Employees who operate motor vehicles must be licensed to drive and must abide by all applicable driving rules and regulations
- Employees must follow all safety rules established in their initial classroom and on-the-job training

**Dangerous Goods**

Employees frequently work around dangerous goods and hazardous materials. As part of an employee's initial training, they will undergo dangerous goods and hazardous materials training as required by the Occupational Safety and Health Act (OSHA), the Department of Transportation (DOT) and the Environmental Protection Agency (EPA).

Employees must adhere to the following regulations:

- Employees shall only handle dangerous goods specified in their training.
- Employees must not handle any dangerous goods container that appears to be leaking or compromised. Immediately contact a supervisor if this is observed.

Never attempt to clean up a spill. Contact a supervisor so the spill can be cleaned by the proper authorities. If unsure of what dangerous or hazardous material is present, contact a supervisor immediately. Employees must never attempt to dispose of any dangerous or hazardous material.

## 2.9 Security Policy

The Company conducts business in a controlled security environment. As an employee, you play a critical role in helping keep our nation's airports safe and secure. You are an important part of a homeland defense team that includes the airport authority, U.S. Customs and Border Protection, the Transportation Security Administration (TSA), the Federal Aviation Administration (FAA), our airline partners, and local law enforcement.

To protect the property and safety of employees, customers, passengers, and the airports we serve, the Company reserves the right to conduct a search of an employee's work area, desk, locker and equipment.  Employees' personal items may also be subject to search pursuant to the Personal Belongings policy contained in this Handbook.

It is an employee's responsibility to challenge anyone in a secure area who is not wearing a Secure Identification Display Area (SIDA) badge according to airport and TSA regulations. If the person challenged does not present his/her SIDA badge to you, notify your supervisor immediately and keep the person under surveillance until law enforcement agents arrive.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

**Never touch or try to apprehend a suspicious person. Instead, contact your supervisor immediately.**

Employees must report any unattended luggage or suspicious packages to their supervisor immediately – never touch a suspicious package.

When entering a secure area, ensure that the security door closes behind you.

Employees must not allow someone to enter behind them through a security door (tailgating). Report all security breaches to a supervisor immediately.

Employees must maintain the confidentiality of all security door codes.

Employees must not enter, or attempt to enter, a U.S. customs security zone unless they have been issued a U.S. customs seal and are entering the security zone only to perform official Company business.

Employees entrusted with office keys must make certain that the office is secure when they are the last to leave. This includes, but is not limited to, turning off appropriate lights, as well as closing and locking all doors and windows. Report any potential security risks to your supervisor.

## 2.10 Use Of Electronic Devices

If an employee brings a personal cellular phone onto Company property, the phone must remain on the 'off' mode during working time.  An employee with a personal cellular phone that is not approved by Company management for work-related use should not make calls nor accept incoming calls to their personal phones during working hours. These personal cellular phones can be used during approved lunch/rest breaks in the area provided by the location.  Employees may not tape record, videotape, photograph or otherwise conduct any electronic surveillance while on working time unless instructed to do so by management and in accordance with applicable federal, state or local law.  Employees are under no circumstances allowed to record conversations with other company employees without getting their consent ahead of time.

Employees whose job responsibilities include regular or occasional driving, and who are issued a Company cellular phone or other electronic device for business use, are expected to put safety first before all other concerns.  Employees whose job responsibilities do not specifically include driving as an essential function, but who are issued a Company cellular phone or other electronic device for business use, are also expected to abide by these same safety considerations. Employees who are driving, during the course of their Company work, **<u>must</u>** refrain from using their phone while driving.

## 2.11 Training

Training is the primary means of communicating health and safety and security information to our employees at all levels of the organization. OSHA's guidelines emphasize that employee understanding is the key to accident prevention, and that training helps employees, supervisors, and managers understand the hazards to which they might be exposed and how they can protect themselves. During your employment, the Company will provide safety and security training. If




EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

at any point you have any health and safety or security questions, please contact the local Safety Manager.

## 2.12 Railway Labor Act Notice

As a business that provides critical services to commercial airline customers and that must operate consistent with the extensive directions and requirements it receives from its airlines customers, the Company asserts that its labor relations with employees are covered by the Railway Labor Act. Accordingly, consistent with the requirements of that law, and specifically with 45 U.S.C. § 152, Eighth, the Company informs employees that except as otherwise required by law, labor relation disputes within the Company shall be handled in accordance with the requirements of Chapter 8 of Title 45 of the United States Code. The Company further repeats verbatim below the third, fourth and fifth paragraphs of U.S. Code, Chapter 8. Consistent with 45 U.S. Code § 152, Eighth, the third, fourth, and fifth paragraphs of 45 U.S.C. § 152, Eighth, which are adopted into the terms and conditions of all employment with the Company unless otherwise required by law or contract, and are binding upon covered employees and the Company, regardless of any other express or implied agreements.

### 45 U.S. CODE § 152

### § 152. General duties

Third. Designation of representatives. Representatives, for the purposes of this Act shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this Act need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: Provided, That nothing in this Act shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

Fifth. Agreements to join or not to join labor organizations forbidden. No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization; and if any such contract has been enforced prior to the effective date of this Act (enacted May 20, 1926), then such carrier shall notify the employees by an appropriate order that such contract has been discarded and is no longer binding on them in any way.

## SECTION 3 – EMPLOYEE CLASSIFICATION AND PAYROLL

### 3.1 Part-Time and Full-Time Employees

All employees are classified as either full-time or part-time employees. Your classification as either full-time or part-time may affect your eligibility to earn certain employment benefits such as time-off benefits and to participate in benefit plans.

Employees who are regularly scheduled to work 32 hours or more per week are classified as full-time.  Employees who are regularly scheduled to work fewer than 32 hours per week are classified as part-time.

### 3.2 Exempt And Non-Exempt Employees

All employees are also classified as either exempt or non-exempt employees.

Exempt employees meet the federal and applicable state requirements for exempt status, are not eligible for overtime pay regardless of the number of hours worked in a week, and are compensated on a salary basis.  Exempt employees receive their full salary for any week in which they perform any work without regard to the number of days or hours worked. Where an exempt employee does not use any accrued paid time off benefits, deductions may be made for full workweeks in which the employee performs no work.

Non-exempt employees are compensated on an hourly basis and are eligible for overtime compensation in accordance with federal and applicable state law. With the exception of paid time off benefits, non-exempt employees are typically compensated only for the hours that they actually work.

### 3.3 Working Hours and Days

Some job classifications require employees to work irregular and mandatory overtime hours and/or days. You must work your scheduled shift, including any overtime, as assigned by your supervisor. Further, where business demands, a supervisor may elect to change temporarily or regularly the work days or hours of any employee. The Company does not recognize compensatory time off for non-exempt employees, unless mandated by state or local law.

### 3.4 Meal Periods

Non-exempt employees who work more than five (5) hours in a workday are entitled to an unpaid, duty-free meal period of at least 30 minutes.  If you work more than ten (10) hours in a workday, you are entitled to a second, unpaid meal period of at least 30 minutes.  Depending on the



circumstances, you may be able to waive your right to a meal period for shifts lasting less than six (6) hours or to a second meal period for shifts lasting longer than ten (10) hours if you take the first meal period of the shift.  If you are issued a Company radio, cell phone, or other handheld communication device to perform your job responsibilities, you are not required to keep that device with you during any meal period, and if you choose to keep your communication device with you during your meal period, you are not required to respond to any calls received during your meal period until after you have completed your full duty-free meal period.

Non-exempt employees must clock out for their meal periods and clock back in at the end of the meal period, but not sooner than 30 minutes after the meal period began.  Non-exempt employees must not perform any work for at least 30 full, consecutive minutes during a meal period.  Failure to comply with these requirements may result in disciplinary action.

Meal periods are mandatory, and non-exempt employees may not skip a meal period for any reason, or take a meal period at a time other than when scheduled, without permission from their manager or supervisor.  If a non-exempt employee misses a meal period for any reason, takes less than a 30-minute duty-free meal period, or does not take the meal period at the scheduled time, the employee must immediately notify his or her manager or supervisor.

## 3.5 Rest Periods

Non-exempt employees are authorized and permitted to take one 10-minute paid rest break for every four hours worked or major portion thereof.  Rest breaks should be taken as close to the middle of each four-hour work period as practicable.  The Company encourages employees to take all authorized rest breaks each workday.  If you work more than six hours in a day, then you are authorized and permitted to take two paid rest breaks each day.  If you work six hours or fewer, then you are authorized and permitted to take one paid rest break each day.  If you work more than 10 hours in a day, then you are authorized and permitted to take an additional rest break.  Employees working fewer than 3-1/2 hours in a day are not entitled to a rest break.

Non-exempt employees do not clock out for their rest periods.  If you are issued a Company radio, cell phone, or other handheld communication device to perform your job responsibilities, you are not required to keep that device with you during any rest period, and if you choose to keep your communication device with you during your rest period, you are not required to respond to any calls received during your rest period until after you have completed your full duty-free rest period.

Rest periods are mandatory and non-exempt employees must immediately notify their manager or supervisor if they do not receive a rest period for every four (4) hours of work or major fraction thereof.

## 3.6 Employee Rest

To provide a safe working environment, the Company has adopted the following limitations regarding the number of consecutive hours non-management employees may work and the amount of rest employees should receive between shifts.

- No single shift will exceed 12 hours.





- Extended shifts of 16 hours or more are an exception and require written authorization from the Manager.
- Employees should receive a minimum of eight hours off from work in between shifts. Employees working an extended shift should receive a minimum of 12 hours off from work in between shifts.

Exceptions to these limitations can only be the result of major operational situations or staff disruption, and must be approved by senior management.

## 3.7 Overtime

Employees who are non-exempt are entitled to overtime pay for all hours worked in excess of 8 hours per day and/or 40 hours per week.  Hours worked in excess of 8 in one day up to 12 in one day, in excess of 40 per week, and/or on the seventh consecutive day in a workweek will be paid at one and one-half times the non-exempt employee's regular rate of pay.  Hours worked in excess of 12 hours in one day, and over 8 in a day on the seventh consecutive day of work in a workweek, will be paid at two times the non-exempt employee's regular rate of pay.  All overtime hours worked must be approved in advance by management.  Employees who work overtime without prior approval by management will be paid for such time, but may also be subject to disciplinary action up to and including termination of employment.

All hours during a work week that are calculated in total for overtime must be hours actually worked. The Company does not include the following time when calculating overtime pay: paid vacation, holidays, sick leave and personal days.

For purposes of overtime pay, an employee's defined workweek and workday normally depend upon shift schedule and the starting time of each employee's shifts, such that different employee groups will have different applicable workweeks and workdays.  However, to ensure overtime calculations align with employee working hours, some employees may have a different workweek or workday that departs from this normal approach. Speak to Human Resources if you have questions about your workweek or workday.

## 3.8 Transfers and Promotions

Our policy is to fill job vacancies whenever possible from the ranks of our employees. Opportunities will depend on employee job performance, qualifications, length of service and overall employment record.  Filling a vacancy is within the sole discretion of the Company, and an employee who requests a transfer may not necessarily receive one.

A move into an equal position at the same salary level is considered a lateral transfer.  A move into a higher level position is considered a promotional transfer.  Transfers and promotions from one department to another are arranged through Human Resources subject to the consent of both departments involved.

Transfers or promotions shall not be counted as an interruption of service; therefore, in computing benefits the current anniversary date will be used.  Employees must have been in their present position for one (1) year prior to requesting a transfer.




**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF**

## 3.9 Payroll Schedules

Pay dates for employees vary by location. See your local Human Resources representative for more information on the pay dates applicable to your location.

 The workweek for payroll purposes begins on Monday and ends on Sunday, and accounts for each employee's workweek and workday as stated in Section 3.7 above. In the event payday should fall on a holiday, employee pay will be distributed the business day before the holiday.

## 3.10 Employee Pay

Employees are offered the option to receive their wages either through direct deposit or Paycard, unless applicable law requires otherwise. Employee pay is distributed on the established payday. Federal, state, and any other required taxes will be withheld from wages, as will any voluntary deductions.

Employees who resign their employment will receive their final payment on the next regular payday following their last day of employment, unless otherwise required by applicable state law. Employees involuntarily terminated from the Company will receive their final paycheck in accordance with applicable state law.

## 3.11 Personnel Records

**Employee Records**
Protecting the privacy and integrity of employment records is important to us. Generally, only authorized management personnel and those who have a legitimate reason to review your employment records are allowed to do so.

**Request to Review Personnel Records**
Current employees are entitled to review their personnel records. Contact your local Human Resources representative to schedule an appointment to review your personnel file. All reviews of personnel records must take place in the Human Resources Department.

**Changes in Personal Information**
Because we use the information in your personnel file to take action on your behalf, it is important that the information in your file is as accurate as possible. You must make any applicable changes to your personal information through the online self-service portal, but if you cannot make them online, please notify your local Human Resources representative whenever any of the following changes occur:

- You change your name
- You change your mailing address
- You change your phone number
- A change in dependent status (spouse, children)
- Emergency contact name and number changes
- Restrictions on your driver's license
- A change in immigration status





## SECTION 4 – PERFORMANCE STANDARDS

### 4.1 Code of Conduct

Employee conduct is governed by certain rules and policies that are intended to ensure orderly operations and protect the interests and safety of all individuals. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace.  However, the following are examples of conduct that may result in disciplinary action, up to and including immediate termination of employment:

- Possession, distribution, consumption, or being under the influence of alcohol or illicit and/or illegal drugs (including non-prescription use of legal drugs) during working hours and/or while on Company or customer premises;
- Unauthorized possession, removal, theft, misappropriation or use of Company funds or property belonging to any employee, passenger or client, or to the Company;
- Falsification of employment records (including recording the work time of another employee or allowing any other employee to record your work time), employment information, or other records;
- Willful damage or destruction of property of another, which includes negligence or improper conduct leading to damage of said property;
- The possession or use of any firearm or weapon on the job, or on Company or customer premises, unless expressly permitted by law;
- Failure to effectively perform job duties;
- Insubordination, including but not limited to failure or refusal to obey reasonable work-related orders or instructions of a supervisor or manager, failure to follow any work guidelines or Company policies, and the use of abusive, malicious and/or threatening language or conduct toward any coworker, customer, passenger, or client of the Company that causes or tends to cause a threatening, hostile or intimidating work environment;
- Failure to properly follow notification rules when unable to report to work;
- Failure to observe working schedules, including any scheduled or required break periods;
- Unauthorized or excessive absenteeism or tardiness;
- Sleeping on the job and while on working time;
- Working overtime without authorization or refusing to work assigned overtime;
- Gross misconduct while on Company property, or while conducting Company business, including: attempting bodily injury, fighting or threatening violence, boisterous or disruptive activity that interferes with your job duties, others' job duties, or passenger service;
- Sexual, racial, religious, ethnic, or any other unlawful harassment or discrimination;
- Violation of any safety or any security rule;
- Unauthorized disclosure of confidential financial data (not including information about your personal wages, benefits or terms and conditions of employment), or other non-public proprietary information of the Company, its business partners, or customers;
- Unauthorized use of airport identification badge or identification;
- Failure to report any employee injury or damage to Company or customer equipment;
- Wagering, betting, gambling, or encouraging such behavior on Company property; and
- Concealment or working time use of any video camera equipment, tape recorder, CD player, radio or other audio visual device, or the failure to report the concealment or use of these devices without supervisory approval.




EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

Nothing in the foregoing Standards of Conduct modifies in any way the at-will nature of employment with the Company.

## 4.2 Progressive Discipline

The Company enforces work rules through discipline as necessary in order for the Company to maintain order, promote safety, and ensure quality work. The Company's progressive discipline policy is intended to correct misconduct or improper behavior with the goal of eliminating future occurrences of inappropriate conduct, though in certain circumstances immediate termination of employment may be deemed by the Company, in its sole discretion, to be necessary.

Depending on the nature of and severity of the inappropriate conduct, the Company may discipline employees through any of the below disciplinary steps.  Repeated instances of inappropriate conduct will generally result in progression through the following disciplinary steps toward termination of employment. However, progressive discipline is not a "one size fits all" approach, and the Company may in its sole discretion skip one or more disciplinary steps. Furthermore, nothing in the Company's progressive discipline policy creates any expectation of continued employment or in any way alters the at-will nature of employment with Menzies Aviation.

**Formal Or Informal Counseling**
A supervisor or manager will meet with the employee, explain the unsatisfactory behavior and establish that the employee understands what is expected. The fact of the formal or informal counseling will be documented by the supervisor or manager and placed in the employee's personnel file.

**Coaching**
As with counseling, a supervisor or manager meets with the employee to discuss the unsatisfactory behavior and establish what is expected of the employee, notifying the employee that he or she has received a verbal warning. The supervisor or manager will document the discussion and a follow-up counseling date to determine whether or not the performance or conduct issue has been corrected. The verbal counseling documentation is placed in the employee's personnel file.

**Written Warning**
A written warning is the result of a more serious violation or a second violation addressed in a prior counseling session or verbal warning. A memo or reprimand is given to the employee and a copy is placed in his or her personnel file. Written warnings may take the form of a "final" warning indicating that subsequent unsatisfactory behavior will result in termination of employment.

**Suspension**
The employee is sent home without pay for a defined period of time depending on the seriousness of the offense and prior disciplinary action taken. During the suspension, the Company will assess the severity of inappropriate conduct and may decide to terminate the individual's employment upon return from suspension. Employees who are not terminated at the conclusion of a suspension are deemed to be on "final" warning.



**Discharge**

Termination of employment may either be the result of continuous and uncorrected behavior that has been addressed through previous disciplinary steps or the result of a single instance of inappropriate conduct depending on the nature of infraction.

## 4.3 Attendance

In any organization such as ours, where the flow of work depends upon the cooperation, coordination and teamwork of a number of people, the absence or tardiness of one person can delay and interfere with the work of others.  As part of the expectation that employees conduct themselves in a professional manner, the Company requires employees to report to work as scheduled, on time and ready to start their job duties.  The Company also requires employees to remain at work for the duration of their entire shift, except for any meal or break periods, or where otherwise excused from work by a supervisor.

The Company maintains a formal and separate attendance policy with which you are expected be familiar.  Generally speaking, under that policy, failure to comply with attendance requirements will result in disciplinary action for unexcused tardiness, unauthorized absence, or no-call/no-show absence.    Three (3) consecutive no-call/no-shows is considered job abandonment and will result in immediate termination of employment.  Other attendance violations will normally be addressed through the disciplinary steps set forth in the separate written attendance policy, though the Company may in its sole discretion address employee attendance concerns in a manner different from the separate written attendance policy.

Under some circumstances, absence or tardiness on your part may be excused, but only if you give proper notice as described in the attendance policy of such a problem before the start of your shift so that other arrangements can be made to cover your absence, if necessary.

## 4.4 Alcohol and Drug Abuse

The Company is committed to providing employees, customers, and the general public with a safe, comfortable, and productive work environment. As part of our effort to provide a drug-free work environment, new employees must undergo a pre-employment drug test. As a condition of employment, employees must agree, in writing, that drug test results may be furnished and used by the Company. Refusal by an applicant or employee to submit to a drug or alcohol test administered in accordance with this policy, or refusal to permit the test results from being furnished to the Company will result in the employee's termination for violation of this policy. Applicants and employees who are subject to Department of Transportation regulations may be subject to separate testing requirements.

The Company does not discriminate against employees with drug or alcohol addictions on the basis of that addiction, but does reserve the right to discipline employees who violate this policy.

Employees who are prescribed medical marijuana must also comply with this policy.  The Company does not discriminate against employees for engaging in lawful activities outside the workplace during non-working hours, so long as such lawful activity does not violate this policy or otherwise inhibit an employee from performing his or her job duties.



The Company prohibits the illegal use, sale, attempted sale, conveyance, distribution, manufacture, purchase, attempted purchase, possession, cultivation, and/or transfer of drugs and controlled substances at any time. "Illegal drugs" include all drugs that are illegal to possess or use under federal, state or local law. This includes prescription drugs that are used in a manner inconsistent with their prescribed purpose, or which are sold, distributed, purchased, possessed and/or transferred to an individual other than that to whom the drugs were prescribed. This prohibition does not apply to employees who lawfully use or possess prescription or over-the-counter drugs.

**Medications**

Employees who use prescribed or over-the-counter medications should notify Human Resources if (i) the use of such medications may impair the employee's ability to safely perform his or her essential job duties, or (ii) the employee requires a reasonable accommodation. To the extent necessary under the circumstances, the Company will follow its Reasonable Accommodations policy if an employee requires a reasonable accommodation to perform the essential duties of his or her job.

**Testing for Drugs and Alcohol**

The Company will conduct drug and alcohol testing of current employees under the following circumstances:

**Reasonable Suspicion**

A supervisor's or manager's reasonable suspicion that an employee is in violation of this policy, and poses a clear and direct threat to self or others, is based on objective factors and observations concerning the appearance, behavior, speech, or bodily odor of the employee. Examples include, but are not limited to, the following:

- Evidence of drugs or alcohol on or about the employee's person or possession
- Conduct or odor on the employee's part that suggests the employee may be under the influence of drugs or alcohol
- Negative performance patterns
- Excessive and unexplained absenteeism or tardiness

**Random Testing**

Where past circumstances dictate a need, the Company may adopt, on a location-by-location basis, a random testing program in accordance with applicable federal and state law. Employees at such locations will be notified that the Company has adopted a random testing program and that employees have no expectation of privacy with respect to testing to determine the presence of unlawful or illicit substances in their system. Any such random testing will be done in compliance with applicable law.

When an employee is asked to submit to a drug test, the employee must be escorted to the medical clinic by a member of management. The test will be performed at Company expense. In the case of reasonable suspicion, the employee will be provided with transportation home and will be suspended with pay pending the results of the test. If the results of the initial medical test are positive, a second medical test may be conducted to ensure the accuracy of the first test. If the second test is positive, the employee will be terminated.

 

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

**Confidentiality**

All records pertaining to an employee's or applicant's drug and/or alcohol test results will be kept confidential and maintained separately from the individual's personnel file, accessible only on a need-to-know basis.

## 4.5 Uniform Attire & Appearance

Employees are expected to wear clothing and safety equipment appropriate for the nature of their job to project a business appearance. For employees who are required to wear a uniform, the Company will provide the uniform to the employee. Uniforms are to be kept clean, in good repair, and worn neatly at all times. Shirts are to be tucked in. Extremely oversized uniforms, or uniforms that are too snug, are not allowed; nor are attachments, slogans, pictures, or decorations, other than those issued by the Company. Employees who operate equipment that could cause serious injury may not wear dangling necklaces or ear rings, chains, bracelets or large rings.

Each employee must visibly display an airport identification badge, as required, and abide by all airport rules and regulations. Uniforms must be returned to the Company at the end of the employee's employment.

No one shall be permitted to wear jewelry on their face such as nose rings, eyebrow rings, tongue piercing, etc. These are not only a safety hazard; they do not demonstrate the professional appearance expected by the Company or its customers.

**Hair** must be kept clean and well-groomed. For safety reasons, those employees with shoulder length hair or longer, who work on the ramp or in the warehouse area, will be required to tie their hair back. Facial hair, such as beards, sideburns, goatees, and mustaches, must be neatly trimmed.

**Hats** are to be worn correctly with the bill facing forward; not facing backwards or the side.

**Footwear** should be safe and kept tied at all times. Industrial shoes with rubber soles and durable leather uppers are provided by the Company for personnel working out on the ramp and in warehouses. With the exception of administrative personnel working in the main office, tennis shoes and opened-toed shoes are not allowed.

Violation of the uniform dress code policy will result in disciplinary action, up to and including possible termination.

**Casual Attire**

Employees are responsible for ensuring that their dress and grooming present a positive image to clients and the public. The Managers can specify additional or alternative dress and grooming requirements based on the business needs of their departments. The Managers also can impose special dress and grooming requirements when necessary for employee safety. The Company will offer reasonable accommodations for any religious beliefs impacted by these requirements as required by applicable federal, state or local law. Company customers may have separate uniform policies that supersede this policy.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## 4.6 Conflict of Interest

Employees have a responsibility to avoid actual or potential conflicts of interest. A potential conflict of interest involves a situation that might develop into an actual conflict of interest. Conflicts of interest are situations in which employees have a personal interest sufficient to jeopardize the objective exercise of their duties. A wide variety of employee activities, circumstances, and relationships can give rise to a conflict of interest, including but not limited to:

- Having romantic relationships with fellow employees, customers, or employees of competitors;
- Accepting gifts or favors from customers or clients;
- Engaging in outside business activities that overlap with work; or
- Using confidential information for personal gain (for purposes of this policy, "confidential information" does not include information about compensation, benefits or the terms and conditions of employment)

An employee becoming aware of a conflict of interest must immediately report it to their local Human Resources representative.

### Employment Of Relatives And Friends

The employment of relatives or friends of current employees may also create potential conflicts of interest.  The Company may consider relatives and friends of current employees for employment on the basis of their qualifications. However, the Company may refuse to place a relative or friend under the direct supervision of another relative or friend, or place relatives or friends in the same work crew, department, or other area of the Company. These principles also apply when assigning, transferring or promoting an employee.

### Outside Employment

The Company expects that our employees will make their jobs their first priority, and therefore strongly discourages employees from accepting outside employment in addition to their employment with the Company. In addition to the conflict of interest such outside employment may create, due to the safety-sensitive nature of the work the Company performs, the working of multiple jobs can cause fatigue and create unacceptable risks.

While the Company will not expressly prohibit employees from accepting outside employment, it reserves the right to determine, in its sole discretion, that an employee's second job is interfering or may reasonably be expected to interfere with the employee's ability to perform his or her job with the Company.  Employees have no expectation of privacy with respect to the fact of outside employment, and employees choosing to accept such outside employment must disclose to their local human resource representative that they are working a second job and provide details about the nature of the second job so the Company may determine if the working of the second job is interfering or may likely interfere with the employee's safe and satisfactory performance his or her Company responsibilities.  If the Company determines in its sole discretion that an unacceptable conflict of interest, safety or security risk exists or may be expected to exist due to any individual's outside employment, it reserves the right to make changes to the employee's job conditions or require as a condition of continued employment that the employee resign the outside position to ensure the employee's work with the Company is the first priority.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## SECTION 5 – EMPLOYEE BENEFITS

### 5.1 Health And Welfare Benefit Plan

The following benefits may be available to eligible employees:

Group Medical Insurance or a Qualified Discounted Medical program
Group Dental Insurance
Vision Insurance
Life Insurance
Supplemental Life Insurance (if applicable)
Accidental Death and Dismemberment Insurance
Short Term Disability
Long Term Disability (if applicable)

Benefit eligibility may be determined by the requirements of the Los Angeles and San Jose Living Wage Ordinances, the San Francisco Quality Standards Program, and/or other local ordinance. See your local Human Resources representative for more information.

### 5.2 Eligibility

Employees scheduled to work 30 hours or more per week who are not covered by the Los Angeles and San Jose Living Wage Ordinances, the San Francisco Quality Standards Program, or other applicable local ordinance are eligible to participate in a Health and Welfare Company benefit plan. The Company reserves the right, without notice, to revise the eligibility requirements in accordance with applicable law. For employees covered by the Los Angeles and San Jose Living Wage Ordinances, the San Francisco Quality Standards Program, or other applicable local ordinance, employee eligibility for participation in a Health and Welfare benefit plan offered by or participated in by the Company is determined by the terms of the applicable local ordinance.

Employees will be notified during new hire orientation of their eligibility to participate in a Health and Welfare benefit plan and of the applicable eligibility requirements. Employees may also see their local Human Resources representative for more information.

### 5.3 Benefit Election Period

During orientation, every eligible employee receives a detailed summary of benefits. Each year the Company conducts an annual enrollment period. During this enrollment period, qualified employees can change benefit elections for the next plan year. Otherwise, upon completion of the eligibility waiting period, employees may elect benefits. Federal tax laws require that some of the benefit elections must remain in effect for the entire calendar year in which elections are made. The only exception is if the employee has a qualifying event during the year. Some examples include: marriage, divorce, birth or adoption of a child, change in your and your spouse's employment status or death of an immediate family member. You have 30 days following a qualifying event to notify your local Human Resources representative of any benefit election changes otherwise you will not be allowed to make changes until the next open enrollment period.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## 5.4 COBRA

The Company offers continued medical benefits to employees who lose eligibility due to termination or reduction to part-time status for insurance coverage. The Consolidated Omnibus Budget Reconciliation Act (COBRA) provides employees and their qualified beneficiaries the opportunity to continue health coverage under the Company's health plan. The employee pays the full cost for the coverage, plus a 2% administration fee. This information will be provided separately through our third party administrator.

## 5.5 Vacation, Sick Leave And Paid Time Off

Employees who are not covered by applicable local ordinance, such as the Los Angeles Living Wage Ordinance, San Francisco Quality Standards Program, or other applicable local ordinance, are eligible for paid time off for the purposes of vacation, personal days, and paid sick time in compliance with applicable law.  Employees will receive more information regarding their applicable paid time off benefits from their local Human Resources Department.

All paid and unpaid time off benefits for employees covered by the Los Angeles Living Wage Ordinance, San Francisco Quality Standards Program, or other applicable local ordinance, which includes vacation, sick leave and other types of time off, are set by the provisions of the applicable Living Wage Ordinance or Quality Standards Program. Please see your local Human Resources representative for more information.

## 5.6 Family and Medical Leave Act

The Company will grant family and medical leave in accordance with the requirements of applicable state and federal law in effect at the time the leave is granted.  No greater or lesser leave benefits will be granted than those set forth in the applicable state or federal laws.  In certain situations, the federal law requires that provisions of state law apply.  In any case, employees will be eligible for the most generous benefits available under either law.

### Eligibility And Duration
To be eligible for family and medical leave benefits, you must:  (1) have worked for the Company for a total of at least 12 months; (2) have worked at least 1,250 hours in the 12 months immediately prior to the requested leave, and (3) work at a location that employs at least 50 employees within a 75 mile radius.

Eligible employees may take up to a maximum of 12 work weeks of unpaid family and medical leave within a 12-month period for most types of family and medical leave, and may take up to 26 work weeks within a 12-month period of unpaid leave to care for a family member who is wounded while on active military duty. The Company calculates this twelve-month period as a rolling twelve-month period, measured backward from the date an employee first uses any leave under the policy. Each time an employee takes leave, the Company will compute the amount of leave the employee has taken under the policy and subtract it from the 12 weeks of available leave.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

**Types Of Leave Covered**

Family and medical leave may be used for one or more of the following reasons: (1) for the birth or placement of a child for adoption or foster care; (2) to care for an immediate family member (spouse, child, parent or domestic partner) with a "serious health condition" as that term is defined by applicable federal or state law; (3) for the employee's own "serious health condition" as that term is defined by applicable federal or state law; (4) for a "qualifying exigency" if an employee's spouse, child or parent is called to active military service; or (5) to care for an employee's child, parent, spouse or next of kin who suffers a serious injury or illness in the line of duty while on active duty in the United States Armed Forces, as well as to care for certain veterans who are undergoing medical treatment, recuperation or therapy.

Employees may take family and medical leave in one continuous block of time or intermittently by reducing their normal weekly or daily work schedule. For employees taking intermittent leave, The Company may temporarily transfer them to available alternative positions with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule.

**Notice And Certification**

Employees requesting or needing to take family and medical leave must contact their local Human Resources representative – not their direct managers or supervisors – in order to notify the Company of their need for or interest in taking family and medical leave.

Employees are further required to provide 30 days' advance notice when the need for the leave is foreseeable or must notify their local Human Resources representative of their need for leave as soon as possible when the need is not foreseeable. If the employee fails to provide 30 days' notice for foreseeable leave, with no reasonable excuse for the delay, then the leave request may be denied until at least 30 days from the date the Company receives notice.

Employees must provide documentation from a health care provider certifying the existence of a serious health condition suffered either by the employee or the employee's immediate family member prior to beginning the leave. Except where prohibited by state law, the Company has the right to request and may require a second opinion regarding the certification of a serious health condition where it has reason to doubt the validity of the certification.

While an employee is on family and medical leave for the employee's or employee's immediate family member's serious health condition, the employee must provide periodic recertification of the serious health condition and periodic reports regarding the employee's intentions regarding his or her return to work. For leave taken for the employee's own serious health condition, the employee must also provide certification from a medical provider of the ability to return to work and any restrictions on the employee's ability to perform his or her duties and responsibilities prior to returning to work.

**Compensation And Benefits During Leave**

Family and medical leave is unpaid. The Company requires employees to use their accrued time off benefits while on family and medical leave. While an employee is on leave, the Company will continue to pay its portion of the health insurance premium during the leave at the same level and under the same conditions as if the employee had continued to work. While on family and



medical leave, the employee remains responsible for his or her portion of any health insurance premium.

### Return To Work

Under most circumstances, employees will be reinstated to their previous position, or to an equivalent job with equivalent pay, benefits, and other employment terms and conditions, upon timely return from a family medical leave.  However, employees have no greater right to reinstatement than if they had been continuously employed rather than on leave.

## 5.7 Pregnancy Disability Leave

The Company will grant an unpaid pregnancy disability leave if you are disabled because of your pregnancy, childbirth, or a related medical condition.

### Leave Available

If you are disabled due to pregnancy, childbirth, or a related medical condition, you may take up to a maximum of four months leave time.  As an alternative, the Company may transfer you to a less strenuous or hazardous position if you request, with the advice of your physician, and if the transfer can be reasonably accommodated.

### Notice & Certification Requirements

You must provide the Company with as much advance notice as is practicable, as well as a health care provider's statement certifying the day you became disabled due to pregnancy, the probable duration of the period or periods of disability and leave, and a statement that, due to the disability, you are unable to perform one or more of the essential functions of your position with undue risk to yourself, the successful completion of your pregnancy, or to other persons.

### Compensation During Leave

Pregnancy disability leaves are without pay.  However, you may utilize accrued vacation time and any other accrued paid time off during the leave.  All of those payments will be integrated with any state disability or other wage reimbursement benefits that you may receive.  At no time will you receive a greater total payment than your regular compensation.

### Benefits During Leave

If you are also eligible for federal or state family and medical leave, the Company will maintain, for up to a maximum of 12 workweeks, any group health insurance coverage that you were provided before the leave on the same terms as if you had continued to work. In some instances, the Company may recover premiums it paid to maintain health coverage if you do not return to work following pregnancy disability leave.

If you are on pregnancy disability leave but you do not receive continued paid coverage, you may continue your group health insurance coverage through the Company in conjunction with federal COBRA guidelines by making monthly payments to the Company for the amount of the relevant premium.  Contact your local Human Resources representative for further information.

### Reinstatement

Upon the submission of a medical certification from a health care provider that you are able to return to work, you will, in most circumstances, be offered the same position held at the time of

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF



the leave or an equivalent position.  However, you will not be entitled to any greater right to reinstatement than if you had been employed continuously rather than on leave.  For example, if you would have been laid off if you had not gone on leave, then you will not be entitled to reinstatement.  Similarly, if your position has been filled in order to avoid undermining the Company's ability to operate safely and efficiently while you were on leave, and there is no equivalent position available, then reinstatement will be denied.

## 5.8 Bereavement Leave

The Company will provide reasonable time off for employees to attend funerals of loved ones. Provided that the employee has been employed full-time for at least six (6) months, the Company will provide up to three (3) days paid leave to attend to family matters and funeral arrangements for the death of an immediate family member. The compensable day(s) must fall within the employee's regularly scheduled work week.

For purpose of bereavement leave, immediate family member refers to a parent, spouse, domestic partner, grandparent, child, sibling, mother-in-law or father-in-law. Documentation will be required to receive pay.

## 5.9 Military Leave

Employees who enlist in, and/or are called to, active duty with the military will be granted unpaid leave of absence and reemployment rights consistent with the Uniformed Services Employment and Reemployment Rights Act (USERRA).

## 5.10 Voting Time Off

If you cannot vote in a statewide public election before or after working hours, then you will be allowed sufficient time off to go to the polls.  The Company will pay you for up to the first two hours of absence from regularly scheduled work that is necessary to vote in a statewide public election.  Any additional time off will be without pay.  You must give reasonable notice to your manager or supervisor of the need to have time off to vote and must give at least three (3) days' notice when three days' notice is possible.

## 5.11 Time Off For School Activities

If you are a parent, guardian, or grandparent with custody of a child in kindergarten, grades 1-12 or a licensed day care center, and you wish to take time off to visit your child's school for a school activity, you may take off up to eight hours each calendar month (up to a maximum of 40 hours each calendar year), per child, provided you give reasonable notice to the Company of your planned absence.  Employees wishing to take leave for a child's school activities must utilize their existing vacation time in order to be paid.  Employees who do not have vacation time available will take the time off without pay.  The Company requires documentation from the school noting the date and time of your visit.

If both parents of a child work for the Company, only one parent (the first to provide notice) may take the time off, unless the Company approves both parents taking time off simultaneously.



E X C E L L E N C E  FROM TOUCHDOWN TO TAKEOFF

You may also be granted time off to attend a school conference involving the possible suspension of your child.  Please contact your local Human Resources representative if time off may be needed for this reason.

## 5.12 Workers' Compensation

While the Company strives to maintain a safe and injury-free workplace, workplace injuries do occasionally occur. In the event you suffer an occupational illness or injury, you may be eligible to receive compensation in accordance with applicable state workers' compensation law.

### Reporting an Occupational Illness or Injury

If you become ill or injured while working, you **must** report the illness or injury immediately, even if you believe the illness or injury is minor or insignificant. Failure to report a workplace illness or injury may adversely affect your ability to receive benefits under applicable workers' compensation laws and may further subject you to discipline by Menzies Aviation for failure to comply with Company policy.

To report an occupational illness or injury, you must inform your manager or supervisor of the illness or injury immediately, and in no case more than 24 hours after you suffered the workplace illness or injury. You must also complete the required Company incident report forms. If you are required to take any period of time off work related to your workplace illness or injury, you must also provide the Company with a health care provider's statement certifying your work-related illness or injury, your inability to work, and the expected duration of your leave.

### Mandatory Drug And Alcohol Testing

Due to the extremely safety sensitive nature of the work performed by the Company, if you suffer a workplace illness or injury and/or are involved in any workplace accident, and the Company has a reasonable suspicion that drug or alcohol use may have contributed to the accident or injury, you will be required to submit to a drug and alcohol test within 24 hours of the incident as permitted by applicable law. Refusal to submit to such a test is the equivalent of a positive test result and will subject you to immediate termination of employment, which may adversely affect your ability to receive benefits under applicable workers' compensation law.

### Workers' Compensation Leave

If you are unable to perform the duties of your position as a result of a workplace illness or injury, you may be eligible pursuant to applicable law to take a workers' compensation disability leave of absence to recover from your illness or injury.  As an alternative, the Company may offer you limited modified duty work in lieu of a disability leave.  Leave taken under the workers' compensation disability policy runs concurrently with family and medical leave under federal and applicable state law.

While on workers' compensation disability leave, you may be eligible to receive compensation for lost earnings pursuant to the Company's workers' compensation insurance policies. You may also utilize any accrued vacation or other paid time off benefits during the leave to supplement any workers' compensation benefits, state disability, or other wage reimbursement benefits you receive while on leave.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

If you are eligible for family and medical leave under applicable federal or state laws, the Company will maintain, for up to a maximum of 12 workweeks, any group health insurance coverage that you were provided before the leave on the same terms as if you had continued to work.  In some instances, the Company may recover premiums it pays to maintain health coverage if you do not return to work following your workers' compensation disability leave. If you are not eligible for family and medical leave under federal and applicable state law, you may continue any group health insurance coverage through the Company in conjunction with federal COBRA guidelines by making monthly payments to the Company for the amount of the relevant premium.

**Returning to Work**

Employees on workers' compensation disability leave may not return to work until released to return to work by their treating physician. Returning employees must provide to their local Human Resources representative a note signed and dated by their treating physician that states that they are released to return to work in a full or modified capacity and setting forth any restrictions on their ability to perform their job responsibilities.

## SECTION 6 – FACILITIES AND USE OF COMPANY RESOURCES

### 6.1 Internet Use

The Company provides certain employees with Internet access to assist them in the performance of their jobs, and the Internet should be used only for that purpose.  Employees must use the Internet in an informed and responsible way and exercise care and caution when inputting information into any Internet site, and uploading and downloading materials to and from any Internet site.  Access to the Internet using Company computer systems is provided for business use and may not be used in any way that interferes with any employee's performance of his or her duties, including use that distracts any employee from the performance of his or her duties. However, occasional and limited use of Company computer systems to access the Internet during breaks and other non-working time for personal purposes is allowed.

Employees may not access the Internet using any Company resources for any inappropriate purpose, including but not limited to visiting, downloading from, storing on or distributing through any Internet site any sexually explicit content or content that could be construed as obscene, offensive, harassing or disparaging of any individual based on any characteristic protected by federal, state or local law. Such use violates the Company's policy of zero tolerance with respect to discrimination and harassment, and any individual found to have accessed the Internet using any Company resource for any such inappropriate purpose will be subject to disciplinary action, up to and including immediate termination of employment.  Furthermore, access to the Internet using Company resources may not be used to violate any law or regulation of country, state, province, or municipality. Such prohibited use includes using, downloading, and/or distributing any pirated or unlicensed software or data, attempting to access secured sites without authorization such as through "hacking" or other means, distributing, introducing or creating any virus, Trojan horse, worm, trap-door or equivalent, and/or disabling, disrupting or overloading any computer system or network. Any employee found to have accessed the Internet for such purposes using any Company resource will be subject to disciplinary action, up to and including immediate termination of employment.



## 6.2 E-Mail Use

The Company's email systems are intended for business use, and any messages, data, electronic files, or other information composed, transmitted, received using, or stored on, the Company's email systems are the property of the Company. While Company email systems are for business use and may not be used in any way that interferes with any employee's performance of his or her duties, including use that distracts any employee from the performance of his or her duties, occasional and limited use of the Company email system for personal purposes is allowed. Any personal messages transmitted or received using the Company's email systems remain the property of the Company and employees have no expectation of privacy with respect to such personal messages. Upon separation of employment of an employee, management may request the former employee's email to have an out of office reply placed for a period of 30 days with the business contact taking over the immediate responsibilities of the former employee.

The Company's email systems may not be used for the display or transmission of inappropriate material, including but not limited to sexually explicit material or material containing content that could be construed as harassing or disparaging of any individual based on any characteristic protected be federal, state or local law. Such use violates the Company's policy of zero tolerance with respect to discrimination and harassment, and any individual found to have used the Company's email systems for such purposes will be subject to disciplinary action, up to and including immediate termination of employment.

## 6.3 Voice Mail

The Company's telephone and voicemail systems are intended for business use, and employees should not use the Company's telephone and voicemail systems for non-emergency personal use. Voicemails left for employees on the Company's systems are business records of the Company that may be accessed by the Company at any time. Employees therefore should have no expectation of privacy with respect to any voicemails they leave or that are left for them on Company telephone and voicemail systems.

## 6.4 Monitoring Of Email And Internet Usage

The Company has the ability to access all email boxes and monitor and record – and does actively monitor and record – use of the Internet using its computer systems for each and every employee. Employees thus have no expectation of privacy with respect to any email or Internet-related activities using any Company computer system or resource. The Company further reserves the right to, in its sole discretion, inspect any and all files stored on any Company computer or network system, access and/or monitor and audit any individual's usage of the Internet or the Company's email systems at any time, and will in its sole discretion monitor any individual's usage of the Company's computer systems if circumstances indicate any potential misuse in order to assure compliance with this and other relevant policies.

## 6.5 Use Of Company Property

**Company Tools and Property**

Company employees use various tools, equipment, postage systems, shipping accounts and accounts with various vendors and suppliers to complete required job tasks. All of these tools and equipment are the property of the Company and are intended for official Company business only.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

At no time is an employee permitted to remove Company property from the premises. Violation of this policy may result in disciplinary action, up to and including possible termination.

**Motor Vehicle and Workplace Equipment Operation**

Employees may be called upon to operate a variety of motor vehicles and industrial machinery. Employees must be licensed drivers to operate any Company motor vehicle, and must have been trained and certified by the Company to operate each specific piece of equipment. This includes, but is not limited to: tugs, belt loaders, pushback tugs, lower and main deck loaders, forklifts, and Company automobiles. Additional qualifications may be required by contracted airline carriers, as specified during your initial training. If an employee has not been trained on the use of a specific vehicle or piece of equipment or machinery, then he/she is forbidden to operate it. Any employee who violates this policy shall be subject to discipline, up to and including immediate termination.

## 6.6 Confidential Information Security

As a matter of course, some employees will have access to sensitive, confidential and proprietary information, including Company trade secrets. This information includes, but is not limited to, pricing, customer lists, contractual agreements, and sales strategies, which are obtained by employees during their employment and which are not otherwise known or available to the public and which have proprietary value to the Company (Confidential Information).

Employees are to exercise discretion at all times when receiving Confidential Information and to avoid disclosing it to any individuals, whether inside or outside of the Company, who should not have access to it. If you have reason to believe that Confidential Information, including Company trade secrets, has been misappropriated or improperly used or disclosed by an employee, vendor, or other individual, you should utilize the Company's Open Door policy and inform your manager, supervisor or Human Resources immediately.

All files, records, documents and other information pertaining to the Company's business, obtained by any employee during employment, are important proprietary assets of the Company. At no time, whether during or after employment, shall any employee be entitled to take or use, directly or indirectly, or to disclose to any other person, any Company records, files, documents, or information (written or otherwise) pertaining to our business obtained by virtue of employment, except as may be necessary to carry out employment responsibilities. This policy does not prohibit employees from discussing or disclosing wages or other terms and conditions of employment and does not serve to interfere with any employee's existing rights under federal labor law. Further, this policy is not intended to restrict or otherwise limit an Employee's ability to (i) disclose to an attorney or a federal, state or local government official, in confidence, a Company trade secret solely for the purpose of reporting or participating in the investigation of a suspected violation of law, or (ii) disclose a Company trade secret in a court document filed under seal and does not otherwise disclose the trade secret except as required by court order. The Company prohibits retaliation against an Employee who, in good faith, initiates or participates in an investigation conducted by a federal agency into a violation of law, or who files a complaint with a court or other tribunal, alleging violations of applicable law, and who discloses a Company trade secret in the manner described above in connection with that investigation or proceeding.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

Following the termination of your employment with the Company, you must continue to maintain the confidentiality of the Company's Confidential Information and may not use or disclose the information without written authorization from the Company.

## 6.7 Non-Solicitation/Disclosure

Solicitation by any employee of another employee during the working time of either employee for any reason is strictly prohibited. Likewise, the distribution of literature, advertising materials, handbills and other printed or written materials is prohibited during working time and in all work areas. Non-employees are not permitted to solicit or distribute materials on any Company premises at any time.

Working time is defined as those hours during which you are not at lunch, not on break or not on the premises before or after work. "Work areas" do not include employee break areas, parking lots or common areas shared by employees during non-working hours.

## 6.8 Bulletin Board

You can find out important information about the Company on the Company bulletin boards. These boards are generally posted in the break rooms at each location. Employees are not to post any materials on Company billboards, and any unauthorized material found on Company billboards will be immediately removed.

## 6.9 Travel

The Company may require an employee to travel for a variety of reasons. Travel must be approved by your supervisor.  All air travel must be booked through the person designated as the Travel Coordinator at your location or the corporate office.  For further information, please refer to the Company's Travel Policy.

## 6.10 Claiming Business Expenses

Employees may occasionally incur expenses on behalf of the Company.  The Company will reimburse employees for typical business expenses, such as mileage (for example, when the Company asks an employee to travel to a different jobsite during the workday) and certain job-related supplies or materials.  These expenses must be pre-approved by the employee's supervisor or manager and turned into the accounting department within 45 days for reimbursement.

## 6.11 Personal Belongings

Because our workplace is a highly regulated, secure and safety-sensitive environment, the Company is obligated to take all reasonable measures to provide a safe and secure operating and working environment for all and to prevent the commission of crimes by Company personnel in the course of carrying out their duties.

In keeping with this responsibility, the Company reserves the right to search and inspect any personal items or effects brought onto Company premises by employees, including personal items



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF



or effects kept in lockers, desks, file cabinets, storage areas and workspaces. Employees are further advised that their personal items and effects are subject to unannounced search and that employees shall have no expectation of privacy, reasonable or otherwise, with regard to any items employees bring onto and/or maintain on their person while present on the Company premises. The Company will further comply with all requests by law enforcement and Transportation Security Administration regulations, which may include directions to inspect and/or search employee personal items and effects.

## 6.12 Media Communications

The Company has designated officials to speak to the media on behalf of the Company. Unless you have been authorized by your Manager or other Company officer to speak on the Company's behalf, you should not respond to any media requests for comment on behalf of the Company, and should direct all such inquiries to your Manager.

## SECTION 7 – SEPARATION OF EMPLOYMENT

### 7.1 Resignation, Termination and Layoff

Employees are requested to give their supervisor two (2) weeks' written notice of their intent to resign. Failure to provide such notice may adversely affect an employee's eligibility for rehire.

### 7.2 Exit Interview

Employees who are leaving their job for any reason may be asked to participate in an exit interview with their local Human Resources representative.

### 7.3 Terminations

On the last day of employment, employees must return all Company property to their supervisor. The Company makes every effort to ensure that all terminations and separations from employment are conducted professionally, in a courteous manner, and in accordance with all provisions and requirements of applicable federal and state laws.

### 7.4 Layoff

If it becomes necessary to conduct mass layoffs due to various business circumstances, the Company will comply with notice requirements of the Worker Adjustment and Retraining Notification Act (WARN) and applicable state law.

### 7.5 Final Paycheck

Final paychecks are available through the local payroll department within the timeframe mandated by state and federal law.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## 7.6 Employment References

The local Human Resources representative will only verify hire date, separation date, and job title for reference verification of previous employment.

# EXHIBIT 9



*page 1*

# MEAL AND REST PERIOD POLICY, CALIFORNIA

This policy is being issued to clarify and supplement the company's policies on Meal and Rest Periods for all non-exempt employees of Menzies Aviation in California. It is being issued in addition to the formal policy set out in the California Employee Handbook. Where provisions of this policy depart from the language of the California Employee Handbook, the provisions of this policy shall govern.

Meal Periods
All non-exempt employees who work more than five (5) hours in a workday are entitled to an unpaid, duty-free meal period of at least 30 minutes that begins by the conclusion of your fifth hour of work. If you work more than ten (10) hours in a workday, you are entitled to a second, unpaid meal period of at least 30 minutes that begins by the conclusion of your tenth hour of work. Depending on the circumstances, you may be able to waive your right to a meal period for shifts lasting less than six (6) hours or to a second meal period for shifts lasting longer than ten (10) hours if you take the first meal period of the shift. Employees are free to use their meal period time for their own purposes, and may leave the work or break area during their meal periods at their discretion.

All employees scheduled to work a shift of five (5) hours or more in a workday will automatically be allocated a meal period of at least 30 minutes. Any employees scheduled to work a shift of ten (10) hrs or more will in addition be scheduled a second meal period of at least 30 minutes. The start and finish time allocated for your meal break(s) will be set out in the daily manpower sheet which will be posted each day on the staff notice board besides the time clock for your work location. If the manpower sheet is missing, does not show the scheduled start and finish times for your meal period(s), or you will be working additional hours on any workday that will entitle you to a first or second meal period, it is your responsibility to immediately bring this to your manager's or supervisor's attention, and for you to ensure you take your full meal period entitlement.

It is your responsibility to ensure that you start your meal period at the time scheduled. The only exception to this is where operational requirements necessitate a change being made, for example if a flight you have been assigned to work is operating off-schedule. In those circumstances you should take your meal period as soon as operational circumstances allow, which may be either before or after your originally scheduled meal period (but in no case later than the conclusion of your fifth hour of work), with the agreement of your supervisor or manager. You are required to clock out for your meal period and clock back in at the end of the scheduled meal period. The company will not require you to perform any work during meal periods and you should not recommence your duties until your full scheduled break has finished.

The company's policy is that meal periods are mandatory, and that employees should not skip a meal period for any reason or take a meal period at a time other than when scheduled, except as noted above. Any change that occurs will be recorded by your manager or supervisor with the dispatch office so that it can be noted in your time records. If you have any doubt that a change has been recorded you should immediately contact the dispatch office in order that they can obtain the appropriate authorization from your manager. Furthermore, if you have any concerns regarding your ability to take a full 30-minute, uninterrupted meal period, you must immediately notify your manager or Human Resources so that the company can take appropriate action to ensure you are receiving the opportunity to take your meal periods.

Attendance Standards & Progressive Discipline Policy | Page 1 of 2

MENZIES_000898

EXHIBIT 9 - 186





*Page 2*

**Rest Periods**

In addition to your scheduled meal break non-exempt employees are entitled to periodic paid rest periods during the normal workday of at least one (1) 10-minute rest break for every four (4) hours of work or major fraction thereof. You are therefore entitled to a rest period as follows:

- One 10-minute rest period on all shifts in excess of 3½ hrs up to 6hrs
- A second rest period of 10-minutes on all shifts more than 6hrs and up to 10hrs
- A third rest period of 10-minutes on any shift more than 10hrs and up to 14hrs

The company's policy is that rest periods are mandatory and non-exempt employees must immediately notify their manager or supervisor if they do not receive a rest period as stated above. You must not clock out during a rest period.


_____          _5-A-2015_____
Employee Signature                        Date


_____
Print Name

# EXHIBIT 10



## KRONOS ADOPTION, E-SELF SERVICE AND NOTICE OF INFORMATIONAL MESSAGING TO MOBILE PHONES

We are currently converting our timekeeping and attendance management system to Kronos Workforce Dimensions (Kronos).  As part of this conversion, we will be making use of Kronos functionality permitting rapid distribution of informational communications to employees regarding material related to their employment.

For some employees, many of these changes will not be significant because they have already been using the Kronos system for certain purposes, such as clocking in and out.  For others however, the move to Kronos will introduce a completely new way of doing things.  For all employees, except those who decide not to participate, one change will be receipt of text messages providing important information about their employment.

Regardless of whether you have been using a Kronos system before or will be transitioning to it, the Kronos system offers you a greater level of convenience in managing your schedule than ever before.  In connection with this increased functionality, Kronos will become the exclusive means by which employees will perform certain actions, such as submitting requests for time off, submit missed punch information, add schedule bids, open shifts and overtime signup.

The Kronos platform for Menzies Aviation now contains significant "self-service" features that allow you to manage certain scheduling-related functions in a far more efficient, employee-friendly way using either an internet portal or an app that may download to and use on your personal device.  For example, using any internet-enabled computer, a tablet or smart phone, you can do things like check your work schedule, view your paystub information, check your available vacation, sick time or paid time off balance, request time off, submit missed punch details and other common actions.  This means you no longer necessarily need to be at work or speak to human resources or to your supervisor for certain work-related actions.  Rather, at any time you can look after your schedule, request time off, or accomplish other actions from your personal device or home computer whenever it is convenient to you.  Alternatively, Menzies Aviation will make the same functionality available on kiosk computers at your working location so that you can perform all these same actions without having to use your own smart phone, tablet or home computer if you prefer.  There is no requirement that you use the app or manage your working schedule or other matters on your own time using your own computer or personal device – you simply have that option available if you feel it is more convenient.

You will receive more information about all the self-service features available through Kronos, including instructions on how to download the app to and use it on your personal device (if you so choose) and how to access your information on Kronos from any internet-enabled computer, including the kiosk computers made available to you at your work location.

Additionally, if you provided your cell or mobile phone number to Menzies Aviation as part of your personal information provided to the Company, you are agreeing to receive calls and text messages from Menzies Aviation at the mobile number you supplied containing informational messages relating to your employment.  Receipt of such messages is voluntary, and you are not required to consent to Menzies communicating with you using your mobile number or receiving text messages as a condition of your employment. Please ask your human representative if you are interested in receiving more information about how we collect and use your personal information.  Message and Data Rates May Apply. If you wish to no longer receive text messages from the Company, please notify your local human resources representative.

**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF**

If you have any questions regarding Kronos, you can direct them to your local human resources representative.

**By my signature below, I acknowledge my understanding that:**
- **The self-service features through the Kronos system are the exclusive method for me to manage aspects of my work schedule, such as making requests for time off from work.**
- **While I may download the Kronos app and manage my working schedule using my personal device or home computer, I am not under any obligation to do so using my personal device or home computer or do so on non-working time.**
- **If I choose, I understand that I can perform all Kronos-related self-service functions using the computer kiosks provided by Menzies Aviation at my worksite.**
- **By providing my cellular or mobile number to Menzies Aviation, I am agreeing to receive calls and/or text messages containing information regarding my employment, and if I do not wish to receive such messages on my mobile or cellular phone, I can cancel receipt at any time by notifying my local human resources representative.**

_____
Employee Signature

_____
Date



# EXHIBIT 11



Incorporating **Simplicity USA** and **ASIG**

# PERSONAL ELECTRONIC DEVICE & CELLULAR PHONES POLICY

This policy is applicable to Menzies Aviation and/or any of its subsidiaries (hereinafter referred to as "The Company"). This policy provides information specific to the appropriate use and compliance with Company policy related to the use of personal electronic devices by employees at work. It should be considered a formal policy document and part of the Company's formal policies and practices.

**Company Provided Electronic Devices**
Where job or business needs demand immediate access to an employee, the Company may provide a business cellular phone or an electronic device to an employee for local and long-distance work-related communications. The Company provided cellular telephone should be used for work-related communications only.

In general, the Company expects employees to use common sense and sound judgment when utilizing a Company provided cellular phone or electronic device. Because cellular phone transmissions or electronic device transmissions may be accessible by individuals outside of the Company, employees should not transmit sensitive or confidential information via these devices. The confidentiality of conversations conducted on a cellular phone, electronic device and/or voicemail should not be assumed.

Employees in possession of Company equipment such as cellular phones or any type of electronic device are expected to protect the equipment from loss, damage or theft. Upon resignation or termination of employment, or at any time upon request, the employee may be asked to produce this device for return, replacement or inspection. Employees unable to present the electronic device they have been issued in good working condition within the time period requested (i.e. 24 hours) may be required to bear the cost of a replacement.

Employees who separate from employment with outstanding debts for equipment loss or unauthorized charges, and who do not provide repayment or replacement, will be considered to have left employment on unsatisfactory terms, as well as subject to legal action for recovery of the loss.

**Personal Cellular Phones**
While at work, employees are expected to apply the same policy in using their personal cellular phones as is expected for making personal phone calls. If an employee brings a personal cellular phone onto Company property, the phone must remain on the 'off' mode during business hours. An employee with a personal cellular phone that is not approved by Company management for work-related use should not make calls nor accept incoming calls to their personal phones during working hours. These personal cellular phones can be used during approved lunch/rest breaks in the area provided by the location.

**Safety Issues for Cellular Phones**
Employees whose job responsibilities include regular or occasional driving, and who are issued a Company cellular phone for business use, are expected to put safety first before all other concerns. Employees whose job responsibilities do not specifically include driving as an essential function, but who are issued a Company cellular phone for business use, are also expected to abide by the provisions herein.

E X C E L L E N C E **FROM TOUCHDOWN TO TAKEOFF** 

Employees who are driving, during the course of their Company work, must refrain from using their phone while driving.

**Special Responsibilities for Managerial Staff**
As with any policy, management staff is expected to serve as appropriate role models for proper compliance with the provisions above and are encouraged to regularly remind employees of their responsibilities in complying with this policy.

I have read and understand the policy above, and hereby agree to abide by this policy.

_____
Date

_____          _____
Employee Signature                                    Employee Name (Printed)

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

# EXHIBIT 12



## KRONOS MEAL PERIOD CLOCKING POLICY AND REMINDER OF MEAL AND REST PERIOD POLICIES AND REQUIREMENTS

As part of the transition to the new Kronos Workforce Dimensions (Kronos) timekeeping and attendance management system for all employees within the Menzies Aviation family of businesses, some employees will be subject to changes regarding their mandatory meal periods and how such meal periods are recoded in Menzies' records.   Effective from the date on which Kronos goes live at your location (which local management will confirm) it will be mandatory for all employees to clock out at the beginning of their meal period and clock back in at the conclusion of the meal period. This requirement will not apply to any employee covered by a collective bargaining agreement that requires a different practice,

In connection with this transition an explanatory brochure on the key features of Kronos has been issued to all employees, and is available on request from your locations HR representative. In addition, Menzies takes this opportunity to remind all employees of its policies regarding meal and rest periods, as well as what you are expected to do if you do not take a meal or rest period:

### Meal Periods
Non-exempt employees who work more than five (5) hours in a workday are entitled to an unpaid, duty-free meal period of at least 30 minutes.  If you work more than ten (10) hours in a workday, you are entitled to a second, unpaid meal period of at least 30 minutes.  Depending on the circumstances, you may be able to waive your right to a meal period for shifts lasting less than six (6) hours or to a second meal period for shifts lasting longer than ten (10) hours if you take the first meal period of the shift.  If you are issued a Company radio, cell phone, or other handheld communication device to perform your job responsibilities, you are not required to keep that device with you during any meal period, and if you choose to keep your communication device with you during your meal period, you are not required to respond to any calls received during your meal period until after you have completed your full duty-free meal period.

Non-exempt employees must clock out for their meal periods and clock back in at the end of the meal period, but not sooner than 30 minutes after the meal period began.  Non-exempt employees must not perform any work for at least 30 full, consecutive minutes during a meal period.  Failure to comply with these requirements may result in disciplinary action.

Meal periods are mandatory, and non-exempt employees may not skip a meal period for any reason or take a meal period at a time other than when scheduled, without permission from their manager or supervisor.  If a non-exempt employee misses a meal period for any reason, takes less than a 30-minute duty-free meal period, or does not take the meal period at the scheduled time, the employee must immediately notify his or her manager or supervisor.

### Rest Periods
Non-exempt employees are authorized and permitted to take one 10-minute paid rest break for every four hours worked or major portion thereof.  Rest breaks should be taken as close to the middle of each four-hour work period as practicable.  The Company encourages employees to take all authorized rest breaks each workday.  If you work more than six hours in a day, then you are authorized and permitted to take two paid rest breaks each day.  If you work six hours or fewer, then you are authorized and permitted to

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

EXHIBIT 12 - 195

take one paid rest break each day.  If you work more than 10 hours in a day, then you are authorized and permitted to take an additional rest break.  Employees working fewer than 3-1/2 hours in a day are not entitled to a rest break.

Non-exempt employees do not clock out for their rest periods.  If you are issued a Company radio, cell phone, or other handheld communication device to perform your job responsibilities, you are not required to keep that device with you during any rest period, and if you choose to keep your communication device with you during your rest period, you are not required to respond to any calls received during your rest period until after you have completed your full duty-free rest period.

Rest periods are mandatory and non-exempt employees must immediately notify their manager or supervisor if they do not receive a rest period for every four (4) hours of work or major fraction thereof.

### Missed Punch Form
Meal and rest period times should be posted so that you can see in advance when Menzies Aviation provides these breaks to you.  If you do not take a meal or rest period during any shift for any reason, you are required to complete a Missed Punch Form so that your time records can be updated, and any other corrective action can be taken.

### Questions
Please direct any questions regarding Kronos clocking and attendance procedures and/or Menzies' meal and rest period policies to your local human resources representative.


_____
Employee Signature


_____
Date



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

# EXHIBIT 13



Incorporating Simplicity USA and ASIG

## MENZIES AVIATION ALTERNATIVE DISPUTE RESOLUTION POLICY

Because disputes arising from employment relationships sometimes occur, and because resolving such disputes through the court system is often exceedingly costly and time-consuming, which results in unsatisfactory resolution of disputes, Menzies Aviation has implemented this Alternative Dispute Resolution **Policy ("ADR Policy").**

While we hope that your employment will be free of major disputes or issues, in the event such a dispute arises, these procedures ensure that all parties have a and fair and equitable opportunity to see if there is a mutually satisfactory basis for resolving their dispute.  If an amicable resolution cannot be reached, these procedures provide for a fair hearing before an impartial, objective individual who has been selected by both sides.  The neutral arbitrator will have the full authority to resolve this matter protecting the rights of both parties.

<u>Who Is Covered</u>

The ADR Policy is <u>mandatory for all disputes arising between signing employees and Menzies Aviation except as specifically excluded by the ADR Policy</u>.  Any disputes which arise and which are covered by the ADR Policy must be submitted to final and binding resolution through the procedures of the Menzies Aviation ADR Policy.

For parties covered by this ADR Policy, alternative dispute resolution, including final and binding arbitration, is the exclusive means for resolving Covered Disputes (as defined below): no other action may be brought in court or in any other forum.  This agreement is a waiver of all rights to a civil court action for a Covered Dispute: only an arbitrator, not a judge or jury, will decide the dispute.

Nothing in this ADR Policy precludes the parties from discussing a mutually acceptable resolution of the dispute without the necessity of formal arbitration proceedings.  Additionally, the parties may agree to engage in mediation prior to arbitration.

<u>Covered Disputes</u>

Covered Disputes include any dispute arising out of or related to your employment, the terms and conditions of your employment and/or the termination of your employment based on, but not limited to, the following:

- Alleged violations of federal, state and/or local constitutions, statutes or regulations:

- Claims of unlawful harassment, discrimination, retaliation or wrongful termination that cannot be resolved by the parties or during an investigation by an administrative agency (such as the California Department of Fair Employment and Housing or the federal Equal Employment Opportunity Commission).  Covered claims include, but are not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing

---

**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF** 

EXHIBIT 13 - 198

Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex;

- Claims based on any purported breach of contract, including breach of the covenant of good faith and fair dealing (unless covered and preempted by a collective bargaining agreement grievance and arbitration process);

- Claims of wrongful termination or constructive termination (unless covered and preempted by a collective bargaining agreement grievance and arbitration process);

- Claims of unfair demotion, transfer, reduction in pay, or any other change in the terms and conditions of employment (unless covered and preempted by a collective bargaining agreement grievance and arbitration process);

- Claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or breaks, entitlement to waiting time penalties and/or other claims involving employee wages, including, but not limited to, claims brought under the California Labor Code, the applicable wage orders, the Fair Labor Standards Act and any other statutory scheme (unless covered and preempted by a collective bargaining agreement grievance and arbitration process);

- Claims based on any purported breach of duty arising in tort, including alleged violations of public policy and for emotional distress (unless covered and preempted by a collective bargaining agreement grievance and arbitration process);

- Claims of defamation, pre and post-termination (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); and

- Any claim Menzies Aviation may have against employees, regardless of the nature, arising out of the employment relationship (unless covered and preempted by a collective bargaining agreement grievance and arbitration process).

However, nothing in this ADR Policy is intended to require arbitration of any claim or dispute which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration or claims for which a collective bargaining agreement requires be resolved through its own grievance and arbitration procedures.  The following types of disputes are expressly excluded and are not covered by this ADR Policy:

- **Disputes related to workers' compensation and unemployment insuranc**e;

- Disputes or claims that are expressly excluded by statute that the courts of this jurisdiction have expressly held are not subject to mandatory arbitration, or are expressly required to be arbitrated under a different procedure pursuant to the terms of a collective bargaining agreement or separate agreement.

<u>Class Action Waiver</u>

The Menzies Aviation ADR Policy includes a waiver of the ability to participate in a class action or act as a collective action representative.  By agreeing to be bound by the ADR Policy, you understand and agree this ADR Policy prohibits you from joining or participating in a class action or as a collective action representative, or otherwise consolidating a covered claim with the claims of others.



## Initiating The Alternative Dispute Resolution Procedures

In the event a dispute should arise and you wish to initiate these procedures, you must deliver a written request for alternative dispute resolution to Menzies Aviation within the statute of limitations period that would apply to the filing of a civil complaint alleging the same claims in court. Menzies Aviation will deliver a written request to you for any claim it may wish to assert. If a request for an alternative dispute resolution is not submitted timely, the claim will be deemed to have been waived and forever released.

## The Arbitration

The dispute will be decided by a single decision-maker, called the arbitrator. The arbitrator will be mutually selected by Menzies Aviation and the Employee. If the parties cannot mutually agree on an arbitrator, then a **list of arbitrators will be obtained from the American Arbitration Association's ("AAA") Employment Panel. The** arbitrator will be selected by the parties according to the method of selection specified by the AAA in its Employment Arbitration Rules and Mediation Procedures.

The arbitrator shall be bound by the provisions and procedures set forth in the Employment Arbitration Rules and Mediation Procedures of the AAA. The applicable substantive law shall be the law of the State of California or federal law. If both federal and state law speak to a cause of action, the party commencing the action shall have the right to elect his/her choice of law.

The parties shall cooperate to the greatest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. After selection of the arbitrator, the parties shall have the right to take depositions and to obtain discovery regarding the subject matter of the action and to use and exercise all of the same rights, remedies and procedures, and be subject to all of the same discovery duties, liabilities and objections as provided in the California Code of Civil Procedure and/or the Federal Rules of Civil Procedure. The arbitrator shall have the authority to rule on motions and the power to issue orders and determine appropriate remedies) regarding discovery and to issue any protective orders necessary to protect the privacy and/or rights of parties and/or witnesses.

The arbitrator shall have the same authority to award remedies and damages on the merits of the dispute as provided to a judge and/or jury under parallel circumstances. However, the arbitrator shall only be permitted to award those remedies in law or equity which are requested by the parties and which are supported by the credible, relevant evidence. The arbitrator shall issue a written opinion and award. Nothing in this Agreement is intended to waive the right to seek punitive damages, where allowable by law.

Following the issuance of the **arbitrator's decision, any party may petition a court to confirm, enforce, correct or vacate the arbitrator's opinion and award under the Federal Arbitration Act, 9 U.S.C. §§ 1**-16, if applicable, and/or applicable state law.

## Fees And Costs Of Arbitration

Fees and costs shall be allocated in the following manner:

- Each party will be responsible for its own attorneys' fees and expenses, except as otherwise provided by law, and the cost of a copy of the reporter's transcript of the proceedings, if desired.

- Menzies Aviation shall be responsible for the arbitrator's fee and expenses and any costs associated with the facilities for the arbitration.

## Revocation Of Participation – Opt Out Policy

If you agree to participate in the ADR Policy and later wish to opt out at any time during your employment with Menzies Aviation, you may do so by delivering a written request to revoke your agreement to be bound by the ADR Policy to your local human resources representative. However, should you revoke your agreement to participate in the ADR Policy, that revocation shall be prospective only, and shall not apply to any claims

**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF** 

initiated prior to opting out of the ADR Policy as to any claims based on facts occurring before you deliver your written request to revoke your agreement to be bound by the ADR Policy. Failure to opt out will demonstrate your intention to be bound by this Agreement and your agreement to arbitrate all disputes arising out of or related to your employment. You will not be subject to any adverse employment action or be retaliated against in any way because of your decision to opt out.

Severability

In the event that any provision of this ADR Policy is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable to any extent, such term or provision shall be enforced to the extent permissible under the law and all remaining terms and provisions of this ADR Policy shall continue in full force and effect.

Nothing in this ADR Policy is intended to preclude any employee from filing a charge with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, the National Labor Relations Board or any similar federal or state agency seeking administrative resolution. However, any claim that cannot be resolved through administrative proceedings shall be subject to the procedures of this ADR Policy.

For Further Information

If you have questions about anything contained in this ADR Policy, please contact your local Human Resources Manager.

I, _Dora Patricia Amaya_____, acknowledge that I have read the above policy.

_8/28/2021_____
Date

| Electronically Signed By |
| Dora Patricia Amaya |
_____
Employee Signature

_Dora Patricia Amaya_____
Employee Name (Printed)

**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF**    M

**P000054**

EXHIBIT 13 - 201



Incorporating **Simplicity USA** and **ASIG**

## AGREEMENT TO BE BOUND BY ALTERNATIVE DISPUTE RESOLUTION POLICY

I agree that in the event employment disputes arise between Menzies Aviation, which includes Simplicity USA, ASIG and any other subsidiaries of Menzies Aviation, Inc., (hereinafter referred to collectively as "Menzies Aviation" or "Menzies"), on the one hand, and me, on the other hand, I agree to be bound by the Menzies Aviation ADR Policy, which provides for final and binding arbitration of employment-related disputes.

I understand that the Menzies Aviation ADR Policy applies to disputes relating to my employment and the terms and conditions of my employment (unless those terms and conditions are covered and preempted by a collective bargaining agreement grievance and arbitration process), including but not limited to my compensation, wages, claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or rest breaks, entitlement to waiting time penalties and/or other claims involving employee wages, benefits, discipline, performance evaluations, promotions and transfers, and the termination of my employment, as defined in the ADR Policy materials.  I also understand that this ADR Policy prohibits me from joining or participating in a class action or as a collective action representative, or otherwise consolidating a covered claim with the claims of others.  However, this ADR policy does not apply to any claim or dispute which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

I further acknowledge and agree that the Menzies ADR Policy applies to claims that include, but are not limited to, the following: (a) alleged violations of federal, state and/or local constitutions, statutes or regulations, (including but not limited to claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex; (b) claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); (c) claims of wrongful termination or constructive termination (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); (d) claims based on any purported breach of duty arising in tort, including violations of public policy, for emotional distress and defamation (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); and (e) claims related to the payment or non-payment of wages, expenses and/or the provisions of breaks as required by law, including, but not limited to, alleged violations of the California Labor Code, the wage order applicable to my industry, the Fair Labor Standards Act and any other statutory scheme governing wages (unless covered and preempted by a collective bargaining agreement grievance and arbitration process).

In consideration of Menzies Aviation's return agreement to be bound by the Menzies Aviation ADR Policy and have any and all claims arising out of the employment relationship it may have against me resolved in arbitration, and pay the arbitration fees as described therein, it is agreed that the Alternative Dispute Resolution Policy attached hereto which provides for final and binding arbitration, is the exclusive means for resolving



Covered Disputes as defined in the Alternative Dispute Resolution Policy.  No other action may be brought in court or in any other forum.  I understand that this Agreement is a waiver of all rights to a civil court action for all disputes relating to my employment, the terms and conditions of my employment and/or the termination of my employment whether brought by me or by Menzies.  Only an arbitrator, not a judge or jury, will decide the dispute, and any dispute relating to the interpretation or application of this Agreement, including enforceability, revocability, or validity, shall be decided by an arbitrator and not by a court or judge.  In addition, I understand I am prohibiting from joining a class action or acting as a collective action representative, or otherwise consolidating a covered claim with the claims of others. I understand that if I do not wish to be bound by this Agreement, I must opt out by following the steps outlined in this Agreement.  I agree that my failure to opt out will demonstrate my intention to be bound by this Agreement and my agreement to arbitrate all disputes arising out of or related to your employment as set forth below.  Nothing contained in this Agreement is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

I also acknowledge and agree that the following types of disputes are expressly excluded and not covered by this policy: (a) disputes related to workers' compensation and unemployment insurance; and (b) disputes or claims that are expressly excluded by federal or state statute from mandatory arbitration or are expressly required to be arbitrated only under a different procedure pursuant to the terms of an employee benefit plan or collective bargaining agreement.  I also acknowledge and agree that nothing in this ADR Policy prohibits any employee from filing a charge with a state or federal administrative agency, such as the U.S. Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or the National Labor Relations Board.  A state or federal administrative agency would also be free to pursue any appropriate action.  However, any claim that is not resolved administratively through such an agency shall be subject to this agreement to arbitrate and the ADR Policy.

I understand that I have the opportunity to ask questions regarding anything contained in the Menzies ADR Policy prior to my execution of my agreement to be bound by the Menzies ADR Policy.

I also understand that I am free at any time during my employment to opt out of my agreement to be bound by the Menzies ADR Policy and that I must take specific action to participate in legal action in court and/or to participate in any class action, collective action, or representative action.  I understand that Menzies does not require arbitration as a mandatory condition of my employment, so if I want to opt out of this Agreement, I may do so by submitting a written request to opt out to Human Resources.  I also understand that if I opt out, my revocation shall be prospective in character as explained in the ADR Policy.  I understand that if I do opt out of this Agreement, I will not be subject to any adverse employment action or be retaliated against in any way because of my decision to opt out.  I am aware that I have had an opportunity to consult with an attorney regarding this Agreement and how it affects my rights.

Nothing contained in this Agreement To Be Bound By Alternative Dispute Resolution Policy is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration. Unlike the provisions of the Menzies Aviation Employee Handbook, the terms of this Agreement To Be Bound By Alternative Dispute Resolution Policy are contractual in nature.

By signing below, I acknowledge that I have reviewed and agreed to the terms and conditions set forth in the ADR Policy and this Agreement.  I further understand that I may change my mind and opt out of this Agreement at any time during my employment, and that my revocation shall be prospective in character and shall not apply to any claims initiated prior to opting out of the ADR Policy or to any claims based on facts occurring before you deliver your written request to revoke your agreement to be bound by the ADR Policy.


Dora Patricia Amaya
I, _____, acknowledge that I have read the above policy.

8/28/2021
_____
Date

---

EXCELLENCE **FROM TOUCHDOWN TO TAKEOFF** 

P000135
**ADR Agreement (CA) | v1/Rev 1 | Page 2 of 3     © Menzies Aviation 2017**

EXHIBIT 13 - 203

Electronically Signed By
Dora Patricia Amaya

Employee Signature

Dora Patricia Amaya

Employee Name (Printed)

Electronically Signed By
Nelly Marin

For Menzies Aviation

8/28/2021

Date


EXHIBIT 13 - 204

# EXHIBIT 14

## AGREEMENT TO BE BOUND BY ALTERNATIVE DISPUTE RESOLUTION POLICY

I agree that in the event employment disputes arise between Menzies Aviation, Inc., including any subsidiaries of Menzies Aviation, Inc., (hereinafter referred to collectively as "Menzies Aviation" or "Menzies"), on the one hand, and me, on the other hand, I agree to be bound by the Menzies Aviation ADR Policy, which provides for final and binding arbitration of employment-related disputes.

I understand that the Menzies Aviation ADR Policy applies to disputes relating to my employment and the terms and conditions of my employment, including but not limited to my compensation, wages, claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or rest breaks, entitlement to waiting time penalties and/or other claims involving employee wages, benefits, discipline, performance evaluations, promotions and transfers, and the termination of my employment, as defined in the ADR Policy materials. I also understand that this ADR Policy prohibits me from joining or participating in a class action or as a collective action representative, or otherwise consolidating a covered claim with the claims of others. However, this ADR policy does not prohibit me from acting as a private attorney general or participating in a private attorneys general action as allowed for under the California Labor Code.

I further acknowledge and agree that the Menzies ADR Policy applies to claims that include, but are not limited to, the following: (a) alleged violations of federal, state and/or local constitutions, statutes or regulations, (including but not limited to claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex; (b) claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing; (c) claims of wrongful termination or constructive termination; (d) claims based on any purported breach of duty arising in tort, including violations of public policy, for emotional distress and defamation; and (e) claims related to the payment or non-payment of wages, expenses and/or the provisions of breaks as required by law, including, but not limited to, alleged violations of the California Labor Code, the wage order applicable to my industry, the Fair Labor Standards Act and any other statutory scheme governing wages.

In consideration of and as a material condition of employment with Menzies Aviation, and in consideration of Menzies Aviation's return agreement to be bound by the Menzies Aviation ADR Policy and have any and all claims arising out of the employment relationship it may have against me resolved in this forum, and pay the arbitration fees as described therein, it is agreed that the Alternative Dispute Resolution Policy attached hereto which provides for final and binding arbitration, is the exclusive means for resolving Covered Disputes as defined in the Alternative Dispute Resolution Policy. No other action may be brought in court or in any other forum. I

© Menzies Aviation 2009  Updated 07/2014

EXHIBIT 14 - 206

MENZIES_001306



understand that this Agreement is a waiver of all rights to a civil court action for all disputes relating to my employment, the terms and conditions of my employment and/or the termination of my employment whether brought by me or by Menzies. Only an arbitrator, not a judge or jury, will decide the dispute. In addition, I understand I am prohibiting from joining a class action or acting as a collective action representative, or otherwise consolidating a covered claim with the claims of others.

I also acknowledge and agree that the following types of disputes are expressly excluded and not covered by this policy: (a) disputes related to workers' compensation and unemployment insurance; (b) disputes or claims that are expressly excluded by federal or state statute or are expressly required to be arbitrated under a different procedure pursuant to the terms of an employee benefit plan; and (c) private attorneys general actions as allowed for under the California Labor Code. I also acknowledge and agree that nothing in this ADR Policy prohibits any employee from filing a charge with a state or federal administrative agency, such as the U.S. Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or the National Labor Relations Board. A state or federal administrative agency would also be free to pursue any appropriate action. However, any claim that is not resolved administratively through such an agency shall be subject to this agreement to arbitrate and the ADR Policy.

I understand that I have the opportunity to ask questions regarding anything contained in the Menzies ADR Policy prior to my execution of my agreement to be bound by the Menzies ADR Policy.

Nothing contained in this Agreement To Be Bound By Alternative Dispute Resolution Policy is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

Unlike the provisions of the Menzies Aviation Employee Handbook, the terms of this Agreement To Be Bound By Alternative Dispute Resolution Policy are contractual in nature.

5/2/2015
_____
Date

Digitally Signed By: Anibal Aexis Silva on 5/2/2015          Anibal Aexis Silva
_____          _____
Employee Signature                        Employee Name (Printed)

      Digitally Signed By: Aurea Quinonez on 5/7/20          5/7/2015
By: _____          _____
For Menzies Aviation                      Date

© Menzies Aviation 2009  Updated 07/2014

MENZIES_001307

EXHIBIT 14 - 207



## MENZIES AVIATION ALTERNATIVE DISPUTE RESOLUTION POLICY

Because disputes arising from employment relationships sometimes occur, and because resolving such disputes through the court system is often exceedingly costly and time-consuming, which results in unsatisfactory resolution of disputes, Menzies Aviation has implemented this Alternative Dispute Resolution Policy ("ADR Policy").

While we hope that your employment will be free of major disputes or issues, in the event such a dispute arises, these procedures ensure that all parties have a and fair and equitable opportunity to meet and see if there is a mutually satisfactory basis for resolving their dispute. If an amicable resolution cannot be reached, these procedures provide for a fair hearing before an impartial, objective individual who has been selected by both sides. The neutral arbitrator will have the full authority to resolve this matter protecting the rights of both parties.

### Who Is Covered

The ADR Policy is <u>mandatory for all disputes arising between signing employees and Menzies Aviation except as specifically excluded by the ADR Policy</u>. Any disputes which arise and which are covered by the ADR Policy must be submitted to final and binding resolution through the procedures of the Menzies Aviation ADR Policy.

For parties covered by this ADR Policy, alternative dispute resolution, including final and binding arbitration, is the exclusive means for resolving Covered Disputes (as defined below); no other action may be brought in court or in any other forum. This agreement is a waiver of all rights to a civil court action for a Covered Dispute; only an arbitrator, not a judge or jury, will decide the dispute.

Nothing in this ADR Policy precludes the parties from discussing a mutually acceptable resolution of the dispute without the necessity of formal arbitration proceedings. Additionally, the parties may agree to engage in mediation prior to arbitration.

### Covered Disputes

Covered Disputes include any dispute arising out of or related to your employment, the terms and conditions of your employment and/or the termination of your employment based on, but not limited to, the following:

- Alleged violations of federal, state and/or local constitutions, statutes or regulations;

- Claims of unlawful harassment, discrimination, retaliation or wrongful termination that cannot be resolved by the parties or during an investigation by an administrative agency (such as the California Department of Fair Employment and Housing or the federal Equal Employment Opportunity Commission). Covered claims include, but are not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of

© Menzies Aviation 2009  Updated 07/2014



- 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex;

- Claims based on any purported breach of contract, including breach of the covenant of good faith and fair dealing;

- Claims of wrongful termination or constructive termination;

- Claims of unfair demotion, transfer, reduction in pay, or any other change in the terms and conditions of employment;

- Claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or breaks, entitlement to waiting time penalties and/or other claims involving employee wages, including, but not limited to, claims brought under the California Labor Code, the applicable wage orders, the Fair Labor Standards Act and any other statutory scheme;

- Claims based on any purported breach of duty arising in tort, including alleged violations of public policy and for emotional distress;

- Claims of defamation, pre and post-termination; and

- Any claim Menzies Aviation may have against employees, regardless of the nature, arising out of the employment relationship.

However, nothing in this ADR Policy is intended to require arbitration of any claim or dispute which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration. The following types of disputes are expressly excluded and are not covered by this ADR Policy:

- Disputes related to workers' compensation and unemployment insurance;

- Disputes or claims that are expressly excluded by statute or are expressly required to be arbitrated under a different procedure pursuant to the terms of a separate agreement; or

- Private attorneys general actions as allowed for under the California Labor Code.

© Menzies Aviation 2009  Updated 07/2014

EXHIBIT 14 - 209

MENZIES_001309



**Class Action Waiver**

The Menzies Aviation ADR Policy includes a waiver of the ability to participate in a class action or act as a collective action representative. By agreeing to be bound by the ADR Policy, you understand and agree this ADR Policy prohibits you from joining or participating in a class action or as a collective action representative, or otherwise consolidating a covered claim with the claims of others. However, this ADR policy does not prohibit employees from acting as a private attorney general or participating in a private attorneys general action as allowed for under the California Labor Code.

**Initiating The Alternative Dispute Resolution Procedures**

In the event a dispute should arise and you wish to initiate these procedures, you must deliver a written request for alternative dispute resolution to Menzies Aviation within the time limits, which would apply to the filing of a civil complaint in court. Menzies Aviation will deliver a written request to you for any claim it may wish to assert. If a request for an alternative dispute resolution is not submitted timely, the claim will be deemed to have been waived and forever released.

**The Arbitration**

The dispute will be decided by a single decision-maker, called the arbitrator. The arbitrator will be mutually selected by Menzies Aviation and the Employee. If the parties cannot mutually agree on an arbitrator, then a list of arbitrators will be obtained from the American Arbitration Association's ("AAA") Employment Panel. The arbitrator will be selected by the parties according to the method of selection specified by the AAA in its Employment Arbitration Rules and Mediation Procedures.

The arbitrator shall be bound by the provisions and procedures set forth in the Employment Arbitration Rules and Mediation Procedures of the AAA. The applicable substantive law shall be the law of the State of California or federal law. If both federal and state law speak to a cause of action, the party commencing the action shall have the right to elect his/her choice of law.

The parties shall cooperate to the greatest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. After selection of the arbitrator, the parties shall have the right to take depositions and to obtain discovery regarding the subject matter of the action and to use and exercise all of the same rights, remedies and procedures, and be subject to all of the same discovery duties, liabilities and objections as provided in the California Code of Civil Procedure and/or the Federal Rules of Civil Procedure. The arbitrator shall have the authority to rule on motions (including the power to issue orders and determine appropriate remedies) regarding discovery and to issue any protective orders necessary to protect the privacy and/or rights of parties and/or witnesses.

The arbitrator shall have the same authority to award remedies and damages on the merits of the dispute as provided to a judge and/or jury under parallel circumstances. However, the

© Menzies Aviation 2009  Updated 07/2014



arbitrator shall only be permitted to award those remedies in law or equity which are requested by the parties and which are supported by the credible, relevant evidence. The arbitrator shall issue a written opinion and award. Nothing in this Agreement is intended to waive the right to seek punitive damages, where allowable by law.

Following the issuance of the arbitrator's decision, any party may petition a court to confirm, enforce, correct or vacate the arbitrator's opinion and award under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, if applicable, and/or applicable state law.

**Fees And Costs Of Arbitration**

Fees and costs shall be allocated in the following manner:

- Each party will be responsible for its own attorneys' fees and expenses, except as otherwise provided by law, and the cost of a copy of the reporter's transcript of the proceedings, if desired.

- Menzies Aviation shall be responsible for the arbitrator's fee and expenses and any costs associated with the facilities for the arbitration.

**Severability**

In the event that any provision of this ADR Policy is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable to any extent, such term or provision shall be enforced to the extent permissible under the law and all remaining terms and provisions of this ADR Policy shall continue in full force and effect.

Nothing in this ADR Policy is intended to preclude any employee from filing a charge with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, the National Labor Relations Board or any similar federal or state agency seeking administrative resolution. However, any claim that cannot be resolved through administrative proceedings shall be subject to the procedures of this ADR Policy.

**For Further Information**

If you have questions about anything contained in this ADR Policy, please contact your local Human Resources Manager.

© Menzies Aviation 2009 Updated 07/2014

EXHIBIT 14 - 211

MENZIES_001311



Menzies Aviation

P.O. Box 610330
2520 W. Airfield Drive
Dallas Ft. Worth International Airport
Texas 75261
USA

T: +1 972 739 6600
F: +1 972 426 6551

www.menziesaviation.com

**MENZIES AVIATION ALTERNATIVE DISPUTE RESOLUTION POLICY**

Because disputes arising from employment relationships sometimes occur, and because resolving such disputes through the court system is often exceedingly costly and time-consuming, which results in unsatisfactory resolution of disputes, Menzies Aviation has implemented this Alternative Dispute Resolution Policy ("ADR Policy").

While we hope that your employment will be free of major disputes or issues, in the event such a dispute arises, these procedures ensure that all parties have a and fair and equitable opportunity to meet and see if there is a mutually satisfactory basis for resolving their dispute. If an amicable resolution cannot be reached, these procedures provide for a fair hearing before an impartial, objective individual who has been selected by both sides. The neutral arbitrator will have the full authority to resolve this matter protecting the rights of both parties.

**Who Is Covered**

The ADR Policy is <u>mandatory for all disputes arising between employees and Menzies Aviation except as specifically excluded by the ADR Policy</u>. Any disputes which arise and which are covered by the ADR Policy must be submitted to final and binding resolution through the procedures of the Menzies Aviation ADR Policy.

For parties covered by this ADR Policy, alternative dispute resolution, including final and binding arbitration, is the exclusive means for resolving Covered Disputes (as defined below); no other action may be brought in court or in any other forum. This agreement is a waiver of all rights to a civil court action for a Covered Dispute; only an arbitrator, not a judge or jury, will decide the dispute.

Nothing in this ADR Policy precludes the parties from discussing a mutually acceptable resolution of the dispute without the necessity of formal arbitration proceedings. Additionally, the parties may agree to engage in mediation prior to arbitration.

**Covered Disputes**

Covered Disputes include any dispute arising out of or related to your employment, the terms and conditions of your employment and/or the termination of your employment based on, but not limited to, the following:

- Alleged violations of federal, state and/or local constitutions, statutes or regulations;

- Claims of unlawful harassment, discrimination, retaliation or wrongful termination that cannot be resolved by the parties or during an investigation by an administrative agency (such as the California Department of Fair Employment and Housing or the federal Equal Employment Opportunity Commission). Covered claims include, but are not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex;



MENZIES_001312

EXHIBIT 14 - 212



- Claims based on any purported breach of contract, including breach of the covenant of good faith and fair dealing;

- Claims of wrongful termination or constructive termination;

- Claims of unfair demotion, transfer, reduction in pay, or any other change in the terms and conditions of employment;

- Claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or breaks, entitlement to waiting time penalties and/or other claims involving employee wages, including, but not limited to, claims brought under the California Labor Code, the applicable wage orders, the Fair Labor Standards Act and any other statutory scheme;

- Claims based on any purported breach of duty arising in tort, including alleged violations of public policy and for emotional distress;

- Claims of defamation, pre and post-termination; and

- Any claim Menzies Aviation may have against employees, regardless of the nature, arising out of the employment relationship.

However, nothing in this ADR Policy is intended to require arbitration of any claim or dispute which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration. The following types of disputes are expressly excluded and are not covered by this ADR Policy:

- Disputes related to workers' compensation and unemployment insurance;

- Disputes or claims that are expressly excluded by statute or are expressly required to be arbitrated under a different procedure pursuant to the terms of a separate agreement.

**Class Action Waiver**

The Menzies Aviation ADR Policy includes a waiver of the ability to participate in a class action or representative action. By agreeing to be bound by the ADR Policy, you understand and agree this ADR Policy prohibits you from joining or participating in a class action or representative action, acting as a private attorney general or representative of others, or otherwise consolidating a covered claim with the claims of others.

**Initiating The Alternative Dispute Resolution Procedures**

In the event a dispute should arise and you wish to initiate these procedures, you must deliver a written request for alternative dispute resolution to Menzies Aviation within the time limits, which would apply to the filing of a civil complaint in court. Menzies Aviation will deliver a written request to you for any claim it may wish to assert. If a request for an alternative dispute resolution is not submitted timely, the claim will be deemed to have been waived and forever released.



MENZIES_001313

EXHIBIT 14 - 213



### The Arbitration

The dispute will be decided by a single decision-maker, called the arbitrator. The arbitrator will be mutually selected by Menzies Aviation and the Employee. If the parties cannot mutually agree on an arbitrator, then a list of arbitrators will be obtained from the American Arbitration Association's ("AAA") Employment Panel. The arbitrator will be selected by the parties according to the method of selection specified by the AAA in its Employment Arbitration Rules and Mediation Procedures.

The arbitrator shall be bound by the provisions and procedures set forth in the Employment Arbitration Rules and Mediation Procedures of the AAA. The applicable substantive law shall be the law of the State of California or federal law. If both federal and state law speak to a cause of action, the party commencing the action shall have the right to elect his/her choice of law.

The parties shall cooperate to the greatest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. After selection of the arbitrator, the parties shall have the right to take depositions and to obtain discovery regarding the subject matter of the action and to use and exercise all of the same rights, remedies and procedures, and be subject to all of the same discovery duties, liabilities and objections as provided in the California Code of Civil Procedure and/or the Federal Rules of Civil Procedure. The arbitrator shall have the authority to rule on motions (including the power to issue orders and determine appropriate remedies) regarding discovery and to issue any protective orders necessary to protect the privacy and/or rights of parties and/or witnesses.

The arbitrator shall have the same authority to award remedies and damages on the merits of the dispute as provided to a judge and/or jury under parallel circumstances. However, the arbitrator shall only be permitted to award those remedies in law or equity which are requested by the parties and which are supported by the credible, relevant evidence. The arbitrator shall issue a written opinion and award. Nothing in this Agreement is intended to waive the right to seek punitive damages, where allowable by law.

Following the issuance of the arbitrator's decision, any party may petition a court to confirm, enforce, correct or vacate the arbitrator's opinion and award under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, if applicable, and/or applicable state law.

### Fees And Costs Of Arbitration

Fees and costs shall be allocated in the following manner:

- Each party will be responsible for its own attorneys' fees and expenses, except as otherwise provided by law, and the cost of a copy of the reporter's transcript of the proceedings, if desired.

- Menzies Aviation shall be responsible for the arbitrator's fee and expenses and any costs associated with the facilities for the arbitration.

### Severability

In the event that any provision of this ADR Policy is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable to any extent, such term or provision shall be enforced to the extent permissible under the law and all remaining terms and provisions of this ADR Policy shall continue in full force and effect.



MENZIES_001314

EXHIBIT 14 - 214



Nothing in this ADR Policy is intended to preclude any employee from filing a charge with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, the National Labor Relations Board or any similar federal or state agency seeking administrative resolution. However, any claim that cannot be resolved through administrative proceedings shall be subject to the procedures of this ADR Policy.

**For Further Information**

If you have questions about anything contained in this ADR Policy, please contact your local Human Resources Manager.



MENZIES_001315

EXHIBIT 14 - 215



Menzies Aviation

P.O. Box 610330
2520 W. Airfield Drive
Dallas Ft. Worth International Airport
Texas 75261
USA

T: +1 972 739 6600
F: +1 972 426 6551

www.menziesaviation.com

### AGREEMENT TO BE BOUND BY ALTERNATIVE DISPUTE RESOLUTION POLICY

    I agree that in the event employment disputes arise between Menzies Aviation, Inc., including any subsidiaries of Menzies Aviation, Inc., (hereinafter referred to collectively as "Menzies Aviation" or "Menzies"), on the one hand, and me, on the other hand, I agree to be bound by the Menzies Aviation ADR Policy, which provides for final and binding arbitration of employment-related disputes.

    I understand that the Menzies Aviation ADR Policy applies to disputes relating to my employment and the terms and conditions of my employment, including but not limited to my compensation, wages, claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or rest breaks, entitlement to waiting time penalties and/or other claims involving employee wages, benefits, discipline, performance evaluations, promotions and transfers, and the termination of my employment, as defined in the ADR Policy materials. I also understand that this ADR Policy prohibits me from joining or participating in a class action or representative action, acting as a private attorney general or representative of others, or otherwise consolidating a covered claim with the claims of others.

    I further acknowledge and agree that the Menzies ADR Policy applies to claims that include, but are not limited to, the following: (a) alleged violations of federal, state and/or local constitutions, statutes or regulations, (including but not limited to claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex; (b) claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing; (c) claims of wrongful termination or constructive termination; (d) claims based on any purported breach of duty arising in tort, including violations of public policy, for emotional distress and defamation; and (e) claims related to the payment or non-payment of wages, expenses and/or the provisions of breaks as required by law, including, but not limited to, alleged violations of the California Labor Code, the wage order applicable to my industry, the Fair Labor Standards Act and any other statutory scheme governing wages.

    <u>In consideration of and as a material condition of employment with Menzies Aviation, and in consideration of Menzies Aviation's return agreement to be bound by the Menzies Aviation ADR Policy and have any and all claims arising out of the employment relationship it may have against me resolved in this forum, and pay the arbitration fees as described therein, it is agreed that the Alternative Dispute Resolution Policy attached hereto which provides for final and binding arbitration, is the exclusive means for resolving Covered Disputes as defined in the Alternative Dispute Resolution Policy. No other action may be brought in court or in any other forum. I understand that this Agreement is a waiver of all rights to a civil court action for all disputes relating to my employment, the terms and conditions of my employment and/or the termination of my employment whether brought by me or by Menzies. Only an arbitrator, not a judge or jury, will decide the dispute. In addition, I understand I am prohibiting from joining a class action or representative action, acting as a private attorney general or representative of others, or otherwise consolidating a covered claim with the claims of others.</u>

    I also acknowledge and agree that the following types of disputes are expressly excluded and not covered by this policy: (a) disputes related to workers' compensation and unemployment insurance; and (b) disputes or claims that are expressly excluded by federal or state statute or are expressly required to be arbitrated under a different procedure pursuant to the terms of an employee benefit plan. I also acknowledge and agree that nothing in this ADR Policy prohibits any employee from filing a charge with a state or federal



MENZIES_001316

EXHIBIT 14 - 216



administrative agency, such as the U.S. Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or the National Labor Relations Board.  A state or federal administrative agency would also be free to pursue any appropriate action.  However, any claim that is not resolved administratively through such an agency shall be subject to this agreement to arbitrate and the ADR Policy.

I understand that I have the opportunity to ask questions regarding anything contained in the Menzies ADR Policy prior to my execution of my agreement to be bound by the Menzies ADR Policy.

Nothing contained in this Agreement To Be Bound By Alternative Dispute Resolution Policy is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

Unlike the provisions of the Menzies Aviation Employee Handbook, the terms of this Agreement To Be Bound By Alternative Dispute Resolution Policy are contractual in nature.

5/2/2015
―――――――――――――――――――――
Date

Digitally Signed By: Anibal Aexis Silva on 5/2/2015                    Anibal Aexis Silva
―――――――――――――――――――――                    ―――――――――――――――――――――
Employee Signature                    Employee Name (Printed)

By: Digitally Signed By: Aurea Quinonez on 5/7/20                    5/7/2015
    ―――――――――――――――――――――                    ―――――――――――――――――――――
    For Menzies Aviation                    Date



MENZIES_001317

EXHIBIT 14 - 217