# EXHIBIT 1



**ATTORNEYS AT LAW**

11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA  92130-2594
858.847.6700 TEL
858.792.6773 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
858.847.6734
kjackson@foley.com

CLIENT/MATTER NUMBER
043015-0101

September 8, 2022

C. Joe Sayas, Jr.                         David P. King
Karl P. Evangelista                       King Cheng Miller & Jin, LLP
Law Office of C. Joe Sayas, Jr.           3675 Huntington Drive, Suite 200
500 N. Brand Boulevard, Suite 980         Pasadena, CA 91107
Glendale, CA 91203

Re:    *Dora Patricia Amaya v. Menzies Aviation (USA), Inc., et al.*,
       Case No. 2:22-cv-05915

Dear Counsel,

Please be advised that this Firm represents Menzies Aviation (USA), Inc. ("Menzies") in connection with the above-referenced matter.  Please direct all future correspondence to our attention.

We write to inform you that Ms. Amaya is subject to multiple contractual obligations that prohibit her from proceeding with a civil action on a class basis.  First, Ms. Amaya is subject to a Collective Bargaining Agreement ("CBA"), a copy of which is attached as Attachment 1 for your reference.  Several of Ms. Amaya's claims are preempted by the CBA (or subject to CBA interpretation and, therefore, preemption) unless and until she exhausts the grievance and arbitration process (which she has not done).  *See, e.g.,* Cal. Lab. Code §§ 512(d), 514; *Firestone v. So. Cal. Gas Co.*, 219 F.3d 1063, 1068 (9th Cir. 2000); *McCray v. Marriott Hotel Services, Inc.*, 902 F.3d 1005 (2018); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).

Second, Ms. Amaya signed a valid and binding Alternative Dispute Resolution agreement (the "ADR Agreement"), a copy of which is attached as Attachment 2 for your reference.  The ADR Agreement requires Ms. Amaya to submit *all* employment disputes (other than those covered by the CBA, which sets forth its own grievance and arbitration procedures) to final and binding arbitration.  It further provides that Ms. Amaya is prohibited from joining a class action or serving as a class representative.

Now that you are aware of Ms. Amaya's obligations under the CBA and the ADR Agreement, we trust that she will refrain from serving the Summons and Complaint and will utilize the appropriate procedural mechanisms to resolve her claims if she desires to do so.  In that spirit, it remains our understanding that you have not served the Summons and Complaint on Menzies; but if you believe our understanding is in error, please provide us proof of such service.

AUSTIN          DETROIT         MEXICO CITY     SACRAMENTO      TALLAHASSEE
BOSTON          HOUSTON         MIAMI           SALT LAKE CITY  TAMPA
CHICAGO         JACKSONVILLE    MILWAUKEE       SAN DIEGO       WASHINGTON, D.C.
DALLAS          LOS ANGELES     NEW YORK        SAN FRANCISCO   BRUSSELS
DENVER          MADISON         ORLANDO         SILICON VALLEY  TOKYO



**FOLEY & LARDNER LLP**

C. Joe Sayas, Jr.
David King
September 8, 2022
Page 2

Please contact me if you have any questions.

Sincerely,

Kevin Jackson

Enclosures

cc:     Christopher Ward

# ATTACHMENT 1

**LAX Master Passenger Services Agreement**

**May 1, 2017 to April 30, 2022**

**between**

**SEIU United Service Workers West**

**and**

**ABM Aviation**

**AeroPort Services**

**G2 Secure Staff, LLC**

**Gateway Frontline Services, Inc.**

**Menzies Aviation (USA) Inc.**

**SDH Services West LLC, a subsidiary of Sodexo, Inc.**

**SOS Security, LLP**

**World Service West LA Inflight Service Company, LLC**

# Contents

PURPOSE ................................................................................................................................................ 5

ARTICLE 1. UNION REPRESENTATION .................................................................................................. 5

Section 1, Recognition: ........................................................................................................................ 5
Section 2, Registration of Job Location: ............................................................................................. 5
Section 3, New Jobs: ............................................................................................................................ 5

ARTICLE 2. DIGNITY AND RESPECT ...................................................................................................... 5

ARTICLE 3. PRIVACY RIGHTS ................................................................................................................ 6

Section 1, Non-Discrimination in Employment: .................................................................................. 6
Section 2, Non-Discrimination in Representation: .............................................................................. 6
Section 3, Notification: ........................................................................................................................ 6
Section 4, Information: ......................................................................................................................... 6
Section 5, Termination for Invalid Work Authorization: ..................................................................... 6
Section 6, Change of Name or Social Security Number: ..................................................................... 6
Section 7, "No Match" Letter: ............................................................................................................. 6

ARTICLE 4. TRAINING AND EMPLOYEE INPUT FOR SECURITY, SERVICE, HEALTH, AND SAFETY ............. 7

Section 1, Passenger Safety and Security: .......................................................................................... 7
Section 2, Quality Service Committee: ................................................................................................ 7
Section 3, Guard Card Training and Certification: .............................................................................. 7
Section 4, Health, Safety, and Injury Prevention Training: ................................................................ 7
Section 5, Training for New Job Functions: ........................................................................................ 7

ARTICLE 5. IMPROVING SERVICE TO PASSENGERS WITH DISABILITIES AND OTHERS REQUIRING WHEELCHAIRS ... 7

Section 1, Wheelchair Maintenance: ................................................................................................... 7
Section 2, Passenger Limits: ............................................................................................................... 7

ARTICLE 6. UNION MEMBERSHIP AND UNION RIGHTS ........................................................................ 7

Section 1, Union Membership as a Condition of Employment: ........................................................... 7
Section 2, Discharge: ........................................................................................................................... 8
Section 3, Check-Off for Dues, Fees, and Voluntary Political Action Fund: ....................................... 8
Section 4, Dues, First Paycheck: ......................................................................................................... 8
Section 5, Dues Deduction: .................................................................................................................. 8
Section 6, Dues Remittance Deadline: ................................................................................................ 8
Section 7, Employer Indemnity: .......................................................................................................... 9
Section 8, Union Stewards: .................................................................................................................. 9
Section 9, Union Access: ..................................................................................................................... 9
Section 10, Right to Investigation: ...................................................................................................... 9
Section 11, Union Orientation: ............................................................................................................ 9

ARTICLE 7. WAGES, HOURS, AND OVERTIME ...................................................................................... 9

Section 1, Wages: ................................................................................................................................ 9
Section 2, Paycheck Protection: .......................................................................................................... 10
Section 3, Work Week: ......................................................................................................................... 10
Section 4, Working Out of Class: ......................................................................................................... 10
Section 5, Training Wages: .................................................................................................................. 10

Section 6, Grace Period: ...........................................................................................................................................10
Section 7, Breaks: ...................................................................................................................................................10
Section 8, Minimum Hours: ....................................................................................................................................10
Section 9, Exchange and Donation of Shifts: ..........................................................................................................11
Section 10, Split Shifts: ...........................................................................................................................................11
Section 11, Payment While on Premises: ................................................................................................................11
Section 12, Payment for Travel: ..............................................................................................................................11
Section 13, Overtime: .............................................................................................................................................11
Section 14, Shift Bids, Unanticipated Changes in Service Levels and Schedule Change Process: ...........................12
Section 15, Bargaining Unit Work: ..........................................................................................................................13
Section 16, Maintenance of Conditions: .................................................................................................................13
Section 17, Definition of Full-Time Employee: ........................................................................................................13
Section 18, New Job Classifications: ........................................................................................................................13

ARTICLE 8. HEALTH CARE ..........................................................................................................................................13

Section 1, Contributions: ........................................................................................................................................13
Section 2, Trust Fund: .............................................................................................................................................13
Section 3, Coverage: ...............................................................................................................................................13
Section 4, Eligibility: ...............................................................................................................................................21
Section 5, Preservation of Full Time Work: .............................................................................................................23

ARTICLE 9. SENIORITY ...............................................................................................................................................24

Section 1, Definitions and Applications: .................................................................................................................24
Section 2, Seniority List: ..........................................................................................................................................24
Section 3, Transfer Requests and Promotions: .......................................................................................................25
Section 4, Seniority Accrual on Layoff: ...................................................................................................................25
Section 5, Loss of Seniority: ....................................................................................................................................25
Section 6, Recall: .....................................................................................................................................................25
Section 7, Recall Priority: ........................................................................................................................................25
Section 8, Probationary Period: ..............................................................................................................................25
Section 9, Part-Time Employees: .............................................................................................................................26
Section 10, Overtime and Additional Hours: ...........................................................................................................26
Section 11, Mandatory Hours Beyond Regularly Scheduled Shifts: .........................................................................26

ARTICLE 10. ASSIGNING WORK ..................................................................................................................................26

ARTICLE 11. LEAVES OF ABSENCE ..............................................................................................................................27

Section 1, Scheduling of Time Off: ..........................................................................................................................27
Section 2, Use of Accrued Paid Time Off (PTO) and Impact on Benefits When on a Leave of Absence: .................27
Section 3, Reinstatement When Returning From a Leave of Absence: .....................................................................27
Section 4, Family Medical Leave Act, Family Rights Act, and Pregnancy Disability Leave: ......................................27
Section 5, Jury Duty Leave: ......................................................................................................................................28
Section 6, Subpoena: ...............................................................................................................................................28
Section 7, Military Leave: ........................................................................................................................................28
Section 8, Union Leave: ...........................................................................................................................................28
Section 9, Unpaid Personal Leave: ..........................................................................................................................29
Section 10, Blackout Periods: ..................................................................................................................................29

ARTICLE 12. HOLIDAYS, PAID TIME OFF, BEREAVEMENT AND SICK LEAVE ..................................................................29

Section 1, Holidays: .................................................................................................................................................29
Section 2, Paid Time Off: .........................................................................................................................................29
Section 3, Unpaid Personal Days: ............................................................................................................................30
Section 4, Bereavement Leave: ...............................................................................................................................31

Section 5, Sick Leave:..................................................................................................................................31

ARTICLE 13. DISCIPLINE AND DISCHARGE .........................................................................................32

    Section 1, Discipline:...................................................................................................................................32
    Section 2, Progressive Discipline: ..............................................................................................................33
    Section 3, Attendance: ...............................................................................................................................33
    Section 4, Copies of Discipline for the Union: ............................................................................................33
    Section 5, Shop Steward:.............................................................................................................................33
    Section 6, Expiration of Disciplinary Notices: ............................................................................................33
    Section 7, Right to See Personnel Files:......................................................................................................33
    Section 8, Transfer of Warning Notices:.....................................................................................................33
    Section 9, Reasonable Notice of Discipline: ...............................................................................................34

ARTICLE 14. GRIEVANCE AND ARBITRATION PROCEDURE ..................................................................34

    Section 1, Definition:..................................................................................................................................34
    Section 2, 1st Step Grievance:....................................................................................................................34
    Section 3, 2nd Step Grievance: ...................................................................................................................34
    Section 4, 3rd Step Non-Binding Mediation: ..............................................................................................34
    Section 5, 4th Step Arbitration: .................................................................................................................34
    Section 6, Arbitration Hearing Limits: .......................................................................................................35
    Section 7, Failure to Respond Within Timelines:........................................................................................35
    Section 8, Failure to Comply with Signed Settlements or Arbitration Awards:...........................................35

ARTICLE 15. WORKING CONDITIONS .................................................................................................35

    Section 1, Uniforms: ...................................................................................................................................35
    Section 2, Materials and Equipment: .........................................................................................................35
    Section 3, Break Rooms:..............................................................................................................................36
    Section 4, Lockers:......................................................................................................................................36
    Section 5, Bulletin Boards:..........................................................................................................................36
    Section 6, Steward Petitions: ......................................................................................................................36
    Section 7, No Speed-Up:..............................................................................................................................36
    Section 8, Lie Detector Tests: .....................................................................................................................37
    Section 9, Cabin Cleaning, Hygienic Assignments: .....................................................................................37

ARTICLE 16. LAYOFF AND PROTECTION OF WORK .............................................................................37

    Section 1, Notice of Layoff: ........................................................................................................................37
    a)  Notice – Definition: ..............................................................................................................................37
    b)  Notice of Layoff:..................................................................................................................................37
    Section 2, Recall: ........................................................................................................................................37
    Section 3, Termination of Employer's Services:..........................................................................................37
    Section 4, Sub-Contracting:.........................................................................................................................38

ARTICLE 17. EMPLOYER JOB BIDDING PROCEDURES ..........................................................................38

    Section 1, Employer Job Bidding Information: ............................................................................................38
    Section 2, Employer Job Bidding Procedure:..............................................................................................39
    Section 3, Employer Award Procedure:......................................................................................................39
    Section 4, Non-Signatory Service Contract Transfer Procedure:.................................................................39

ARTICLE 18. LABOR-MANAGEMENT COMMITTEE: .............................................................................40

ARTICLE 19. MOST FAVORED NATIONS..............................................................................................40

    Section 1:....................................................................................................................................................40
    Section 2:....................................................................................................................................................40

Section 3:.................................................................................................................................................40
Section 4:.................................................................................................................................................40

ARTICLE 20.  NO STRIKE - NO LOCKOUT.......................................................................................41

ARTICLE 21.  SCOPE OF AGREEMENT AND SAVINGS CLAUSE.................................................41

Section 1, Entire Agreement: ...................................................................................................41
Section 2, Savings Clause:.........................................................................................................42

ARTICLE 22.  MANAGEMENT RIGHTS.............................................................................................42

ARTICLE 23.  LEADERSHIP TRAINING AND EDUCATION FUND (LTEF - BSP)....................42
ARTICLE 24.  MAINTENANCE COOPERATION TRUST FUND (MCTF) ....................................42

ARTICLE 25.  DURATION AND TERM ..............................................................................................43

APPENDIX A: WAGES...........................................................................................................................45

Section 1, Minimum Wage Differential ...................................................................................45
Section 2, Minimum Wage Rates .............................................................................................45
Section 3, Across the Board Increases......................................................................................46
Section 4, Wage Differentials ...................................................................................................46

APPENDIX B: COVERED CLASSIFICATIONS ....................................................................................47

APPENDIX C: NEW NON-UNION WORK ...........................................................................................48

APPENDIX D: SUPERSESSION ...........................................................................................................50

APPENDIX E ...........................................................................................................................................52

APPENDIX F ...........................................................................................................................................53

APPENDIX G...........................................................................................................................................54

APPENDIX H...........................................................................................................................................55

APPENDIX I ............................................................................................................................................56

APPENDIX J ............................................................................................................................................57

APPENDIX K............................................................................................................................................59

APPENDIX L ............................................................................................................................................60

APPENDIX M ..........................................................................................................................................61

APPENDIX N............................................................................................................................................63

APPENDIX O............................................................................................................................................64

APPENDIX P ............................................................................................................................................65

APPENDIX Q............................................................................................................................................66

APPENDIX R............................................................................................................................................67

## PURPOSE

This Collective Bargaining Agreement (hereinafter referred to as "Agreement") made this May 1, 2017 by and between Service Employees International Union, United Service Workers West (hereinafter referred to as "Union"), and ABM Aviation, AeroPort Services, G2 Secure Staff, LLC, World Service West LA Inflight Service Company, LLC, Menzies Aviation (USA) Inc., SDH Services West LLC, a subsidiary of Sodexo, Inc., SOS Security, LLP, and Gateway Frontline Services, Inc. (hereinafter referred to as "Employer" individually, and "Employers" jointly).  It is understood and acknowledged that each Employer is entering this Agreement on its own behalf and as a separate and distinct business entity and that under no circumstances shall any Employer or group of Employers be considered a "joint employer" or comprise a multi-employer bargaining unit for any purpose.

In entering into this Agreement, the Union and the Employers recognize that the greatest threats to their continued success are the proliferation of non-union competition in this industry and insourcing.  As such, it is imperative that the Union and the Employers work together to preserve Union jobs by supplying customers and clients with the best possible passenger services at the Los Angeles International Airport (LAX).  Only by cooperation and understanding each other's needs and the realities of the market place, can both the Union and the Employers prosper.

For the purpose of mutual understanding and so that a harmonious and respectful relationship may exist between the Union, the Employers and the employees in the bargaining unit herein defined, and to the end that continuous and efficient service may be rendered, it is hereby agreed that:

## ARTICLE 1. UNION REPRESENTATION

### Section 1, Recognition:
The Employer recognizes the Union as the exclusive representative for the purpose of collective bargaining with respect to the rates of pay, hours of work, and other conditions of employment for the Employer's non-supervisory, non-clerical employees in job classifications covered by this Agreement at the time of ratification as specified in Appendix B, at Los Angeles International Airport (LAX), passenger terminals, cargo warehouse or cabin cleaning locations.  Janitors, warehouse cargo handlers and cabin cleaners that have been or are covered by another collective bargaining agreement are not covered by this Agreement.

### Section 2, Registration of Job Location:
The Employer shall furnish the Union, in writing, the names and addresses of all job locations and clients covered by this Agreement, the number of employees on each job and classification, wage rates, and hours employed per week. This information shall be submitted to the Union by the Employer on a quarterly basis.

### Section 3, New Jobs:
The Employer shall notify the Union, in writing of the name and address, and total number of employees, of any new job location covered by this Agreement that the Employer obtains within ten (10) days of notification of award of the work by the awarding authority.  All new jobs will be covered under the appropriate terms of this Agreement, as indicated in Article 17, Employer Job Bidding Procedures.

## ARTICLE 2. DIGNITY AND RESPECT

The Union, the Employers, and the employees agree that they are in a service business and that the traveling public, airline employees and airport employees should always be treated with courtesy, dignity, and respect.

## ARTICLE 3. PRIVACY RIGHTS

### Section 1, Non-Discrimination in Employment:

The Employer and the Union shall not discriminate against any employee covered by this Agreement because of: ancestry, age (40 and above), color, physical or mental disability, genetic information, gender, gender identity, or gender expression, marital status, medical condition, military or veteran status, national origin, race, religion, sex, sexual orientation, family status, political belief, Union membership or activities on behalf of the Union.

### Section 2, Non-Discrimination in Representation:

The Union is obligated to represent all employees as required by law.

### Section 3, Notification:

The Employer shall notify the Union, unless otherwise prohibited by federal law, judicial order, or other government agency, by phone and give oral notice to the Union Steward, as quickly as possible, if any Department of Homeland Security ("DHS") or U.S. Immigration and Customs Enforcement ("ICE") agent appears at the premises to enable a Union representative or attorney to take steps to advise employees of their legal rights. Additionally, the Employer shall notify the Union immediately upon receiving notice from the DHS, ICE or the Social Security Administration that an audit of employee records (for any purpose) is scheduled, proposed or contemplated.

### Section 4, Information:

The Employer shall not violate the privacy rights of employees by revealing to third parties, including the DHS, any employee's name, address or other similar information, unless required by law. The Employer shall notify affected employees and the Union in the event it furnishes such information to any third party.

### Section 5, Termination for Invalid Work Authorization:

Any employee who is terminated due to lack of valid work authorization (I-9 related issues) and presents a valid work authorization, within six (6) months of commencement of the termination shall be reinstated to the layoff list, with their seniority date intact, less any time lost due to the immigration matter. The burden shall be upon the employee or their bargaining unit representative to establish to the Employer's reasonable satisfaction, consistent with legal requirements, that the employee(s) in question are authorized to work in the U.S.

### Section 6, Change of Name or Social Security Number:

Employees shall not be discharged, disciplined or suffer loss of seniority or any other benefit or be otherwise adversely affected by a lawful change of name or Social Security number.

### Section 7, "No Match" Letter:

A "No-Match" letter from the Social Security Administration shall not itself constitute a basis for taking adverse action against an employee or for requiring an employee to re-verify work authorization. The Employer shall promptly forward a copy of any "No-Match" letter that it receives to the Union and to affected employee(s). In the event it is determined that the employee was in violation of applicable federal or state law regarding their Social Security number, the Employer reserves the right to discipline the employee up to and including termination.

## ARTICLE 4. TRAINING AND EMPLOYEE INPUT FOR SECURITY, SERVICE, HEALTH, AND SAFETY

### Section 1, Passenger Safety and Security:
The Union and Employer acknowledge that passenger safety and security are of paramount concern, and that employees possess vital information and experience for improving safety and security.

### Section 2, Quality Service Committee:
The Union and Employer shall form a Quality Service Committee for each respective company to improve the quality of training provided to employees, and explore ways to improve service to passengers. The Committee shall include an equal number of employee and Employer representatives.

### Section 3, Guard Card Training and Certification:
Employees who perform a security function and are not in possession of a Guard Card, if required by airport, client or law, shall be trained and certified to receive a Guard Card. The Employer shall not be required to pay the fee for the Guard Card itself, training, or renewal fees.

### Section 4, Health, Safety, and Injury Prevention Training:
The Employer agrees to provide health, safety, and injury prevention training to employees so that they may be properly informed of risks associated with their jobs and can do them safely. If the employee believes that there is a real and imminent danger of death or serious injury, the employee shall not be disciplined for asking the Employer to correct the hazard or, if the Employer refuses to correct the hazard, for asking the Employer for an alternative assignment.

### Section 5, Training for New Job Functions:
In the event an employee is required by the Employer to perform the job functions of another job classification within this bargaining unit, the Employer will train the employee in the requirements of that job function before the employee is required to perform the function.

## ARTICLE 5. IMPROVING SERVICE TO PASSENGERS WITH DISABILITIES AND OTHERS REQUIRING WHEELCHAIRS

### Section 1, Wheelchair Maintenance:
In order to improve service to passengers requiring wheelchairs, as well as protect employee health and safety, the Employer shall ensure that wheelchairs are maintained in proper repair, with working brakes, hand grips, foot rests, tires, and without tears or other damage to seats or backrests. Employees shall immediately notify the Employer of any wheelchair requiring repair or replacement.

### Section 2, Passenger Limits:
No more than one passenger shall be assigned to each wheelchair attendant, and workers pushing wheelchairs shall not be forced nor permitted to handle luggage equipment such as carts at the same time as wheelchairs are being pushed.

## ARTICLE 6. UNION MEMBERSHIP AND UNION RIGHTS

### Section 1, Union Membership as a Condition of Employment:
It shall be a condition of employment that all employees of the Employer covered by this Agreement shall become and remain members of the Union in good standing, or tender to the Union the Union dues and

initiation fees customarily required of members in the manner provided in this Agreement, and under applicable law. It shall be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, no later than the 31st calendar day following the beginning of employment or following the effective date of this Agreement, whichever is later, become and remain members in good standing, or tender to the Union the Union dues and initiation fees customarily required of members in the manner provided for in this Agreement, and under applicable law.

## Section 2, Discharge:

The Employer agrees to discharge upon receiving seven (7) days' written notice from the Union, any employee with respect to whom such notice may state that such employee is not a member in good standing of the Union for the reasons set forth in Section 1 above, provided that a copy of such notice shall have been sent to such employee, and, provided further, than any such employee has not, within that additional seven (7) day period, tendered to the Union the amount then in default.

## Section 3, Check-Off for Dues, Fees, and Voluntary Political Action Fund:

The Employer agrees to a check-off for the payment of Union dues and initiation fees and voluntary political action fund payments and to deduct such payments from the wages of all employees and remit same to Union, and according to the method set forth below. The Employer shall be the agent for receiving such monies and the deduction of said dues by the Employer shall constitute payment of said dues by the employees.

## Section 4, Dues, First Paycheck:

For newly hired employees, half of the initiation fee and the first month's dues shall be deducted from the employee's paycheck for the first payroll period with an ending date on or after the thirty-first (31st) calendar day following the beginning of said employee's employment. The balance of the initiation fee and the next month's dues shall be deducted from said employee's first paycheck in the following calendar month. Regular monthly dues for such employee shall thereafter be deducted in the normal manner described in Section 5. In the event that the employment of any employee terminates on or after the 31st calendar day following the beginning of his/her employment, and any initiation fees and/or dues are unpaid, such initiation fees and/or dues shall be deducted from such employee's final paycheck, including payment for any pro-rated PTO or any other compensation.

## Section 5, Dues Deduction:

The monthly dues for all other employees shall be deducted half from the employee's first paycheck in each calendar month and half from the second check. In cases where employees are paid four (4) times a month, dues would be spread throughout four (4) paychecks.

## Section 6, Dues Remittance Deadline:

All sums deducted for monthly dues and/or initiation fees shall be remitted to the Union not later than the twenty-first (21st) day of the following calendar month, together with an alphabetized electronic list of all employees specifying the following:

  (a) The names of all employees who have received pay during the calendar month for which remittance is made.
  (b) The amount of deduction for each employee for whom a deduction was made.
  (c) The names, addresses, social security numbers, phone numbers, dates of hire and job locations of all employees whose names are listed on the above list for the first time.
  (d) A notation of "No Authorization" beside the name of any employee who has not signed a payroll deduction authorization.
  (e) The Union shall have the right to receive, within five days, upon request, the corrected address of any employee covered by this Agreement.

(f)   The Employer agrees that the list set forth in this Article shall be submitted in a form that is mutually acceptable to both parties.

## Section 7, Employer Indemnity:

The Union shall indemnify and hold the Employer harmless against any claims, demands, suits and other forms of liability of any kind which may arise out of or by reason of action taken or omitted by the Employer in reliance upon authorization cards for the deduction of Union dues and initiation fees or for the purpose of complying with any provision of this Article.

## Section 8, Union Stewards:

The Union will have the right to elect/select one shop steward and one alternate per terminal and shift. In terminals where the Employer has more than one hundred and seventy-five (175) employees, the Union may elect/select additional stewards, not to exceed one additional steward per every additional seventy-five (75) employees.  The Union will inform management in writing upon election/selection.  The Employer agrees to recognize such stewards upon written notice from the Union.

## Section 9, Union Access:

Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of enforcement of this Agreement at the herein listed sites, adjusting disputes, investigating working conditions, collection of dues, and ascertaining that the Agreement is being adhered to, provided, however, that the Union representative give reasonable notice to the Employer's representative in charge of the area and Human Resources.  The Union agrees that this visitation right shall not interfere with conduct of the Employer's business or employees working.

## Section 10, Right to Investigation:

When conducting an investigation related to allegations of a specific violation of this Agreement, the Union shall have the right to inspect and audit employee-related records, specifically related to the alleged violations, in order to determine whether the allegations have merit.  The Union shall have the right to conduct such investigation at the office of the Employer where such records are customarily maintained.

## Section 11, Union Orientation:

The Employer will notify the Union of the first day of work for new hires and will allow the Union the opportunity to meet with the new hire employees on unpaid time in order to provide orientation about the Union and this Agreement.  The Employer will advise the Union of the names of new hired employees on a monthly basis.

# ARTICLE 7.  WAGES, HOURS, AND OVERTIME

## Section 1, Wages:

Wages shall be shown in Appendix "A". The wage scales in Appendix A of this Agreement are minimum wage scales.  Nothing in this Agreement shall be interpreted to prohibit an Employer from paying an employee higher wages or additional benefits beyond those set forth in this Agreement.  All wages shall be paid according to the Employer's current schedule and practice, in compliance with California Labor Code.  The Employer agrees to notify the Union in advance of any changes to the foregoing and discuss the impact of any such change. Employees will have the option to have paychecks deposited via direct deposit, provided the Employer has the capacity to provide direct deposit.

## Section 2, Paycheck Protection:

Paychecks that are not correct as a result of an error on the part of the Employer (including PTO or sick leave pay, overtime pay, etc.) may be brought to the attention of management and management shall pay by check all of the money owed within forty-eight (48) hours, excluding Saturday and Sunday. Any time beyond the end of the 48-hour grace period shall be subject to a premium penalty of 5% per day for each twenty-four (24) additional hours that the employee is forced to wait for his/her pay.

## Section 3, Work Week:

The Employer shall be free to fix the hours of employment, provided that a normal work week for full-time employees shall consist of forty (40) hours divided into five (5) days of eight (8) hours each. Employees shall be scheduled two (2) consecutive days off in each work week. Employees may be scheduled for non-consecutive days off by mutual agreement between the Employer and the employee. The Employer shall establish and maintain an official work week indicating the weekly start and end days and times. The Employer shall post this schedule in a conspicuous place on the Employer's premises, at the worksite where possible and with a copy to the Union. Nothing contained in this Section shall be construed as a guarantee of any hours of work.

## Section 4, Working Out of Class:

Any employee who works in a higher paid classification for a minimum of two hours shall receive the rate of that classification for the hours so worked. An employee temporarily assigned to work in a lower paid classification shall retain their rate. Such work will be assigned as determined by management.

## Section 5, Training Wages:

All employees shall be compensated at their regular rate of pay for any non-new-hire training required by the Employer. In addition, employees shall be eligible for travel reimbursement in regard to any such training. Newly hired employees may be compensated by the Employer for their initial forty (40) hours at the Employer designated training rate, provided said rates are in compliance with the requirements of the California Labor Code.

## Section 6, Grace Period:

If the Employer has historically allowed grace periods for tardiness, that practice will continue during the life of this Agreement.

## Section 7, Breaks:

(a) The Employer agrees to allow each and every employee a ten (10) minute paid rest break for each four (4) hours worked, or major fraction thereof, plus a thirty (30) minute unpaid lunch break during any shift lasting six (6) hours or more.
(b) Employees who work shifts lasting more than five (5) hours shall be entitled to one paid rest break, and one thirty (30) minute unpaid lunch break. Lunches shall be taken as close to the middle of the shift as practicable.
(c) Employees who work shifts less than five (5) hours or less but more than two (2) hours shall be entitled to one paid rest break.
(d) Breaks shall be taken as close to the middle of each half-shift as possible.
(e) Lunches shall be taken as close to the middle of each shift as practicable.

## Section 8, Minimum Hours:

Each workday an employee is required to report to work, but is not put to work or is furnished with less than half of his or her usual or scheduled day's work, the employee must be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at his or her regular rate of pay.

The exception to the above is any of the following:

Page 10 of 71

1. When operations cannot begin or continue due to threats to employees or property, or when civil authorities recommend that work not begin or continue; or
2. When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or
3. When the interruption of work is caused by an Act of God or other cause not within the Employer's control, for example, an earthquake; or
4. If the employee is not fit to work; or
5. If the employee has not reported to work on time and is fired or sent home as a disciplinary action; or
6. Any occurrences beyond the reasonable control of the Employer.

## Section 9, Exchange and Donation of Shifts:

The Employer may, at its discretion, allow employees to exchange or "donate" shifts on a limited short-term basis with another employee within the bargaining unit, provided the exchange shall not create an economic impact for the Employer and the employee(s) obtains prior written approval from the Employer's designee.

## Section 10, Split Shifts:

a) Split shifts may not occur within these classifications: janitors, warehouse cargo handlers or cabin cleaners.
b) Split shifts for any classifications other than those cited in 10.a above shall not be separated by a period of more than two (2) hours.
c) Where split shifts have not historically been used prior to July 1, 2013, the Employer agrees not to use split shifts to reduce the number of full time positions or for the purpose of increasing the overall proportion of part time positions.
d) Where an Employer can demonstrate that the airlines service schedules demand split shifts separated by more than two (2) hours, the Employer will provide no less than two (2) weeks advance notification in writing to the Union. Any Employer proposal to establish split shifts separated by more than two (2) hours shall include a plan to mitigate the impact of such schedules on current employees so as to protect the maximum number of full-time positions possible. The Union, upon receiving effective notice of such operational demands, agrees to meet with the Employer concerning the proposed split shifts at that job location and no reasonable request shall be denied by the Union.

## Section 11, Payment While on Premises:

Any employee who is required by the Employer to remain on the job location shall be paid for all such time, including overtime, regardless of whether work is performed. Overtime rates will apply after eight (8) hours.

## Section 12, Payment for Travel:

Any employee who is required by the Employer to move from location to location in the course of performing his/her work assignments shall be paid in accordance with California law with respect to determination of time worked for the Employer.

## Section 13, Overtime:

For overtime calculations, eight (8) hours of labor constitutes a day's work, and employment beyond eight (8) hours in any workday, more than forty (40) hours in any workweek, or more than six (6) days in any workweek provided the employee is compensated for the overtime at not less than:

(a) One and one-half times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, for all hours worked over forty (40) in a workweek, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of twelve (12) hours in any workday and for all hours worked in excess of eight (8) on the seventh (7th) consecutive day of work in a workweek.

There shall be no pyramiding of overtime hours.

**Section 14, Shift Bids, Unanticipated Changes in Service Levels and Schedule Change Process:**
a)  <u>Shift Bids.</u>  Shift Bids and Schedule Changes shall be handled according to the following process:

    <u>Step 1.</u> The Employer shall notify a shop steward, or a different representative of the Union if the Union has designated such, in writing, by email of its intent to conduct a shift bid or schedule change and provide the following information in writing:
      i.    Explanation of the need for a new shift schedule,
      ii.   Proposed new shift schedule,
      iii.  Current shift schedules,
      iv.  Pertinent seniority list(s),
      v.   Any changes in flight schedules or other work specifications, if available and if applicable, and
      vi.  The Employer shall provide independently verifiable documentation of the need for the proposed changes, if available.

    The Union shall have up to seven (7) calendar days to review and discuss the proposed shift bid with the Employer and the Employer agrees to consider any reasonable requests made by the Union.  If the proposed changes do not reasonably reflect the explanation or documentation, the Union will have the right to grieve.

    <u>Step 2.</u>  No later than seven (7) calendar days from the date of the Employer's notice to the Union of its intent to conduct a shift bid, the Employer shall post the Shift Bid for review by bargaining unit members, together with the pertinent seniority list(s).  The Employer and the Union shall attempt to notify employees who are on an authorized leave that there has been a shift bid posted.

    The employees shall have no more than seven (7) calendar days to select their shifts following the date the Employer posts the Shift Bid.

    <u>Step 3.</u>  The new shifts will become effective no earlier than seven (7) calendar days after all affected employees have selected their shifts, or seven (7) calendar days following the date the Employer posted the Shift Bid, whichever comes first.

b)  <u>Unanticipated Changes in Service Levels.</u>  When unanticipated changes in service levels necessitates the Employer to reduce regularly scheduled hours, the Employer will provide no less than forty-eight (48) hours advance notification in writing to the Union.  The Union, upon receiving effective notice of such proposed change, agrees to meet with the Employer concerning a reduction in total hours of work at that job location and no reasonable request shall be denied by the Union.  Upon request, the Employer shall provide independently verifiable documentation of the need for any proposed reductions, if available.  Any reductions required shall be applied in order of Site Seniority within the affected classification(s).

c)  <u>Temporary Schedule Change Process.</u>  When unplanned flight delays or cancellations result in a temporary reduction in the need for service, the Employer may make corresponding reductions in schedules on the impacted shift(s) or work group(s), provided said reductions are applied in order of Site Seniority.

**Section 15, Bargaining Unit Work:**
Except in case of bona fide emergency, the Employer agrees that only employees covered by this Agreement shall be allowed to replace and/or relieve the duties of other bargaining unit employees, except to meet an immediate short-term need (less than four (4) hours) or for a one-time specific assignment to ensure the security and safety of the traveling public or law enforcement, so long as no bargaining unit employees lose employment.

**Section 16, Maintenance of Conditions:**
Unless provided for by this Agreement, the Employer shall not reduce the number of employees, the hours worked or rates of pay of any employee at any job location because of the execution of the Agreement.

**Section 17, Definition of Full-Time Employee:**
A full-time employee is one who regularly works 30 hours per week or more.

**Section 18, New Job Classifications:**
The Employer has the right to establish new bargaining unit job classification(s) and change(s) in an existing job classification that would be appropriately within the bargaining unit. Such changes may be due to, but not limited to, changes in responsibilities and production. The Employer shall give seven (7) calendar days' notice to the Union of any changes in job classifications, which shall include the rate of pay assigned to any new classification prior to offering such job classification for posting. The Employer shall meet with the Union to discuss the new or changed job classification. Nothing contained herein shall prevent the Employer from implementing such new or changed job(s). It is agreed to by the parties that the Union has the right to negotiate the effects of any significant changes in job classifications.


## ARTICLE 8.  HEALTH CARE

This Article expresses the understanding of the Employer and the Union concerning Employer contributions to provide health and welfare benefits on behalf of LAX Passenger Service employees covered by this Agreement.

**Section 1, Contributions:**
All Employer contributions referred to in this Article shall be paid into the California Service Employees Health and Welfare Trust Fund (CSETF) to the Depository Bank, as named by the Board of Trustees. It is understood that all questions concerning eligibility of employees for coverage, including the commencement and termination of coverage, shall be determined by the Trustees of said Trust Fund.

**Section 2, Trust Fund:**
The Employer agrees to be bound by all the terms and provisions of the Agreement and Declaration of Trust of the California Service Employees Health and Welfare Trust Fund, and any plan documents or summary plan description thereof, as each of these may from time to time be amended by the Board of Trustees, and hereby acknowledges prior receipt of a copy thereof. The Employer shall comply with all the provisions of the California Service Employees Health and Welfare Trust Fund and shall maintain, as required by law, furnish and make available for audit such data and records as the Trustees may require, as provided in the Agreement and Declaration of Trust of the California Service Employees Health and Welfare Trust Fund.

**Section 3, Coverage:**
The Employer shall provide Health and Welfare coverage for employees covered by this Agreement pursuant to the terms of coverage contained herein as follows:

    a.    <u>Report of Eligible and Qualifying Employees.</u>  Between the first (1st) and the fifteenth (15th) day of each calendar month, the Employer shall, except as prohibited by law, submit a list to the

Trust Fund containing the name, address and social security number of each eligible and qualifying employee indicating the number of hours paid to each employee in the previous calendar month.

b.    <u>Qualifying hours</u> for continuing full-time employees will be one hundred and twenty (120) hours in the previous calendar month to provide Health and Welfare coverage the following month after contribution has been received by the Trust Fund. PTO and paid sick leave shall be included in computing qualifying hours. Employees hired on or after July 1, 2013 shall be covered under the provisions of Section 4 Eligibility paragraph (a) of this Article.

If the Employer has paid to an employee at the employee's request PTO in advance of the month or months in which the employee takes the corresponding PTO, such pre-paid PTO shall not count in computing the qualifying hours of the employee for the month or months in which it is paid, including for the purpose of determining Employer overpayments or underpayments. At the employee's written request such PTO shall be credited toward eligibility for the month(s) that the employee actually takes time off from work. The employee shall inform the Employer, in writing, as to when they shall actually take time off from work. PTO and Sick Leave cash-outs, when an employee is terminated or laid-off, are also to be included in computing qualifying hours in the month it is paid to the employee.

c.i    Except as may be provided otherwise in this Article, when an employee qualifies for health and welfare coverage, the Employer shall, for the anniversary year commencing with May 2017 work hours/payroll due June 2017 for coverage in July 2017, contribute on behalf of each qualifying employee, the required composite or tiered contribution rates as set forth below, to the California Service Employees Health and Welfare Trust Fund. The Employer contribution will provide the employee and his/her dependents with Kaiser Medical Plan "C-9", including Kaiser "C-9" Prescription Drug coverage, Liberty Pre-Paid Dental Plan LDP200, Vision Service Plan #C and $5,000 Life Insurance coverage (including $2,500 dependent coverage).

Upon completion of thirty-six (36) months of employment, otherwise eligible employees hired prior to July 1st, 2015 shall be eligible for the levels of coverage and Employer contributions described in Article 8, Section 3.c.i.

For example, an employee hired in July of 2014 would complete their 36th month of employment in June of 2017. The Employer contribution would be due by no later than the 20th of June 2017, for Plan C-9 coverage effective on the first day of July 2017, the employee's 37th calendar month of employment.

| LENGTH OF SERVICE | RATE | BENEFITS |
|---|---|---|
| Upon completion of 8 months of employment up to 36 months | $342.48 | • Kaiser 5808 benefits with $4500 individual annual deductible, 40% coinsurance for office visit, 40% coinsurance after deductible for ER, 30% coinsurance for each generic Rx /40% coinsurance for each brand name Rx<br>• Liberty Dental LDP200 |

| | | | |
|---|---|---|---|
| | | | <ul><li>Vision Service Plan C</li><li>$5,000 Member-Only Life Insurance</li></ul> |
| After the completion of 36 months of employment | Composite<br>-OR-<br><br>Tiered EE Only<br>Tiered EE+1<br>Tiered EE+F | $836.48<br>-OR-<br><br>$505.48<br>$983.48<br>$1,377.48 | <ul><li>Kaiser C-9 benefits with $30 office visit copay, $125 ER, $15 generic Rx copay/$35 brand name Rx copay</li><li>Liberty Dental LDP200</li><li>Vision Service Plan C</li><li>$5,000 Life Insurance</li></ul> |

c.ii    <u>New Employee Coverage</u>.

Maintenance of Standards: For employees hired on or after July 1st, 2015, except as may be provided otherwise in this Article, when such an employee first qualifies for health and welfare coverage, the Employer shall, for the anniversary year commencing with May 2017 - work hours/payroll due June 2017 for coverage in July 2017, contribute on behalf of each qualifying employee, the required contribution rates as set forth below, to the California Service Employees Health and Welfare Trust Fund.  The Employer contribution will provide the employee with the corresponding benefits as described below.

Upon completion of eight (8) months of employment, otherwise eligible employees shall be eligible for the levels of coverage and Employer contributions described in Article 8, Section 3.c.ii.

Upon completion of thirty-six (36) months of employment, otherwise eligible employees hired on or after July 1st, 2015 shall be eligible for the levels of coverage and Employer contributions described in Article 8, Section 3.c.ii.

Upon completion of forty-eight (48) months of employment, otherwise eligible employees hired on or after July 1st, 2015 shall be eligible for the levels of coverage and Employer contributions described in Article 8, Section 3.c.ii.

Upon completion of sixty (60) months of employment, otherwise eligible employees hired on or after July 1st, 2015 shall be eligible for the levels of coverage and Employer contributions described in Article 8, Section 3.c.ii.

| LENGTH OF SERVICE | RATE | BENEFITS |
|---|---|---|
| Upon completion of 8 months of employment up to 36 months | $342.48 | <ul><li>Kaiser Bronze 5808 benefits with $4500 individual annual deductible, 40% coinsurance for office visit, 40% coinsurance after deductible for ER, 30% coinsurance for each generic Rx /40% coinsurance for each brand name Rx</li><li>Liberty Dental LDP200</li><li>Vision Service Plan C</li></ul> |

| | | | • $5,000 Member-Only Life Insurance |
|---|---|---|---|
| After the completion of 36 months of employment up to 47 months | $424.48 | | • Kaiser Silver 6761 benefits with $1000 individual annual deductible, $40 office visit copay, 30% coinsurance after deductible for ER, $25 generic Rx copay/$50 brand name Rx copay<br>• Liberty Dental LDP200<br>• Vision Service Plan C<br>• $5,000 Member-Only Life Insurance |
| After the completion of 48 months of employment up to 59 months | Tiered EE Only<br>Tiered EE+1<br>Tiered EE+F | $424.48<br>$821.48<br>$1,149.48 | • Kaiser Silver 6761 benefits with $1000 individual annual deductible, $40 office visit copay, 30% coinsurance after deductible for ER, $25 generic Rx copay/$50 brand name Rx copay<br>• Liberty Dental LDP200<br>• Vision Service Plan C<br>• $5,000 Life Insurance |
| After the completion of 60 months of employment | Composite<br>-OR-<br>Tiered EE Only<br>Tiered EE+1<br>Tiered EE+F | $799.48<br>-OR-<br>$483.48<br>$939.48<br>$1,314.48 | • Kaiser C-9 benefits with $30 office visit copay, $125 ER, $15 generic Rx copay/$35 brand name Rx copay<br>• Liberty Dental LDP200<br>• Vision Service Plan C<br>• $5,000 Life Insurance |

c.iii    Opt-Up: Except as may be provided otherwise in this Article, employees may, on a voluntary basis, indicate to the Employer and the Trust Fund, at the time of enrollment, on a form provided by the Trust Fund that they wish to "Opt-Up" to the Kaiser C-9 health & welfare package shown in Article 8, Section 3.c.i above.  The "Opt-Up" provision is optional only to the employee and not the Employer.  For employees who choose to "Opt Up", the Employer will charge the employee a premium calculated as the difference between the Employee-Only contribution for the employee's current health & welfare package and the Employee-Only contribution for Plan C-9 through payroll deductions as permitted by Section 224 of the California Labor Code; in the first paycheck of the calendar month, for every month in which the employee is eligible for health coverage and has "Opted Up" through the California Service Employees Health and Welfare Trust Fund.  For employees who choose to "Opt Up" into C-9 coverage for any dependents, 50% of the difference in cost between the 5808 Employee-Only contribution the cost of any dependent coverage under Plan C-9 shall be borne by the employee, through payroll deductions as permitted by Section 224 of the California Labor Code and the Employer will pay the remaining 50%.  It is understood that the "Opt Up" status and the accompanying payroll premium deduction will be effective in the month following the receipt of the appropriate documents by the Trust Fund office from the participant.

Employees may on a voluntary basis, indicate to the Employer and the Trust Fund, at the time of enrollment, on a form provided by the Trust Fund that they wish to "Opt-Up" to either the Plan 6761 or the Plan C-9 health & welfare package shown in Article 8, Section 3.c.ii above.  The "Opt-Up" provision is optional only to the employee and not the Employer.

For employees who choose to "Opt Up" from Plan 5808 to Plan 6761, the Employer will charge the employee a premium calculated as the difference between the Employee-Only contribution for Plan 5808 and the Employee-Only contribution for Plan 6761 through payroll deduction. Employees who choose to "Opt Up" into Plan 6761 for any dependents will pay for 50% of the additional cost above the 5808 Employee-Only contribution through payroll deduction as permitted by Section 224 of the California Labor Code and the Employer will pay the remaining 50% of the additional cost;

For employees who choose to "Opt Up" from Plan 6761 to Kaiser C-9, the Employer will charge the employee a premium calculated as the difference between the Employee-Only contribution for Plan 6761 and the Employee-Only contribution for Plan C-9 through payroll deduction as permitted by Section 224 of the California Labor Code. Employees who choose to "Opt Up" into Plan C-9 for any dependents will pay for 50% of the additional cost above the 5808 Employee-Only contribution through payroll deduction as permitted by Section 224 of the California Labor Code and the Employer will pay the remaining 50% of the additional cost;

For employees with eligible dependents who choose to "Opt Up" from Plan 6761 to Kaiser C-9, the Employer will charge the employee a premium calculated as fifty percent (50%) of the additional cost above the Plan 6761 contribution through payroll deduction as permitted by Section 224 of the California Labor Code and the Employer will pay the remaining 50% of the additional cost.

The Employer is hereby authorized to make the payroll deduction necessary as permitted by Section 224 of the California Labor Code; in the first paycheck of the calendar month, for every month in which the employee is eligible for health coverage and has "Opted Up" through the California Service Employees Health and Welfare Trust Fund.

c.iv    <u>Opt-Down:</u> Employees who are otherwise eligible for Kaiser Plan "C-9", as described in Article 8, Section 3.c.i above, may on a voluntary basis, indicate to the Employer and the Trust Fund, at the time of enrollment, on a form to be provided by the Trust Fund that they wish to "Opt Down" to: the Kaiser Plan "6761" family, the Kaiser Plan "6761" employee-only, or the Kaiser Plan "5808" employee-only as described in Article 8, Section 3.c.ii above. Employees wishing to Opt Down must complete and provide the required form to their Employer and to the Trust Fund Office by no later than June 15th, 2017. Thereafter, employees wishing to Opt Down must complete and provide the required documentation to their Employer and to the Trust Fund Office during the month of January of each calendar year and no later than thirty (30) days when the employee first qualifies for health and welfare coverage. Once an employee has Opted Down, that employee may not change group health coverage through California Service Employees Health and Welfare Trust Fund again until the following calendar year in January and no later than the tenth (10th) day.

<u>Opt-Down Premium.</u> For employees otherwise eligible for Kaiser Plan "C-9", who Opt Down to one of the lower levels of coverage provided through the California Service Employees Health and Welfare Trust Fund and shown in the 'Opt-Down Premium Chart' below, the Employer will, for every month in which the employee is otherwise eligible for health coverage and has Opted Down, pay the Opt Down Premium amount shown in the chart below.

The equivalent hourly wage differentials shown in the 'Opt-Down Premium Chart' are calculated by dividing the monthly Opt Down Premium by 173 hours.

If paid hourly, the Opt Down Premium hourly differential will be added to the employee's regular wage and be applicable to all paid hours and premium pay calculations for every month in which the employee is otherwise eligible for health coverage and has Opted Down.

If paid monthly, the Opt Down Premium will be paid in the first paycheck of every month for every month in which the employee is otherwise eligible for health coverage and has Opted Down.

The Employer will notify the Union and the employees in writing by July 1st of 2017 and by January 1st of each subsequent year of this Agreement whether it will pay Opt Down Premiums as the monthly figures or the hourly differentials shown in the 'Opt-Down Premium Chart'.

| Opt Down Premium Chart | | | |
|---|---|---|---|
| Employees Eligible For: | Who Opt Down To: | Opt Down Premium | |
| | | Monthly Bonus | Hourly Differential |
| Kaiser Gold C-9 – Dependents | Kaiser Silver 6761 – Dependents | $65.00 | $0.38 |
| Kaiser Gold C-9– Dependents | Kaiser Silver 6761 – Employee Only | $200.00 | $1.16 |
| Kaiser Gold C-9– Dependents | Kaiser Bronze 5808 – Employee Only | $250.00 | $1.45 |

It is understood that the Opt-Down status will be effective in the following month after the receipt of the appropriate documents by the Trust Fund office from the participant.

d.    **Base Premiums:** Said amounts referenced in Article 8, Section 3c above shall constitute base premiums for the contract year beginning July 1, 2017 and ending June 30th, 2018. Commencing with May 2018 work hours and thereafter, the Employer shall pay such greater amounts, if any, pursuant to Article 8, Section 3e and Article 8, Section 3f below, as determined by the Trustees to be necessary to maintain the benefits in the plans provided by the Trust, or such successor plans which may be adopted by the Trustees after May 1, 2018. These greater amounts shall constitute base premiums for each succeeding plan year, subject to the terms of Article 8, Section 3(e) below.

e.    **Maintenance of Benefits:** It is agreed that the employee benefits established hereunder for all employees receiving such benefits during the term of this Agreement, shall be maintained for the life of this Agreement. In the event that the Trustees of the Trust ("Trust") referred to in Article 8, Section 1 above determine that it is necessary to increase premiums above the base premium in order to maintain the benefits which were in effect on May 1, 2017, or which may be adopted hereafter by the Employer and the Union, the Employer shall, during each anniversary year and each anniversary date of this Agreement thereafter, commencing with May 2018 work hours, pay up to six percent (6%) of any such premium increase over the prior plan year's base premium. Any premium increase in excess of six percent (6%), but less than twelve percent (12%) over the prior plan year's base premium in any contract anniversary year commencing with May 2018 work hours shall be paid from the reserves of the Trust. Any premium increase in excess of 12% over the prior plan year's base premium in any contract

anniversary year shall be shared equally between the Employer and affected employees through payroll deductions as permitted by Section 224 of the California Labor Code. Premium increases subject to payment from Trust Fund reserves that are in excess of six (6%) percent annually are subject to the Plan Consultant certifying by January 31 of each contract year that the reserves of the Trust will equal or exceed twelve (12) months, through April 30, of the following year. The contract anniversary year by example of this Agreement is May 01, 2017 and each May 01 thereafter through May 01, 2022. The Trustees have agreed to continue the subsidy through June 2022 payment based on May 2022 work hours for July 2022 coverage.

f.     In the event the Trust Consultant is unable to certify the maintenance of at least the above mentioned 12-month reserve level, any premium increase above six (6%) percent shall be shared equally between the Employer and affected employees through payroll deductions as permitted by Section 224 of the California Labor Code; provided, however, that the Employer and the Union may by mutual agreement enter into non-binding discussions with respect to the lowering of health and welfare plan premiums or some other arrangement for sharing of plan increases above six (6%) percent. The Employer and the Union agree that any such mutually agreeable changes shall be reduced into writing and incorporated by reference into this Agreement.

g.     Opt-Out: Employees who have completed the eligibility waiting period to qualify for the Plan C-9 coverage and who can provide credible written proof of other coverage through another Employer, a spouse or family member's plan, the US Department of Veterans Affairs, MediCare, or any other coverage which the Trust Fund may indicate in writing to be acceptable, may Opt Out of the health and welfare benefits described in this Article. Employees wishing to Opt Out must provide the required documentation of alternate coverage to their Employer and to the Trust Fund Office by no later than thirty (30) days when the employee first qualifies for health and welfare coverage. Thereafter, employees wishing to Opt Out must provide the required documentation of alternate coverage to their Employer and to the Trust Fund Office during the month of January of each calendar year and no later than the 10th day. Employees who are turning 65 years old may opt out of Trust Fund coverage at the time they first become eligible or within 30 days of qualifying for Medicare. Once an employee has opted out of coverage, that employee may not enroll again for group health coverage through California Service Employees Health and Welfare Trust Fund until the following calendar year in January and no later than the 10th day, unless the employee has a "qualifying event", in which case the employee may enroll within two calendar months of the date when the employee became aware of the qualifying event. Qualifying events include marriage, divorce, loss of an existing source of other health care coverage, and birth or adoption of a child under the age of 26 years. Eligibility to re-enroll due to a qualifying event shall be determined by the Trust Fund's plan rules.

Employees who have completed the eligibility waiting period to qualify for the Bronze Plan 5808 or the Silver Plan 6761 may Opt Out of the health and welfare benefits described in this Article without proof of other coverage. Once an employee has opted out of coverage, that employee may not enroll again for group health coverage through California Service Employees Health and Welfare Trust Fund until the following calendar year in January and no later than the 10th day, unless the employee has a "qualifying event" as described above. Eligibility to re-enroll due to a qualifying event shall be determined by the Trust Fund's plan rules.

**Opt-Out Premium.** For employees who Opt Out of the coverage provided through the California Service Employees Health and Welfare Trust Fund for which they are eligible and shown in the 'Opt-Out Premium Chart' below, the Employer will, for every month in which the employee is otherwise eligible for health coverage and has Opted Down, pay the Opt-Out Premium amount shown in the chart below.

The equivalent hourly wage differentials shown in the 'Opt-Out Premium Chart' are calculated by dividing the monthly Opt-Out Premium by 173 hours.

If paid hourly, the Opt-Out Premium hourly differential will be added to the employee's regular wage and be applicable to all paid hours and premium pay calculations for every month in which the employee is otherwise eligible for health coverage and has Opted Down.

If paid monthly, the Opt-Out Premium will be paid in the first paycheck of every month for every month in which the employee is otherwise eligible for health coverage and has Opted Down.

The Employer will notify the Union and the employees in writing by July 1st of 2017 and by January 1st of each subsequent year of this Agreement whether it will pay Opt-Out Premiums as the monthly figures or the hourly differentials shown in the 'Opt-Out Premium Chart'.

| Opt-Out Premium Chart | | |
|---|---|---|
| Employees Eligible For: | Will Receive This Opt-Out Premium | |
| | Monthly Bonus | Hourly Differential |
| Kaiser Gold C-9 | $300.00 | $1.73 |
| Kaiser Silver 6761 | $260.00 | $1.50 |
| Kaiser Bronze 5808 | $225.00 | $1.30 |

It is understood that the Opt-Out status will be effective in the following month after the receipt of the appropriate documents by the Trust Fund office from the participant.

h.    **Annual Rate Selection:** Effective January 1st, 2018 and annually thereafter, for hours worked in January, the Employer shall have until February 15th of each calendar year to notify the Trust Fund in writing whether it will pay monthly to the Trust Fund the Composite or the Tiered rates for the following month's (March) contribution, as indicated in paragraph 3.d.i and 3.d.ii above for each eligible employee and their eligible dependents enrolled in the plan provided by the Trust Fund. The Employer must indicate whether they will use the Composite rate or the Tiered rates for all employees. The Employer may not use the Composite rate for some employees and the Tiered rates for others, except as indicated in Rate Selection for Accounts Acquired from Other Signatories below. Once the Employer has indicated their rate selection, that Employer may not change that rate selection until the following calendar year in February and by no later than the 15th day. The composite plan rate of $836.48 will be considered as full payment for the period of May 2017 work hours (due in June 2017) through April 2018 work hours (due in May 2018) only. The tiered plan rates of $505.48 (Employee-Only), $983.48 (Employee +1) and $1,377.48 (Employee +2 or more) will be considered as full payment for the period of May 2017 paid/work hours (due in June 2017) through April 2018 paid/work hours (due in May 2018) only. The Trust Fund reserves the right to increase rates annually thereafter. The Employer's

obligations with regards to any such increases beyond 2017 are outlined in Article 8, Section 3.g, above.

i.    Each calendar year during the term of this Agreement the Trustees shall provide the Employer with written notice of the monthly premium per employee which shall be effective no sooner than sixty (60) calendar days following service of such notice, and shall continue through such calendar year, subject to paragraphs 8.3.d, 8.3.f, 8.3.g and 8.3.i of this Article. The Employer's obligation to pay increased premiums during any calendar year shall be conditioned upon receipt of above-referenced sixty (60) calendar days advance written notice of any premium change for such calendar year, or sixty (60) calendar days prior to any premium change occurring during a calendar year in which a premium increase has previously been implemented by the Trustees. A copy of such notice shall be served contemporaneously on the Union.

## Section 4, Eligibility:

Eligibility and qualifications for contributions for Health & Welfare contributions under this Article are as follows:

a.    <u>Initial Eligibility for Contributions, New Employees</u>:

Employees hired on or after July 1, 2013 must work eight (8) calendar months and be paid no less than one hundred and twenty (120) hours per month for six (6) consecutive months to become eligible for their initial contribution to the Trust for health and welfare coverage. Initial contribution shall be made during the first (1st) calendar month following completion of both eight (8) calendar months of employment and six (6) consecutive months of payment of no less than one hundred and twenty (120) hours per month in order for coverage to begin no later than the first (1st) day of the second (2nd) calendar month following completion of these initial eligibility requirements.

For example, an employee hired on July 1st, 2017 will complete eight (8) calendar months of employment on February 28th, 2018. If this employee has been paid no less than one hundred and twenty (120) hours per month for six (6) consecutive months between July 1st, 2017 and February 28th, 2018, then the Employer shall submit payment to the Trust on behalf of this employee by no later than the twentieth (20th) day of March of 2018 for the employee's coverage to begin on April 1st, 2018.

An employee hired on July 1st, 2017 will complete eight (8) calendar months of employment on February 28th, 2018. If this employee does not complete six (6) consecutive months of employment for which there was payment for at least one hundred and twenty (120) hours per month until May 1st, 2018, then the Employer shall submit payment to the Trust on behalf of this employee by no later than the twentieth (20th) day of June of 2018 for the employee's coverage to begin on July 1st, 2018.

b.    <u>Continuing Eligibility for Benefits</u>: Eligibility and qualifications for all employees provided with benefits under this Article are:

1)    Minimum qualifying hours for continuing eligibility for health and welfare contributions will be one hundred and twenty (120) hours or more per calendar month, measured from the first (1st) day of each calendar month.

2)    The Employer will submit contributions to the Trust by no later than the twentieth (20th) day of the calendar month of any month in which the employee has been paid one hundred and twenty (120) hours or more per month during the previous calendar month.  PTO and paid sick leave shall be included in computing qualifying hours in the week in which the employee would have normally worked such hours.  If the Employer has paid to an employee at the employee's request PTO in advance of the week(s) in which the employee takes the corresponding PTO time, such pre-paid PTO shall not count in computing the qualifying hours of the employee for the month or months in which it is paid, including for the purpose of determining Employer overpayments or underpayments.  At the employee's written request such PTO shall be credited toward eligibility for the week(s) that the employee actually takes time off from work.  The employee shall inform the Employer, in writing, as to when they shall actually take time off from work.  PTO and Sick Leave cash-outs, when an employee is terminated or laid-off, are also to be included in computing qualifying hours in the month it is paid to the employee.

For example, if an employee has worked one hundred and twenty (120) hours in the month of July 2017, then the Employer shall submit contributions to the Trust for that employee's health and welfare coverage by no later than August 20th of 2017, for coverage effective on September 1st of 2017.

3)    <u>Look Back & Stability Periods:</u>  Beginning on December 1st of 2017 and annually thereafter for the life of this Agreement, the Employer shall continue to submit monthly contributions to the Trust in the months of December 2017 through May 2018, regardless of hours paid or worked, for any employee who qualified for health and welfare contributions during the months of September, October and November 2017 and is an active duty employee or on an authorized leave for which medical benefits are contractually protected.  For any otherwise eligible employee who does not qualify for health and welfare contributions during the months of September, October and November 2017 and annually thereafter, the minimum qualifying hours for continuing eligibility will be as described in Section 1, above, of "Continuing Eligibility for Benefits" for the months of December 2017 through May 2018 and annually thereafter.  During the months of June 2018 through November 2018 and annually thereafter, the minimum qualifying hours for continuing eligibility will be as described in Section 1, above, of "Continuing Eligibility for Benefits".

4)    Any employee who has worked and/or been paid for the equivalent, or more, of the qualifying hours (as specified in this Article) in the preceding calendar month and who is on a leave pursuant to the Federal or California Family Leave Act (FMLA) and does not work and is not paid for the necessary number of qualifying hours in that month or consecutive subsequent months while on FMLA leave shall have his/her Health and Welfare contributions made by the Employer as if the employee had worked and/or been paid for the qualifying hours.

5)    <u>Bidding and Change of Contractor:</u>  When an Employer signatory to this Agreement takes over a service contract from another signatory Employer, the following terms shall apply:

a) <u>Rate Selection</u>:  When, during the life of this Agreement, the Employer acquires a service contract at LAX from another signatory Employer and the rate selection (Tiered or Composite) in place for employees under that service contract ('acquired account') is different from the selection the Employer has currently designated in "Annual Rate Selection" above, the Employer must indicate in writing to the Trust by no later than the 15th of the first month in which premium payments become due whether the Employer will maintain the rate selection then in place for the acquired account.  At each subsequent "Annual Rate Selection" period, the Employer must notify the Trust if it will exercise the option to maintain the original rate selection for the acquired account.

b) <u>Incoming Employer</u>:  Continuing employees who were eligible and had not opted out of coverage as of the date the incoming signatory takes over the service contract shall be eligible for contributions by the Incoming Employer in the second and third calendar months of employment with the Incoming Employer.  Once these employees have completed ninety (90) days on payroll with the Incoming Employer, the eligibility requirements outlined in Article 8, Section 4b(1) and 4b(2) above shall apply.  Continuing employees who were eligible and had opted out of coverage as of the date the incoming signatory takes over the service contract shall maintain their "opt-out" status with the Incoming Employer.

6)    Employee Forms:  During the same calendar month in which the Employer submits the first contribution to the Trust for an employee, the Employer will provide the employee with health & welfare forms from the Trust for enrollment, Opt-Up, Opt-Down and Opt-Out.  The Trust will make such forms available to the Employer upon request.

## Section 5, Preservation of Full Time Work:

a) Where an Employer can demonstrate that the client demands shifts of less than full-time hours among the Employer's current service contracts, the Employer will provide advance notification in writing to the Union.  The Employer will notify the Union as far in advance as reasonably possible, but in no case less than two (2) business days of receipt of the client request.  Any Employer proposal to establish shifts of less than full-time hours shall include a plan to ensure the maximum number of full-time shifts as the client's demands will allow.  The Union, upon receiving effective notice of such operational demands, agrees to meet with the Employer concerning the proposed shifts at that job location and no reasonable request shall be denied by the Union.

b) Except as indicated in Sections 5a and 5c of this Article 8, the Employer agrees not to exceed a total percentage of 15% part-time positions, or the percentage of part-time positions indicated in the employee census information shown in Appendix Q to this Agreement, whichever is greater.

c) Seasonal and/or temporary hires (not to exceed a total of five hundred and twenty (520) hours on payroll) who are working part-time shall not be counted in determining the Employer's overall percentage of part-time positions on payroll.  Employees working part-time in new service contracts or new expansions of existing contracts acquired after July 1, 2013 shall not count in determining the Employer's overall percentage of part-time positions on payroll.

## ARTICLE 9. SENIORITY

### Section 1, Definitions and Applications:

There shall be three terms used with reference to seniority, provided an employee is otherwise qualified, the following applications of seniority shall prevail:

(a) "Airport Seniority" shall be defined as the employee's length of continuous service with the current Employer as measured from the employee's recorded date of hire with Employer and its predecessor employer(s) signatory with the Union at the Airport, if any. Airport seniority shall apply for purposes of determining wage rates, benefit eligibility, layoffs, reductions in hours, recall and bidding rights for job openings or promotions.

(b) "Classification Seniority" shall be determined by the employee's Airport Seniority, within and relative to the employees working in a given Classification in a given Site. Classification Seniority shall be used for scheduling for PTO and time off, for temporary assignments, for assignment of overtime and for assignment of mandatory hours beyond the regular shift.

(c) "Site Seniority" shall be determined by the employee's length of continuous service at or on a given account and within the same line of service as measured from the employee's recorded date of assignment to that account and line of service with the Employer and predecessor Employer(s) signatory with the Union. Site Seniority shall apply within the relevant classification for purposes of selection for shift bids and schedule determinations. An employee's Site Seniority shall not be affected if a customer relocates to a new location or terminal. In cases where a work crew has historically assigned employees across multiple sites, that crew will be treated as a site.

(d) Tie-breaker. In cases where two or more employees have the same Airport Seniority date, the Employer will refer to the last four (4) digits of the employees' Social Security Numbers. The employee with the highest four (4) digit number will have first preference, the next highest second preference and so on. In cases where two or more employees have the same Site or Classification Seniority dates, the employees' Airport Seniority dates shall serve as the tie-breaker.

(e) Bumping. Seniority shall not be used for purposes of bumping.

(f) Provided such selection shall not cause an extreme burden on the Employer's operational needs.

(g) An individual employee who is involuntarily transferred without a showing of cause shall retain their Site Seniority date from their original location.

### Section 2, Seniority List:

(a) Each Employer shall maintain a separate seniority list posted at a conspicuous place on the Employer's premises, at the worksite where possible, with a copy furnished to the Union. Any employee who questions his Airport or Site Seniority date must notify the Union and the Employer within thirty (30) days of the posting date.

(b) The seniority list shall be updated quarterly. In the event of any shift bid, the seniority list relevant for the bid shall be posted with a copy to the Union seven (7) days prior to the bid.

(c) The information posted in the seniority list shall be limited to the employee's full name and all seniority dates described in Section 1.

## Section 3, Transfer Requests and Promotions:

(a) In the event a promotional opportunity or a job opening occurs, the Employer agrees to notify all employees of that respective Employer of this opening by posting notice at bulletin boards and where employees sign in for seven (7) calendar days and sending a copy to the Union.

(b) Qualified employees working at the Site where the opening occurs shall have preference over employees from other Sites for filling the position(s), by Airport Seniority.

(c) Current employees shall have preference over new hires for filling the position(s), by Airport Seniority.

(d) The Employer shall not require that any employee move permanently from one site to another without providing prior written notice of the reason for said involuntary transfer.

## Section 4, Seniority Accrual on Layoff:

Any employee on layoff shall retain his/her seniority for a period of 180 days.

## Section 5, Loss of Seniority:

Seniority shall be broken for any of the following reasons. In such circumstances, the employee shall be considered a new employee for all purposes, if and when rehired into the bargaining unit:

a) Resignation or other voluntary termination of employment, or

b) Discharge for just cause, or

c) Continuous employment outside of the bargaining unit with the same Employer for more than 180 days, or

d) Failure to return to work within seven (7) calendar days after the postmark of Employer's written notice to return to work, unless the Employer and Union agree to extend this time period. Such notice shall be deemed sufficiently given if sent to the employee by a reliable, documented, means to the last address given by the employee to management, or

e) Continuous layoff for a period beyond 180 days from the date of layoff, or for a period equal to the employee's length of service, whichever is shorter.

## Section 6, Recall:

Any employee who has been laid off shall be eligible for recall for a period of 180 days from the effective date of layoff. Employees on recall status shall retain their original date of hire for Airport Seniority. Recalled employees must report to work within seven (7) calendar days after the postmark on the Employer's written notice to return to work, unless the Employer and the Union agree to extend this time period.

## Section 7, Recall Priority:

If an opening occurs, the Employer shall offer the position to qualified laid off employees on recall status in order of Airport Seniority prior to offering the position to any other employee or new hire. The Employer must provide adequate training to any employee recalled into a classification new to that employee. The employee shall remain eligible for future recall if the position offered is a new classification for the employee and the Employer fails to provide adequate training. If the Employer fails to provide adequate training within seven (7) days of the employee's reinstatement, the employee shall have the right to return to layoff status and continue to retain their seniority and recall rights for a period of 180 days from the date employee returns to recall status.

## Section 8, Probationary Period:

The probationary period for new employees shall be ninety (90) calendar days of continuous employment. Probationary employees may be discharged without recourse to the grievance and arbitration procedures of Article 14. Discharged probationary employees shall not be eligible for recall. Upon completion of such probationary period, an employee shall accrue all seniority retroactively from the date of his or her hire.

**Section 9, Part-Time Employees:**
Regular part-time employees shall be entitled to the same seniority rights as regular full-time employees, except as may otherwise be provided in this Agreement. Part time employees shall have first preference for additional hours, based on Classification Seniority.

**Section 10, Overtime and Additional Hours:**
**(a)** The Employer shall maintain a sign-up sheet containing names of interested employees who wish to work a full eight (8) hour shift of overtime hours. The Employer shall call from this sign-up sheet on a rotating basis by Classification Seniority to fill full eight (8) hour openings or when a client requests additional service.
**(b)** The Employer agrees to assign any additional hours to employees working less than forty (40) hours, even in other classifications, if and only if they are qualified to do the work, prior to hiring new employees or assigning overtime to employees already working forty (40) or more hours, whenever feasible.

**Section 11, Mandatory Hours Beyond Regularly Scheduled Shifts:**
In circumstance where the Employer must require employees to stay additional hours beyond their regularly scheduled shift, the Employer will whenever feasible:

a) Provide a minimum of two (2) hours advance notice of mandatory overtime, and if not given, the Employer shall not discipline employees for leaving work at the end of their regularly scheduled shift.
b) Offer such additional hours to workers in the classification that performs the required additional work, first to part-time employees by Classification Seniority, then to full-time employees by Classification Seniority on a rotating basis. If there are no volunteers, the Employer may require employees to perform the additional hours by reverse Classification Seniority.
c) Identify clearly the manager or supervisor with whom employees should address conflicts of schedule.
d) Not require employees to work mandatory overtime of twelve (12) hours or more for periods of longer than three (3) consecutive calendar days or totaling more than five (5) calendar days in any two (2) week period. Refusal to work beyond these maximum limits shall not be cause for discipline or discharge.
e) Not require employees to work mandatory shifts of more than ten (10) hours for periods of longer than four (4) consecutive calendar days.

In all cases, it is the employee's responsibility to make a good faith effort to address conflicts due to responsibilities to care for a child or sick family member in order to accommodate the Employer's request.

The Employer shall not unreasonably deny requests to be released from the requirement to work additional hours in cases where the employee has been unable to resolve conflicts due to responsibilities to care for a child or sick family member.


# ARTICLE 10. ASSIGNING WORK
The Employer shall have the right to assign any employee, in reverse seniority order, in any job classification to any other job classification within the bargaining unit on a temporary or part-time basis, for a period of no longer than fifteen (15) days, provided that the employee is paid at the rate set for that job classification and not less than the employee's regular scheduled pay rate, and provided that the employee has been trained to perform the duties of the other job classification. The fifteen day limitation shall not apply in the case of a bona fide government, airport, or airline created emergency, and only for the duration of the emergency situation.

## ARTICLE 11. LEAVES OF ABSENCE

Section 1, Scheduling of Time Off:

    (a) Scheduling of time off requests will be handled on a first-come, first-served basis, when presented to the Employer's designee at the worksite. In cases where two or more employees are requesting the same day or days off and neither employee's request had been approved in writing before the other's was submitted, preference for approval will be given in order of Classification Seniority. In cases where an employee has already had a time off request approved in writing, that employee's request will not be subject to 'bumping' by any more senior employee.

    (b) Employees requesting time off for three (3) consecutive days or more shall submit such request in writing to the Employer with no less than twenty-one (21) calendar days advance notice. The Employer shall provide a written approval or disapproval to the employee in no more than seven (7) calendar days.

    (c) Employees requesting time off for less than three (3) consecutive days shall submit such request in writing to the Employer with no less than seven (7) calendar days advance notice. The Employer shall provide a written approval or disapproval to the employee in no more than four (4) calendar days.

    (d) The Employer may waive advance notice requirements in cases of emergency.

    (e) If an employee has not received written disapproval within the time limits indicated in 1(b) and 1(c) above of a written time off request that was timely submitted, the employee's request shall be considered as approved.

Section 2, Use of Accrued Paid Time Off (PTO) and Impact on Benefits When on a Leave of Absence:

At the commencement of a leave of absence, an employee may request to use accrued but unused Paid Time Off (PTO) for medical or non-medical leaves. Payment will be made in accordance with the normal payroll procedures. An employee on a leave shall receive pay and paid benefits only if required by law or a provision of this Agreement.

Section 3, Reinstatement When Returning From a Leave of Absence:

An employee returning from any legally or contractually protected leave (e.g., contractually protected leaves include Military, Union and Unpaid Personal Leave as set forth in Sections 7, 8 and 9 respectively below) shall be entitled to reinstatement to his/her position, hours, and work unit unless the position or shift has been eliminated or modified as a result of layoffs, shift bids or other legitimate business needs. In such event, the employee shall be offered a position of like seniority, status and pay. If a particular law provides a superior right of reinstatement, that law shall govern the employee's right of reinstatement. Vacancies created by such leaves may be filled temporarily at the Employer's discretion.

Section 4, Family Medical Leave Act, Family Rights Act, and Pregnancy Disability Leave:

a) <u>Eligibility.</u> Under the Family Medical Leave Act (FMLA) and the California Family Rights Act of 1993 (CFRA), an employee who has more than 12 months of service with the Employer and who has worked at least 1,250 hours in the 12-month period before the date he or she wants to begin a leave of absence, may have a right to an unpaid family care or medical leave. This leave may be up to 12 workweeks in a 12-month period for the birth, adoption, or foster care placement of the eligible employee's child, or for his or her own serious health condition or that of his or her current husband,-current wife, current domestic partner, children or step children, parents or legal guardian, brother or sister.

b) <u>Pregnancy-Related Disability and Leave.</u> Irrespective of eligibility for CFRA leave, employees are entitled to take a pregnancy disability leave of up to four months, depending on the period(s) of actual disability, for disabilities related to pregnancy, childbirth, or a related medical condition. In addition to leave, pregnant

employees are entitled to reasonable accommodations at work, such as modified duties, a chair, or frequent bathroom breaks. If she is CFRA-eligible, an employee may take both a pregnancy disability leave and a CFRA leave consecutively for reason of the birth of and bonding with her child.

c) <u>Reinstatement</u>. The leaves in Section 4 contain a guarantee of reinstatement, subject to any defense allowed under the law.

d) <u>Notice</u>. If possible, an eligible employee must provide at least 30 days advance notice for foreseeable events (such as the expected birth of a child or a planned medical treatment for him or herself or of a family member). For events which are unforeseeable, the eligible employee must notify the Employer as soon as he or she learns of the need for the leave. Failure to comply with these notice rules is grounds for, and may result in, deferral of the requested leave until the eligible employee complies with this notice policy.

e) <u>Certification</u>. The Employer requires written certification from the eligible employee's health care provider before allowing a leave for pregnancy or for the employee's own serious health condition, and/or written certification from the health care provider of the eligible employee's child, parent, or spouse who has a serious health condition, before allowing a leave to take care of that family member. When medically necessary, leave may be taken on an intermittent or a reduced work schedule. If taking a leave for the birth, adoption or foster care placement of a child, the basic minimum duration of the leave is two weeks and the leave must be concluded within one year of the birth or placement for adoption or foster care.

f) <u>Impact</u>. Taking a family care or pregnancy disability leave may impact certain benefits and seniority date. For leaves involving serious health conditions, including leaves for family care, medical leave and pregnancy disability, the eligible employee requesting the leave and his or her health care provider must complete and return a "Certification of Health Care Provider" form to the Employer.

## Section 5, Jury Duty Leave:

An employee who is required to report for jury service on the days and during the hours which the employee is scheduled to work shall be unpaid. Where Employer policy has historically provided for payment for jury duty, those policies will continue.

## Section 6, Subpoena:

When an employee is requested by either the Employer or subpoenaed by the Employer or other acting on behalf of the Employer to attend court or be a witness in court in any hearing as a result of his/her employment, he/she shall be paid not less than a day's wages for each day the worker shows up in court or is scheduled to show up in court. The worker need not work on such days.

## Section 7, Military Leave:

An employee who enters the Armed Forces of the United States, or is called to active duty or military training, will be granted an unpaid leave of absence according to applicable laws. The employee will accumulate seniority during such period of service, provided s/he has not been dishonorably discharged, is physically and mentally able to do the work with or without a reasonable accommodation, and reports for work within ninety (90) days of their date of discharge.

## Section 8, Union Leave:

Employees designated by the Union in writing to the Employer's HR Department, will be allowed to take a Union leave of absence without any loss of rights, including their current work assignment, not to exceed thirty (30) days. This leave will be limited, depending on the operational needs of the Employer, to no more than two (2) employees at a time unless the Employer agrees to release more employees. Such leave may be renewed for

additional thirty (30) day periods upon approval of the Employer. Notice of such leave must be made at least five (5) working days in advance and approved by management. Such approval will be communicated in writing within forty-eight (48) hours and shall not be unreasonably denied. The Union will notify the Employer's HR Department in writing at least seventy-two (72) hours prior to the employee returning to his/her regular job.

## Section 9, Unpaid Personal Leave:

Upon written notice to the Employer, an employee with at least one year of service may apply for a personal leave of absence of up to 30 calendar days. An employee must submit a written request at least 30 calendar days in advance; however, the Employer may consider exceptions for unforeseen circumstances. The application shall specify the reason and the requested length of time for leave. The leave may be extended for 30 calendar days by mutual agreement of the parties in writing in advance of the conclusion of the original leave. The employee shall give a minimum of 14 calendar days' notice of such request. All leave requests shall be approved in the sole discretion of the Employer and must include a return to work date.

## Section 10, Blackout Periods:

Other than instances where leaves are guaranteed by law, if the Employer grants days off and/or Paid Time Off (PTO) during the "blackout period" (high travel times during the year such as weeks of major holiday travel), such time off shall be granted on a rotating basis by seniority. Blackout periods shall not exceed a total of up to sixteen (16) weeks in any calendar year. The Employers agree to post or publish the blackout dates during the first quarter of every calendar year.

# ARTICLE 12. HOLIDAYS, PAID TIME OFF, BEREAVEMENT AND SICK LEAVE

## Section 1, Holidays:

a) For an employee with less than one year of employment with the Employer, work performed on the following recognized holidays shall be paid at one and a half (1.5) times the employee's regular rate of pay:                    New Year's Day, Memorial Day, July 4th

b) For an employee with one year or more of employment with the Employer, work performed on the following recognized holidays shall be paid at one and a half (1.5) times the employee's regular rate of pay:                    New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, Christmas Day

## Section 2, Paid Time Off:

a) <u>Paid Time Off.</u>

    i.    On the first day of the first year of employment, the employee begins to accrue paid time off (PTO) at the rate of one (1) paid day per each calendar month worked. An employee may carry over available PTO for one year up to a maximum of twenty-four (24) PTO days at any time. Once the cap of 24 PTO days has been reached, no additional PTO is accrued or received until an employee uses some or all of his or her available PTO.

    ii.    On the first day of the fifth year of employment, the employee begins to accrue paid time off (PTO) at the rate of fourteen (14) paid days per every year (12 month period) worked. An employee may carry over available PTO for one year up to a maximum of twenty-four (24) PTO days at any time. Once the cap of 24 PTO days has been reached, no additional PTO is accrued or received until an employee uses some or all of his or her available PTO.

b) <u>Accrued Time on Pay Stub.</u> The Employer shall show on the employee's pay stubs the amount of accumulated Paid Time Off (PTO) available to the employee, provided the Employer's payroll system has

the capacity to do so.  Upon employee request, the Employer shall provide a written report of accumulated PTO.

c) <u>Payment</u>.  The payment of accumulated PTO pay shall be made on the regularly scheduled payroll day preceding the employee's use of PTO, provided the employee has given two (2) weeks' prior written notice of his/her requested PTO start date.  The actual taking of said PTO by employees shall not be unreasonably denied.  If approved by the Employer, the employee shall have the option to work during their PTO.

d) <u>Full Time and Part Time Employee PTO</u>.  PTO for full time employees will be paid based on the employee's regularly scheduled hours.  Part-time employees will receive PTO on a pro-rated basis.  Part time employees' entitlements are based on a proportionate share of PTO entitlement due full time employees.  The proportionate share is computed based on the average number of hours paid in the previous calendar year.  For example, a part time employee may have been paid 520 hours in the 12 months prior to their PTO request.  Since the non-overtime hours in a year are 2080, and a full time employee would be entitled to one week (40 hours) PTO, then the part time employee would be entitled to 520/2080 times 40, or 10 hours of PTO.

e) <u>PTO Payout on Termination of Employment</u>.  Upon termination or resignation of employment with Employer, the employee will receive payment for all accrued but unused PTO in accordance with the law.

f) <u>Scheduling of Time Off.</u>  Scheduling of time off requests will be handled on a first-come, first-served basis, when presented in writing to the Employer's designee at the worksite.  In cases where two or more employees are requesting the same day or days off and neither employee's request had been approved in writing before the others was submitted, preference for approval will be given in order of seniority.  In cases where an employee has already had a time off request approved in writing, that employee's request will not be subject to 'bumping' by any more senior employee.

g) <u>Requesting Time Off for Three Consecutive Days or More</u>.  Employees requesting time off for three (3) consecutive days or more shall submit such request in writing to the Employer with no less than twenty-one (21) calendar days advance notice.  The Employer shall provide a written approval or disapproval to the employee in no more than seven (7) calendar days.  The Employer may waive advance notice requirements in cases of emergency.

h) <u>Requesting Time Off for Less Than Three Consecutive Days</u>.  Employees requesting time off for less than three (3) consecutive days shall submit such request in writing to the Employer with no less than seven (7) calendar days advance notice.  The Employer shall provide a written approval or disapproval to the employee in no more than four (4) calendar days.  The Employer may waive advance notice requirements in cases of emergency.

i) <u>Failure of Employer to Respond to Request for PTO.</u>  If an employee has not received written disapproval within the time limits indicated in subsections (g) and (h) above of a written time off request that was timely submitted, the employee's request shall be considered as approved.

j) <u>Blackout Periods</u>.  If the Employer grants paid time off (PTO) during the "blackout period" (high travel times during the year such as weeks of major holiday travel), such time off shall be granted on a rotating basis by seniority.

## Section 3, Unpaid Personal Days:
a) Employees with two (2) or more years of service may use unpaid personal days as follows:

   i) Up to three (3) unpaid personal days per year before using any available paid time off, and

    ii)   Up to two (2) additional unpaid personal days per year after using all available paid time off,

by notifying the Employer at least four (4) hours prior to the beginning of his or her scheduled shift of his or her desire to use the unpaid personal day.

b)   Unpaid personal days cannot be accrued or rolled over.

c)   The start date of "year," as referenced in a.i and a.ii of this Section 3, shall be determined by each Employer and communicated in writing to the Union within thirty (30) days of ratification of this Agreement. Once defined, that start date for each Employer shall remain fixed for the life of this Agreement. For example, one Employer might define the "year" as the calendar year starting on January 1st, while another might define the "year" as a fiscal year starting on July 1st.

## Section 4, Bereavement Leave:

In the event of a death in the employee's family, it is recognized that the employee may require time off to attend services. In all cases, paid or unpaid time off will be measured in hours according to the actual hours lost from work. For the purposes of this Section, the term "family" shall be defined as current husband, current wife, current domestic partner, children or step children, parents or legal guardian, brother or sister, grandparents, grandchildren, aunt, uncle or parent-in-law.

## Section 5, Sick Leave:

a)   <u>Eligibility</u>. An employee who works for the same employer for 30 or more days within a year from the commencement of his or her employment is entitled to paid sick time in accordance with the California Healthy Workplaces, Healthy Families Act, and the City of Los Angeles Minimum Wage Ordinance, with the understanding that an employee who is entitled to at least 48 hours or six days of paid time off (PTO) per year shall not receive any additional paid sick time pursuant to this Section, however, his or her paid time off (PTO) may be used for the same purposes and under the same conditions as specified in this Section. In all cases, paid or unpaid time off will be measured in hours according to the actual hours lost from work.

b)   <u>Accrual or Frontload Methods</u>. Effective on the first day of employment, an employee shall either accrue paid sick time at the rate of one hour per every 30 hours worked (the "Accrual Method"), or receive 48 hours or six days of paid sick time at the beginning of each year of employment, calendar year, or 12-month period (the "Frontload Method"). The Employer, in its sole discretion, may determine whether to use the Accrual Method or the Frontload Method, and shall provide a notice to the employee informing him or her of which Method it will apply to the employee.

c)   <u>Payment for Sick Leave</u>. Payment for available sick leave taken by an employee shall be made by the Employer no later than the payday for the next regular payroll period after the sick leave was taken.

d)   <u>Notice to Employer of Intention to Use Paid Sick Leave</u>. If the need for paid sick leave is foreseeable, the employee shall provide reasonable advance notification. If the need for paid sick leave is unforeseeable, the employee shall provide notice of the need for the leave as soon as practicable.

e)   <u>When Sick Leave May be Used</u>. Upon the oral or written request of an employee, the Employer shall provide available paid sick time for:

    i.   the diagnosis, care, or treatment of an existing health condition of, or preventive care for, an employee or his or her family member (defined as any of the following: a (1) biological, adopted, or foster child, stepchild, legal ward, or a child to whom the employee stands in loco parentis,

regardless of age or dependency status; (2) biological, adoptive, or foster parent, stepparent, or legal guardian of an employee or his or her spouse or registered domestic partner, or a person who stood in loco parentis when the employee was a minor child; (3) spouse; (4) registered domestic partner; (5) grandparent; (6) grandchild; (7) sibling; or (8) any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship); or

ii.   an employee who is a victim of domestic violence, sexual assault, or stalking, (1) to obtain or attempt to obtain any relief, including, but not limited to, a temporary restraining order, restraining order, or other injunctive relief, to help ensure the health, safety, or welfare of the victim or his or her family, (2) to seek medical attention for injuries caused by domestic violence, sexual assault, or stalking, (3) to obtain services from a domestic violence shelter, program, or rape crisis center as a result of domestic violence, sexual assault, or stalking, (4) to obtain psychological counseling related to an experience of domestic violence, sexual assault, or stalking, or (5) to participate in safety planning and take other actions to increase safety from future domestic violence, sexual assault, or stalking, including temporary or permanent relocation.

f)   <u>Employee Use of Paid Sick Leave</u>.  An employee shall be entitled to use available paid sick time beginning on the 90th day of his or her employment, after which day the employee may use paid sick time as they are available for the purposes described in subsection (e) above.  An employee may determine how much available paid sick leave he or she needs to use, but he or she may not use any paid sick leave before it becomes available as set forth in subsection b) above.

g)   <u>Carry Over and Cap on Accrual of Paid Sick Leave</u>.  An employee's total accrual of paid sick leave shall not exceed 72 hours or nine days and may be carried-over to the following year of employment, however, an employee's use of accrued paid sick time shall be limited to 48 hours or six days in each year of employment, calendar year, or 12-month period.

h)   <u>Notice of Available Paid Sick Leave</u>.  The Employer shall provide an employee with written notice that sets forth the amount of paid sick leave available for use on either the employee's itemized wage statement or in a separate writing provided on the designated pay date with the employee's payment of wages.

i)   <u>Cash Out of Unused Paid Sick Leave on Severance of Employment</u>. An employee shall be paid for unused paid sick time upon termination, resignation, retirement, or other separation from employment.  If said employee is rehired by the Employer within one year from the date of separation, previously accrued or frontloaded unused paid sick time shall be reinstated and the employee shall be entitled to use those unused paid sick time.

j)   This Section of the Agreement establishes minimum requirements pertaining to paid sick time and does not preempt, limit, or otherwise affect the applicability of any other law, regulation, statute or ordinance that provides for greater accrual or use by employees of paid sick time, whether paid or unpaid, or that extends other protections to an employee.

# ARTICLE 13.  DISCIPLINE AND DISCHARGE

## Section 1, Discipline:

a.   Employer shall conduct its own, independent investigation (not to exclude counsel) before disciplining any employee.

b. No employee shall be disciplined or discharged without just cause.  Involuntary transfers shall not be used to replace a step in the discipline process without cause.  The foregoing does not apply to employees in their probationary period.

## Section 2, Progressive Discipline:

Discipline can consist of up to four (4) steps:
1. Documented verbal warning
2. Written warning
3. Suspension or Final written warning
4. Termination

The type of discipline imposed in any instance depends on the nature and seriousness of the offense involved.

## Section 3, Attendance:

An employee must be ready, willing and able to work as scheduled unless his or her lateness or absence is excused by law or by a specific provision of this Agreement. Unless an employee uses a paid sick leave day mandated by law, in which case any requirements imposed by law shall apply, 1) when an employee misses work due to a bona fide personal or family illness or emergency, the employee must notify management according to the Employer's established call off procedures, or as soon as the employee is aware of the illness or emergency, whichever is less, stating the reason for the absence, 2) absences due to bona fide emergencies or illnesses will not be subject to discipline as the triggering event, but may be considered while evaluating the employee's total attendance record, 3) the Employer may require a physician's certificate of inability to work or evidence of the emergency in the event of absences which may indicate a pattern of abuse.

## Section 4, Copies of Discipline for the Union:

The Employer will supply, via fax or email, copies of any disciplinary notices to the Union office within 48 hours of issuance.

## Section 5, Shop Steward:

The shop steward may be present during a discipline or discharge meeting, or any investigatory meeting that may lead to discipline or discharge, if the employee so requests.  If the matter involves a potential discharge and a shop steward is not available, the affected employee will be sent home with no pay.  The employee will be told to report for a meeting as soon as a shop steward can be present.

## Section 6, Expiration of Disciplinary Notices:

Provided there have been no further occurrences of a similar nature, each disciplinary notice will expire after twelve (12) months.

## Section 7, Right to See Personnel Files:

Employees have the right to see their personnel files and the Employer shall make his/her records available for inspection within a reasonable period of time after the written request is made.

Personnel file is defined as: any files, papers, or computer records which are used (or have been used) to make an employment decision about the employee. This includes decisions to hire, promote, discipline, fire, transfer, or set or raise salary and benefits.

Upon request, employee shall be given a copy of any document that he/she signs.

## Section 8, Transfer of Warning Notices:

Warning notices shall not be transferred between Employers.

Page 33 of 71

**Section 9, Reasonable Notice of Discipline:**
The Employer shall notify the employee of discipline or of an investigation that may lead to discipline within seven (7) calendar days of the occurrence of the alleged incident.

# ARTICLE 14.  GRIEVANCE AND ARBITRATION PROCEDURE

**Section 1, Definition:**
Any dispute pertaining to the application or interpretation of this Agreement, including but not limited to any alleged violation of the Age Discrimination in Employment Act, Title VII, the California Fair Employment and Housing Act, the California Family Rights Act, the Family and Medical Leave Act and the Americans with Disabilities Act, must be handled in the following manner.  The phrase "business days" shall not include Saturdays, Sundays and recognized State or federal holidays.

**Section 2, 1ˢᵗ Step Grievance:**
The employee or the Union shall notify the Employer in writing of an alleged violation of this Agreement, within five (5) business days after the occurrence of the alleged violation.  The department head and the Union shall attempt to settle the dispute within three (3) business days.

**Section 3, 2ⁿᵈ Step Grievance:**
If no settlement is reached within the three (3) business day period, then the dispute shall be submitted in writing within five (5) business days to the Human Resources Director or Designee by the Union. The Human Resources Director or Designee and the Union shall attempt to settle the dispute within five (5) business days.

**Section 4, 3ʳᵈ Step Non-Binding Mediation:**
If the dispute cannot be resolved within five (5) business days from the date of such written notice to the Human Resources Director or Designee, then the dispute shall be submitted in writing to mediation within ten (10) business days by the Union or the Employer.  The parties shall request that the Regional Director for the local office of the FMCS assign a mediator.  The mediator's recommendations shall not be used in any manner by either party.  Information shared only in mediation shall not be used as evidence should the dispute proceed to arbitration.

**Section 5, 4ᵗʰ Step Arbitration:**
If the dispute cannot be resolved during a maximum of ten (10) business days of the date of mediation, then the Union or the Employer may submit the dispute in writing to arbitration within eight (8) business days.  Within five (5) business days of the date the Employer or the Union receives written notice of the desire to submit to arbitration, the Employer and the Union shall meet to select an arbitrator.  If within five (5) business days the parties cannot agree upon an arbitrator, the grieving party shall request a list of seven (7) arbitrators from the FMCS, stating in its request that the parties request a panel of potential arbitrators who have designated on their resumes that they are affiliated with the National Academy of Arbitrators and are located in Southern California, and the parties shall select an arbitrator from that list.

Upon receipt of the list of seven arbitrators, the Employer and the Union shall determine by a flip of the coin who shall strike the first name from the list.  They shall then alternate striking names until one is left.  That name shall be the one deemed to be chosen by the parties as the arbitrator.  Both parties to the Agreement agree to expedite the grievance and arbitration procedure to the end that the dispute is settled quickly.  The arbitrator shall render his or her award in writing and shall have no authority to modify, change, add to or take away any of the terms or provisions of this Agreement.  The arbitrator shall lack the authority to issue any remedy which is in excess of 100 working days for wages and or benefits.  The arbitrator must deduct from any award any earned

income or unemployment insurance.  The arbitrator must consider any employee on workers comp or disability insurance as unable to have worked at his usual job because of such disability during the period time he/she was terminated or suspended without pay.  The arbitrator's award shall be final and binding upon the parties.  The expenses of the arbitrator shall be borne equally by the parties.  Either party shall have the right to utilize a court reporter, at its own expense.

### Section 6, Arbitration Hearing Limits:
The arbitrator shall not have the right to hear more than one grievance at an arbitration hearing unless mutually agreed by both parties.

### Section 7, Failure to Respond Within Timelines:
Grievances beyond the first step shall automatically be moved to the next level if either party fails to respond within the timelines described above.  Timelines may be waived by mutual agreement in writing.

### Section 8, Failure to Comply with Signed Settlements or Arbitration Awards:
In cases where the Union or the Employer fails or refuses to comply with the terms of a signed settlement agreement or arbitration award for more than thirty (30) days, the case may be moved immediately to arbitration or court to confirm the award.

## ARTICLE 15.  WORKING CONDITIONS

### Section 1, Uniforms:
   a) The Employer will furnish the employees with a sufficient amount of wash and wear uniforms to be worn during work hours, in a sufficient quantity.  The Employer will replace soiled and worn uniforms as needed.  Furthermore, the Employer will furnish jackets, gloves and rain gear to all employees who are required to work outside during inclement weather.  For employees whose assignments require their use, the Employer will furnish safety vests.  When necessary, the Employer shall provide the employee with modified uniforms to provide reasonable accommodation for medical conditions.  Employer will provide Skycaps with at least one (1) cap.
   b) If the Employer charges a uniform deposit, they must do so in compliance with California Labor Code requirements.  Employees will be responsible for replacement costs of uniform and equipment damaged, lost or stolen due to the employee's dishonest or willful act, or gross negligence.
   c) All employees will be required to wear said uniforms while on duty and present a neat appearance and a courteous attitude in public and to customers of the Employer or the Airport at all times.
   d) Upon termination of employment with the Employer, employees must return all uniforms in their possession.

### Section 2, Materials and Equipment:
1) General Requirements
   a) The Employer agrees to provide and to maintain properly equipment and materials adequate to perform any and all work assignments.  The Employer agrees that all chemicals provided to employees by the Employer will be properly labeled, including but not limited to health, safety and utilization instructions, and that employees will be instructed and trained in their use.
   b) The Employer agrees to provide proper safety appliances and equipment to safeguard the health and safety of all employees, and to observe all federal and state laws regarding working conditions.

c) In the event an employee is required to wear safety gloves, earplugs, ergonomically correct back braces, the Employer shall furnish and maintain all such items and to replace such items as needed to keep up with regular wear and tear.

d) Employees whose duties require them to stand in one place for a period longer than one hour shall be furnished rubber mats.

e) Safety Shoes: If the Employer requires the use of safety shoes which are not appropriate for daily casual wear outside of work, the Employer shall either provide or reimburse the worker for the full cost of the shoes as needed.

f) Upon employee request, and where prescribed by a health care professional in writing, the Employer will provide ergonomically correct back braces to employees who are required to
   i) Push wheelchair passengers up inclined ramps or walkways, or
   ii) lift or carry baggage or cargo as a routine job duty.

2) Accidental Equipment Breakage: Employees shall not be liable for any accidental breakage.

## Section 3, Break Rooms:

a) The Employer shall provide an adequate break room in each terminal and/or area where employees work if the Employer can acquire the space from the client or the Airport. The break room shall contain appliances to heat food and keep it cold, as well as enough tables and chairs to accommodate employees who will take their break at the same time.

b) If the Employer is not able to secure adequate space as above, employees shall not be disciplined for taking their breaks or eating in any public or common area of the terminal and/or area where they work, unless restricted by the Employer's client or Airport regulations.

c) The Employer and the Union will form a labor-management committee including all signatory Employers to identify those terminals and work areas where the Employer is not able to secure adequate space and airline or Airport restrictions prevent employees from taking breaks or eating in public or common areas, identify alternative areas where employees may take breaks or eat, and determine appropriate travel time to allow employees to use such alternative areas. This committee will convene within ninety (90) days of ratification of this Agreement.

## Section 4, Lockers:

The Employer shall provide enough lockers in each terminal and/or working area to accommodate all employees, if the Employer can acquire the space from the client or the airport.

## Section 5, Bulletin Boards:

The Employer agrees to furnish a dedicated employee bulletin board in the areas where employees sign in, for the purpose of sharing information about Union meetings, events, elections, etc. Union stewards and Union representatives shall have sole authority to determine what material is posted on bulletin boards provided it is not false or misleading.

## Section 6, Steward Petitions:

The Employer agrees to meet and confer in response to employee petitions related to workplace issues presented by the shop steward and such petitions shall only be presented to the Employer and not to the Employer's customer.

## Section 7, No Speed-Up:

Except as otherwise provided in this Agreement, there shall be no speed-up or increase in the workload so as to impose an undue burden upon any employee covered by the Agreement, or where the effect of such speed-up

or increase in the workload will unreasonably diminish the work force or lessen the total number of hours worked at any job location.

Section 8, Lie Detector Tests:
Nothing in this Agreement shall prohibit any employee from volunteering to take a lie detector test, however, the Employer shall not require any employee to take any lie detector test and shall not take any discriminatory or disciplinary action against an employee who refuses to take a lie detector test, regardless of circumstances involved.

Section 9, Cabin Cleaning, Hygienic Assignments:
No cabin cleaning employee shall be required to perform both lavatory and water service duties on the same shift.

## ARTICLE 16.  LAYOFF AND PROTECTION OF WORK

In the event the Employer desires to lay off any employee or employees for reasons such as the loss of a job or a portion of a job, the Union agrees to meet with the Employer and discuss the proposed layoff in good faith.

Section 1, Notice of Layoff:

a)  Notice – Definition:
Notices of layoff will be provided in writing.  The Employer will provide notice by posting a copy of layoff notice where notices are regularly posted for employees, sending a copy of the notice to the Union by fax or e-mail, and sending a copy of the notice by certified mail to the last known address of any employee who may not be scheduled to work during the notice periods specified below.  It is the sole responsibility of the employee to provide the Employer with an accurate and current address.

b)  Notice of Layoff:
In a case where a layoff is required due to any of the following: staff reduction, scope change, specification change, hourly reductions, frequency reduction, vacancies, seasonal change, airline closures, and the Employer has received at least five (5) days advance notice, the Employer shall give a minimum of five (5) days' notice to the affected employee or pay the employee an amount equivalent to the employee's normal wages for one (1) week in lieu of such notice.  In cases where the Employer can demonstrate receipt of less than five (5) days advance notice, the Employer will notify the affected employee within twenty-four (24) hours or pay the employee an amount equivalent to the employee's normal wages for the period of notice provided to the Employer, in lieu of such notice.

Section 2, Recall:
Employees on layoff pursuant to Article 9 shall receive preference over all new hires in the event the Employer hires employees.

Section 3, Termination of Employer's Services:
The Employer shall furnish to the Union, in writing, the name and address of any job location covered by this Agreement where the Employer's services are being terminated, together with the number of employees, job classification, number of work hours per day and per week of each employee at the job location.

The above information shall be submitted to the Union within five (5) business days of the Employer's receipt of notice of termination.

Page 37 of 71

Section 4, Sub-Contracting:

(a) The Employer shall have the right to sub-contract work covered by this Agreement to any signatory Employer to this Agreement, provided that if a signatory Employer is not available, or lacks the necessary experience or equipment or certification required to perform the work, the Employer may sub-contract to another employer/entity needed to perform the work, provided said work is contracted to any Employer who maintains in effect wages, hours, and working conditions no less than those contained in this Agreement.

(b) Except in cases of emergency, the Employer shall give the Union fifteen (15) days' notice of its intention to sub-contract. Said notice will include the name, address and phone number of the Employer/entity which was awarded the sub-contract.

## ARTICLE 17, EMPLOYER JOB BIDDING PROCEDURES

## Section 1, Employer Job Bidding Information:

a) The Incumbent Employer shall provide in writing the following information for any service contract which is out to bid and covered by this Agreement within three (3) business days (excluding weekends and holidays) of the Employer's receipt of a written request from the Union:

    i. The number of employees and the name of each employee;

    ii. List of the Job classifications for the service contract being bid;

    iii. Wage rates;

    iv. The Airport and Site Seniority dates of each employee;

    v. The current insurance premium, if any, being paid for each employee.

    vi. For any full-time employee who has not yet qualified for health care contributions, the monthly hours paid for the previous six months.

b) The Union agrees that it will designate an authorized person(s) to request the stated information. Upon receipt of such information, the Union will treat the information on a confidential basis and will release it to another Qualified Signatory Employer only in accordance with Section 1a of this Article only when the Employer requesting the information has provided clear documentation that a bona fide bid(s) are being requested ('Qualified Signatory' shall be defined as an Employer who is signatory to this Agreement, or to an SEIU agreement which requires they become signatory to this Agreement in the event they are awarded the service contract being bid, and is invited to participate in the bid process).

c) It is the responsibility of the Incumbent Employer to provide correct and timely information pursuant to this Section in response to staffing information requests both at the time of bidding and at the time of transfer of service.

d) The Incumbent Employer agrees to indemnify upon verification the incoming Employer for all employee costs associated with the Incumbent Employer's provision of inaccurate, incomplete or untimely information. By entering into this Agreement with the Union, all signatory Employers expressly agree that they will handle any disputes over the application of this Article 17 through the Grievance and Arbitration procedures of this Agreement. With respect to the Grievance and Arbitration procedures, the terms 'grievant' and 'Union' will be substituted with the terminology 'Grieving Employer' for 'Grievant/Union' and 'Responding Employer' for 'Employer' only in situations directly related to Grievances and Arbitrations under this Article 17, Section 1.

## Section 2, Employer Job Bidding Procedure:

Whenever the Employer bids on the servicing of any service contract where the incumbent employees work under the terms of a collective bargaining agreement to which a local of the Service Employees International Union ("SEIU") is signatory at LAX, the Employer agrees to do the following:

a) Contact the Union for the information referenced in Section 17.1a above regarding the incumbent employees servicing the service contract that is out to bid.

b) Comply with the City of Los Angeles Service Worker Retention Ordinance.

c) Request from the Union copies of any economic terms of the collective bargaining agreement and any side agreement covering the incumbent employees servicing the service contract that is out to bid.

## Section 3, Employer Award Procedure:

a) Whenever the Employer takes over the servicing of any service contract where the incumbent employees work under the terms of a collective bargaining agreement to which a local of the Service Employees International Union ("SEIU") is signatory at LAX, the Employer agrees to do the following:

   i. Contact the Union no less than thirty (30) calendar days prior to take over of the service contract for updated information referenced in Section 17.1.c above regarding the incumbent employees servicing the service contract that has been awarded.

   ii. Comply with the City of Los Angeles Service Worker Retention Ordinance, provided that written offers of employment shall be made to those employees who have been employed by the Incumbent Employer for the preceding eight (8) calendar months or longer and honor the employees' regular straight time hours worked at that service account, seniority dates, classifications, wage rates and benefits.

   iii. Should the Employer wish to implement efficiencies gained through advances in technology, equipment, leveraging of scale and/or operational methods which may impact the total number of hours worked per month, the Employer shall contact the Union prior to any actual reduction and negotiate the effects of such reduction, in good faith, provided any proposed reductions will not result in unreasonable or unsafe workloads. The Union shall not unreasonably withhold consent.

   iv. When it is verified that service specifications of a job are altered by the client, efficiencies gained through advances in technology, equipment, leveraging of scale and/or operational methods, the Employer may increase or decrease the work force pursuant to the terms of this Agreement, provided any proposed reductions will not result in unreasonable or unsafe workloads. The Union shall not unreasonably withhold consent.

b) Whenever a Qualified Signatory makes a request for the information referenced in 17.1.a above, the Union agrees to provide the Qualified Signatory with a copy of the economic terms of the collective bargaining agreement covering the incumbent employees servicing the service contract that is out to bid. It is the responsibility of the Union to ensure that only the economic terms of the collective bargaining agreement covering the incumbent employees servicing the contract that is out to bid be provided. The Union must send a copy of said economic terms to the Incumbent Employer for approval prior to releasing this information to the Qualified Signatory. The Incumbent Employer must notify the Union of any corrections to said economic terms within the time limits in Section 17.1.a.

## Section 4, Non-Signatory Service Contract Transfer Procedure:

Whenever the bidding Employer takes over the servicing of any service contract where the present employees are not represented by the Union or another local of the Service Employees International Union ("SEIU"), the Employer agrees to do the following:

a) Subject to changes in bid specifications made per the client's request for proposals, provide written offers of employment to those employees who have been employed by the incumbent contractor for the preceding eight (8) calendar months or longer,

b) Cover the retained employees under the terms of Appendix C of this Agreement if and as allowed by law.

## ARTICLE 18. LABOR-MANAGEMENT COMMITTEE:

The Employer and the Union will establish an Employer-specific Labor-Management Committee composed of equal numbers of representatives from the specific Employer's bargaining unit and from management. The Committee shall, at minimum, meet for one hour every three months or as requested and agreed to by both. The Committee will meet for the purposes of discussing and resolving employee issues and concerns.

## ARTICLE 19. MOST FAVORED NATIONS

### Section 1:

Subsequent to the implementation and/or execution of this Agreement, no other agreement shall be made by the Union with any other employers of employees in job classifications similar to those covered by this Agreement within the Los Angeles International Airport, where such agreement contains any terms more favorable to any employer than the terms of this Agreement.

### Section 2:

During the term of this Agreement, the Union shall not enter into any collective bargaining agreement with any Employer which covers job sites and classifications currently covered by this Agreement and provides lower rates than currently in place for said job sites and classifications, including all wages, fringe benefits and any other existing cost items which directly compensate employees. The Union shall notify the signatory Employers to this Agreement and provide copies of such agreement to the signatory Employers upon executing any such agreement. Should the Union enter into any such collective bargaining agreement, the incumbent, signatory Employer may implement said lower rates on the same effective dates as specified in said agreement in the same job sites and classifications covered by said agreement. Any failure on the part of the Union to comply with the requirements of this section may be subject to Expedited Arbitration. This Section 2 shall not apply to phase-in agreements previously serviced by an employer not signatory to this Agreement with the Union or to phase-in work acquired by signatory Employers after the effective date of this Agreement.

### Section 3:

The Employer, when bidding against any employer signatory to any collective bargaining agreement with the Union covering job classifications outlined by this Agreement at Los Angeles International Airport, may observe the total package of terms and conditions of that employer's agreement that govern the particular bidding circumstances at hand, if that total package of terms and conditions is more favorable to the Employer. Bidding circumstances may include bidding to retain existing work, bidding to acquire another signatory's work or bidding for work not currently covered by any Union agreement (new, non-Union work).

### Section 4:

To effectuate this Article, the Union shall disclose the existence of any written or oral agreement or understanding it has with any other employer that contains any terms more favorable to any employer than the terms of this Agreement within five (5) business days of the date of the agreement or understanding, and simultaneously provide copies of such to the Employers identified in this Agreement. If an Employer believes that the Union has entered into or is honoring an agreement or understanding that is more favorable as defined

in this Article, the Employer shall notify the Union of such in writing and the parties shall meet and confer to discuss such within the next five (5) business days. If the matter has not been resolved within five (5) business days of written notification to the Union, the Employer may request a list of seven (7) potential arbitrators who have an office in Southern California from the Federal Mediation and Conciliation Service, stating in its request that the parties request a panel of potential arbitrators who have designated on their resumes that they are affiliated with the National Academy of Arbitrators. Within five (5) business days of receiving the list of arbitrators, the parties will select an arbitrator using an alternate striking method. The arbitration shall be scheduled to take place within the next thirty (30) calendar days. The parties shall share the expenses of the arbitrator, hearing room and transcript incurred with the arbitration, equally. The party or parties requesting a copy of the transcript of the hearing shall incur the cost of the transcript. The arbitrator shall decide the issue of whether the Union has entered into or is honoring an agreement or understanding with another employer or group of employers employing employees working in job classifications similar to those covered by this Agreement within the Los Angeles International Airport that provides for more favorable terms or conditions of employment than those set forth in this Agreement. The arbitrator shall not amend, take away, modify, add to, change or disregard any provision of this Agreement, and he or she shall issue a final and binding award in writing that includes any relief necessary to effectuate the intent of this Article and remedies available under applicable law.

## ARTICLE 20. NO STRIKE - NO LOCKOUT

a) The Union agrees that it will not collectively, concertedly or individually engage in or participate, directly or indirectly play a part in: any strike, sympathy strike, slowdown, work stoppage, refusal to handle merchandise, the distribution of pamphlets by either physical or electronic means that concerns matters covered by the grievance and arbitration provisions of this Agreement, bannering or any other interference with or interruption of the work or operations of the Employer during the term of this Agreement.

b) In exchange, the Employer agrees that during the term of this Agreement it will not lock out any of the employees in the bargaining unit covered by this Agreement.

c) It is specifically agreed and understood that proven violations of a) above will subject employees to termination or other disciplinary action at the sole discretion of the Employer.

d) Personal communications by individual employees by electronic or other means regarding matters covered by the grievance and arbitration provisions of this Agreement which do not interrupt work performance, operations or client relations will not be considered violations of a) above.

## ARTICLE 21. SCOPE OF AGREEMENT AND SAVINGS CLAUSE

### Section 1, Entire Agreement:

The Employer and the Union acknowledge and agree that during the negotiations which resulted in this Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, that the complete understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement and that any past practices, economic or otherwise, heretofore exercised and not contained in this Agreement, are hereby abolished. Therefore, this Agreement representing the full and complete understanding between the parties, for the term of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject specifically referred to in this Agreement, even though such subject may not have been within the knowledge or contemplation of the parties at the time they negotiated or signed this Agreement.

Section 2, Savings Clause:
In the event an administrative agency or court issues a final decision holding that any clause or part of this Agreement is unconstitutional or illegal, or should any clause or part of this Agreement be found contrary to present or future laws, it shall not invalidate the other provisions of this Agreement.

## ARTICLE 22. MANAGEMENT RIGHTS

Except as provided in this Agreement, the management of the Employer's operation and the direction of the employees, including all of the rights, powers, authority and prerogatives, which the Employer has traditionally exercised, are expressly reserved to the Employer.  Management agrees to exercise these rights consistent with its obligations under applicable Federal, state, and local laws. The choice, control, and supervisory and management staff shall be vested solely and exclusively in the Employer.

All management functions, rights and responsibilities which the Employer has not expressly modified or restricted by a specific provision of this Agreement are retained and vested exclusively in the Employer. More specifically, without limiting the generality of the foregoing, the Employer retains the exclusive right to direct and schedule the work force; to plan, direct and control operations; to establish, reorganize, combine or discontinue operations; to contract out work; to hire, promote, transfer, lay-off and recall employees to work; to determine the number of employees and the duties to be performed; to establish, add to, reduce, combine or discontinue job classifications; to reprimand, suspend, discharge or otherwise discipline employees for cause; to introduce new or improved methods, equipment and facilities; to make and change Employer rules, regulations, policies and practices not inconsistent with the terms of this Agreement; and otherwise generally to manage the facilities of the Employer so as to attain and maintain full operating efficiency.

## ARTICLE 23.  LEADERSHIP TRAINING AND EDUCATION FUND (LTEF - BSP)

Effective June 1, 2017, the Employer shall contribute one cent ($0.01) per hour for each hour paid for or worked during the previous calendar month into the "LTEF" Leadership Training and Education Fund ("Trust"), which monies shall be used for the purpose of providing job skills and education programs through the Building Skills Partnership ("BSP") for employees covered under this Agreement.

Said Trust and the obligations to make contributions to said Trust shall continue through the date on which such Trust is terminated pursuant to Article IX, Section 1 of the Declaration of Trust.

## ARTICLE 24.  MAINTENANCE COOPERATION TRUST FUND (MCTF)

Beginning in the third year of this Agreement, on May 31 and November 30, 2019, and on May 31st and November 30th thereafter, the Employer shall remit a lump sum payment at the rate of fifty cents ($0.50) per employee covered by this Agreement in the months of May and November each year into the Maintenance Cooperation Trust Fund (MCTF), which monies shall be used for the purposes for which the MCTF was created, including for labor standards enforcement at the Airport.

The inclusion of this Article in the Agreement is contingent on the Employers receiving the most current balance sheet and income statement of the MCTF.

## ARTICLE 25. DURATION AND TERM

This Agreement shall become effective on May 1st, 2017 and shall continue in effect for five years until midnight on April 30th, 2022, and it shall thereafter automatically renew itself from year to year unless the Employer and/or the Union serves a written notice on the other party of termination or modification at least sixty (60) days prior to the expiration date hereof in accordance with Section 8(d) of the National Labor Relations Act, as amended.

In the event a change is made to the City of Los Angeles Living Wage Ordinance covering Los Angeles World Airport, the Employer and/or the Union may reopen only the wage scales of this Agreement by giving the other at least sixty (60) days written notice of its desire to do so, and the parties shall thereafter meet and confer in good faith regarding potential changes only to the wage scales of this Agreement.

Appendices are incorporated as a part of this Agreement and shall have the same effect as though fully set forth herein.

**For the Union:**

| Signature | 8/16/17 Date |

Mireya Aviña — Date

Ana Espindola — Date

Rafael Farias — Date

Norma Gilliam — Date

Ana Bell Gonzalez — Date

Abby Guerrero — Date

Edward Lopez — Date

**For the Employer:**

ABM Aviation — 8/28/17 Date

AeroPort Services — 8/28/17 Date

G2 Secure Staff, LLC — 8/21/17 Date

Gateway Frontline Services, Inc. — 8/30/17 Date

Menzies Aviation (USA) Inc. — 8/30/17 Date

SDH Services West, LLC, a subsidiary of Sodexo, Inc. — 8/27/17 Date

SOS Security, LLP — 8/23/17 Date

World Service West LA Inflight Service Company, LLC — 9/1/17 Date

Tim Maddox _____    Date _____

Oscar Monterrosa _____    Date _____

Armando Muñoz _____    Date _____

Dorothy Richards _____    Date _____

Rosa Rivera _____    Date _____

Maria Romero _____    Date _____

Juan Sanchez _____    Date _____

Miguel Torres _____    Date _____

Robin Wilson _____    Date _____

_____

# APPENDIX A: WAGES

## Section 1, Minimum Wage Differential

No employee covered by this Agreement with more than one (1) year of Airport Seniority shall at any time be paid less than fifteen ($0.15) cents more than the applicable statutory minimum wage.

## Section 2, Minimum Wage Rates

The following minimum wage rates shall apply to all employees:

| Months of Service | New Hire (Start to 1 year) | 13 to 18 months (1 to 1.5 years) | 19 to 24 months (1.5 to 2 years) | 25 to 36 months (2 to 3 years) | 37 to 48 months (3 to 4 years) | 49 to 60 months (4 to 5 years) | 61+ months (5 years and over) |
|---|---|---|---|---|---|---|---|
| Effective 5/1/17 | 10.65 | 10.75 | 11.00 | 12.00 | 13.00 | 14.00 | 15.00 |
| Effective 7/1/17 | 12.10 | 12.15 | 12.20 | 12.25 | | | |

At no time shall any employee receive less than the rates shown above corresponding to their current Airport Seniority.

For example, on May 1st, 2017, an employee with an Airport Seniority date of June 15th, 2013 will have 47 months of Airport Seniority and therefore be paid no less than $13.00 an hour. As of June 16th, 2017, the same employee will have begun their 49th month of Airport Seniority and therefore be paid no less than $14.00 an hour.

Using a less senior employee as an example, on May 1st, 2017, an employee with an Airport Seniority date of April 1st, 2016 will be in their 14th month of Airport Seniority and therefore be paid no less than $10.75 an hour. On July 1st, 2017, the rate for employees with 13 to 18 months of Airport Seniority increases to $12.15 an hour and the same employee will therefore be paid no less than $12.15 an hour.

As another example, as of May 1st, 2017, an employee with an Airport Seniority date of December 10th, 2014 will be in their 29th month of Airport Seniority will be paid no less than $12.00 an hour. On July 1st, 2017, the rate for employees with 25 to 36 months of Airport Seniority increases to $12.25 an hour and the same employee will be in their 31st month of Airport Seniority and therefore be paid no less than $12.25.

## Section 3, Across the Board Increases

Effective July 1, 2017, all employees with at least seventy-two (72) months of airport seniority will receive a wage increase of thirty-five cents ($0.35). This increase is separate and distinct from increases required to comply with the minimum wage rates referenced in Section 2 above.

For example, an employee with an Airport Seniority date in February of 2011 might have been at a wage rate of $14.05 as of April 30th, 2017. This employee would be in their 76th month of Airport Seniority on May 1st, 2017, and therefore would go to a wage of no less than $15.00 in order to comply with the minimum wage rates referenced in Section 2 above. On July 1st, 2017, the same employee would receive the across-the-board increase of $0.35, increasing their wage to $15.35.

If the same employee happened to have been paid above the minimum wage rate of $15.00, for example if the employee had been at a rate of $16.00 an hour on June 30th, 2017, the employee would still receive the $0.35 increase on July 1, 2017, increasing their wage to $16.35 an hour.

## Section 4, Wage Differentials
All existing wage differentials shall remain in effect.

Night shift cleaners who begin their shifts between the hours of 8:00pm and midnight shall receive a differential of ten cents ($0.10) for the entire shift, in addition to their regular wages.

## APPENDIX B: COVERED CLASSIFICATIONS

For purposes of Union Recognition, hourly employees, excluding supervisory, clerical employees performing duties in the following areas of service are covered by this Agreement.

| CARGO | BAGGAGE | CABIN |
|---|---|---|
| CATERING | PASSENGER SERVICE | SECURITY |
| JANITORIAL | | |

# APPENDIX C: NEW NON-UNION WORK
## RETAINED EMPLOYEES
**Passenger Service Work Previously Serviced by a Non-Signatory Employer**

The terms of this Appendix apply only to employees retained from the previous, non-signatory Employer, in this Appendix C referred to as 'Retained Employees', at service contract accounts at LAX newly acquired from any employer that is not signatory to a collective bargaining agreement with the Union.

Any wage, benefit level, trust fund contribution or other condition of employment not specifically referenced in this Appendix shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term May 1st, 2017 to April 30, 2022 ('LAX Master').

1) Retained Employees will not be subject to any reductions in benefits or rates of pay other than those referenced below in this Appendix C.

2) The Employer will recognize as the employee's Airport Seniority date the date of hire provided by previous employer per the requirements of the City of Los Angeles Service Contract Worker Retention Ordinance.

3) There shall be no change to the Retained Employees' wages or benefits during the Employer's first six (6) calendar months of servicing the newly acquired account.

4) Effective the first (1st) day of the Employer's seventh calendar month of service on the account, all Retained Employees shall have until the first (1st) day of the seventh calendar month to indicate on a one-time basis, in writing, to the Employer and to the Union their choice of the following options. The Retained Employee's choice will be implemented effective the first day of the eighth calendar month. This choice remain in effect for the life of the current LAX Master, subject to change only in case of an "qualifying event" in accordance with the Rules of the California Service Employees Trust Fund, in which case the Retained Employee will have sixty (60) days from the date of the qualifying event to make a new choice. Any Retained Employee who does not indicate their choice shall default to Option B.

Option A: Master Contract Rates
The Retained Employee's wages, holidays, paid time off, health & welfare benefits and Trust Fund contributions will be determined, based on Airport Seniority, by the relevant Article of the LAX Master. The parties recognize that this choice may result in a wage reduction, depending on the Retained Employee's seniority and current rate of pay.

Option B: Living Wage
The Retained Employee will not have Health & Welfare coverage. The Retained Employee's wage and paid time off will be determined by the City of Los Angeles Living Wage Ordinance as published by the City of Los Angeles, including any future increases. No wage increases, health & welfare benefit, holiday or paid time off provisions of the LAX Master shall apply.

Option C: Employer Discretion
The Employer may, at its discretion, offer to Retained Employees who choose Option B the opportunity to enroll in the coverage described below.

Eligibility for this coverage shall be as described in Article 8, Section 4 of the LAX Master (eight (8) months seniority with six (6) consecutive months of no less than one-hundred and twenty (120) hours paid per month).

For eligible employees who choose to enroll in this plan, sixty percent (60%) of the cost of the monthly contribution shall be borne by the Employer and forty percent (40%) by the employee, through bi-weekly or bi-monthly payroll deductions, as permitted by Section 224 of the California Labor Code.

As of the effective date of this Agreement, the monthly contribution for this plan is Three Hundred and Forty-Two Dollars and Forty-Eight Cents ($342.48).  None of the "Opt-Up", "Opt-Down" or "Opt-Out" provisions of Article 8, Section 3c of the LAX Master shall apply.

| Benefits | Contributions |
|---|---|
| • Kaiser Bronze 5808 benefits with $4500 individual annual deductible, 40% coinsurance for office visit, 40% coinsurance after deductible for ER, 30% coinsurance for each generic Rx /40% coinsurance for each brand name Rx | Full Monthly Premium  $342.48 |
| • Liberty Dental LDP200 | Employer Contribution (60%)  $205.49 |
| • Vision Service Plan C | Employee Contribution (40%)  $136.99 |
| • $5,000 Member-Only Life Insurance | |

In the event that the Trustees of the Trust ("Trust") referred to in Article 8, Section 1 of the LAX Master determine that it is necessary to increase this premium above $342.48 in order to maintain the benefits which were in effect on May 1, 2017, the Employer and the Employee will continued to pay 60% and 40% respectively of the increased premium.

## APPENDIX D: SUPERSESSION

The Employer and the Union hereby agree the provisions of this Agreement supersede all of the requirements of the City of Los Angeles "Living Wage Ordinance". In addition, the Union agrees to cooperate in good faith and in a timely manner by providing the Employer at the Employer's request with a letter or other documentation acceptable to the Employer, which will substantiate the provisions of this Article.

## Appendices
## Economic Conditions for Employees hired before July 1, 2013

| Appendix | Client/Service[1] | Employer as of 5/1/17 | Page # |
|---|---|---|---|
| E | Southwest / Passenger Service & Catering | Gateway Frontline Services, Inc | 52 |
| F | T3 - Consortium / Passenger Services | ABM Aviation | 53 |
| G | Southwest / Janitorial & Cabin Cleaning | ABM Aviation | 54 |
| H | T6 – American Airlines, Former US Airways / Cabin Cleaning | ABM Aviation | 55 |
| I | Hawaiian / Passenger Services<br>T3 - Consortium / Security<br>TBIT - Consortium / Passenger Services<br>Imperial Terminal - Flying Food / Catering, Security<br>Aeromexico, China / Cargo Services | AeroPort Services (APS) | 56 |
| J | American / Cabin Cleaning & Passenger Services<br>Delta & Delta Code Share Partners / Passenger Services<br>Delta, Virgin Atlantic & Aeromexico / Cabin Cleaning<br>American /Remote Bus Operations<br>Alaska Havana / Cabin Search<br>American, United / Cargo Services | G2 Secure Staff<br><br>SOS Security | 57 |
| K | United, Delta, Alaska, TBIT Consortium / Janitorial<br>T2 – Consortium / Cabin Cleaning | ABM Aviation<br>World Service West | 59 |
| L | T3 - Virgin Australia, T6, T7, T8 - United / Passenger Services | ABM Aviation | 60 |
| M | United / Cabin Cleaning | G2 Secure Staff | 61 |
| N | Aeroflot, British Airways, Cathay Pacific, China Eastern, Iberia, Lan Chile, Jet Blue, Korean Air, Norwegian, Qantas Airways, Singapore Airlines, Virgin Australia / Cabin Cleaning | Menzies Aviation | 63 |
| O | Interline Baggage Services | AeroPort Services (APS) | 64 |
| P | United Cargo Warehouse and West Hangar / Security | SOS Security | 65 |
| Q | Part-Time Staffing Percentage Ratios | | 66 |
| R | Delta / Cabin Clean ing | G2 Secure Staff | 67 |

---

[1] Locations listed in T2, T3, T4, T5 or T6 refer to location of service prior to Delta`s 2017 move from T5 to T2 & T3

# APPENDIX E
## SOUTHWEST AIRLINES - PASSENGER SERVICE & CATERING
### Serviced by Gateway Frontline Services, Inc. as of May 1st, 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix E shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master').  The following wage and benefit levels apply only to employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix E are covered by the following provisions:

1) **Differentials**
   a)  Dispatchers' differential shall be no less than $1.00 in addition to the employee's regular pay.
   b)  Coordinators' differential shall be no less than $0.25 in addition to the employee's regular pay.

2) **Holiday Pay**
   In addition to Recognized Holidays indicated in Article 12, Section 1, for employees covered under this Appendix E with one (1) or more years of service, Martin Luther King Jr Day shall also be considered a Recognized Holiday.

# APPENDIX F
## T3 – CONSORTIUM – PASSENGER SERVICES
### Serviced by ABM Aviation as of May 1, 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix F shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). The following wage and benefit levels apply only to employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix "F" are covered by the following provisions:

**Holiday Pay**
In addition to Recognized Holidays indicated in Article 12, Section 1, for employees covered under this Appendix F with one (1) or more years of service, Martin Luther King Jr Day shall also be considered a Recognized Holiday.

## APPENDIX G
### SOUTHWEST AIRLINES – JANITORIAL & CABIN CLEANING
### <u>Serviced by ABM Janitorial Services – Southwest, Inc. as of May 1, 2017</u>

Any wage or benefit level or condition of employment not specifically referred to in this Appendix G shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix G are covered by the following provisions:

**1) Differentials**

Wage differentials shall remain as follows:

|     |                            |        |
|-----|----------------------------|--------|
| a)  | Lead/Foreperson/Dispatcher | $0.45  |
| b)  | Restrooms/Driver           | $0.32  |
| c)  | Project Worker             | $0.37  |
| d)  | Ramp Worker                | $0.47  |
| e)  | Night shift                | $0.20  |

Night shift differential applies for the entire shift. To qualify for shift differential, employees must work at least 50% of their shift after 9pm, except on Saturday it shall be after 7pm.

**2) Paid Days Off**

| Seniority      | Paid Days Off |
|----------------|---------------|
| 25-60 months   | 14            |
| 61+ months     | 16            |

**3) Holiday Pay**

In addition to the Recognized Holidays indicated in Article 12, Section 1, for employees covered under this Appendix G with four (4) or more years of service, Martin Luther King Jr Day shall also be considered a Recognized Holiday.

# APPENDIX H
## T6 –AMERICAN AIRLINES, FORMER US AIRWAYS – CABIN CLEANING
### <u>Serviced by ABM Aviation as of May 1, 2017</u>

Any wage or benefit level or condition of employment not specifically referred to in this Appendix H shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix H are covered by the following provisions:

**1)      Differentials**
Wage differentials shall remain as follows:
| | | |
|---|---|---|
| a) | Lead/Foreperson/Dispatcher | $0.45 |
| b) | Restrooms/Driver | $0.32 |
| c) | Project Worker | $0.37 |
| d) | Ramp Worker | $0.47 |
| e) | Night shift | $0.20 |

To qualify for shift differential, employees must work at least 50% of their shift after 9pm, except on Saturday it shall be after 7pm.

**2)  Paid Days Off**

| Seniority | Paid Days Off |
|---|---|
| 25-60 months | 13 |
| 61+ months | 15 |

**3)  Holiday Pay**
In addition to the Recognized Holidays indicated in Article 12, Section 1, for employees covered under this Appendix H with four (4) or more years of service, Martin Luther King Jr Day shall also be considered a Recognized Holiday.

# APPENDIX I
## HAWAIIAN – PASSENGER SERVICES
## T3 – CONSORTIUM - SECURITY
## TBIT – CONSORTIUM – PASSENGER SERVICES
## IMPERIAL TERMINAL – FLYING FOOD – CATERING, SECURITY
## CARGO - AEROMEXICO, CHINA

### Serviced by AeroPort Services as of May 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix I shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix I are covered by the following provisions.

1. **Paid Days Off**

   | Seniority | Paid Days Off |
   |-----------|---------------|
   | 49 + months | 14 |

   Employees may accrue up to twenty-eight (28) PDOs.

2. **Paid Breaks**
   Employees covered under this Appendix I shall be entitled to fifteen (15) minute paid breaks as described in Article 7, Section 7f.

APPENDIX J
**AMERICAN – CABIN CLEANING & PASSENGER SERVICES
DELTA & DELTA CODE-SHARE PARTNERS –PASSENGER SERVICES
DELTA, VIRGIN ATLANTIC & AEROMEXICO - CABIN CLEANING
AMERICAN – REMOTE BUS OPERATIONS
ALASKA – HAVANA - CABIN SEARCH
CARGO – AMERICAN – CARGO SERVICES
CARGO – UNITED – CARGO SERVICES**

**Serviced by G2 Secure Staff, LLC and SOS Security\* as of May 1, 2017**

Any wage or benefit level or condition of employment not specifically referred to in this Appendix J shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master for the services, clients and locations described in the title of this Appendix J are covered by the following provisions:

1) **Differentials**
   a) Dispatchers' differential shall be no less than $1.00 in addition to the employee's regular pay.
   b) Leads' differential shall be no less than $1.00 in addition to the employee's regular pay and in no case less than a total wage of $13.00
   c) Speakers' differential shall be no less than $0.50 in addition to the employee's regular pay and in no case less than $1.00 above the current start rate for new hires.
   d) Resolution agents' differential shall be no less than $2.00 in addition to the employee's regular pay.

2) **Paid Days Off**

| Employees hired prior to 7/1/13 | |
| --- | --- |
| Seniority | Paid Days Off |
| 37-60 months | 14 |
| 61 + months | 15 |

All employees may carry over PTOs for one year. Unused compensable days that were accrued from the previous year will be paid. Subject to operational and manpower requirements and prior approval employees can use a maximum of twenty (20) consecutive days during times not occurring in the non-black out periods listed below. Because of peak travel seasons no PTO's either paid or unpaid will be approved for the following times: One week before Thanksgiving to one week after New Year's inclusive. Employer shall permit employees to cash-out up to 50 hours of PTO every two years. Employees may request, and shall be granted, an exemption from the 50 hr/2 yr cap in case of demonstrated financial hardship. If a financial hardship request is initially denied, the employee may appeal directly to the Employer's Regional Director of Operations regard the matter. Such request shall not be unreasonably denied. If Employer fails to publish employee's current PTO balance on each pay stub, the 50 hour/2 year cap on cash provided for above shall not apply.

3) **Jury Duty Leave**
Employees actually serving on juries shall receive the difference between their straight-time weekly base hourly wage rate and the amount received while on jury duty. They will be expected to work their regularly posted schedule on days when the jury is not in session. Proof of Jury Service and payment is required prior to payment of Jury Duty.

**4) Paid Breaks**

Employees covered under this Appendix J shall be entitled to fifteen (15) minute paid breaks as described in Article 7, Section 7f.

**5) Grace Periods**

Employees arriving late to work will be allotted two (2) ten (10) minute grace periods per calendar month. In any instance(s) wherein twenty (20%) percent of the workforce calls in or reports in or arrives late to work on any workday, no such grace period will be granted to any employee for that day.

\*Nothing in this Appendix J, including anything related to Differentials, Paid Days Off, Jury Duty Leave, Paid Breaks and Grace Periods as set forth herein, shall apply to SOS employees other than those retained from G2 Secure Staff on July 1, 2016.

# APPENDIX K
**UNITED – JANITORIAL[2]**
**DELTA – JANITORIAL[3]**
**T2 – CONSORTIUM – CABIN CLEANING**
**TBIT – CONSORTIUM - JANITORIAL**
**ALASKA – JANITORIAL**

## Serviced by ABM Aviation, SDH Services West (Sodexo) and World Service West as of May 1, 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix K-1 shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term of May 1, 2017 to April 30, 2022 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix K-1 are covered by the following provisions.

1) **Differentials**
   a) Drivers and Warehousemen shall be paid $0.50/hour over cabin cleaners of the same seniority.
   b) Leads and Dispatchers shall be paid $1.25/hour over cabin cleaners of the same seniority.
   c) Any janitor who drives for more than two (2) hours a day shall be considered a Driver for that day.
   d) Employees hired before 12/2/09 and working a shift that starts at 8pm but no later than 4am will receive a shift differential of $0.20 for each hour worked.

---

[2] Excluding janitorial services for United Airlines' Premiere Access Club, which are covered by the LAX Master Janitorial Agreement.
[3] Including janitorial services for Delta Airlines' Sky Club.

# APPENDIX L
## T3 – VIRGIN AUSTRALIA – PASSENGER SERVICES
## T6, T7, T8 – UNITED –PASSENGER SERVICES

### Serviced by ABM Aviation as of May 1, 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix L shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term June 27, 2014 to October 31, 2016 ('LAX Master'). Employees, as defined in Article 1 of the LAX Master, hired prior to 7/1/13 for the services, clients and locations described in the title of this Appendix L are covered by the following provisions:

1) **Differentials**
   a) Dispatchers shall earn no less than $12.50 per hour.
   b) Per Diem for T.W.O.V. Classification. All employees who perform the duties of the above-named classification and are required to work the overnight shift or graveyard, at a hotel, shall be paid a $5.00 per shift per diem. The Employer shall provide the necessary radios to those employees as well.

2) **Paid Days Off**

| Seniority | Paid Days Off |
|-----------|---------------|
| 10+ months | 16 |

   Employees may accrue up to thirty-two (32) PTO's days.

3) **Paid Breaks**
   Employees covered under this Appendix L shall be entitled to fifteen (15) minute paid breaks as described in Article 7, Section 7f.

4) **Grace Periods**
   Employees arriving late to work will be allowed three (3) ten (10) minute unpaid grace periods per month.

# APPENDIX M
## UNITED CABIN CLEANING
### SERVICED BY G2 SECURE STAFF AS OF APRIL 2017

The terms of this Appendix apply only to employees performing cabin cleaning for United Airlines at LAX hired on or before May 7, 2014 or retained from the previous employer, US Aviation, referred to as 'Retained Employees' as of April 2017.

Any wage, benefit level, trust fund contribution or other condition of employment not specifically referenced in this Appendix shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term May 1st, 2017 to April 30, 2022 ('LAX Master').

1) Retained Employees will not be subject to any reductions in benefits or rates of pay other than those referenced below in this Appendix M.

2) Seniority dates shall be maintained for all purposes for all Retained Employees, including the seniority dates from employees who have been retained by the Employer from the previous contractor as referenced in Attachments A and B.

3) Retained Employees' choices between Options A and B made in 2016 are recorded in Attachment A. This choice remains in effect for the life of the current LAX Master, subject to change only in case of an "qualifying event" in accordance with the Rules of the California Service Employees Trust Fund, in which case the Retained Employee will have sixty (60) days from the date of the qualifying event to make a new choice. Any Retained Employee who did not indicate their choice defaults to Option B.

Option A:  Master Contract Rates
The Retained Employee's wages, holidays, paid time off, health & welfare benefits and Trust Fund contributions will be determined, based on Airport Seniority, by the relevant Article of the LAX Master. The parties recognize that this choice may result in a wage reduction, depending on the Retained Employee's seniority and current rate of pay.

Option A1:  Hybrid Rate
Elect to retain their current rate of pay and select the Kaiser 5808 health insurance plan.  For employees who choose the Kaiser 5808 Employee-Only plan, the cost of the monthly contribution, Three Hundred and Forty-Two Dollars and Forty-Eight Cents ($342.48), shall be borne by the employee, through bi-weekly payroll deductions in the amount of One Hundred and Fifty-Eight Dollars and Forty-Eight Cents, as permitted by Section 224 of the California Labor Code.  In the event that the Trustees of the Trust ("Trust") referred to in Article 8, Section 1 of the LAX Master determine that it is necessary to increase premium above the base premium in order to maintain the benefits which were in effect on May 1, 2017, or which may be adopted hereafter by the Employer and the Union, the employee shall bear the cost of such increases.  The Employer will increase the employee's wage simultaneous with and by the same amount as any future increases to the City of Los Angeles Living Wage Ordinance.  No other wage increases shall apply.

Option B:  Living Wage
The Retained Employee will not have Health & Welfare coverage through the Employer.  The Retained Employee's wage and paid time off will be determined by the City of Los Angeles Living Wage Ordinance as

published by the City of Los Angeles, including any future increases.  No wage increases, health & welfare benefit, holiday or paid time off provisions of the LAX Master shall apply.

Attachment A:  Wage & Benefit Seniority List
Parties agree that the aforementioned seniority list will be used for purposes of wages and benefits.   The US Aviation dates shown are the dates to be used for purposes of administering this Agreement to determine wages and benefits.  The current wage rates are also indicated on this list.

Attachment B: Shift Bid Seniority List
Parties agree that the aforementioned seniority list will be used for purposes of the shift bid process, and for any and all purposes other than wages and benefits as defined under the LAX Master.

# APPENDIX N
## CABIN CLEANING
### AEROFLOT, BRITISH AIRWAYS, CATHAY PACIFIC, CHINA EASTERN, IBERIA, LAN CHILE, JET BLUE, KOREAN AIR, NORWEGIAN, QANTAS AIRWAYS, SINGAPORE AIRLINES, VIRGIN AUSTRALIA SERVICED BY MENZIES AVIATION AS OF APRIL 2017

The terms of this Appendix apply only to former employees of Scientific Concepts hired by World Service West on or before September 1st, 2015 to perform cabin cleaning services servicing the airlines referenced above and Retained by Menzies, referred to as 'Retained Employees'.

Any wage, benefit level, trust fund contribution or other condition of employment not specifically referenced in this Appendix shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term May 1st, 2017 to April 30, 2022 ('LAX Master').

1) Retained Employees will not be subject to any reductions in benefits or rates of pay other than those referenced below in this Appendix N.

2) For any Retained Employee who had performed cabin cleaning services for the Employer on this account and maintained continuous employment at this account during the period from May of 2012 through April of 2017, the Employer will honor the Retained Employee's original date of hire with the Employer as their Airport Seniority date.

3) Effective May 1st, 2017, Retained Employees shall have until June 1st, 2017 to indicate on a one-time basis, in writing, to the Employer and to the Union their choice of the following options. The Employer will notify the California Service Employees Trust Fund ('Trust') in writing by no later than June 15th, 2017 of those Retained Employees who have chosen Option A. Any resulting contributions due to the Trust per the terms of the LAX Master will be due beginning with June 2017 hours for August 2017 payment and September 2017 coverage. Any change to the Retained Employee's rate of pay will be effective August 1st, 2017. This choice remain in effect for the life of the current LAX Master, subject to change only in case of an "qualifying event" in accordance with the Rules of the California Service Employees Trust Fund, in which case the Retained Employee will have sixty (60) days from the date of the qualifying event to make a new choice. Any Retained Employee who does not indicate their choice shall default to Option B.

Option A: Master Contract Rates
The Retained Employee's wages, holidays, paid time off, health & welfare benefits and Trust Fund contributions will be determined, based on Airport Seniority, by the relevant Article of the LAX Master. The parties recognize that this choice may result in a wage reduction, depending on the Retained Employee's seniority and current rate of pay.

Option B: Living Wage
The Retained Employee will not have Health & Welfare coverage. The Retained Employee's wage and paid time off will be determined by the City of Los Angeles Living Wage Ordinance as published by the City of Los Angeles, including any future increases. No wage increases, health & welfare benefit, holiday or paid time off provisions of the LAX Master shall apply.

# APPENDIX O
## INTERLINE BAGGAGE SERVICES
## SERVICED BY AEROPORT SERVICES AS OF APRIL 2017

The terms of this Appendix apply only to employees performing interline baggage services, referred to as 'Retained Employees' as of April 2017.

Any wage, benefit level, trust fund contribution or other condition of employment not specifically referenced in this Appendix shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term May 1st, 2017 to April 30, 2022 ('LAX Master').

1) Retained Employees will not be subject to any reductions in benefits or rates of pay other than those referenced below in this Appendix O.

2) Effective June 1st, 2017, Retained Employees shall have until July 1st, 2017 to indicate on a one-time basis, in writing, to the Employer and to the Union their choice of the following options. The Retained Employee's choice will be implemented effective August 1st, 2017. This choice remain in effect for the life of the current LAX Master, subject to change only in case of an "qualifying event" in accordance with the Rules of the California Service Employees Trust Fund, in which case the Retained Employee will have sixty (60) days from the date of the qualifying event to make a new choice. Any Retained Employee who does not indicate their choice shall default to Option B.

Option A: Master Contract Rates
The Retained Employee's wages, holidays, paid time off, health & welfare benefits and Trust Fund contributions will be determined, based on Airport Seniority, by the relevant Article of the LAX Master. The parties recognize that this choice may result in a wage reduction, depending on the Retained Employee's seniority and current rate of pay.

Option B: Living Wage
The Retained Employee will not have Health & Welfare coverage. The Retained Employee's wage and paid time off will be determined by the City of Los Angeles Living Wage Ordinance as published by the City of Los Angeles, including any future increases. No wage increases, health & welfare benefit, holiday or paid time off provisions of the LAX Master shall apply.

# APPENDIX P
**SECURITY SERVICES**
**UNITED AIRLINES - CARGO WAREHOUSE AND WEST HANGAR**
**SERVICED BY SOS SECURITY AS OF APRIL 2017**

The terms of this Appendix apply only to the two continuing employee groups described below, referred in this Appendix P as 'Retained Employee Group A' and 'Retained Employee Group B'.

Any wage, benefit level, trust fund contribution or other condition of employment not specifically referenced in this Appendix shall be determined by the appropriate Article of the LAX Master Passenger Services Agreement with term May 1st, 2017 to April 30, 2022 ('LAX Master').

> **Retained Employee Group A:  Continuing Employees Previously Employed by Aviation Safeguards prior to July 1, 2016 and Retained by the Employer on July 1, 2016.**
>
> **Retained Employee Group B:  Continuing Employees Employed by SOS prior to July 1, 2016**

1) Retained Employees will not be subject to any reductions in benefits or rates of pay other than those referenced in this Appendix.

2) For Retained Employee Group A, the Employer will recognize as the employee's Airport Seniority date the date of hire provided by Aviation Safeguards to the Employer per the requirements of the City of Los Angeles Service Contract Worker Retention Ordinance.

3) Effective May 1st, 2017, Retained Employees shall have until June 1st, 2017 to indicate on a one-time basis, in writing, to the Employer and to the Union their choice of the following options.  The Employer will notify the California Service Employees Trust Fund ('Trust') in writing by no later than June 15th, 2017 of those Retained Employees who have chosen Option A.  Any resulting contributions due to the Trust per the terms of the LAX Master will be due beginning with June 2017 hours for August 2017 payment and September 2017 coverage.  Any change to the Retained Employee's rate of pay will be effective August 1st, 2017.  This choice remain in effect for the life of the current LAX Master, subject to change only in case of an "qualifying event" in accordance with the Rules of the California Service Employees Trust Fund, in which case the Retained Employee will have sixty (60) days from the date of the qualifying event to make a new choice. Any Retained Employee who does not indicate their choice shall default to Option B.

Option A:  Master Contract Rates
The Retained Employee's wages, holidays, paid time off, health & welfare benefits and Trust Fund contributions will be determined, based on Airport Seniority, by the relevant Article of the LAX Master.

Option B:  Living Wage
The Retained Employee will not have Health & Welfare coverage.  The Retained Employee's wage and paid time off will be determined by the City of Los Angeles Living Wage Ordinance as published by the City of Los Angeles, including any future increases.  No wage increases, health & welfare benefit, holiday or paid time off provisions of the LAX Master shall apply.

# APPENDIX Q
## PART-TIME STAFFING PERCENTAGE RATIOS

Pursuant to Article 8, Section 5     LAX Master Passenger Service CBA Signatories     6/14/2017
Percentages of Part-Time and Full Time Employees

| Employer | Total EEs | Over 30 | | Under 30 | | 25-29 | | 20-24 | | Under 20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ABM Aviation | 454 | 366 | 81% | 88 | 19% | 30 | 7% | 26 | 6% | 32 | 7% |
| APS | 344 | 284 | 83% | 60 | 17% | 25 | 7% | 12 | 3% | 23 | 7% |
| Menzies* | 90 | 78 | 87% | 12 | 13% | 5 | 6% | 2 | 2% | 2 | 2% |
| Sodexo* | 66 | 64 | 97% | 2 | 3% | 0 | 0% | 2 | 3% | | 0% |
| SOS* | 45 | 42 | 93% | 3 | 7% | 1 | 2% | 1 | 2% | 1 | 2% |
| G2 | 1021 | 810 | 79% | 155 | 15% | 100 | 10% | 41 | 4% | 14 | 1% |
| Gateway | 110 | 80 | 73% | 30 | 27% | 3 | 3% | 21 | 19% | 6 | 5% |
| World | 146 | 146 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Total | 2276 | 1870 | 82% | 350 | 15% | 164 | 7% | 105 | 5% | 78 | 3% |

*Data drawn from responses to 2016-2017 bargaining information requests

Figures shown reflect historic data provided during 2013 bargaining except as noted by "*"     Page 1 of 1

# APPENDIX R
## CABIN CLEANING
## DELTA AIRLINES
## SERVICED BY G2 SECURE STAFF AS OF MAY 2017

Any wage or benefit level or condition of employment not specifically referred to in this Appendix shall be determined by Appendix J to the LAX Master Passenger Services Agreement with term May 1, 2017 to April 30, 2022 ('LAX PS Master') or, if not addressed in Appendix J, by the appropriate Article of the LAX PS Master. Legacy Employees, defined as all employees retained from Gate Gourmet/Gate Aviation, including dispatchers, upon transfer of the LAX Delta Cabin Cleaning service contract to G2 Secure Staff are covered by the following provisions:

1. **Seniority**
   a. Legacy Employees retained by Gate Gourmet pursuant to May 2014 take-over of Delta Cabin Cleaning services (determined by Appendix J to the LAX Master Passenger Services aff Airport Seniority as shown in Attachment A to this Appendix R.
   b. All other Legacy Employees shall retain their original date of hire with Gate Gourmet as their airport seniority date as shown in Attachment A to this Appendix R.

2. **Wages**
   a. No Legacy Employee shall suffer any reduction in wages as a result of execution of this agreement.
   b. G2 Legacy Employees shall be placed at the wage corresponding to their original G2 Secure Staff Airport Seniority as shown in Attachment A to this Appendix R under the terms of the LAX PS Master, effective upon ratification of this Appendix R.
   c. Differentials
   The following classifications will have a $2.00 an hour differential:
   Leads, Lavatory Agents, Drivers, Dispatchers

3. **Health & Welfare**
   This Article expresses the understanding of the Employer and the Union concerning Employer contributions to the Health and Welfare Plan on behalf of retained Employees under this Appendix R.

   TRUST FUND
   All Employer contributions referred to in this Article shall be paid into the California Service Employees Health and Welfare Trust Fund, to the Depository Bank as named by the Board of Trustees. It is understood that all questions concerning eligibility of employees for coverage, including the commencement and termination of coverage, shall be determined by the Trustees of said Trust Fund.

   The Employer agrees to be bound by all the terms and provisions of the Agreement and Declaration of Trust of the California Service Employees Health and Welfare Trust Fund and any plan documents or summary plan description thereof, as each of these may from time to time be amended by the Board of Trustees, and hereby acknowledges prior receipt of a copy thereof.

   The Employer shall comply with all the provisions of the California Service Employees Health and Welfare Trust Fund and shall maintain, furnish and make available for audit such data and records as the Trustees may require, as provided in the Agreement and Declaration of Trust of the California Service Employees Health and Welfare Trust Fund.

**A.   Initial Eligibility for Contributions, Employees**
**Eligibility and qualifications for all employees provided with benefits under this Article are:**

Between the first (1st) and the fifteenth (15th) day of each calendar month, the Employer shall submit to the Trust Fund, a list of eligible employees containing their names, addresses and social security numbers who have worked and/or been paid at least one hundred and twenty (120) hours per month during the preceding calendar month and contributions due thereon.  Health and Welfare coverage shall be applied towards the following month after payment has been received by the Trust Fund.  Paid vacation, paid holidays and paid sick leave shall be included in computing qualifying hours in the month in which the employee would have normally worked such hours.  Vacation and Sick Leave cash-outs, when an employee is terminated or laid-off, are also to be included in computing qualifying hours in the month it is paid to the employee.

Paid vacation also shall be included in computing qualifying hours with the following exception.  If the employer has paid to an employee at the employee's request accrued vacation pay in advance of the month or months in which the employee takes the corresponding vacation time, such pre-paid vacation pay shall not count in computing the qualifying hours of the employee for the month or months in which it is paid, including for the purpose of determining employer overpayments or underpayments.  At the employee's written request such vacation hours shall be credited toward eligibility for the month(s) that the employee actually takes time off from work.  The employee shall inform the Employer, in writing, as to when they shall actually take time off from work.

**B.   Benefits**
The Employer shall contribute, effective initially with July 2016 hours/payroll, due in August 2016 for September 2016 coverage, on behalf of each qualifying employee the amount, as determined by the eligible employees plan selection, per month to the California Service Employees Health and Welfare Trust Fund.  The Employer contribution will provide the employee with the optional plan selected by the eligible employee when he/she is first eligible.

    a.   Legacy Employees shall receive health and welfare coverage in accordance with the terms of Article 8 of the LAX PS Master with the following modifications:

    (i)    The terms of Article 8, Section 4b of the LAX PS Master will govern for continuing eligibility for contributions for Kaiser Plan C-9. The following contribution rates are valid from June 2017 through May 2018 contributions only and are subject to change every June of each year by the Board of Trustees.

| KAISER PLAN C9 | Monthly Premium | Benefit Description |
|---|---|---|
| Employee Only | $505.48 | No annual plan deductible. Co-pays are $30 per doctor visit, $125 per emergency room visit; $15 for each generic drug & $35 for each brand name drug. This plan option includes Liberty LDP2, VSP Plan C and $5,000 member life insurance with $2,500 dependent life insurance |
| Employee +1 | $983.48 | |
| Employee + 2 or more | $1,377.48 | |

(ii)     Non G2 Legacy Employees with an Airport Seniority date of 5/15/14 or earlier will have the option, in addition to the Kaiser Plan 5808 described in Article 8 of the LAX PS Master, of selecting the following plan when first eligible:

a.   **Kaiser Silver Plan #6761**[4] - This plan includes medical and prescription drug coverage through Kaiser Permanente, as well as vision, dental and life insurance, see the applicable summary plan description.

| KAISER SILVER PLAN 6761 | Monthly Premium | Employer Contribution | Employee Contribution | Benefit Description |
|---|---|---|---|---|
| Employee Only | $424.48 | 100%<br>$424.48 | $0.00 | Plan deductible is $1,000 for each individual up to $2,000 for family.  $40 copay per doctor and urgent care visit, 30% coinsurance per emergency room visit after plan deductible is met. |
| Employee +1 | $821.48 | 80%<br>$657.18 | 20%<br>$164.30 | Rx copay, generic drug: $25 at plan pharmacy/$50 via mail order; brand name drug: $50 at plan pharmacy/$100 via mail order. |
| Employee + 2 or more | $1,149.48 | 70%<br>$804.64 | 30%<br>$344.84 | Vision Service Plan –Regular Plan #C<br>Liberty Dental – LDP2 Plan Member-Only Life Insurance - $10,000<br>Dependent Life - $2,500 |

(iii)    Non G2 Legacy Employees
   a.   Have an Airport Seniority date of 5/15/14 or earlier.
   b.   The terms of Article 8, Section 4b of the LAX Master will govern for continuing eligibility for contributions for Kaiser Plan 6761 or 5808 coverage.

(iv)    Opt Out of Coverage
       Employees may opt out of the Kaiser Plans 5808 and 6761 described in this Appendix without proof of other coverage.  Employees wishing to opt out of the Kaiser Plan C9 must provide proof of other coverage as set forth in Article 8, Section 3.g of the LAX PS Master.  Employees wishing to opt out must comply with the deadlines set forth in Article 8, Section 3.g of the LAX PS Master.

It is agreed that the employee benefits established hereunder for all employees receiving such benefits during the term of this Agreement, shall be maintained for the life of this Agreement. In the event that the Trustees of the Trust ("Trust") referred to in LAX PS Master determine that it is necessary to increase premiums above the base premium in order to maintain the benefits which were in effect on May 1, 2017, or which may be adopted hereafter by the Employer and the Union, the Employer shall, during each anniversary year and each anniversary date of this Agreement thereafter, commencing with May 2017 work hours, pay up to six percent (6%) of any such premium increase over the prior plan year's base premium. Any premium increase in excess of six percent (6%), but less than twelve percent (12%) over the prior plan

---

[4] Addition of dental, vision and life coverage and pricing dependent on final approval by the Trust

year's base premium in any contract anniversary year commencing with May 2017 work hours shall be paid from the reserves of the Trust. Any premium increase in excess of 12% over the prior plan year's base premium in any contract anniversary year shall be shared equally between the Employer and affected employees through payroll deductions as permitted by Section 224 of the California Labor Code.  Premium increases subject to payment from Trust Fund reserves that are in excess of six (6%) percent annually are subject to the Plan Consultant certifying by January 31 of each contract year that the reserves of the Trust will equal or exceed twelve (12) months, through April 30, of the following year.

In the event the Trust Consultant is unable to certify the maintenance of at least the above mentioned 12-month reserve level, any premium increase above six (6%) percent shall be shared equally between the Employer and affected employees through payroll deductions as permitted by Section 224 of the California Labor Code; provided, however, that the employer and the union may by mutual agreement enter into non-binding discussions with respect to the lowering of health and welfare plan premiums or some other arrangement for sharing of plan increases above six percent (8%). The employer and the union agree that any such mutually agreeable changes shall be reduced into writing and incorporated by reference into this Agreement.

It is the sole responsibility of the Employer to transmit the entire contribution to the Trust Fund.  The Employer is hereby authorized to make the payroll deduction necessary to make the required contribution to the Trust Fund.  No Individual authorization of the employee is required.  The Employer is hereby authorized to make the payroll deduction necessary to make the required contribution to the Trust Fund, as authorized by California Labor Code Section 224. Failure by the Employer to make a payroll deduction does not relieve the Employer's obligation to transmit to the Trust Fund the entire contribution amount for eligible employees.

**C.  LIABILITY**
If any employee has worked and/or has been paid for the minimum required hours per Section A of this Article and is eligible for benefits per the Agreement, but is not listed by the Employer, the Employer shall be personally liable and fully responsible for all claims incurred by said employee during any resulting period of ineligibility.  The personal liability however does not in any way relieve the Employer of its liability to make payments under this Article.

**4.  Paid Days Off**
In addition to the Paid Day Off schedule in Appendix J, the Employer agrees to provide the following Paid Days Off for Legacy Employees:

| Seniority | Paid Days Off |
|---|---|
| 120+ months (10+ years) | 16 |
| 180+ months (15+ years) | 18 |
| 240+ months (20+ years) | 20 |

**5.  Scheduled Leaves**
   a.  The Employer agrees, on a one time basis, to allow up to four (4) Legacy Employees at a time to schedule leaves, based on seniority, not to exceed twenty-nine (29) calendar days during 2016 and 2017.

**6.  Loyalty Bonus**
For Legacy Employees with an Airport Seniority date of 5/15/14 or before, the Employer agrees to pay a loyalty bonus of $50 a month.

7.  **Working Conditions**
    a.  The Employer agrees to ensure the following are available and easily accessible:
        i.   an employee breakroom in the Delta cabins warehouse
        ii.  fresh drinking water
        iii. fresh water hose readily accessible for Lavatory Agents' use, or access to the shower located in the Delta cabins warehouse, in case of spills.

ATTACHMENT 2



Incorporating **Simplicity USA** and **ASIG**

# AGREEMENT TO BE BOUND BY ALTERNATIVE DISPUTE RESOLUTION POLICY

I agree that in the event employment disputes arise between Menzies Aviation, which includes Simplicity USA, ASIG and any other subsidiaries of Menzies Aviation, Inc., (hereinafter referred to collectively as "Menzies Aviation" or "Menzies"), on the one hand, and me, on the other hand, I agree to be bound by the Menzies Aviation ADR Policy, which provides for final and binding arbitration of employment-related disputes.

I understand that the Menzies Aviation ADR Policy applies to disputes relating to my employment and the terms and conditions of my employment (unless those terms and conditions are covered and preempted by a collective bargaining agreement grievance and arbitration process), including but not limited to my compensation, wages, claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, failure to reimburse expenses, failure to pay wages upon termination, failure to provide accurate, itemized wage statements, failure to provide meal and/or rest breaks, entitlement to waiting time penalties and/or other claims involving employee wages, benefits, discipline, performance evaluations, promotions and transfers, and the termination of my employment, as defined in the ADR Policy materials.  I also understand that this ADR Policy prohibits me from joining or participating in a class action or as a collective action representative, or otherwise consolidating a covered claim with the claims of others.  However, this ADR policy does not apply to any claim or dispute which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

I further acknowledge and agree that the Menzies ADR Policy applies to claims that include, but are not limited to, the following: (a) alleged violations of federal, state and/or local constitutions, statutes or regulations, (including but not limited to claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Equal Pay Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Pregnancy Disability Leave Law, or any other statutory or common law scheme prohibiting, among other things, discrimination or harassment because of race, color, age, religious creed, national origin, ancestry, disability, sexual orientation, gender identity and sex; (b) claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); (c) claims of wrongful termination or constructive termination (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); (d) claims based on any purported breach of duty arising in tort, including violations of public policy, for emotional distress and defamation (unless covered and preempted by a collective bargaining agreement grievance and arbitration process); and (e) claims related to the payment or non-payment of wages, expenses and/or the provisions of breaks as required by law, including, but not limited to, alleged violations of the California Labor Code, the wage order applicable to my industry, the Fair Labor Standards Act and any other statutory scheme governing wages (unless covered and preempted by a collective bargaining agreement grievance and arbitration process).

In consideration of Menzies Aviation's return agreement to be bound by the Menzies Aviation ADR Policy and have any and all claims arising out of the employment relationship it may have against me resolved in arbitration, and pay the arbitration fees as described therein, it is agreed that the Alternative Dispute Resolution Policy attached hereto which provides for final and binding arbitration, is the exclusive means for resolving

E X C E L L E N C E **FROM TOUCHDOWN TO TAKEOFF**   

Covered Disputes as defined in the Alternative Dispute Resolution Policy.  No other action may be brought in court or in any other forum.  I understand that this Agreement is a waiver of all rights to a civil court action for all disputes relating to my employment, the terms and conditions of my employment and/or the termination of my employment whether brought by me or by Menzies.  Only an arbitrator, not a judge or jury, will decide the dispute, and any dispute relating to the interpretation or application of this Agreement, including enforceability, revocability, or validity, shall be decided by an arbitrator and not by a court or judge.  In addition, I understand I am prohibiting from joining a class action or acting as a collective action representative, or otherwise consolidating a covered claim with the claims of others. I understand that if I do not wish to be bound by this Agreement, I must opt out by following the steps outlined in this Agreement.  I agree that my failure to opt out will demonstrate my intention to be bound by this Agreement and my agreement to arbitrate all disputes arising out of or related to your employment as set forth below.  Nothing contained in this Agreement is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration.

I also acknowledge and agree that the following types of disputes are expressly excluded and not covered by this policy: (a) disputes related to workers' compensation and unemployment insurance; and (b) disputes or claims that are expressly excluded by federal or state statute from mandatory arbitration or are expressly required to be arbitrated only under a different procedure pursuant to the terms of an employee benefit plan or collective bargaining agreement.  I also acknowledge and agree that nothing in this ADR Policy prohibits any employee from filing a charge with a state or federal administrative agency, such as the U.S. Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or the National Labor Relations Board.  A state or federal administrative agency would also be free to pursue any appropriate action. However, any claim that is not resolved administratively through such an agency shall be subject to this agreement to arbitrate and the ADR Policy.

I understand that I have the opportunity to ask questions regarding anything contained in the Menzies ADR Policy prior to my execution of my agreement to be bound by the Menzies ADR Policy.

I also understand that I am free at any time during my employment to opt out of my agreement to be bound by the Menzies ADR Policy and that I must take specific action to participate in legal action in court and/or to participate in any class action, collective action, or representative action.  I understand that Menzies does not require arbitration as a mandatory condition of my employment, so if I want to opt out of this Agreement, I may do so by submitting a written request to opt out to Human Resources.  I also understand that if I opt out, my revocation shall be prospective in character as explained in the ADR Policy.  I understand that if I do opt out of this Agreement, I will not be subject to any adverse employment action or be retaliated against in any way because of my decision to opt out.  I am aware that I have had an opportunity to consult with an attorney regarding this Agreement and how it affects my rights.

Nothing contained in this Agreement To Be Bound By Alternative Dispute Resolution Policy is intended to require arbitration of any matter or claim which the courts of this jurisdiction have expressly held are not subject to mandatory arbitration. Unlike the provisions of the Menzies Aviation Employee Handbook, the terms of this Agreement To Be Bound By Alternative Dispute Resolution Policy are contractual in nature.

By signing below, I acknowledge that I have reviewed and agreed to the terms and conditions set forth in the ADR Policy and this Agreement.  I further understand that I may change my mind and opt out of this Agreement at any time during my employment, and that my revocation will be prospective in character and shall not apply to any claims initiated prior to opting out of the ADR Policy or to any claims based on facts occurring before you deliver your written request to revoke your agreement to be bound by the ADR Policy.

Dora Patricia Amaya
I, _____, acknowledge that I have read the above policy.

8/28/2021
_____
Date



Electronically Signed By
Dora Patricia Amaya

Employee Signature

Electronically Signed By
Nelly Marin

For Menzies Aviation

Dora Patricia Amaya

Employee Name (Printed)

8/28/2021

Date

