# EXHIBIT 4

Videotaped Deposition of

# Anibal A. Silva

May 19, 2023

Amaya

vs.

Menzies Aviation (USA), Inc.



www.aptusCR.com | 866.999.8310

1    throughout your employment at Menzies?

2        A. Correct.

3        Q. Sitting here, can you identify other specific

4    operations or services that Menzies provides to airlines

5    other than ramp ground handling operations?

6        A. Yes.

7        Q. What are those?

8        A. They also worked as freighters.  They would

9    take care of the breakdowns and the buildup of their

10   cargos.  Also they would do the cleaning, aircraft

11   cleaning.  Along with that, I know for certain flights,

12   we had coordinators that were employed by Menzies.  And

13   I believe under my understanding in that location,

14   that's all I was really familiar with.

15       Q. And when you say you were familiar with it, is

16   your familiarity limited to just knowing that these are

17   generally the services that are provided?

18       A. By what I have visually seen on the tarmac,

19   yes, that is my understanding.

20       Q. All right.  So what, if anything, do you know

21   about Menzies's operations for cabin cleaning?

22       A. I have had friends that have transferred from

23   that department over to the ramps.  We have shared

24   breaks and meals together.  And that's just with the

25   cleaning crew, so that was the main -- that and the

1  freighters were just the main ones I visually saw on the

2  day-to-day basis.

3      Q. When you say visually saw, you witnessed the

4  operations themselves or just interacted with employees

5  who worked in those departments?

6      A. I have interacted and we've worked -- I

7  would -- I would say side by side per flight is just

8  they were inside the aircraft as we were outside.

9      Q. Are you aware that whether the turn time to

10 complete the cabin cleaning services were different or

11 the same compared to the ramp ground handling services?

12     A. I don't know.

13     Q. And same question with respect to freight.

14     A. I don't know.

15     Q. Okay.  Are you -- strike that.

16         What, if anything, do you know about Menzies's

17 operations for into-plane fueling services?

18     A. Nothing at all.

19     Q. What, if anything, do you know about Menzies's

20 operations for fuel farm management?

21     A. That was a department that I did see eventually

22 turn into a Menzies department, but during the beginning

23 of my career there, I don't believe I saw Menzies's

24 fuelers very often, so I was unaware that that was

25 something that we took care of.

Anibal A. Silva

1      Q. And are you familiar with the fuel farm

2   management duties and protocols?

3          A. No.

4      Q. Okay.  What, if anything, do you know about

5   Menzies's operations for ground service equipment

6   maintenance and repair?

7          A. Nothing.

8      Q. What, if anything, do you know about Menzies's

9   operations on any other airlines other than the ones you

10  worked on?

11         A. I worked on the majority of them, and they are

12  all roughly the same.

13     Q. Well, roughly the same except for the

14  differences that you've already testified to here today,

15  right?

16         A. That is correct.

17     Q. But would you -- would you agree that you don't

18  have personal knowledge or familiarity with airlines

19  that Menzies services other than the ones that you

20  personally provided services to?

21         A. Correct.

22     Q. And what, if anything, do you know about

23  Menzies's operations at any location in California other

24  than LAX?

25         A. I'm unaware.

**Page 47**

1  certifications for certain aircrafts, certain airlines.

2      Q. Let's come back to that in a second.  I just

3  want to wrap this up.

4          Would you agree that based on your personal

5  experience, whether somebody was experiencing late or

6  interrupted meal periods really depended on the manager

7  and that particular employee?

8          A. No.

9      Q. Help me understand because it -- you made it

10 sound -- a second ago you told me that, you know, in

11 your observation, some people were getting compliant

12 breaks and some weren't because the managers were

13 picking and choosing who to give, you know, additional

14 work to or needed somebody to do a quick turn.  Did I

15 misunderstand that?

16     A. No, that is correct.  But that came with

17 certifications; depending on the certifications, on the

18 turnaround rate on employment, there was very vast, very

19 quick, unexperienced new leads that weren't able to

20 complete the tasks or be certified for the certain

21 tasks, and we would be pulled, the people with more

22 experience, more seniority and certifications for

23 their -- for the airlines would take a bigger punch when

24 it came down to lunches being missed.

25     Q. Okay.  So if you were a more experienced

**Anibal A. Silva**

1    what other airports Menzies works along with or in.

2        Q. And similarly, do you have any knowledge of the

3    types of operations and services Menzies provides at any

4    other airport in California other than LAX?

5        A. No.

6        Q. But you do agree, we've discussed it already,

7    that Menzies does provide a number of different services

8    and operations, correct?

9        A. Correct.

10       Q. Aside from the ramp service operations at LAX,

11   you have little to no knowledge of the other operations

12   or departments at LAX or other airports, correct?

13       A. Correct.

14       Q. And, you know, I understand that you're aware

15   of some of the positions that exist, but is it fair to

16   say that the day-to-day job experience, for instance, of

17   a ramp agent like yourself is going to be very different

18   from that of a passenger service agent?

19       A. Yes.

20       Q. And would you agree that it's possible that,

21   you know, even within your own job classification, a

22   ramp service agent position could be different at LAX

23   than it is at a different airport that Menzies services?

24       A. I don't know.

25       Q. And you don't know one way or another, right,

**Page 64**

1   This is filed by your attorneys.  Is it correct that you

2   have not seen this document before?

3        A. Yeah.  Like I said, other than my own

4   declaration, that's all that I have seen.  I don't know

5   that document.

6        Q. Okay.  Do you understand that you're asserting

7   claims against Menzies for alleged wage and hour

8   violations?

9        A. Yes.

10        Q. Do you understand that you're asserting these

11   claims on behalf of yourself and all other nonexempt

12   Menzies's employees in California?

13        A. Yes.

14        Q. And you're willing to take on the

15   responsibilities of that representation whatever they

16   might be?

17        A. Yes.

18        Q. Do you understand what it means to be a class

19   representative?

20        A. Yes.

21        Q. And what's your understanding?

22        A. To represent my fellow peers who have gone

23   through similar scenarios while working with Menzies.

24        Q. Do you understand that in this case, you're

25   alleging that Menzies violated California law regarding

1   operating equipment, correct?

2       A. That is correct.

3       Q. Did you operate equipment as part of your job

4   as a ramp agent?

5       A. Very frequently, yes.

6       Q. Okay.  And did you ever use your cell phone

7   while you were operating machinery or equipment?

8       A. I have.  I'm not a hundred percent sure.  I'm

9   sure I've been -- yeah, I've been probably at fault for

10  that.

11      Q. And you -- you would agree that instruction

12  from the managers like that which you've described

13  already to use your cell phone while you're on the

14  tarmac would be an explicit violation of Menzies's

15  policy, correct?

16      A. Correct.

17      Q. And your experience in that regard was limited

18  to the ramp and the managers in that department, right?

19      A. Yes.

20      Q. And you have no personal knowledge one way or

21  another whether other managers in other departments at

22  LAX also engaged in conduct that you believe violates

23  this policy of Menzies's, correct?

24      A. Correct.

25      Q. And similarly with respect to other airports in

1  **California that Menzies services, regardless of which**

2  **department, you would not know one way or another**

3  **whether there were managers there who were instructing**

4  **employees in a manner that would violate this policy,**

5  **correct?**

6          **A. That is correct.**

7          MR. JACKSON:  Okay.  I think this is a -- we

8  can go off the record.

9          THE VIDEOGRAPHER:  Okay.  Off the record at

10  12:33 p.m.

11          (Whereupon, a lunch break was taken.)

12          THE VIDEOGRAPHER:  This is Media 5.  We're back

13  on the record at 1:11 p.m.

14  BY MR. JACKSON:

15      **Q. Welcome back.  I hope you had a nice lunch.**

16          **Mr. Silva, you understand that you are still**

17  **under oath, correct?  I think you're on mute, sir.**

18  **Sorry.**

19          A. There you go.  Yes.

20      **Q. Any reason why your deposition can't proceed**

21  **here this afternoon?**

22          A. No.

23          MR. JACKSON:  Okay.  I'd like to screen share

24  again.  Are we up to Exhibit 8 now?  The last one was 7?

25          THE REPORTER:  Correct.

1     Q. Okay.  And you see under personal cell

2  phones -- well, strike that.

3           Starting at the top, it states:

4           "The company may provide a business cell phone

5  or electronic device to an employee for local and long

6  distance work-related communications."

7           Do you see that?

8     A. Yes.

9     Q. And you mentioned before radio.  That would be

10  a type of electronic device that Menzies provided to

11  employees at times, correct?

12     A. That is correct.

13     Q. And then with respect to personal cell phones,

14  this policy reads:

15           "An employee with a personal cellular phone

16  that is not approved by company management for

17  work-related use should not make calls nor accept

18  incoming calls to their personal cell phones during

19  working hours."

20           Do you see that?

21     A. Yes.

22     Q. And you would agree that was your understanding

23  of Menzies's written policy?

24     A. Yes.

25     Q. And just like with Exhibit 7 we reviewed before

1    lunch, you would agree that the conduct that you

2    described whereby managers would allegedly contact you

3    and others on your personal devices, that would also be

4    a violation of this policy; do you agree?

5          A. I agree.

6          Q. And, again, you don't have personal knowledge

7    of whether managers at other departments at LAX were

8    engaging in conduct that you believe violates this

9    policy, right?

10         A. Correct.

11         Q. And the same is true with respect to other

12   airports?

13         A. Yes.

14         Q. Okay.  All right.  We can stop sharing this for

15   now.

16         Have we covered all of the ways in which you

17   recall needing to use your cell phone for work-related

18   purposes, that is, one, communication with coworkers and

19   management during your shift and, two, the use of the

20   flight tracker app?

21         A. Yes.  The phone was used for those two

22   instances, and there wasn't just during work hours.

23   Managers would also contact us regarding work after work

24   hours.

25         Q. And when did that occur?

1      Q. Okay.  Do you recall approximately how much

2   time you believe you spent attending to work duties,

3   including responding to communications that were not on

4   the clock for which you were not paid?  Can you

5   approximate how much time you think you spent on that

6   over the course of your employment?

7      A. I cannot recall, to be honest.

8      Q. Is it accurate to say it was no more than a

9   couple of minutes here and there?

10      A. After work regarding, yes, I would say five,

11   ten-minute stretches, whenever it took for that

12   conversation to end or whenever the specifics and

13   details were established that they needed.

14      Q. Okay.  But sitting here today, you're unable to

15   actually identify specific days or times or duration of

16   time you believe you worked off the clock; is that

17   correct?

18      A. That is correct.

19      Q. And do you have personal knowledge one way or

20   another of whether employees outside of the ramp agent

21   position experienced something similar to what you just

22   described?

23      A. I'm unaware.

24      Q. And same question with respect to other

25   airports.

Page 95

1      A. Same answer, I'm unaware.

2      Q. Have we now covered all of the ways that you

3   believe or recall that you utilized your personal cell

4   phone for work purposes during your employment at

5   Menzies?

6      A. Yes.

7      Q. Moving on now to your second reimbursement

8   expense that you identified, which was boots, did I hear

9   correctly that you said Menzies provided boots but that

10  you found them to be uncomfortable so you bought your

11  own?

12     A. That is correct.  Up until the fourth year did

13  they begin to provide different shoes for leads that

14  were more comfortable.

15     Q. Did you ever lodge a complaint or even speak to

16  anybody at the union about the boots that Menzies

17  provided being uncomfortable?

18     A. Yes.

19     Q. You spoke to a union rep about that?

20     A. I brought it up.

21     Q. When was that?

22     A. I would say after I turned into a lead towards

23  2016.

24     Q. And what do you recall the union's response

25  being?

1          A. There was many factors that will come into play

2     for that to occur, yes.

3          **Q. So what are those factors?**

4          A. It can come down to whether tower

5     miscommunication, flights having to fly around the

6     airport until they have an opportunity to land.  Other

7     flights just caught a really nice gust of wind and

8     showed up very early, an hour, hour and a half early,

9     and we're still told to continue and finish our work.

10         **Q. But the circumstances you just described, you**

11    **would agree that those are all outside of Menzies's**

12    **control, right?  Like the weather or the communications**

13    **between traffic control and the airlines, Menzies is not**

14    **involved in any of those things, right?**

15         A. No.

16         **Q. Okay.  And are you aware, based on your**

17    **personal knowledge or observation, of employees outside**

18    **of the ramp being instructed by supervisors to skip meal**

19    **periods?**

20         A. I was aware that other departments were going

21    through similar situations, yes.

22         **Q. How did you become aware?**

23         A. There was a strike.  There was walkouts.  There

24    was -- I remember there being meetings in regards of

25    continuous meal premiums not being paid.

                                                        **Page 122**

Anibal A. Silva

1      Q. But did you ever personally witness employees

2   in departments outside of your own being instructed to

3   skip meal breaks?

4      A. I've never been in that conversation --

5      Q. Okay.

6      A. -- between a manager and another fellow

7   employee.

8      Q. And same question for rest breaks.

9      A. I was not in that conversation.  I was just

10   told thirdhand.

11      Q. Okay.  And how many times would you estimate

12   that one of your supervisors instructed you to skip a

13   meal break?

14      A. It happened very often, and I don't think I

15   will be able to put an accurate number or even a

16   ballpark number, but it happened very often, even to the

17   point where denying that became an issue.

18      Q. Did a manager or supervisor ever instruct you

19   to skip a rest break, one of those ten-minute,

20   on-the-clock breaks?

21      A. Rest breaks were never a terminology that was

22   used or that was practiced or even acknowledged in our

23   department.

24      Q. So just so I'm clear, is it your testimony that

25   you never received a single ten-minute unpaid rest break

1      A. We were always near an aircraft, and we were

2   always on call ready to continue work.  I would not

3   consider that a ten-minute un -- uninterrupted break.

4   Work was always related and involved.

5      Q. And but sitting here, you don't have personal

6   knowledge one way or another of whether that was the

7   same situation in other departments, right?

8      A. In other departments, no.

9      Q. That's correct, you don't have personal

10  knowledge about the rest break practices in other

11  departments?

12     A. That is correct.

13     Q. And similarly, you don't have personal

14  knowledge about the rest break practices at other

15  airports?

16     A. That is correct.

17        MR. JACKSON:  All right.  We've been going for

18  about an hour.  Let's go off the record and take a

19  ten-minute break.

20        THE VIDEOGRAPHER:  Okay.  Off the record -- off

21  the record at 2:11 p.m.

22        (Whereupon, a short break was taken.)

23        THE VIDEOGRAPHER:  This is Media 6.  We're back

24  on the record at 2:23 p.m.

25

1    only the person that approved it, and even his manager

2    overruled his decision.

3          Q. And so you agree Menzies had a mechanism for

4    reporting missed breaks, correct?

5          A. Correct.

6          Q. And you were aware that Menzies had a mechanism

7    for seeking premium for those missed breaks, correct?

8          A. Correct.

9          Q. So you would agree, then, that if you submitted

10   a form and you did not receive a premium, that would be

11   because there was a supervisor somewhere up in the chain

12   of approval that was violating Menzies's policy, right?

13         A. Correct.

14         Q. And whether other supervisors similarly

15   violated company policy, that would be something that we

16   could only figure out by going supervisor by supervisor

17   at Menzies, right?

18         A. I would say so.

19         Q. Okay.  I'd like to introduce as Exhibit 16?

20         THE VIDEOGRAPHER:  Yes.

21   BY MR. JACKSON:

22         Q. A copy of your time records.

23         (Whereupon Deposition Exhibit No. 16 was marked

24         for identification.)

25

1    Q. Okay.  And similarly, if in your belief you

2  submit a proper meal -- missed punch form requesting a

3  meal break premium for what you believe is a valid

4  reason and a manager denies that and you're not paid a

5  premium, in your view, that would be a violation of

6  Menzies's written policies, right?

7    A. That is correct.

8    Q. And so then do you agree that to determine

9  whether a violation of Menzies's policy is taking place,

10  we would really have to look at it on a case-by-case and

11  manager-by-manager situation?

12    A. I would say so.

13        MR. JACKSON:  Okay.  Go off the record.

14        THE VIDEOGRAPHER:  Okay.  Off the record at

15  2:48 p.m.

16        (Whereupon, a short break was taken.)

17        THE VIDEOGRAPHER:  This is Media 7.  We're back

18  on the record at 3:01 p.m.

19  BY MR. JACKSON:

20    Q. Okay.  Mr. Silva, we are at the home stretch

21  here.  I appreciate your attention and cooperation

22  today.  I just want to go through a couple of quick

23  documents.

24        (Whereupon Deposition Exhibit No. 18 was marked

25        for identification.)

1  company provided you a uniform to wear during your

2  shifts, right?

3          A. Correct.

4          Q. And they covered the expenses of that uniform?

5          A. Yes.

6          Q. I know you've testified at length today that

7  your personal knowledge is really limited to the ramp

8  agent or ramp agent lead position at LAX, right?

9          A. Could you rephrase that?

10          Q. It sounds like -- I mean, you would agree that

11  the -- your personal knowledge and experience is really

12  largely limited to the ramp area and the ramp agent

13  position at LAX because that's where you actually

14  worked, right?

15          A. Correct.

16          Q. And we talked a little bit earlier about your

17  understanding that in this case, you're seeking to be a

18  representative of other people, right?

19          A. Yes.

20          Q. So your -- that -- that -- that position that

21  you're seeking to be is referred to as a class

22  representative; do you understand that?

23          A. Yes.

24          Q. In your role as a class representative, have

25  you taken any steps to investigate the allegations

1   you're making as they relate to positions other than

2   ramp agent?

3        A. I'm sorry.  Could you repeat that?

4        Q. Yeah.

5           Have you -- so your -- the allegations -- you

6   would agree that the allegations that you're making in

7   this action are based on the experiences that you had as

8   a ramp agent at LAX, right, because that's the only

9   time --

10       A. And for -- yes, what I witnessed around my work

11  area, yes.

12       Q. Right.

13          But that work area was largely just other ramp

14  agents, right?

15       A. Yes.

16       Q. And so my question is have you done anything to

17  investigate or figure out if employees in other

18  departments at LAX had the same experiences that you

19  had?

20       A. No.

21       Q. And have you done anything to investigate

22  whether employees at other locations, other airports,

23  had the same experience that you had at LAX?

24       A. No.

25       Q. And I know you said that you felt that you had

1  worked on most of the airlines that Menzies serviced,

2  but have you done anything to investigate whether your

3  experience -- strike that.

4         Other than the airlines that you provided

5  services to at Menzies, have you taken any steps to

6  investigate or figure out if employees who provided

7  services for other airlines at Menzies experienced the

8  same issues that you claim to have experienced?

9         A. You lost me.  I'm sorry.  It's -- yeah.  Can

10  you repeat that one more time?

11         Q. Yeah.

12         So you -- you testified today about the

13  experience that you had in your position at LAX with

14  that list of 10 or 12 airlines that you recall working

15  for, right?

16         A. Correct.

17         Q. And you know that there are other airlines that

18  Menzies provides services to in addition to just the

19  ones that you provided services to, correct?

20         A. I am aware.

21         Q. And in your role as a class representative,

22  have you taken any steps to investigate the experiences

23  of employees who provided services to airlines other

24  than the ones that you provided services to?

25         A. I have not.