# EXHIBIT 5

Videotaped Deposition of

# Patricia Villagra

April 26, 2023

Volume I

Amaya

vs.

Menzies Aviation (USA), Inc.



Page 9

1  THE VIDEOGRAPHER: The court reporter today is
2  Lisa Richardson, and she may now swear in or affirm the
3  deponent.
4       PATRICIA VILLAGRA,
5  having been administered an oath, was examined and
6  testified as follows:
7       THE STENOGRAPHER: Proceed, Counsel.
8       MR. WARD: Thank you.
9            EXAMINATION
10 BY MR. WARD:
11  Q   So good morning, Ms. Amaya. I know I
12 introduced myself just before we started today, but I'm
13 Christopher Ward, I represent Menzies Aviation. And I'm
14 going to be asking you some questions today.
15      Ideally we'll have an orderly, smooth process.
16 I'm not going to make this any more difficult than it
17 has to be, I hope.
18      But before we kind of jump into some things,
19 can I ask you to state and spell your complete legal
20 name for the record?
21  A   My legal name is Dora Patricia Amaya Serna.
22 And my current legal name is Patricia Villagra, is
23 because due to my marriage, so I changed my last name.
24  Q   Okay. And just, just so that we are clear, can
25 you spell both the full legal name and your current

Page 10

1  married name so we have it clean on the record, please?
2   A   Yes. For my birth legal name is D-O-R-A,
3  P-A-T-R-I-C-I-A, A-M-A-Y-A, S-E-R-N-A. Dora Patricia
4  Amaya Serna. And my current legal name due to marriage,
5  it's P-A-T-R-I-C-I-A, Villagra. V as in Victor,
6  I-L-L-A-G-R-A. Villagra. Patricia Villagra.
7   Q   When were you married?
8   A   June 3rd, 2022.
9   Q   And when did you legally change your name to
10 Patricia Villagra?
11  A   I changed my name on June 3rd. I -- it's --
12 actually, I change -- I removed my first name and my
13 last -- second last name when I became to be a citizen
14 on September 13, 2021.
15  Q   Okay.
16  A   So I changed my name two times.
17  Q   Got it. Congratulations on your marriage last
18 year, by the way --
19  A   Thank you.
20  Q   -- coming up on your first anniversary --
21  A   Thank you.
22  Q   -- that's great.
23      I -- if it's okay with you, I'm going to refer
24 to you as "Ms. Amaya" today, only because I sort of
25 baked that name into my brain. That's how you appear on

Page 11

1  the case, that's how you appear on Menzies's records.
2      Is that okay?
3   A   That's okay.
4   Q   I mean no disrespect by it, I just don't want
5  to stumble over myself. Okay?
6   A   No. No worries.
7   Q   Appreciate it.
8      So, Ms. Amaya, have you ever had your
9  deposition taken before?
10  A   I do.
11  Q   How many times have you had your deposition
12 taken?
13  A   Once.
14  Q   And when was that?
15  A   It was -- I'm not pretty sure the exact date,
16 but it was this year. And it was for a work injure.
17  Q   It was for a work -- it was within the context
18 of a workers' compensation claim?
19  A   Correct.
20  Q   Okay. And is that a workers' compensation
21 claim you've made against Menzies or is it against
22 another employer?
23  A   Against Menzies.
24  Q   And you were represented by counsel in that
25 deposition?

Page 12

1   A   Yes.
2   Q   Okay. And your best recollection is it
3  happened sometime in the last -- it happened in 2023?
4   A   It happens in 2022.
5   Q   2022. Okay.
6      Toward the end of the year last year?
7   A   Yes.
8   Q   Okay. Do you recall the name of the attorney
9  who took your deposition in that case?
10  A   It's Sevan Harabidian.
11  Q   And am I correct in understanding that the --
12 essentially the scope of that deposition covered any
13 injuries or -- physical or emotional injuries you are
14 alleging against Menzies Aviation based on a workplace
15 injury?
16  A   Yes.
17  Q   Okay. Other than that deposition, this is your
18 second time ever having a deposition.
19      Do I understand you correctly?
20  A   Yes.
21  Q   Okay. So just for the sake of us having an
22 orderly process today, or trying to, I'm going to go
23 over what we attorneys typically refer to as admonitions
24 or ground rules, just to make sure that we are all on
25 the same page before we get too deep into it.

Page 65

1 switchers, CBP. That's from the airport, not from
2 Menzies Aviation.
3  Q  Is it your testimony that you were not
4 permitted to use any of the phones that were located at
5 the ticket counters?
6  A  The phones -- we are allowed to use the phone
7 from the counter just for the job purposes. Personal
8 phones, we cannot use it.
9  Q  Okay. What about at the gate desks, there are
10 phones there for use, correct?
11  A  The gates are -- yes. The phones are from the
12 airport that you can use to call the CBPs. But not the
13 Smartphones, it's just the regular lines from the
14 airport.
15  Q  Sure.
16     If you were to try and describe for me how much
17 of your work time you generally spent out of 100 percent
18 working at the unsecured side ticket counter locations,
19 what percentage would you ascribe to that?
20  A  If my shift is -- I would state the unsecured
21 side I spend 35 percent.
22  Q  What about at the secured side gate desks?
23  A  We have to spend more. We have to spend
24 75 percent of the time.
25  Q  What about at -- the amount of time you would

Page 66

1 spend, as you said, kind of going to various locations
2 trying to track down passenger baggage, things like
3 that, how much time would you ascribe to that?
4  A  At the baggage I can spend about three to --
5 sometimes three to four hours. Between three to four
6 hours.
7  Q  Per day?
8  A  Per day.
9  Q  On an eight-hour shift?
10  A  Yes.
11  Q  That's in addition to the time spent at the
12 ticket counter and the gate desk?
13  A  Yes.
14  Q  Different airlines ran different schedules as
15 well, correct?
16  A  Correct.
17  Q  So your working hours might be impacted based
18 on the airline schedules as well, right?
19  A  Right.
20  Q  And sometimes the airlines have delays,
21 correct?
22  A  Correct.
23  Q  And, you know, one airline might be delayed one
24 day and another airline might be delayed another day,
25 correct?

Page 67

1  A  Correct.
2  Q  And all of those variations would generally
3 impact how any given shift would go for you, correct?
4  A  Correct.
5  Q  And those are things that are generally outside
6 the control of Menzies, would you agree?
7  A  Agree.
8  Q  Okay. We were talking earlier about your
9 understanding of what the Menzies business was when you
10 started. And if I understood you correctly, it was
11 largely limited to the passenger service function,
12 right?
13  A  Right.
14  Q  And obviously you started to learn more about
15 what their business overall is, right?
16  A  Right.
17  Q  Okay. As you sit here today, now, can you
18 describe all -- or what is your knowledge of all of the
19 different types of services Menzies provides?
20  A  So as today, I learned that Menzies Aviations
21 has ramp agents, the ones that are in charge to upload
22 and download the luggages. They handle catering, so the
23 personnel that is in charge to clean the airplanes, they
24 handle also cargo for different airlines from China or
25 any other airlines. I also learn that they have a

Page 68

1 maintenance personnel. You know, passenger service
2 agents. Fueling personnel as well.
3  Q  Any other types of services or job categories
4 that you can identify?
5  A  Not that I can recall, unless are you talking
6 about the management.
7  Q  Sure. Got it.
8     What about -- does Menzies perform all of these
9 services at LAX, to your knowledge?
10  A  I, I know the company is a big company, so I
11 know that they have different locations. And I believe
12 in Canada as well.
13  Q  Okay. What about within California, do you
14 have any knowledge of what kind of operations they offer
15 at, let's say, San Diego?
16  A  They might have an Ontario. I don't know.
17  Q  Well, that's what I'm asking. If you are just
18 going to speculate, that's fine. I don't want you to
19 guess. I'm just asking what knowledge.
20     Do you have any knowledge whether Menzies has
21 operations at San Diego?
22  A  No.
23  Q  Do you have any knowledge whether Menzies has
24 operations at Ontario?
25  A  No.

Case 2:22-cv-05915-HDV-MAR   Document 76-10   Filed 05/09/24   Page 5 of 11   Page ID #:2401

Volume I                                                                     Amaya vs.
Patricia Villagra                                              Menzies Aviation (USA), Inc.

Page 69

1  Q   Do you have any knowledge of any Menzies
2  operation at any California location other than LAX?
3  A   No.
4  Q   Okay.  What do you know about their operations
5  at LAX beyond Tom Bradley?
6  A   I don't.
7  Q   Okay.  But you do know that they have quite a
8  bit of different types of business, right?
9  A   Yes.
10 Q   And is it fair to say that, you know, the, the
11 job experience of a ramp agent is going to be very
12 different from that of a passenger service agent, right?
13 A   Yes.
14 Q   Would you agree that it's possible that, you
15 know, a passenger service agent's job at San Francisco,
16 if they have that job, would be different than
17 somebody's at LAX?
18 A   Can you repeat that?  I'm sorry.
19 Q   Sure.  So let's say Menzies has passenger
20 service agents at San Francisco.  Would you imagine that
21 there would still be some differences between the job at
22 San Francisco versus the job at LAX?
23 A   I don't know.
24 Q   You don't know one way or another?
25 A   No.

Page 70

1  Q   Okay.  All right.  So let me understand -- tell
2  me all of the ways that you had to use -- or you
3  believed that you had to use your cell phone to perform
4  your job responsibilities.
5  A   When I start working for Menzies Aviation, we
6  sign up the contract and then the COVID 19 was placed.
7  They hand up a handbook for us with some instructions
8  that we need to scan a QR code to be able to sign in, to
9  clock in, clock out break, clock in back and clock out
10 home.  We were doing it through our cell phone
11 100 percent for the job.  And then we have to also
12 activate the geolocation, which means Menzies Aviation
13 was able to find our location 24/7, because we were
14 using, since 2021, since I started working for Menzies
15 Aviation 2021 until middle of 2022, I believe, that I
16 have the injure, we were using the cell phone to clock
17 in and out.
18 Q   Okay.  So timekeeping, in other words, would be
19 one function you had to use your cell phone, correct?
20 A   Correct.
21 Q   Okay.  Did Menzies provide time clocks at your
22 work location to use?
23 A   They had these devices located to the office.
24 But when I start working for them, the machine, the
25 device was broken.

Page 71

1  Q   Did you ever --
2  A   And then --
3  Q   I'm sorry, go ahead and finish your answer.
4  A   And then what I was told from management, it's
5  due to COVID-19, Menzies Aviation require us to clock in
6  and out, do all the timekeeping on our phones, avoiding
7  to get -- spread COVID-19 or get contagious.  So that's
8  why we were not using the Kronos device from the office.
9  Q   Okay.  At any point after when you started, did
10 you ever investigate whether that time clock at your
11 work location was operable?
12 A   They -- when -- the COVID-19 was lifted.  So
13 Menzies Aviation send a communication that we were able
14 to clock in and out from the device.
15 Q   Okay.  My question was different though.
16     You had said earlier that when you started
17 working, the time clock in your work location wasn't
18 working correctly, right?
19 A   Correctly.
20 Q   And at any point after that, did you ever check
21 to see whether it was operating correctly and usable?
22 A   Yes.
23 Q   Okay.  And was it operating correctly at that
24 point?
25 A   No, it was not.

Page 72

1  Q   Okay.  At what point -- when did you make
2  that -- when did you check that?
3  A   We were checking it, like -- I believe it was
4  after 2021, because it was kind of hard to find good
5  reception to be able to clock in and out.  So we were
6  wandering to -- accurately to log in and record our
7  entire shift.
8      So from 2021 -- I'm sorry, 2022, the beginning
9  of 2022, on January, I start asking for the device to be
10 able for me to clock in and out in a proper manner.
11 Q   Okay.  And was it working and was it operable
12 at that point?
13 A   No.  It was not.
14 Q   All right.  And then you also testified that
15 you would use your cell phone for various communication
16 purposes, correct?
17 A   Correct.
18 Q   And then I think you identified group chats,
19 because that's what Copa required, right?
20 A   And also Iberia and Level.  The -- all the
21 airlines.
22 Q   Okay.  Well, are you now testifying that Iberia
23 required you to have the group chat the way Copa did?
24 A   The management, yes.  Not group chat.  It was
25 just text messages between two managers and coworkers.

Page 73

1  Q   Okay. And then you might have to use your cell
2  phone, is your testimony, to communicate with passengers
3  themselves?
4  A   Yes.
5  Q   Okay. And any other ways that you would have
6  to use your cell phone for communications purposes?
7  A   Yes.
8  Q   Okay. And what were those?
9  A   To call different airlines to recover luggages.
10 To call CBPs. To, to provide the time the flight
11 arriving, the passengers for the flight, the petty
12 cabins, switchers, and be assigned to the carousel.
13     We also were using our cell phones -- I also
14 was using my personal cell phone calling to the shuttle
15 for the crew members, the hotels, to make sure the crew
16 member was having the, the hotel booked. Also I was
17 using my phone to call the company that it was
18 delivering our luggages that the passengers didn't
19 arrive with the luggage, so I was in charge to deliver
20 the luggages to the passengers inside the United States
21 or outside of United States.
22 Q   Okay. It sounds to me -- well, other than for
23 these communication purposes that you've identified and
24 for timekeeping purposes, were there any other work-
25 related things that you were required to do through your

Page 74

1  cell phone?
2  A   When I start the training for Menzies Aviation,
3  the manager, the training manager, Guillermo Ramiro, we
4  were at the hotel, Hilton Hotel. It was about like 20
5  of new hires. And training. Guillermo Ramiro asked us
6  to get the Smartphone, Android or iPhone. So Menzies
7  Aviation was sending us documents to sign up to -- also
8  to respond the test for the training and then send it
9  through the ER -- AirDrop to Menzies Aviation, Menzies
10 Aviation software.
11     So Guillermo Ramiro, the training manager, was
12 the person that it was receiving the files during the
13 training, and he was the one that he was sending us the
14 link at the training purposes. So since the training --
15 since the beginning of the training -- we go to training
16 for seven days -- we were required to use our personal
17 cell phones, the Smartphones, to be able to receive all
18 documents from Menzies Aviation, respond to those
19 documents and send them back to the Menzies Aviation
20 software for the training purposes.
21 Q   Any other instances that you can identify,
22 communication, training, timekeeping, where you felt you
23 were required to use your cell phone?
24 A   Mostly I was using my phone just for
25 work-related.

Page 75

1  Q   Okay. And I guess that's my question. It
2  sounds like it's your assertion that having a cell phone
3  was a necessary piece of equipment for you to perform
4  your job, correct?
5  A   Correct.
6  Q   And it's also your assertion that Menzies did
7  not provide you a cell phone to perform these necessary
8  parts of your job, true?
9  A   True.
10 Q   And is it your contention in this case that
11 Menzies should have either provided you that cell phone
12 to perform your job or otherwise reimbursed you the cost
13 for it?
14 A   Yes.
15 Q   Okay. Because it's a necessary piece of
16 equipment for you to perform the work, right?
17 A   Yes.
18 Q   O==kay. What about with respect to ramp agents,==
19 ==what knowledge, if any, do you have about whether it was==
20 ==necessary for those groups of employees to use their==
21 ==phone to perform the work?==
22 A   ==Yes.==
23 Q   ==What knowledge do you have?==
24 A   ==I, I do have knowledge that they need it.==
25 Q   And what is, what is the basis for that

Page 76

1  knowledge?
2  A   My son is a cargo agent, and they use his cell
3  phone for all the communication between his manager,
4  coworkers and doing the same. All of the communication
5  is through cell phone.
6  Q   Okay.
7  A   His personal cell phone.
8  Q   All right. So you said he's a cargo agent,
9  right?
10 A   Yes.
11 Q   Is he a cargo agent at LAX?
12 A   Yes.
13 Q   ==Okay. What about ramp agents, do you have any==
14 ==knowledge about ramp agents in terms of --==
15 A   ==Yes.==
16 Q   ==-- what they need to use?==
17     ==What's your basis for that?==
18 A   Because I was talking directly with cargo --
19 ramp agents through my cell phone as well trying to
20 recover luggages, finding luggages, or talking to them,
21 asking them why the luggages were not download to the
22 carousel on time.
23 Q   Okay. To your knowledge, ramp agents at
24 Menzies are represented by a union, correct?
25 A   Correct.

Page 77

1 Q And cargo agents at Menzies at LAX are
2 represented by a union, correct?
3 A Yes.
4 Q Okay. What about fuelers, do you have any
5 knowledge about what their requirements might be for
6 using cell phones?
7 A No.
8 Q Okay. Do you know if fuelers at Menzies are
9 represented by a union?
10 A No.
11 Q Okay.
12 A I don't know that.
13 Q Okay. What about the maintenance folks that
14 you talked about, do you have any knowledge about their
15 cell phone requirements?
16 A No.
17 Q Do you have any knowledge as to whether
18 maintenance employees by Menzies are represented by a
19 union?
20 A No.
21 Q Okay. And you talked about cabin cleaning
22 employees as well. They are represented by a union at
23 LAX as well, aren't they?
24 A I don't know.
25 Q Okay. Do you have any knowledge about whether

Page 78

1 they have to use their cell phones to work?
2 A I don't know.
3 Q Okay. Let's switch over to uniforms now.
4 I think you had said earlier that everybody
5 looked different on the passenger service team at Tom
6 Bradley?
7 A The entire teams. So we all looked different.
8 We supposed to have a coat -- Menzies Aviation uniform,
9 which is a vest, Navy blue vest, Navy blue jacket, Navy
10 blue pants, or a skirt for females, and white shirt.
11 And also we have kind of like a scarf that identified us
12 and also a tag. But I never receive any uniform, so I
13 have to buy my own uniforms: black skirt and white shirt
14 and a Navy blue jacket.
15 Q Okay. So it's your assertion that Menzies was
16 supposed to provide you a specific uniform, correct?
17 A Correct.
18 Q And they never provided you that uniform?
19 A Correct.
20 Q And that would be the same for all the other
21 passenger service agents that you know of as well,
22 right?
23 A Yes.
24 Q Okay. And did Menzies ever tell you: Since we
25 are not providing you a uniform, you need to go buy

Page 79

1 these specific things?
2 A They didn't say it specifically, but they say:
3 You need to dress with business attire --
4 Q Okay.
5 A -- black --
6 Q I'm sorry, go ahead.
7 A Black pants and white shirt or black skirt and
8 white shirt.
9 Q Anything else that they told you that you
10 needed to provide either between a black pants and black
11 skirt and a white shirt?
12 A No.
13 Q Okay. And -- in other words, they, they didn't
14 dictate the specific type of pants or skirt that you had
15 to wear, just the color, right?
16 A Yes.
17 Q And same with the shirt, they didn't dictate
18 that you had to do it, just the color, right?
19 A Yes.
20 Q Okay. And there are -- there would be
21 variations, then, between what some people might wear
22 and other people might wear?
23 A Yes.
24 Q Okay. And -- or -- is it your assertion that
25 having a presentable uniform, that was something that

Page 80

1 you would have needed to do to perform your job?
2 A Yes.
3 Q Okay. Other than uniform-related costs and
4 cell phone-related costs, are there any other ways that
5 you feel that Menzies did not -- or forced you to incur
6 expenses that you had to do to perform your job?
7 A Yes.
8 Q What other ones?
9 A Parking.
10 Q Tell me about the parking.
11 A When you apply for the job, you don't even know
12 where you have to park. And then I find out I have to
13 pay $60 monthly parking to be able to leave my car in a
14 kind of safe place, take the shuttle, and shuttle will
15 drop me up -- off to the terminal.
16 Q Okay. And so it's your contention Menzies
17 should have paid those parking costs for you?
18 A Yes.
19 Q There are ways to get to LAX other than a
20 personal vehicle, aren't there?
21 A Yes and no.
22 Q Well, there's public transportation available
23 to LAX, right?
24 A Yes. But if you are in a shift after the 1:00
25 in the morning, you are not able to get any public

Page 93

1  different question.
2      To your understanding, the wage statement
3  claims depend upon some of these other claims we've
4  talked about, right?
5  A   Yes.
6  Q   And is that the same for the waiting time
7  penalties, in your mind?
8  A   Yes.
9  Q   Okay.  Great.  I just -- I want to make sure I
10 have a complete understanding of what you are alleging
11 in this case so I don't bother you with questions I
12 don't need to ask and whatnot.  So -- okay.
13     And you understand that you are seeking to
14 assert all of these various claims on behalf of not just
15 yourself, but other --
16 A   Yes.
17 Q   -- nonexempt employees in California?
18 A   Yes.
19 Q   Okay.  And do you feel that you are capable of
20 meeting that responsibility?
21 A   Yes.
22 Q   And what is the basis for your belief that you
23 are capable of meeting that responsibility?
24 A   What I'm saying is true, and I live, I live it
25 myself, and I saw it, the same concerns.  I live with my

Page 94

1  coworkers with the same concerns.  And I feel that I'm
2  able to represent the entire group.
3  Q   Have you taken any efforts to investigate these
4  allegations with respect to Menzies employees in
5  San Francisco?
6  A   No.
7  Q   Okay.  Do you know anything about -- do you
8  have any personal knowledge about the circumstances of
9  any Menzies employee at San Francisco?
10 A   No.
11 Q   Okay.  How about at any airport in California
12 other than Los Angeles, have you taken any efforts to
13 investigate these various theories for those employees?
14 A   No.
15 Q   Okay.  And do you have any personal knowledge
16 of the circumstances of any particular employee at any
17 location other than LAX?
18 A   No.
19 Q   Okay. Is it fair to say that your knowledge is
20 generally confined to either passenger service agents or
21 what you know from your son as a cargo agent?
22 A   And -- yes, coworkers.
23 Q   Since you filed this case, have you taken any
24 efforts to speak to fuelers, for example, to investigate
25 their circumstances at LAX?

Page 95

1  A   I have not.
2  Q   Okay.  As far as you know, at this point do you
3  intend to assert any additional claims or theories
4  against Menzies other than what we've discussed today?
5  A   No.
6  Q   Okay.  All right.  You understood while working
7  at Menzies that you were represented by a union, right?
8  A   Yes.
9      MR. WARD:  You know, I'm going to do this, just
10 to keep my sequencing correct.
11     So I am going to mark this as Exhibit 4, and
12 ask you to take a look at it, as soon as I actually get
13 it in there.
14     (Exhibit 4 was marked.)
15 BY MR. WARD:
16 Q   All right.  Let me know when you've had a
17 chance to look at that document.
18 A   It's loading.  It's loading.
19     Okay.  I got it.
20 Q   Okay.  This is Exhibit 4.
21     Do you recognize this?
22 A   Give me one second.
23     Yes.
24 Q   And what do you recognize this to be?
25 A   This is the, the lawsuit.

Page 96

1  Q   Okay.  This is your -- this is your lawsuit, in
2  other words?
3  A   This is my lawsuit.
4  Q   Got it.
5      And this is actually the first amended
6  complaint, which was filed on August 30th of 2022.
7      What's your best recollection of the day you
8  actually first connected with counsel to discuss claims
9  against Menzies?
10 A   It was -- okay.  So it was --
11     MR. KING:  Let me, let me just object to the
12 extent you are seeking attorney-client communications.
13     The date she first contacted, contacted
14 counsel, you are asking her for the content of the
15 communication.
16     MR. WARD:  No.  I just want the date.  I just
17 really -- when did she first decide that she wanted to
18 speak to counsel about claims.
19 BY MR. WARD:
20 Q   I don't want to know anything that you talked
21 about with your counsel.  I just want to know the date
22 that you decided you were going to speak to somebody?
23 A   Well, if this was filed in August, it might be,
24 I don't know, July, my best guessing.
25 Q   Sometime in the summer last year; is that fair?

Case 2:22-cv-05915-HDV-MAR   Document 76-10   Filed 05/09/24   Page 9 of 11   Page ID #:2405

Volume I — Patricia Villagra | Amaya vs. Menzies Aviation (USA), Inc.

Page 101

1     (Exhibit 6 was marked.)
2 BY MR. WARD:
3   Q  All right. That should be in the Chat now.
4   A  I got it.
5   Q  Let me know when you've opened it and had a
6 chance to look at it.
7   A  Okay. I'm looking at it.
8   Q  Okay. So this is a 72-page document.
9     And the first question I have for you is: Do
10 you recognize what this is?
11   A  No.
12   Q  Do you believe you've ever seen this before?
13   A  I've never seen this before.
14   Q  Okay. Well, I'll represent to you that this is
15 the collective bargaining agreement between Menzies and
16 the union that covered your employment.
17     What -- understanding that you were represented
18 by a union, did you also understand that there were
19 agreements between Menzies and unions -- or the union
20 covering your employment?
21   A  No. I didn't know that --
22   Q  Okay.
23   A  -- because I never go through this.
24   Q  I take it that you have never filed a grievance
25 with the union relating to your concerns about cell

Page 102

1 phone usage, correct?
2   A  Correct.
3   Q  And you've never filed a grievance with the
4 union relating to any concerns you have about uniforms,
5 correct?
6   A  Correct.
7   Q  And you've never filed a grievance with the
8 union relating to any concerns you had about parking
9 expenses, correct?
10   A  Correct.
11   Q  And you've never filed a grievance relating to
12 any concerns about rest periods, correct?
13   A  Correct.
14   Q  And you've never filed a grievance with the
15 union relating to any concerns about meal periods,
16 correct?
17   A  Correct.
18   Q  Okay. Do you know -- well, let me ask -- I
19 think you said this earlier.
20     But it's your understanding that other
21 employees represented by Menzies are also represented by
22 unions, correct?
23   A  Correct.
24   Q  Okay. And do you know -- have any
25 understanding of whether that's all nonexempt employees

Page 103

1 of Menzies in California? some? What's your
2 understanding of that?
3   A  I kind of lost in that.
4   Q  Sure. So is, is it your belief that all
5 nonexempt employees of Menzies, other than maybe
6 administrative personnel in the state of California, are
7 represented by unions?
8     MR. KING: Let me just object; it calls for
9 speculation.
10     You can answer, Patricia.
11     THE WITNESS: Okay.
12     I don't know.
13 BY MR. WARD:
14   Q  Okay. But just -- and I'm just trying to
15 understand how far your knowledge goes on this. I'm not
16 trying to give you a hard time. So I apologize if it
17 sounds that way.
18     But, for example, you know there are other
19 groups of employees at LAX that are also represented by
20 unions; is that true?
21   A  I don't know.
22   Q  Okay. So you know the passenger service agents
23 are represented by unions at LAX, we know that, right?
24   A  Right.
25   Q  Okay. Beyond that, do you have knowledge of

Page 104

1 which particular groups of employees are represented by
2 unions or would you only be speculating?
3   A  I would only be speculating.
4   Q  Okay. That's fine.
5     You mentioned earlier, if I recall, that you
6 received an employee handbook in connection with your
7 employment with Menzies, right?
8   A  Yes.
9     MR. WARD: Okay. So let's put this in first.
10 Oops, sorry, hold on.
11     Mark that as Exhibit 7.
12     (Exhibit 7 was marked.)
13     MR. WARD: And if I neglected to do it earlier,
14 I marked the collective bargaining agreement as 6. But
15 everything's labeled in the Chat.
16     So this will be Exhibit 7.
17 BY MR. WARD:
18   Q  Let me know when you've had a chance to take a
19 look at it.
20   A  I'm opening the file right now.
21     Okay. I got it.
22   Q  And you recognize this Exhibit 7?
23   A  Yes.
24   Q  What do you recognize this to be?
25   A  I recognize my signature, dated, and then, yes,

Page 157

1  them.
2  Q   What's Grasiella's last name?
3  A   I cannot recall her last name.
4  Q   How about --
5  A   Grasielli.
6  Q   How about Maria, what's her last name?
7  A   I -- I cannot recall their, their last names
8  completely, because I just -- we only call us for the
9  names.
10 Q   Okay.  What about Stephanie, what was her last
11 name?
12 A   No, I cannot recall her last name.
13 Q   Okay.  And what about Gisella, can you recall
14 her last name?
15 A   No.
16 Q   Okay.  Do you have any personal knowledge that,
17 let's say, a manager in the cabin cleaning operation at
18 LAX is failing to follow the company policies regarding
19 opting out of cell phone usage?
20 A   I do not have any knowledge for that manager.
21 Q   Yeah.  And so if Menzies is following its
22 policies regarding this or not following its policies,
23 the only way for us to figure that out would be to go
24 manager by manager, right?
25 A   I think, as you can see right now, my -- all of

Page 158

1  this is a collective complaint about that -- the policy.
2  So it's no individual by individual that you have to go,
3  it's all of us.
4       And what I'm telling you is from my coworkers.
5  I see my coworkers working -- right here I'm working at
6  this front desk, and then I see my coworker in the other
7  airline that it hasn't been able to get not even the
8  ten-minutes break.  And then we see each other, and then
9  we are like, asking like:  I'm tired, I need to take my
10 ten-minutes break.  And we, we cannot find even the
11 managers around to say:  Hey, can we take ten-minutes
12 break?
13      So it's the nature of the job.  The practice is
14 different than what is supposed to be under the policies
15 for Menzies Aviation.
16      MR. WARD:  Move to strike as nonresponsive.
17 BY MR. WARD:
18 Q   Let's take a different situation.
19     What personal knowledge do you have of a --
20 whether a supervisor on the ramp at Terminal 2 is
21 following or not following the policies set forth in
22 this Exhibit 17?
23 A   I do have knowledge for my son as well.
24 Q   Your son doesn't work at Terminal 2, does he?
25 A   No.

Page 159

1  Q   Okay.  So it's true you have no personal
2  knowledge of what any manager on the ramp working at
3  Terminal 2 might or might not be doing with respect to
4  the policies stated in Exhibit 17, correct?
5  A   Correct.
6  Q   Okay.  And so if we were to try and find out
7  whether that manager was, in fact, following the
8  policies or not, the only way for us to do that would be
9  to go find out from those manager's employees, right?
10     MR. KING:  Let me just object, it calls for
11 speculation.
12     You can answer.
13     THE WITNESS:  Do I need to answer that
14 question?
15     MR. KING:  Yes.  You can answer.
16     I just objected on speculation grounds, but you
17 can answer.
18     THE WITNESS:  Okay.  So, yes, I have only my
19 statements from the managers that I work with.
20     MR. WARD:  Okay.  All right.  This will be 18.
21        (Exhibit 18 was marked.)
22     THE WITNESS:  Working on it.  Opening the file.
23     Okay.  I opened the "Hand Held Electronic
24 Devices Policies -- Policy."
25 BY MR. WARD:

Page 160

1  Q   Okay.  And is this a policy that you received
2  in connection with your employment with Menzies?
3  A   Yes.
4  Q   And are you -- at the end there, there's
5  another electronic signature of August 28th, 2021.
6     Are you the one who placed that electronic
7  signature on this document?
8  A   Yes.
9  Q   Okay.  And did you read this document before
10 executing it electronically?
11 A   Yes -- yes.
12 Q   And did you -- do you see the "Policy
13 Statement" on the first page where it says:
14     {As Read} The Company has a zero tolerance
15     policy applicable to the use of personal mobile
16     phones during working hours as set forth --
17 A   Yes.
18 Q   {As Read} -- in the Company's Personal
19     Electronic Device and Cellular Phones Policy?
20 A   Yes.
21 Q   Okay.  And you understand that that is the
22 written policy of the company?
23 A   Yes.  I understand that's the policy.  And it
24 sounds good, but in the practice it's totally different.
25 Q   And that's going to be a practice that could

Case 2:22-cv-05915-HDV-MAR   Document 76-10   Filed 05/09/24   Page 11 of 11   Page ID #:2407

Volume I — Patricia Villagra | Amaya vs. Menzies Aviation (USA), Inc.

Page 161

1  vary manager to manager, right?
2  A   No.  It's for the entire company -- I mean, for
3  all of us.
4  Q   You don't have personal knowledge of what
5  happens outside of Los Angeles, right?
6  A   No, no, no.  I'm -- I'm sorry if I misstate
7  that.  For Los Angeles.
8  Q   Okay.  And you don't have personal knowledge
9  what happens outside of either -- well, not even your
10 son.  I'm talking about your personal knowledge.
11      Other than your specific working environment,
12 you don't have personal knowledge of what any other
13 manager of Menzies at LAX does or does not do, true?
14 A   I have contact with all the managers through my
15 personal cell phone.
16 Q   Your managers, correct?
17 A   In the Menzies Aviation managers, that means
18 Brayan Galindo manager, which is the operational
19 manager.  Gisella Laverde, which is the general manager
20 for passenger service agents.  For Gabriella Marta,
21 which is another supervisor.  And then the rest of the
22 supervisors.  So it's actually with the entire crew,
23 even though with Aurea Quinonez.  So the personal cell
24 phone, we use it for the entire company.
25 Q   Sure.  Slightly different question though.

Page 162

1      Whether the manager is following the policy
2  with respect to the employees he or she manages, your
3  knowledge is limited to the managers you worked with,
4  correct?
5  A   I don't understand the question.
6  Q   Okay.  I'll just leave it at that then.
7      MR. WARD:  This will be 19.  Sorry, wrong
8  document.
9      (Exhibit 19 was marked.)
10 BY MR. WARD:
11 Q   Let me know when you've had a chance to look at
12 that.
13 A   Working on it.
14     Okay.  I open "Personal Electronic Device &
15 Cellular Phones Policy."
16 Q   And you recognize this document?
17 A   Let me -- "Company" -- yes.
18 Q   And there's an electronic signature on the
19 second page there, looks like another one dated
20 August 28, 2021.
21     Are you the one who caused that electronic
22 signature to be placed there?
23 A   Si.
24 Q   That was a yes?
25 A   Yes.

Page 163

1  Q   You just answered --
2  A   I'm sorry.
3  Q   -- in Spanish.
4      No.  That's okay.
5  A   I'm sorry.
6  Q   That's okay.
7      MR. WARD:  Okay.  I have a sense of what we
8  would get to if we went any deeper in that.
9      Let's mark this one as 20.
10     (Exhibit 20 was marked.)
11 BY MR. WARD:
12 Q   Let me know when you've had a chance to look at
13 that.
14     I'm going to turn my camera off for about ten
15 seconds.  Just give me a second here.
16     Sorry, I have a space heater in my office, and
17 it was getting a little warm, so I'm ducking down to
18 turn it off.
19     Let me know when you've had a chance to look at
20 Exhibit 20.
21 A   I -- actually, I open it right now.  "Personal
22 Effects Policy."
23 Q   You recognize this personal effects policy,
24 Ms. Amaya?
25 A   Yes.

Page 164

1  Q   And is this another one that was provided to
2  you during your orientation -- or your onboarding?
3  A   Yes.
4  Q   And that's -- you are the one who placed your
5  electronic signature on this document?
6  A   Yes.
7  Q   And did so on August 28th, 2021?
8  A   Yes.
9  Q   Okay.  Easy enough.
10     We were looking at Exhibit 14 earlier, which
11 was the missed punch form that you completed on
12 September 13th, 2021.
13     Do you recall that?
14 A   Yes.
15 Q   And so that would have been an instance where
16 you did receive a premium from Menzies for a missed meal
17 or rest --
18 A   Yes.
19 Q   -- period.  Is that true?  Okay.
20 A   That's true.
21     MR. WARD:  This will be 21.
22     (Exhibit 21 was marked.)
23     THE WITNESS:  Opening the --
24 //
25 BY MR. WARD: