C. JOE SAYAS, JR. (CA Bar No. 122397)
cjs@joesayaslaw.com
KARL P. EVANGELISTA (CA Bar No. 250685)
kpe@joesayaslaw.com
**LAW OFFICES OF C. JOE SAYAS, JR.**
500 N. Brand Boulevard, Suite 2000
Glendale, California 91203
Telephone: (818) 291-0088
Facsimile: (818) 240-9955

DAVID P. KING (CA Bar No. 136765)
dpk@kcmlaw.net
**KING CHENG MILLER & JIN, LLP**
150 N. Santa Anita Ave., Ste. 410
Arcadia, California 91006
Telephone: (626) 304-9001
Facsimile: (626) 304-9002

Class Counsel

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DORA PATRICIA AMAYA, an individual; and ANIBAL SILVA, an individual; on behalf of themselves and others similarly situated,

Plaintiffs,

vs.

MENZIES AVIATION (USA), INC., a Delaware corporation; and DOES 1 through 10, inclusive,

Defendants.

Case No. 2:22-cv-05915-HDV-MARx

CLASS ACTION

**DECLARATION OF C. JOE SAYAS, JR., ESQ. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS**

Date:       February 20, 2025 [vacated]
Time:       10:00 a.m.
Judge:     Hon. Hernán D. Vera
Ctrm:      5B, 5th Floor

- 1 -
DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

## DECLARATION OF C. JOE SAYAS, JR.

I, C. Joe Sayas, Jr., hereby declare:

1.      I am an attorney admitted to practice before this Court and all the courts of the State of California. I am counsel of record for Plaintiffs Dora Patricia Amaya and Anibal Silva (collectively, "Plaintiffs") and lead Class Counsel in this action against Defendant Menzies Aviation (USA), Inc. ("Menzies"). I have personal knowledge of the facts stated in this declaration, and, if called as a witness, I could and would competently testify thereto.

**A.    Menzies Delayed in Filing its Motion to Compel Arbitration**

2.      Soon after filing the Complaint on August 19, 2022, my law firm, the Law Offices of C. Joe Sayas, Jr. ("CJS") filed the First Amended Complaint("FAC") on August 30, 2022. The initial Complaint named Dora Patricia Amaya, a Passenger Service Agent of Menzies, as Plaintiff while the FAC added Brayan Gonzales, a ramp agent, as Plaintiff.

3.      On September 8, 2022, counsel for Menzies, Kevin Jackson, Esq., sent a letter to me identifying the case name and number, and informed me that Menzies' ADR Agreement requires Amaya to submit all employment disputes to arbitration. Responding through my letter of September 29, 2022, I stated that pursuant to *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), Amaya's claims are not subject to arbitration.  Despite clear disagreement on arbitrability between the parties in September 2022, Menzies did not move to compel arbitration. A copy of my letter is attached as Exhibit "1".

4.      The parties engaged in extensive discovery following Menzies' filing of its Answer to Plaintiff's FAC. On March 2, 2023, I sent a certified mail to Menzies and copied counsel providing the statutorily required notice of Plaintiffs' intent to prosecute an action under the Private Attorney General Act ("PAGA").  A copy of this statutory PAGA notice is attached as Exhibit "2". On May 9, 2023, my firm filed the Second

- 2 -
DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

Amended Complaint ("SAC") which added Annibal Silva as Plaintiff and added a PAGA cause of action seeking "non-individual" (PAGA penalty) claims. The SAC retains the prior allegations of Ms. Amaya's "individual claims," which could potentially be arbitrable if Menzies ADR position is upheld. Since the non-individual PAGA claims are not arbitrable under state law, the procedure, when arbitration is found appropriate, is to order the individual claims to arbitration while the court action is stayed. See *Adolph v Uber*, 14 Cal. 5th 1104 (2023). It is my experience after years of handling PAGA cases that courts adopt this procedure even before *Adolph*.

5. Despite notices of PAGA claims through formal correspondence and court pleading, Menzies failed to move for arbitration of Ms. Amaya's individual claims and did not request a stay of the PAGA action. Instead, Menzies chose to actively participate in discovery in this court action and sought information on the merits of Amaya's individual claims – discovery that it should do in arbitration. Taking advantage of being in federal court, Menzies spent considerable time in actively litigating here as follows: a) deposed Amaya on April 26, 2023 where Menzies' counsel asked substantive questions relating to her individual wage claims and those relating to PAGA and the class claims; b) propounded Request for Production where it sought documents similarly pertaining to the merits of Amaya's individual claims as well as PAGA and the class claims.; c) sought affirmative relief with the Magistrate Judge on procedures and contents of written notices to the entire putative class before producing the Class List; d) entered into Stipulated Protective Orders regarding production of documents and Stipulations on communications with putative class members on discovery and certification deadlines (see Dkts. 31, 32, 34, 36 and 38); e) provided input into the management of this action through its prior joint submissions of Rule 26(f) and Case Management Reports where Menzies twice represented to the Court that it will file summary adjudication but "does not anticipate filing any motions…or other procedural matters" (see Dkts. 19, 56, 58 and 100), but instead demanded jury trial

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

and chose the option of selecting a magistrate to settle the claims in this litigation; and f) invoked federal preemption in attacking the merits of Amaya's individual wage reimbursement claims and seeking dismissal thereof, which if granted will adversely impact the rights of all Class Members including those with claims that Menzies seeks to arbitrate in any arbitration. see Dkt.76-1 and 76-5. To date, the parties have taken a total of 17 depositions, and exchanged 5 sets of Requests for Production of Documents, and 2 sets of Interrogatories. Hundreds of thousands of pages of documents have been produced including time and pay records of all Class Members including those whose claims Menzies now seeks to arbitrate. The parties have stipulated and jointly submitted a total of 4 reports to the Court. See also Joint Supplement to FRCP Rule 26(f) Report (Dkt. 100) on post certification discovery completed to date.

6. Since the instant Motion to Compel Arbitration ("Motion") was not filed until December 30, 2024, it took Menzies more than nineteen months from the filing of the SAC alleging the PAGA cause of action and nearly 28 months from the filing of the Complaint to file this Motion.

7. By its Motion, Menzies belatedly seeks to arbitrate Ms. Amaya's individual claims and stay Ms. Amaya's PAGA action[1] indefinitely while her individual claims are adjudicated in arbitration. Menzies cannot justify its failure to move for arbitration following its receipt of the FAC by claiming purported inefficiency. It argued that another class representative, Silva, a ramp agent, is exempted from the FAA and allegedly will not have an effect on the class action. However, Mr. Silva is not a PAGA representative in contrast with Ms. Amaya who, in addition to being a class action representative, is also a deputized PAGA representative. If there was the question in

---

[1] Menzies is also seeking dismissal of the action citing *Viking River* Cruises, Inc. v. Moriana, 596 U.S. 639. However, the California Supreme Court, being the final arbiter of state law, ruled in *Adolph* that a plaintiff who files a PAGA action with individual and non-individual claims does not lose standing to litigate the non-individual claims in court simply because the individual claims have been ordered to arbitration. *Adolph*, at 1124.

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

May 2023 of separating her individual claims that Menzies argues should have been arbitrated from the non-individual PAGA claims, then Menzies should have promptly brought its Motion along with its now request for stay of the PAGA action in mid-2023.

8.    When Menzies received the SAC there was no bar for Menzies from moving to arbitrate Ms. Amaya's individual claims. Had Menzies moved to compel arbitration promptly after the SAC was filed, and had Menzies prevailed, that outcome would have stayed this action, the arbitration would have proceeded in 2023 and would likely be nearing conclusion by the end of this year. To allow a stay at this late juncture will not only unduly delay trial of this action for years but will also restrict Plaintiffs' ability to adequately prepare for trial.

9.    In the same vein, there was never any need nor justification for Menzies to wait for the outcome in *Lopez v. Aircraft Serv. Int'l, Inc. and Menzies Aviation (USA), Inc.*, Case No. 23-55015, to determine the arbitrability of Ms. Amaya's claims.  This was first raised in Plaintiffs' Motion for Partial Summary Judgment ("MPSJ") which was denied by the Court on July 16, 2024 with its finding then that it was efficient for Menzies to wait for the outcome of *Lopez*. However, Plaintiffs respectfully request the Court's reevaluation in light of additional evidence now before it – Menzies' Job Descriptions of Ms. Amaya's passenger service agent position and those of other employees whose claims Menzies seeks to arbitrate. See Plaintiffs' Appendix of Menzies Written Job Descriptions filed concurrently herewith.

10.    *Lopez* involves the issue of whether one job position, fueler, is excluded from arbitration under §1 of the FAA. A determination of this question under *Saxon,* decided before this action was filed, involves analysis of whether the employee's **work duties** play a necessary role in the free flow of goods across borders.  *Saxon* pointed to the relevance of what the employee does and the work duties performed – facts that Menzies knew all along. Hence, Menzies could have filed its motion using the guidelines

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

of *Saxon*.[2] Menzies knows the differences among its employees' work duties. A fueler physically puts fuel into aircraft. Amaya's work duties are remarkably different. A passenger service agent checks in passengers, verifies foreign or interstate travel documentation, and checks their baggage for flights at ticket counter and gates. Her work starts the process of moving passengers and loading baggage into airplanes.[3] See Declaration of Amaya. Having different work duties, the adjudication of a fueler as a transportation worker under FAA's §1 is not dispositive of whether or not a passenger service agent like Ms. Amaya is herself a transportation worker. Menzies' appeal in *Lopez* was therefore no excuse for its failure to move to arbitrate in 2023. In opposing the MPSJ, Menzies warned about inconsistent district court decisions. However, Menzies' excuses appear to be an afterthought as Menzies did not mention its plan of moving to arbitrate in any of the joint reports filed with the Court before December 2024. Its warnings are unfounded since work duties for each of these positions are undoubtedly different and may result in different decisions. Each of these issues can and should run on parallel paths to avoid delays because the resolution of one issue is not a condition precedent of the other.

11.     The fact that *Lopez* never had bearing on the arbitrability of the claims of Ms. Amaya becomes clearer now that *Lopez* is the law. The Supreme Court denied Menzies' petition for certiorari in its unsuccessful effort to challenge the 9th Circuit

---

[2] Menzies could have additionally been guided by the principles in *Rittman v. Amazon.com Inc.* 971 F.3d 904 (9th Cir. 2020), a case cited favorably in *Saxon*. The 9th Circuit in *Rittman* decided that engagement of transportation workers in foreign or interstate commerce includes "instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on, and the transportation of persons as well as of goods…" 971 F.3d at 910.

[3] The declarations of Menzies' managers Cass Borthwick and Kyle Stephens acknowledge that passenger service agents move or lift baggage. Menzies Job Description in fact requires these employees to be "capable of lifting comfortably 70 lbs". However, the Managers contradict themselves by also saying that passenger service agents "do not touch or move baggage." See Dkt. 101-15, at 5 and Dkt 101-27 at 5.

- 6 -

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

1   decision that fuelers are exempted from arbitration.   While *Lopez* was decided adversely

2   against it, Menzies can and still litigates the issue of whether the claims of Ms. Amaya

3   are arbitrable or not. Menzies adroitly changes course by now insisting that this Court,

4   in ruling on its Motion, must apply *Lopez* to fuelers only and follow *Saxon* with respect

5   to Amaya and the employees she represents. See Motion, at 19. If Menzies now insists

6   that the 2022 case of *Saxon*, **not** Lopez, must be the guide to adjudicate its Motion,

7   Menzies then had the benefit of *Saxon* in 2022 when it could and should have readily

8   filed its Motion.

9        12.   Notwithstanding Menzies inconsistent positions, applying *Saxon* and

10  other cases should result nonetheless in denial of the Motion. By continuing to insist

11  on arbitration despite the outcome in *Lopez*, Menzies readily recognizes that the

12  different job duties of Lopez and Amaya can result in different outcomes. Hence, it

13  would not only be diligent but also efficient for Menzies to have moved for arbitration

14  in 2022.

15       13.   The same thing is true of the 64 additional job classifications of Class

16  Members whose claims Menzies is seeking to arbitrate. A review of the Job Descriptions

17  that Menzies now submits with the Motion is revealing. These documents show the

18  stark differences in their work duties compared with the fueler in *Lopez*.   Similar to

19  Amaya's individual claims, the outcome of the *Lopez* appeal has no bearing on whether

20  Menzies' Motion with respect to the other employees should be deferred. In the same

21  manner, the Motion with respect to the other job positions should have been filed much

22  earlier.

23       14.   On February 8, 2024, this Court issued an "Order Granting Plaintiffs'

24  Motion for Class Certification" in this action. *See* Dkt. 69. The Court certified a class of

25  non-exempt employees that includes those whose job classifications are now sought to

26  be arbitrated. It ruled that "Amaya is well positioned to represent the interests of those

27  Menzies employees who do not unambiguously fall under *Saxon*." Dkt. 69. It became

28

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION
TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED
CLASS

1  more evident that Menzies should have then promptly moved for arbitration on the
2  claims of these employees - all of whom do not unambiguously fall under *Saxon*.
3  However, Menzies delayed filing its Motion for another ten and one-half months from
4  this Court's certification order.

5         15.    To date, the parties have engaged in nearly two and one-half years of active
6  litigation such that it becomes necessary to move this case forward by scheduling pre-
7  trial and trial dates. However, Menzies now seeks to belatedly stay Ms. Amaya's PAGA
8  claims before this Court, have her go back to square one, and navigate the arbitration
9  process of adjudicating her individual claims. It is not uncommon to have arbitrations
10 completed in 2 to 3 years.   In effect, Menzies seeks to put a stay of the action for this
11 long period of time. Menzies' strategy of delay is thus far from being efficient.

12        16.    In meeting and conferring with defense counsel, Christopher Ward, Esq.
13 before the filing of the Motion, we discussed Menzie's intent to move for arbitration of
14 the claims of 36 employees identified in his firm's letter of September  13, 2024.
15 However, no one among the Plaintiffs' Team had any pre-filing discussions with
16 Menzies' counsel regarding the other job positions (approximately 29 others which
17 Menzies "has since determined" upon filing, as listed in footnote 3 of the Motion). It is
18 unfortunate that these positions have now been added to the Motion without prior
19 discussion and which Plaintiffs have been informed only upon receipt  of the Motion.
20 There were also no pre-filing discussions with defense counsel regarding Menzies
21 sought for relief of dismissing Amaya's PAGA complaint or staying this action while
22 her individual claims are sought to be arbitrated.

23        17.    Menzies claims to have narrowed its Motion by excluding certain job
24 positions from its Motion. However, those excluded were simply employees who
25 unambiguously fall under *Saxon* and thus clearly excluded from arbitration under the
26 law. Menzies appears to attribute its delay in filing its Motion on Plaintiffs' refusal to
27 narrow the scope of job classifications that are subject of arbitration. However, Menzies

28

- 8 -
DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION
TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED
CLASS

knew from my letter of September 29, 2022, that Plaintiffs dispute the applicability of its ADR Agreement pursuant to *Saxon*. Menzies should have started preparing at that point to move for arbitration against Amaya who since the filing of the Complaint had sought to represent all non-exempt employees, including those "who do not unambiguously fall under Saxon." The truth is that in pre-filing communications among counsel, Plaintiffs maintained that the known duties performed by the 36 Class Members listed in its September 13, 2024 correspondence, including the administrative people, are inter-connected and constitutes a vital component of Menzies' ability to provide direct ground handling, cargo and fueling services to its airline customers. See Exhibit "B" to Christopher Ward's Declaration, Dkt. 101-2. Menzies ability to actively move airline passengers and their baggage, as well as cargo, is necessarily accomplished through the work of these employees although, as *Saxon* acknowledges, the duties of some may be "further removed from the channels of interstate commerce or the actual crossing of borders". See 596 U.S. 450, n.2.

18.     If arbitration is ordered and the action is stayed as Menzies wishes, more time will be wasted as trial of this action is delayed due to Menzies' tardy filing of its Motion. Class Members will be prejudiced in meeting their burden of proof as undue passage of time may result in loss of witnesses, evidence, and other information, or impede witness' abilities to recall. As delays occur, Class Members entitled to receive back wages may move, disappear, or die and thus unable to benefit from this class action. I have encountered these unfortunate incidents in prior class actions I handled as class counsel, seen those in experience of colleagues, and from my review of other cases. For some employees, the delay may mean denial of their rights. Menzies' prompt filing then could have avoided the prejudicial delays that imperils the rights of Class Members.

19.     The filing of this action on August 19, 2022, preserves the rights of Class Members whose wage claims extend as far back as seven years ago, on August 19, 2018.

- 9 -

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

However, if claims of some employees are excluded from this certified class as a result of Menzies' late Motion, such claims at individual arbitrations face the risks of having to contend with and oppose t new multiple defenses that Menzies can raise such as: the statute of limitations, laches, delay, waiver, or release of claims. Claims for wages and penalties are respectively governed by the three-year and one-year Statute of Limitations. See California Code of Civil Procedure § 338(a) and § 340(a). The prejudice on employees whose claims are ordered to arbitration is real in light of Menzies ADR Policy provisions as follows:

"In the event a dispute should arise and you wish to initiate these procedures, you must deliver a written request for alternative dispute resolution to Menzies Aviation within the statute of limitations period that would apply to the filing of a civil complaint alleging the same claims in court…. **If a request for an alternative dispute resolution is not submitted timely, the claim will be deemed to have been waived and forever released.**" emphasis supplied. See Exhs. F and G to Bazerkanian Decl. (*See* Dkt.101-12.)

20.    With obstacles imposed by these new defenses available at arbitration, the employees affected will likely find it difficult to find contingency counsel who are willing to oppose Menzies' experienced defense lawyers. In reality, as I have seen in my professional practice, these individual claims will simply remain ineffectual. Proceeding to individual arbitrations after Menzies' 28-month delay, therefore, will result in unfair and unjust consequences to its affected employees.

**B.    Menzies' Refusal to Notifying the Class until after its Arbitration Right is Finally Adjudicated up to Appeal, Significantly Delays This Case**

18.    I am submitting these additional facts to inform the Court of Menzies' pattern of delay and its strategy of using its right to arbitration as a weapon to delay proceedings in this case. On February 9, 2024, the day after this Court granted class certification, my office e-mailed Menzies' counsel requesting that the parties stipulate

- 10 -
DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

to the form and manner of Notice of Class Action to Class Members ("Notice") as required by FRCP Rule 23(c)(2)(B). Attached with the email were Plaintiffs' draft of the Class Notice and Exclusion Form for counsel's review and proposed edits.

19. The Notice informs Class Members of their rights under this class action and gives them an opportunity to opt out or seek other options to protect their rights. Several follow-up requests were made with Menzies' counsel on May 2, May 28, July 17, and July 22 to stipulate and avoid a court motion. See Dkt. 88-2. While there was no dispute on Class Notice contents, Menzies objected to its issuance. Menzies gave the first excuse that the parties should wait for the decision on its Motion for Reconsideration of the Order granting certification. When the same was adjudicated and denied, Menzies then gave the second excuse that the parties should wait for the Court of Appeal's decision on its Rule 23(f) Petition. When the said Petition was decided and denied, Menzies gave a third excuse, this time basing its refusal on the pendency of Plaintiffs' Motion for Partial Summary Judgment ("MPSJ"). The Court denied the MPSJ on July 16, 2024.[4]

20. Menzies continued to refuse to stipulate then gave the excuse that its motion to compel arbitration (which it had still not filed at that time) should first be fully resolved before giving the Class Notice. Menzies thus keeps moving the goalpost once an event is completed to delay issuance of the Class Notice. Considering that Menzies plans to avail of the appellate process if its Motion to Compel Arbitration is denied,[5] Menzies' has strategically used its contractual right to arbitration to delay the required notification process for an extended period of time.

---

[4] Menzies knew the factual and legal basis of Plaintiffs' position on waiver and delay when our office served Menzies' counsel with our initial portion of the Joint Memorandum of Points and Authorities re: MPSJ on April 4, 2024. This knowledge notwithstanding, it took another 8 ½ months for Menzies to move to compel arbitration. See Dkt.76-1.

[5] See Dkt 100.

- 11 -

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

21.     As time passed with Menzies' continued refusals to inform Class Members of the class action, Plaintiffs had to seek the Court's assistance and filed a Motion for Approval of Form and Manner of Class Notice on August 29, 2024.  Dkt. 88.  Menzies opposed and argued that the Class Notice is premature and will create confusion as its right to arbitration has not been adjudicated.  This Court rejected Menzies' argument and held that Menzies' concern:

> "is easily addressed by informing Class Members that some claims may be subject of arbitration. Moreover, given that the class was certified on February 8, 2024, **the Court is unpersuaded that it should delay proceeding with notice to the class** for a motion that has not yet been filed (and which will not be heard or adjudicated for at least another month)."  Dkt. 95 (emphasis supplied).

22.     Refusing Menzies' move to delay the proceedings, this Court granted Plaintiffs' Motion for Approval of Form and Manner of Class Notice on October 1, 2024. This notification process is just only about nearing completion by the Administrator with the last day of opting out on December 30, 2024, when it could have been completed much earlier. Had Menzies stipulated to issue the Notice already prepared by Plaintiffs the day after class certification was ordered, the required notification process would have been completed in or about May of last year.

## C.     Menzies Delayed its Compliance with Discovery

23.     On June 21. 2024, Plaintiffs served Menzies with their Request for Production of Documents, Set 3 ("RFP"). Menzies failed to timely respond to the RFP and despite this deficiency thereafter failed to fully comply with its discovery obligations to produce the documents and to provide a specific written response.  After my firm made several requests on Menzies to comply which were of no avail, Plaintiffs filed their Motion to Compel Production of Documents on November 20, 2024. See Dkt. 96.

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

24.     On December 4, 2004, the Hon. Margo A. Rocconi ordered Menzies to complete production of documents by January 6, 2025, and to supplement its response to specify which documents are responsive . See Dkt. 99. In ruling on the Motion, the Court in its Order expressed its concern over the dilatory tactics that Menzies employed in litigation, stating that:

" Defendant (Menzies)routinely failed to respond to Plaintiffs' counsel's communications, and **inexplicably delayed producing written responses for nearly five months**." (emphasis supplied).

25.     Menzies' inexplicable delay in providing the required responses for such a long period of time in violation of discovery rules presents another example of its strategy to delay this action.

**D.    Menzies' Refusal to Cooperate in Trial Scheduling until Final Resolution of its Contractual Right to Arbitration Further Delays this Case**

26.     On August 28, 2024, I called defense counsel Christopher Ward, Esq.  to discuss respective proposals for pre-trial and trial dates to determine if the parties can submit a joint scheduling proposal with the Court. I was not able to reach an agreement with counsel.

27.     On September 9, 2024, my firm provided Menzies' counsel with this Court's "Schedule of Pretrial and Trial Dates Worksheet," with Plaintiffs' proposed dates reflected therein.  I requested that Menzies provide its proposed dates on the worksheet for submission to the Court. However, Menzies failed to provide its proposed dates, arguing again the pendency of an event- that Menzies' (yet to be filed) arbitration motion should first be "sorted out".  Menzies cites "a complicated, evidentiary-heavy and time-intensive motion" and announces its "plan on appellate

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

litigation" to describe the prolonged process required to reach a final resolution of the arbitration issue. See Dkt. 100, at 9.

28.    However, the time-intensive nature of the Motion based on the work duties of its employees are facts that Menzies knew from the start of this litigation. Its knowledge of the elaborate process of enforcing its contractual right only underscores the imperative of filing this Motion promptly to avoid delays. Moving to arbitrate at this juncture when it is already time to set a trial date is dilatory.

29.    In light of the above facts, Menzies should have commenced its Motion immediately from any of the following important events:

a) the filing of the Complaint on August 19, 2022 in line with the 9th Circuit cases of *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016, *Banq, Inc. v. Purcell*, 2024 WL 4164126 * 2 (9th Cir. Sept. 12, 2024) including other cases cited in the Opposition, and the California Supreme Court case of *Quach v. California Commerce Blub, Inc.*, 16 Cal.5th 562 (2024);

b) when served with the SAC adding Amaya's PAGA cause of action on May 9, 2023, Menzies could have moved to arbitrate Amaya's individual claims and moved to stay the PAGA action following the procedures in *Adolph*; or

c) the Court Order of February 8, 2024, granting class certification.

30.    Since the Motion was belatedly filed on December 30, 2024, it took Menzies a prolonged period of nearly eleven up to twenty-eight months from these events before finally moving to arbitrate.

31.    Menzies' insistence of a final adjudication of its late Motion before scheduling trial puts a brake on scheduling factual discovery deadlines, delays expert work and preparation of reports and disclosures, compliance with this Court's pre-trial requirements, and delays trial preparation efforts. Menzies' Motion and the relief it is

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

requesting thus unreasonably delays this case and seriously prejudices the rights of approximately 6,500 employees whose wage claims should now be adjudicated. Delaying trial, and conditioning its timing to Menzies' strategic arbitration timeline with its associated delays, harms the interests of these employees.

32.     I beg the Court's indulgence for having to read a lengthy Declaration. However, I believe that the Court should be informed of the totality of circumstances for it to determine if Menzies actions in litigation and prolonged delay  in moving to arbitrate have resulted in waiver. It is necessary to evaluate Menzies Motion not only in terms of its timeliness but also in terms of the bigger litigation picture on how Menzies sought to leverage its contractual right to delay the proceedings in this class action to the prejudice of Class Members.

**E.** **Authentication**

33.     Attached as Exhibit "3" is a true and correct copy of relevant excerpts from the transcript of the deposition of Talin Bazerkanian, who was designated by Defendant Menzies as its representative deponent pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and whose deposition was taken in this case by Plaintiffs on April 13, 2023.

34.     Attached hereto as Exhibit "4" is a true and correct copy of relevant excerpts from the transcript of the deposition of Brian Galindo, a managerial employee of Defendant Menzies, whose deposition was taken in this case by Plaintiffs on May 3, 2023.

35.     Attached hereto as Exhibit "5" is a true and correct copy of relevant excerpts from the transcript of the deposition of Jose A. Salcedo Garcia, a managerial employee of Defendant Menzies, whose deposition was taken in this case by Plaintiffs on May 5, 2023.

36.     Attached hereto as Exhibit "6" is a true and correct copy of relevant excerpts from the transcript of the deposition of Lizette Medina, a managerial employee

- 15 -
DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

of Defendant Menzies, whose deposition was taken in this case by Plaintiffs on May 3, 2023.

37.    Attached hereto as Exhibit "7" is a true and correct copy of relevant excerpts from the transcript of the deposition of Dave Funes, a managerial employee of Defendant Menzies, whose deposition was taken in this case by Plaintiffs on May 5, 2023.

38.    Attached as Exhibit "8" is a true and correct copy of the Job Description for Menzies' "Cargo Handler Agent" position, which was not included with Menzies' moving papers.  A further true and correct copy of this document is also included with Plaintiffs' Appendix of Menzies' Written Job Descriptions, filed concurrently herewith.

I  declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 30th day of January 2025, in Glendale, California.

/s/ C. Joe Sayas, Jr.

C. JOE SAYAS, JR.

- 16 -

DECLARATION OF C. JOE SAYAS, JR. IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND EXCLUDE MEMBERS FROM THE CERTIFIED CLASS

Exhibit    1

**LAW OFFICES OF**

# C. JOE SAYAS, JR.

**EMPLOYMENT & CONSUMER RIGHTS ATTORNEYS**
500 N. BRAND BOULEVARD, SUITE 980
GLENDALE, CALIFORNIA 91203
Telephone (818) 291-0088
Facsimile (818) 240-9955

September 29, 2022

*VIA E-MAIL ONLY*

**Kevin Jackson, Esq.**
FOLEY & LARDNER LLP
11988 El Camino Real, Ste. 400
San Diego, California  92130-2594
kjackson@foley.com

> **Re:**  *Dora Patricia Amaya, et al. v. Menzies Aviation (USA), Inc.*
>         U.S.D.C. C.D. Cal. Case No. 2:22-cv-05915-MCS-MAR

Dear Counsel:

This responds to your letter, dated September 8, 2022, regarding the above-captioned case. Thank you for your letter.

Be advised that we disagree with your contention that Plaintiffs' claims are preempted due to a Collective Bargaining Agreement between Defendant Menzies Aviation (USA), Inc. (hereafter, "Menzies") and SEIU United Service Workers West.  The claims asserted here are non-waivable statutory rights under California law, and are thus not preempted.  *See Valles v. Ivy Hill Corp.*, 410 F.3d 1071 (9th Cir. 2005); *Wilson-Davis v. SSP America, Inc.*, 434 F.Supp.3d 806 (C.D. Cal. Jan. 21, 2020); *Andrade v. Rehrig Pac. Co.*, 2020 WL 1934954 (C.D. Cal. Apr. 22, 2020).  We also disagree with your contention that these statutory claims are subject to a valid arbitration agreement.  *See Southwest Airlines Co. v. Saxon*, 142 S.Ct. 1783 (2022).

Per your requested courtesy, attached please find a copy of the Proof of Service in this case.

Very truly yours,

C. Joe Sayas, Jr., Esq.

Encl.

cc:    Christopher Ward, Esq (cward@foley.com)
       David King, Esq. (dpk@kcmlaw.net)

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER | FOR COURT USE ONLY |
|---|---|---|
| **C. Joe Sayas, Jr. SBN 122397**<br>**CONRADO JOE SAYAS, JR.**<br>**500 N. BRAND AVE., #980**<br>**GLENDALE, CA 91203**<br>ATTORNEY FOR  **Plaintiff** | **(818) 291-0088** | |

| First Street Federal Courthouse Los Angeles<br>350 W 1st Street<br>Los Angeles, CA 90012 | | |
|---|---|---|
| SHORT TITLE OF CASE:<br>Amaya, Dora Patricia v. MENZIES AVIATION (USA), INC. | | |
| DATE:          TIME:          DEP./DIV. | | CASE NUMBER:<br>2:22-cv-05915-MCS-MAR x |
| | **Declaration of Service** | Ref. No. or File No:<br>AMA |

United States District Court

I certify that I am authorized to serve the Summons and Complaint in the within action pursuant to F.R.Civ.P 4(c) and that I served the:

**Summons In a Civil Action; First Amended Complaint; Notice of Assignment to United Judges; Notice to Parties of Court Directed ADR Program; Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge; Initial Standing Order for Civil Cases Assigned to Judge Mark C. Scarsi**

On: **MENZIES AVIATION (USA), INC., a Delaware Corporation**

I served the above listed documents in accordance with FRCP 4(h) or CCP 415.20(a)

at: **2710 Gateway Oaks Dr Ste 150N,  Sacramento, CA 95833**

On: **9/21/2022**          Date:  **03:52 PM**

In the above mentioned action by serving to and leaving with

**CSC Lawyers Registered Agent by leaving with Trudy Desbiens**
**Person Authorized to Accept**

A declaration of diligence and/or mailing is attached if applicable.

Person attempting service:

a. Name: **Katrina Williams**
b. Address: **1000 Corporate Center Drive Suite 110, Monterey Park, CA 91754**
c. Telephone number: **213-628-6338**
d. **The fee** for this service was: **90.00**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the return of service and statement of fees is true and correct.



**Katrina Williams**          Date: **09/26/2022**

| Declaration of Service | Invoice #: 6456049 |
|---|---|

Exhibit  2

**LAW OFFICES OF C. JOE SAYAS, JR.**
Employment & Consumer Rights Attorneys
500 N. Brand Boulevard, Suite 980
Glendale, California 91203
Telephone (818) 291-0088
Facsimile (818) 240-9955

**KING CHENG MILLER & JIN, LLP**
3675 Huntington Drive, Suite 200
Pasadena, CA 91107
Telephone 626-304-9001
Facsimile 626-304-9002

March 2, 2023

*<u>VIA CERTIFIED MAIL</u>*

**MENZIES AVIATION (USA), INC.**
c/o CSC – Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California  95833

Re:    **NOTICE OF CLAIMS OF DORA PATRICIA AMAYA AND BRAYAN LOZANO GONZALEZ FOR:**

(1)    **Failure to Pay Wages for Missed Meal Periods under California Labor Code sections 226.7 and 512**

(2)    **Failure to Pay Wages for Missed Rest Periods under California Labor Code section 226.7**

(3)    **Failure to Reimburse for Business Expenses under California Labor Code section 2802**

(4)    **Unlawful Withholding of Earned Wages under California Labor Code section 221**

(5)    **Failure to Keep and Furnish Accurate, Itemized Wage Statements under California Labor Code section 226**

(6)    **Failure to Make Timely Payment of Earned Wages under California Labor Code section 204**

(7)    **Intention to Prosecute Private Enforcement Action under California Labor Code Private Attorney General Act of 2004 (*Cal. Lab. Code §§ 2698 et seq.*), to Collect Civil Penalties for Violations of California's Wage-and-Hour Laws**

Dear Sir/Madam:

Please be informed that our law firms, the Law Offices of C. Joe Sayas, Jr. and the law firm of King Cheng Miller & Jin, LLP, have been retained by Dora Patricia Amaya and Brayan Lozano Gonzalez (collectively, "Claimants") to pursue claims against Menzies Aviation (USA), Inc. (hereafter, "Menzies") for the Labor Code violations described herein. Claimants seek to recover, pursuant to the Labor Code Private Attorney General Act ("PAGA"), all civil penalties arising from wage-and-hour violations committed by Menzies against Claimants and other former and current non-exempt employees, as well as reasonable attorneys' fees and costs. The aforementioned claims are based on the facts, and the Labor Code and Wage Order provisions, set forth herein.

*    *    *    *    *

Menzies has employed Claimant Dora Patricia as a Passenger Service Agent for Menzies since August 2021. Menzies has employed Claimant Brayan Lozano Gonzalez as a Ramp Agent since November 2021. It is undisputed that, throughout the time Claimants have worked for Menzies, they have been classified and paid as non-exempt employees.

As explained below, the wage-and-hour violations asserted by Claimants arise from Menzies' policies and practices regarding: (i) provision of off-duty, uninterrupted meal breaks; (ii) provision of premium wages in lieu of missed meal breaks; (iii) provision of opportunity to take uninterrupted, off-duty rest breaks; (iv) provision of premium wages in lieu of missed rest breaks; and (v) reimbursements for the costs of uniforms and personal mobile phones that employees were compelled to use to perform their work duties. The aforesaid violations further resulted in Menzies repeatedly violating the recordkeeping and timely-payment provisions of the California Labor Code.

### A.    Claimants and Other Non-Exempt Employees of Menzies Were Not Provided All Meal- and Rest-Break Benefits Guaranteed by Labor Code Sections 226.7 and 512, and Wage Order 9

Pursuant to California Labor Code section 512, and Wage Order 9, ¶ 11, employers must provide California employees: (i) an uninterrupted, off-duty meal period of at least 30 consecutive minutes in duration, and occurring no later than the end of the employee's 5th hour of work, for all work periods in excess of 5 hours; and (ii) a second, uninterrupted, off-duty meal period of at least 30 consecutive minutes in duration, and occurring no later than the end of the employee's 10th hour of work, for all work periods in excess of 10 hours.

Moreover, under Wage Order 9, ¶ 12, employers must authorize and permit California employees who work at least 3 and ½ hours per day to take an uninterrupted, off-duty rest period of at least 10 consecutive minutes in duration for every 4 hours worked, or major fraction thereof.

Such meal- and rest-break requirements were repeatedly violated by Menzies as to Claimants and other non-exempt employees. Menzies imposed excessive workloads on these

employees that resulted in repeated violations of the meal- and rest-break provisions California Labor Code sections 226.7 and 512, and paragraphs 11 and 12 of Wage Order 9. Specifically, the excessive workloads imposed by Menzies compelled employees to routinely work through mandated meal and rest periods, resulted in employees routinely not being relieved of all duties during ostensible meal and rest periods, resulted in employees regularly not receiving meal and rest breaks within the time limits imposed by law, and resulted in employees not receiving the full, uninterrupted duration of 30 and 10 minutes, respectively, for meal and rest periods.

Under Section 226.7(b) of the California Labor Code and Wage Order 9, ¶ 11, employers must pay their employees an additional hour of compensation, computed at such employee's regular hourly rate of pay, for each workday that a required meal break is not provided. *Cal. Lab. Code § 226.7(b)*; *Wage Order 9-2001, ¶ 11*. Similarly, under Section 226.7(b) and Wage Order 9, ¶ 12, employers must pay employees an additional hour of compensation, computed at such employee's regular hourly rate of pay, for each workday that a mandated rest break is not provided. *Cal. Lab. Code § 226.7(b)*; *Wage Order 9-2001, ¶ 12*.

Menzies has made no attempt to pay Claimants their earned premium wages for each day they were made to miss a mandated meal or rest break. Claimants are informed and believe that other former and current non-exempt employees of Menzies have been, and are, similarly denied their premium wages for missed meal and rest breaks.

### 1. *Civil Penalties for Violations of Meal-Period Provisions*

Under California Labor Code section 558, and pursuant to PAGA, Menzies is subject to civil penalties for their repeated failures to provide Claimants and other non-exempt employees with mandated meal breaks, which are assessed as follows: (i) $50 per employee for the initial failure to provide a mandated meal break; and (ii) $100 per employee for each subsequent failure to provide a mandated meal break. *Cal. Lab. Code §§ 558(a) & 2699(a)*.

Additionally, Menzies is subject to civil penalties under PAGA for their repeated violations of the requirement to pay premium wages for each day a mandated meal break was not provided, which are assessed as follows: (i) $100 per employee for the initial failure to pay a premium wage for a missed meal break; and (ii) $200 per employee for each subsequent failure to pay a premium wages for a missed meal break. *Cal. Lab. Code § 2699(f)*.

### 2. *Civil Penalties for Violations of Rest-Period Provisions*

Similarly, under California Labor Code section 558, and pursuant to PAGA, Menzies is subject to civil penalties for their repeated failures to authorize or permit Claimants and other non-exempt employees to take mandated rest breaks, which are assessed as follows: (i) $50 per employee for the initial failure to authorize or permit a mandated rest break; and (ii) $100 per employee for each subsequent failure to authorize or permit a mandated rest break. *Cal. Lab. Code §§ 558(a) & 2699(a)*.

Additionally, Menzies is subject to civil penalties under PAGA for their repeated violations of the requirement to pay premium wages for each day a mandated rest break was

missed, which are assessed as follows: (i) $100 per employee for the initial failure to pay a premium wage for a missed rest break; and (ii) $200 per employee for each subsequent failure to pay a premium wages for a missed rest break.  *Cal. Lab. Code § 2699(f)*.

**B.**     **Claimants and Other Non-Exempt Employees of Menzies Were Not Reimbursed for Expenses as Required by Labor Code Section 2802 and Wage Order 9**

Pursuant to California Labor Code section 2802, and Wage Order 9, ¶ 9, employers are required to indemnify California employees for all expenditures necessarily incurred by such employees in direct consequence of their discharge of duties.  The purpose of this requirement is to prevent employers from passing their operating expenses on to their employees.  *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal. 4th 554, 562.

In violation of Labor Code section 2802, Menzies required Claimants and Menzies' other non-exempt employees to pay for expenses incurred during the performance of their job duties, including but not limited to the costs of employees' uniforms and employees' use of their personal mobile phones for purposes of performing work tasks.

Pursuant to PAGA, Menzies is subject to civil penalties for their repeated failures to properly reimburse Claimants and other non-exempt employees for expenditures incurred in the course of their duties, which are assessed as follows: (i) $100 per employee for the initial failure to reimburse under Labor Code 2802; and (ii) $200 per employee for each subsequent failure to reimburse under Labor Code 2802.  *Cal. Lab. Code § 2699(f)*.

**C.**     **Claimants and Other Non-Exempt Employees of Menzies Were Not Timely Paid All Earned Wages, in Violation of Labor Code Section 204**

In light of Menzies' failures and/or refusals to pay Claimant and other non-exempt employees their earned premium wages for missed meal and rest periods, as described above, Menzies has also repeatedly violated the timely-payment provisions of California Labor Code Section 204.  Such timely-payment violations subjects Menzies to PAGA civil penalties under Labor Code Section 210.  *See Cal. Lab. Code § 2699(a)*.

Under Section 210, an initial violation of Section 204 results in a civil penalty of $100 for each initial failure to pay each affected employee, with each subsequent violation resulting in a civil penalty of $200 for each failure to pay each employee, plus 25% of the amount unlawfully withheld.  *Cal. Lab. Code § 210(a)*.  All willful or intentional violations result in civil penalties of $200 for each failure to pay each employee, plus 25% of the amount unlawfully withheld.  *Id.*

**D.**     **Menzies Failed to Maintain and Furnish to Claimants and Other Non-Exempt Employees the Accurate, Itemized Wage Statements Required by Labor Code Sections 226 and 1174, and Wage Order 9**

Under Sections 226 and 1174 of the California Labor Code, and Wage Order 9, ¶ 9, employers are required to keep an accurate record of its employees' hours of work and earned pay.  Employers are also required to prepare and provide to each employee, on every pay period,

an accurate, itemized statement showing the total hours worked by the employee, the amount of wages they earned, the amount of wages paid to them, and the corresponding rates of pay for each category of wages. *Cal. Lab. Code § 226(a).*

In light of Menzies' repeated failures to pay Claimants and other non-exempt employees all of their earned premium wages for missed meal and rest breaks, as described herein, Menzies has continually failed to comply with the above-described recordkeeping requirements. *See id.*

Under Labor Code Sections 226.3 and 1174.5, and pursuant to PAGA, Menzies is subject to civil penalties for its repeated recordkeeping violations against Claimants and other non-exempt employees of Menzies. The civil penalties under Section 226.3 are computed at $250 per employee for initial violations, and $1,000 per employee for subsequent violations. *Cal. Lab. Code § 226.3.* Under Section 1174.5, the systemic failure to maintain accurate and complete payroll records, as required by Section 1174, subdivisions (c) and (d), results in a civil penalty of $500 per employee. *Cal. Lab. Code § 1174.5.*

E.    **Notice of Intent to Seek Civil Penalties and Attorneys' Fees Under the California Labor Code Private Attorney General Act**

This letter serves as formal notice that, if the California Labor and Workforce Development Agency ("LWDA"), to whom this letter is also sent, declines or fails to take action on this notice within the statutory period, Claimants shall file and prosecute a private enforcement action under the California Labor Code Private Attorney General Act (*Cal. Lab. Code, §§ 2698 et seq.*), to recover all applicable civil penalties arising from Menzies' violations of the Labor Code and applicable Wage Orders against Claimants and other non-exempt employees of Menzies, including any other violations that may be disclosed in the course of further investigation and discovery. Claimants will further seek to recover the reasonable attorneys' fees and litigation costs incurred, as authorized under PAGA.

Very truly yours,

C. JOE SAYAS, JR.
Law Offices of C. Joe Sayas, Jr.

cc:    **Labor and Workforce Development Agency**
801 K Street, Suite 2101
Sacramento, California  95814
(***Via Electronic Online Filing***)

Christopher Ward, Esq. (via e-mail)

Kevin Jackson, Esq. (via e-mail)

Exhibit   3

# Deposition Transcript

Case Number: 2:22-cv-05915-MCS-MAR
Date: April 13, 2023

In the matter of:

# Amaya, et al. v Menzies Aviation USA, Inc. et al.

## TALIN BAZERKANIAN - 30(b)(6)

**CERTIFIED COPY**

Reported by:

Alyssa A. Repsik

Notary Public

CONTAINS HIGHLY CONFIDENTIAL PORTIONS



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                         -  -  -
      DORA PATRICIA AMAYA, an    ) CIVIL DIVISION
 4    individual; and BRAYAN     )
      LOZANO GONZALEZ, an        ) Case No.:
 5    individual; on behalf      ) 2:22-cv-05915-MCS-MAR
      of themselves and          )
 6    others similarly           )
      situated,                  )
 7                               )
              Plaintiffs,        )
 8                               )
         -vs-                    )
 9                               )
      MENZIES AVIATION (USA),    )
10    INC., a Delaware           )
      corporation; and DOES 1
11    through 10, inclusive,

12            Defendants.

13                         -  -  -

14         CONTAINS HIGHLY CONFIDENTIAL PORTIONS

15

16            REMOTE VIDEOTAPED DEPOSITION OF TALIN

17    BAZERKANIAN, 30(b)(6), located in California,

18    commencing at 9:47 A.M. PDT, on Thursday, April

19    13, 2023, before ALYSSA A. REPSIK, Court Reporter

20    and Notary Public in and for the Commonwealth of

21    Pennsylvania.

22

23

24

25
```

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

 1  directly supervise, do they hold office in Los

 2  Angeles?

 3       A.    No, they don't.

 4       Q.    Okay.  Are they spread out across

 5  the country?

 6       A.    Yes, they are.

 7       Q.    And what is the type of business

 8  that your employees engage in?

 9       A.    Aviation ground handling.  Aviation

10  ground handling and fueling and cargo handling

11  business.

12       Q.    What is ground hold -- holding

13  business?

14       A.    Ground-handling business.

15       Q.    Yeah.  Yes.  I'm sorry.  Ground

16  handling business.

17            What is that?

18       A.    Ground-handling business is we're

19  the middle -- we would be -- we would be

20  contracted by the airlines to handle all of

21  their ground-handling aspect at the airports,

22  meaning off-loading and loading planes and also

23  checking in passengers.

24       Q.    What about fueling?  What does that

25  consist of?

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1          A.      Fueling consists of fueling

2     aircrafts.

3          Q.      And you mentioned a third one.  I

4     believe that's cargo handling, is it?

5          A.      Yes, cargo handling.

6          Q.      And what does that consist of?

7          A.      Maintaining the warehouses that

8     handle inbound and outbound cargo for the

9     airlines.

10          Q.      So primarily, or principally, the

11     type of customers that Menzies has would be

12     airline customers; is that correct?

13          A.      Yes.

14          Q.      And how many airline customers does

15     Menzies service in California?

16          A.      I can't tell you that number,

17     offhand.

18          Q.      Are you able to give us an estimate

19     of like, 7 to 10, or 10 to 20?

20          A.      It would probably be 10 to 20.

21          Q.      And all these 10 to 20 airline

22     customers are engaged in both interstate and

23     international travel?

24          A.      It just depends on the airlines.

25     They're not all the same.  Some of them are

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1   on California.
 2            Are there different departments
 3   within Menzies in California?
 4       A.    What do you mean by "different
 5   departments"?
 6       Q.    Other department -- is the
 7   organization divided into various departments?
 8       A.    Various department as far as what?
 9   Are you talking about different business units?
10       Q.    Okay.  What about, is there a ramp
11   operations department?
12       A.    That's a business unit, yes.
13       Q.    Okay.  What other business units do
14   you have in Menzies other than the ramp
15   operations?
16       A.    Ramp, cargo, fueling.
17       Q.    Any other business units?
18       A.    No.  That's it.
19       Q.    Is there any separate department
20   known as baggage operations?
21       A.    No.
22       Q.    Is there a separate business unit
23   called cabin-cleaning operations?
24       A.    Cabin cleaning falls under ramp.
25       Q.    So as far as you know, there are
```

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    only three business units at Menzies in

2    California; correct?

3        A.    Not as far as I know.  We do have

4    three business units in California.  There are

5    functions that fall under the three business

6    units, but there is three business units in

7    California.

8        Q.    I see.  Ramp operations, what are

9    the functions under this business unit?

10       A.    Ramp handling, cabin cleaning, and

11   passenger service.

12       Q.    What does ramp handling consist of?

13       A.    Loading and unloading airplanes.

14       Q.    When you say loading and unloading,

15   that includes loading and unloading of

16   passengers and their baggages; right?

17       A.    No.  It's just -- it's just loading

18   and unloading luggages.

19       Q.    Luggage.  Okay.  What about

20   passenger services?  What does that consist of?

21       A.    Passenger service consists of

22   checking in -- checking in passengers.

23       Q.    Are there passenger services that --

24   that would have -- they would have job

25   positions like passenger service agents;

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    correct?

2        A.    Correct.

3        Q.    And what other job positions are

4    within the passenger services function?

5        A.    Passenger services, you would have

6    individuals that they would be down at the

7    arrival hall to assist the arriving passengers

8    with the custom and border-protection

9    documents.

10            You would have agents within the

11    same group that would be boarding, working at

12    the boarding gate.

13            There would also be some that would

14    assist when it has to do with lost luggages.

15        Q.    Anything else?

16        A.    Depending on the contract, it could

17    also be some that are assisting with the flight

18    ops.

19        Q.    You say flight ops?  I'm sorry.  I

20    didn't hear that.

21        A.    Flight operation.  You're recording

22    it for the flight operation, yes.

23        Q.    Okay.

24        A.    Depending on the contract.

25        Q.    Any other employees within the

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

```
 1    passenger services unit?

 2         A.    Not that comes to mind, no.

 3         Q.    Okay.  What about the -- this

 4    function of ramp handling under the ramp

 5    operations unit?

 6              What -- what positions of

 7    employees -- what employee -- what job

 8    positions would be under this unit?

 9         A.    Ramp handling would be loading and

10    offloading the -- the baggage, and the cargo

11    from the plane.  It would be ramp -- ramp

12    agents and baggage agent -- bagger agents.

13         Q.    And I think under ramp operations

14    unit you have a third function that I missed.

15    Can you say that again?  I know you mentioned

16    ramp handling, passenger services.

17              I think you mentioned a third one.

18         A.    Are you referring to a cabin

19    cleaner?

20         Q.    Cabin cleaner.  Yes.

21         A.    That's a different department.  It's

22    the same business unit but a different

23    department, yes.

24         Q.    So you're making a distinction

25    between business unit and departments.  Is
```

1  there a distinction within Menzies between

2  business unit and departments?

3      A.    I'm sorry.  I didn't understand the

4  question.  What do you -- can you repeat?

5      Q.    Within Menzies is there a difference

6  between what you referred to as business unit

7  and a department?

8      A.    Yes.  The business unit is a -- a

9  business unit contains different departments

10  with the different employees and the different

11  roles, but it's one business unit when it comes

12  to the financial of it.

13          So cabin cleaning is a different

14  department completely, totally different than

15  the passenger service, totally different than

16  the ramp or bag group, but it falls within that

17  business unit.

18      Q.    Okay.  Is there any other function

19  or -- or department that falls within the

20  general category of business -- of general

21  category of ramp operations?

22      A.    No.  I think that's it.

23      Q.    Now, second business unit that you

24  mentioned is cargo.  What does that consist of?

25      A.    Maintaining the warehouses where the

TALIN BAZERKANIAN - 30(B)(6) - CONTAINS HIGHLY CONFIDENTIAL PORTIONS    JOB NO. 564833
APRIL 13, 2023

1    cargo is inbound and where cargo gets sorted

2    out.

3         Q.    Would that also be -- would that

4    business unit also be responsible for loading

5    and offloading of cargo from airplanes?

6         A.    No, they are not.

7         Q.    So simply limited to warehousing of

8    cargo?  Is that what it is?

9         A.    Warehousing the cargo, breaking

10   down, and obvious -- breaking down and making

11   the cargo.

12        Q.    Now, you also mentioned a third

13   business unit, fueling.

14              What does that business unit do for

15   Menzies?

16        A.    It fuels the airplanes.

17        Q.    Okay.  I saw an abbreviation like

18   LAWFTEC.  What does that stand for?

19        A.    Stands for LAWFTEC.  That's our

20   consortium business.  That's a completely

21   separate business.

22        Q.    What is that business?

23        A.    It's a fueling.  It fuels the

24   consortium.  Los Angeles International Airport

25   has a group of customers that they combine

```
 1    COMMONWEALTH OF PENNSYLVANIA          )
                                            ) SS
 2    COUNTY OF ALLEGHENY                   )

 3                     CERTIFICATE

 4      I, Alyssa A. Repsik, a notary public in and
      for the Commonwealth of Pennsylvania, do hereby
 5    certify that the witness, TALIN BAZERKANIAN,
      was by me first duly sworn to testify the
 6    truth, the whole truth, and nothing but the
      truth; that the foregoing deposition was taken
 7    at the time and place stated herein; and that
      the said deposition was recorded
 8    stenographically by me and then reduced to
      typewriting under my direction, and constitutes
 9    a true record of the testimony given by said
      witness.
10
        I further certify that I am not a relative,
11    employee or attorney of any of the parties, or
      a relative or employee of either counsel, and
12    that I am in no way interested directly or
      indirectly in this action.
13
        IN WITNESS WHEREOF, I have hereunto set my
14    hand and affixed my seal of office this 19th
      day of April 2023.
15

16

17            _Alyssa A. Repsik_____
              Alyssa A.  Repsik, Notary Public
18            Court Reporter
              Notary Public
19            Allegheny County
              My Commission Expires March 3, 2024
20            Commission Number 129614

21

22

23

24

25
```

Exhibit   4

# Deposition Transcript

Case Number: 2:22-cv-05915-MCS-MAR

Date: May 3, 2023

In the matter of:

# Amaya, et al. v Menzies Aviation USA, Inc.

# BRIAN GALINDO



**CERTIFIED COPY**

Reported by:

Katie Wilkerson

Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                          -    -    -
     DORA PATRICIA AMAYA, an        )Case No.:
4    individual; and BRAYAN         )2:22-cv-05915-MCS-MAR
     LOZANO GONZALEZ, an            )
5    individual; on behalf of       )
     themselves and others          )REMOTE VIDEOTAPED
6    similarly situated,            )DEPOSITION OF BRIAN
                                    )GALINDO
7                    Plaintiffs,    )
                                    )
8    Vs.                            )
                                    )
9    MENZIES AVIATION (USA),        )
     INC., a Delaware               )
10   Corporation; and DOES 1        )
     through 10, inclusive,         )
11                                  )
                     Defendants.
12

13

14                         -    -    -

15

16

17

18

19

20      REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
        WITHOUT AUTHORIZATION FROM THE CERTIFYING
21      AGENCY

22

23

24

25
```

```
 1   manager?

 2        A.    Luis Madrigal.

 3        Q.    Have you reported to Mr. Madrigal

 4   since the time you took on the operations

 5   manager position in May of 2022?

 6        A.    Right.

 7        Q.    As operations manager of ramp -- I

 8   assume your responsibilities are for a

 9   department called ramp; is that accurate?

10        A.    Correct.

11        Q.    What does the ramp department do?

12        A.    The ramp has numerous functions,

13   from loading to offloading the aircraft,

14   dealing with baggage, cargo, and everything

15   below the wing of an aircraft.

16        Q.    You said everything below the wing

17   of an aircraft?

18        A.    Correct.

19        Q.    Is the ramp department part of a

20   broader business unit?

21        A.    The ramp is in line with other

22   departments that represent ground handling, as

23   a whole, for Menzies.

24        Q.    The ramp department is part of

25   ground handling?
```

1       Q.      So I better understand, let's take,

2    one by one, the things that ramp does.

3               The first thing you said is you guys

4    take care of loading and unloading the

5    aircraft.

6               Can you tell me what you mean by

7    that?

8       A.      We're responsible, as a service

9    provider, to offload cargo from the belly of an

10   aircraft, as we call it, and load any cargo or

11   baggage to the aircraft using heavy machinery.

12      Q.      What kind of machinery?

13      A.      We call them loaders.

14      Q.      Can you describe what that is?

15      A.      A big piece of machine that has

16   multiple rollers in order for you to offload

17   actual cargo pallets and baggage containers

18   from the aircraft, depending on if it's a

19   wide-body aircraft.

20              For a narrow-body, which is a small

21   aircraft, would be just using a belt loader,

22   that we call it, and we're offloading the bulk

23   baggage from there, or loads of baggage.

24      Q.      The belt loader is the thing where

25   you put the pieces of cargo or luggage on, and

BRIAN GALINDO
MAY 03, 2023

JOB NO. 591518

1    narrow-body one plus four.  There's different

2    customers and aircraft types that require more

3    than one plus four.

4        Q.    What are the other compositions?

5        A.    There's aircrafts that require one

6    plus five or one plus six.

7        Q.    When you say one plus, you mean the

8    one being the lead ramp agent and the second

9    number being the number of ramp agents,

10   correct?

11       A.    Correct.

12       Q.    Besides one plus four, one plus

13   five, one plus six, do you have any other

14   compositions of ramp agents that service

15   aircrafts of Menzies' clients?

16       A.    No.

17       Q.    Basically, your ramp agents bring

18   your machine to the aircraft, you meet the

19   aircraft when they arrive, you take the cargo,

20   and baggage, in whatever form it's in, and you

21   unload them and also bring cargo to the

22   aircraft and load them to get ready for

23   departure; is that correct?

24       A.    Partially correct.

25       Q.    What did I miss?

BRIAN GALINDO
MAY 03, 2023

JOB NO. 591518

1          A.     It's more than just the machinery

2    that's brought to the aircraft.   There's

3    numerous pieces of equipment that's brought

4    over to service an aircraft.

5               It's not just the heavy machinery

6    that's brought over.

7          Q.     What other equipment do your ramp

8    agents bring to the aircraft?

9          A.     Are we referring to a wide-body or a

10   narrow-body aircraft?

11         Q.     Let's start with the wide-body.

12         A.     For a wide-body aircraft, depending

13   on what the airline is bringing into LAX, it

14   requires a set number of dollies, which are

15   devices used to place the containers or cargo

16   pallets.

17         Q.     Anything else besides the dollies?

18         A.     If you're using a conventional

19   pushback, you require a towbar and a pushback.

20   If you're using a towbarless, it requires just

21   the pushback itself.

22         Q.     Can you describe what a towbar is?

23         A.     A device that you connect with the

24   aircraft-nose gear to the pushback that you

25   utilize in order to push out the aircraft onto

BRIAN GALINDO
MAY 03, 2023

JOB NO. 591518

1    the taxiway.

2        Q.    The pushback is the one that pushes

3    the aircraft out; is that right?

4        A.    Correct.

5        Q.    Besides the dolly, the towbar and

6    the pushback, is there any other equipment that

7    your team brings to the wide-body aircraft?

8        A.    Chocks and cones.

9        Q.    What are chocks?

10       A.    The name speaks for itself.  The

11   rubber chocks we utilize to chock the tires on

12   the aircraft to avoid it from rolling back or

13   moving forward.

14       Q.    That's C-H-O-C-K-S, right?

15       A.    Correct.

16       Q.    What are the cones for?

17       A.    Cones are a safety measure utilized

18   to protect the engines and the wing tips of the

19   aircraft.

20       Q.    It sounds to me, from your

21   description, that the ramp agents do loading

22   and unloading of an aircraft.  They also meet

23   them and put on the chocks and the cones to

24   make sure they're stable.  After they've been

25   unloaded and loaded, the ramp agents are also

BRIAN GALINDO
MAY 03, 2023

JOB NO. 591518

1    the ones that push them out to the taxiway.

2              Is that correct?

3         A.    Yes.  They push out the aircraft

4    onto the taxiway.

5         Q.    Besides all of that, is there

6    anything else that ramp agents do that we

7    haven't talked about?

8         A.    Yes.  You touched on bringing the

9    equipment to the gate.  Depending on where the

10   equipment is is where they would grab it from.

11              After the flight is done, they move

12   all the equipment they utilized for that

13   specific flight, they move to another gate or

14   take it back to the position where it needs to

15   be parked.

16              It varies, depending on the day or

17   their assignments.

18        Q.    Where do they usually get the

19   equipment initially at the start of the shift?

20        A.    It varies on what shift you're

21   referring to.

22        Q.    I'm trying to understand what the

23   daily shifts look like for an average ramp

24   agent.

25              When you come into work, do you have

BRIAN GALINDO
MAY 03, 2023

JOB NO. 591518

1   COMMONWEALTH OF PENNSYLVANIA        )
                                        ) SS
2   COUNTY OF ALLEGHENY                 )

3                    CERTIFICATE

4        I, Katie Wilkerson, a notary public in and
    for the Commonwealth of Pennsylvania, do hereby
5   certify that the witness, BRIAN GALINDO, was by
    me first duly sworn to testify the truth, the
6   whole truth, and nothing but the truth; that
    the foregoing deposition was taken at the time
7   and place stated herein; and that the said
    deposition was recorded stenographically by me
8   and then reduced to typewriting under my
    direction, and constitutes a true record of the
9   testimony given by said witness.

10       I further certify that the inspection,
    reading and signing of said deposition were
11  waived by counsel for the respective parties
    and by the witness.

12

13       I further certify that I am not a
    relative, employee or attorney of any of the
    parties, or a relative or employee of either
14  counsel, and that I am in no way interested
    directly or indirectly in this action.

15

16       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office this 10th
    day of May, 2023.
17

18

19             Katie Wilkerson, Notary Public
                    Professional Reporter

20       My Commission Expires February 14, 2026

21

22

23

24

25

# Exhibit  5

# Deposition Transcript

Case Number: 2:22-cv-05915-MCS-MAR

Date: May 5, 2023

In the matter of:

# Amaya, et al. v Menzies Aviation (USA), Inc.

## JOSE A. SALCEDO GARCIA



**CERTIFIED COPY**

**Reported by:**

Alyssa A. Repsik

Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8230
NV: FIRM #108F

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                      -  -  -
     DORA PATRICIA AMAYA, an    ) CIVIL DIVISION
 4   individual; and BRAYAN     )
     LOZANO GONZALEZ, an        ) Case No.:
 5   individual; on behalf      ) 2:22-cv-05915-MCS-MAR
     of themselves and          )
 6   others similarly           )
     situated,                  )
 7                              )
             Plaintiffs,        )
 8                              )
        -vs-                    )
 9                              )
     MENZIES AVIATION (USA),    )
10   INC., a Delaware           )
     corporation; and DOES 1    )
11   through 10, inclusive,     )
                                )
12           Defendants.        )

13                      -  -  -

14            REMOTE VIDEOTAPED DEPOSITION OF

15     JOSE A. SALCEDO GARCIA, located in California,

16     commencing at 1:01 P.M. PDT, on Friday, May 5,

17     2023, before ALYSSA A. REPSIK, Court Reporter

18     and Notary Public in and for the Commonwealth

19     of Pennsylvania.

20

21

22

23

24

25
```

JOSE A. SALCEDO GARCIA                                    JOB NO. 591520
MAY 05, 2023

```
 1          A.     The employees we have on the
 2    freighter.
 3          Q.     And when you say "freighter," are
 4    you talking about the specific department at
 5    Menzies?
 6          A.     Yes.
 7          Q.     Okay.  And freighter, is that
 8    part -- is that department part of a broader
 9    business unit called ground-handling unit?
10          A.     Yes, it's under ground handling.
11          Q.     Okay.  And what does the freighter
12    department do for Menzies?
13          A.     Handle cargo planes.
14          Q.     What is involved in handling cargo
15    planes?
16          A.     Excuse me?
17          Q.     What is -- what work is involved in
18    handling cargo planes?
19          A.     It's still ramp work.  Offloading
20    cargo from the aircrafts and loading cargo into
21    the aircrafts.
22          Q.     And when you say loading and
23    offloading cargo, is that the same as what ramp
24    agents do?
25          A.     Yes.  Yes.
```

JOSE A. SALCEDO GARCIA                                        JOB NO. 591520
MAY 05, 2023

```
 1        Q.    Okay.  Is there any difference at
 2   all between --
 3        A.    We don't deal with --
 4        Q.    -- what your freight unit -- let
 5   me -- I'm sorry.
 6        A.    I'm sorry.
 7        Q.    I understand it's your first
 8   deposition.  That's okay.  That's okay.
 9             Let me -- allow me to finish the
10   question so that you're clear on the record,
11   and I will allow you to complete your answer
12   before I ask my next question, okay, so it'll
13   be clear, all right, on the record.
14             Okay.  So how -- how different are
15   the responsibilities of -- let me withdraw that
16   question.
17             Okay.  The employees you have at
18   your freight department, what would those
19   employees be?
20             What are the job titles?
21        A.    They're still rampers, but they're
22   ramp cargo agents.
23        Q.    And how different is that -- I'm
24   just trying to understand the operations, sir.
25   How different is that from the ramp agents
```

JOSE A. SALCEDO GARCIA
MAY 05, 2023

JOB NO. 591520

1    under the supervision of Mr. Galindo?

2         A.    Mr. Galindo's agents deal with

3    passengers.

4         Q.    Okay.

5         A.    And on our side we have no

6    passengers, only the pilots.  Other than that,

7    it's all cargo.

8         Q.    Okay.  So when you say loading and

9    offloading cargo into planes, you're talking

10   about cargo planes only; correct?

11        A.    Yes.

12        Q.    And these cargo planes, obviously,

13   do not take passengers with them; right?

14        A.    No.

15        Q.    Okay.  And I asked this from

16   Mr. Funes.  What is -- what is the difference

17   between freight and cargo?

18        A.    It's just the title I guess we use

19   to distinguish warehouse agents from the ramp

20   freighter agents.

21        Q.    Okay.  Okay.  A layperson like me,

22   you know, understand freight and cargo to be

23   the same thing.

24             But there is your department, the

25   freight department, and there's the cargo

JOSE A. SALCEDO GARCIA                                    JOB NO. 591520
MAY 05, 2023

1   department.

2           Can you tell me the difference in

3   the type of services that your department does

4   in contrast or as compared to Mr. Funes'

5   department?

6       A.    So Mr. Funes' department, they

7   have -- they are warehouse.  So all they handle

8   is warehouse, which is the buildup and the

9   breakdown of the cargo that we load.

10          Whereas in freight it's already

11  built onto pallet sheets to go onto the planes

12  and come off the planes.

13      Q.    And the employees in your

14  department, they would consist of freighter

15  agents and freighter leads; correct?

16      A.    We are -- yes.

17      Q.    Okay.  Are there other job positions

18  within your department?

19      A.    We have freighter supervisors.

20      Q.    Any other job title or position?

21      A.    I mean, above me, operations

22  manager.

23      Q.    And who's your operations manager?

24      A.    Juan Lopez.

25      Q.    And as I understand it, you have

```
 1   COMMONWEALTH OF PENNSYLVANIA          )
                                           ) SS
 2   COUNTY OF ALLEGHENY                   )

 3                    CERTIFICATE

 4     I, Alyssa A. Repsik, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, JOSE A. SALCEDO
     GARCIA, was by me first duly sworn to testify
 6   the truth, the whole truth, and nothing but the
     truth; that the foregoing deposition was taken
 7   at the time and place stated herein; and that
     the said deposition was recorded
 8   stenographically by me and then reduced to
     typewriting under my direction, and constitutes
 9   a true record of the testimony given by said
     witness.
10
       I further certify that I am not a relative,
11   employee or attorney of any of the parties, or
     a relative or employee of either counsel, and
12   that I am in no way interested directly or
     indirectly in this action.
13
       IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office this 11th
     day of May 2023.
15

16

17   _____

18   Alyssa A.  Repsik, Notary Public
     Court Reporter
19   Notary Public
     Allegheny County
20   My Commission Expires March 3, 2024
     Commission Number 129614
21

22

23

24

25
```

# Exhibit   6

# Deposition Transcript

Case Number: 2:22-cv-05915-MCS-MAR
Date: May 3, 2023

In the matter of:

# Amaya, et al. v Menzies Aviation USA, Inc.

# LIZETTE MEDINA



**CERTIFIED COPY**

Reported by:

Katie Wilkerson

Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                         -   -   -
     DORA PATRICIA AMAYA, an      )Case No.:
 4   individual; and BRAYAN       )2:22-cv-05915-MCS-MAR
     LOZANO GONZALEZ, an          )
 5   individual; on behalf of     )
     themselves and others        )REMOTE VIDEOTAPED
 6   similarly situated,          )DEPOSITION OF LIZETTE
                                  )MEDINA
 7                 Plaintiffs,    )
                                  )
 8   Vs.                          )
                                  )
 9   MENZIES AVIATION (USA),      )
     INC., a Delaware             )
10   Corporation; and DOES 1      )
     through 10, inclusive,       )
11                                )
                   Defendants.
12

13

14                         -   -   -

15

16

17

18
        REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
19   WITHOUT AUTHORIZATION FROM THE CERTIFYING
     AGENCY
20

21

22

23

24

25
```

1        A.    I have been a cabin service agent, a

2    cabin service lead and a cabin service

3    supervisor.

4        Q.    How long were you a cabin service

5    agent for Menzies?

6              You can give me an estimate.  You

7    don't have to be exact.

8        A.    About a year.

9        Q.    How long were you a cabin service

10   lead for Menzies?

11       A.    I want to say about five years.

12       Q.    How long were you a cabin service

13   supervisor?

14       A.    About a year.

15       Q.    When did you start working with

16   Menzies?

17       A.    2011.

18       Q.    You started at the LA location of

19   Menzies?

20       A.    Yes.

21       Q.    What are your work responsibilities

22   as a cabin duty manager?

23       A.    I oversee the entire cleaning

24   department.  That includes scheduling, making

25   sure they're following through with their work

1    duties.   Anything that pertains to the cabin

2    department, I oversee.

3         Q.    The cabin department that you

4    mentioned, is that part of the ground-handling

5    business unit at Menzies?

6         A.    Yes, it is.

7         Q.    What is that cabin team responsible

8    for at Menzies?

9         A.    We are responsible for conducting an

10   aircraft security search and the cleaning.

11   It's a two-in-one process.

12              We do the cleaning and the security

13   search.

14        Q.    What does the team or your

15   department do with respect to conducting a

16   security search?

17        A.    Receive aircrafts to make sure

18   there's no non-identifying object left behind

19   by a previous passenger and/or crew members,

20   following the guidelines that were by the TSA.

21        Q.    Is that usually done when the

22   airplane lands and all passengers have left the

23   airplane?

24        A.    Correct.  When all passengers and

25   crew members have left the aircraft.

LIZETTE MEDINA
MAY 03, 2023                                              JOB NO. 591517

1    Q.    That part of the security search

2  that you do, that your department does for

3  Menzies, who is specifically responsible for

4  that, in terms of the job positions or titles

5  in your department?

6    A.    Can you explain?

7    Q.    Okay.  The persons who do the

8  security search, are those handled by any

9  specific employee?

10    A.    Yes.  Cabin agents and cabin leads

11  are the ones that conduct the security search.

12    Q.    Anything else that you do, in terms

13  of doing the security search services?

14    A.    No.

15    Q.    And you also mentioned cabin

16  cleaning?

17    A.    Yes.

18    Q.    What does that consist of?

19    A.    It consists of cleaning the entire

20  interior of the aircraft, which includes

21  vacuum, restrooms, the seat that the passengers

22  sit on, the crew bunks.

23         Anything within the aircraft that

24  entails a cleaning is what we do.  So changing

25  of the linens, the blankets, pillow cases,

LIZETTE MEDINA
MAY 03, 2023

JOB NO. 591517

1   stuff in that nature.

2       Q.   Does your department also provide

3   the supplies to the airplane?

4            As a supply, I'm talking about maybe

5   food or water?

6       A.   No, we do not.

7       Q.   What about toiletries?

8       A.   No.  That is provided by each

9   airline.

10      Q.   I heard about this information at

11  Menzies.  Does your department do like a

12  short-term cleaning solution?

13      A.   The cleaning solution, meaning a

14  disinfectant?

15      Q.   Yes.

16      A.   Yes, that is purchased.

17      Q.   When you say purchased, Menzies

18  purchased it?

19      A.   Yes.

20      Q.   And then your people or employees

21  provide the actual service of applying the

22  solution into the airplane?

23      A.   Yes.  That is correct.

24      Q.   What does it mean when you talk

25  about -- when people at Menzies talk about

```
 1  COMMONWEALTH OF PENNSYLVANIA        )
                                        ) SS
 2  COUNTY OF ALLEGHENY                 )

 3                      CERTIFICATE

 4       I, Katie Wilkerson, a notary public in and
    for the Commonwealth of Pennsylvania, do hereby
 5  certify that the witness, LIZETTE MEDINA, was
    by me first duly sworn to testify the truth,
 6  the whole truth, and nothing but the truth;
    that the foregoing deposition was taken at the
 7  time and place stated herein; and that the said
    deposition was recorded stenographically by me
 8  and then reduced to typewriting under my
    direction, and constitutes a true record of the
 9  testimony given by said witness.

10       I further certify that the inspection,
    reading and signing of said deposition were
11  waived by counsel for the respective parties
    and by the witness.

12
         I further certify that I am not a
13  relative, employee or attorney of any of the
    parties, or a relative or employee of either
14  counsel, and that I am in no way interested
    directly or indirectly in this action.

15
         IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my seal of office this 9th day
    of May, 2023.

17

18
              Katie Wilkerson, Notary Public
19                 Professional Reporter

20       My Commission Expires February 14, 2026

21

22

23

24

25
```

# Exhibit  7

# Deposition Transcript

Case Number: 2:22-cv-05915-MCS-MAR

Date: May 5, 2023

In the matter of:

# Amaya, et al. v Menzies Aviation (USA), Inc.

# DAVE FUNES

**CERTIFIED COPY**

Reported by:

Alyssa A. Repsik

Notary Public



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                       -  -  -
         DORA PATRICIA AMAYA, an    ) CIVIL DIVISION
 4       individual; and BRAYAN     )
         LOZANO GONZALEZ, an        ) Case No.:
 5       individual; on behalf      ) 2:22-cv-05915-MCS-MAR
         of themselves and          )
 6       others similarly           )
         situated,                  )
 7                                  )
                 Plaintiffs,        )
 8                                  )
            -vs-                    )
 9                                  )
         MENZIES AVIATION (USA),    )
10       INC., a Delaware           )
         corporation; and DOES 1    )
11       through 10, inclusive,     )
                                    )
12               Defendants.        )

13                       -  -  -

14            REMOTE VIDEOTAPED DEPOSITION OF

15       DAVID FUNES, located in California, commencing

16       at 9:02 A.M. PDT, on Friday, May 5, 2023,

17       before ALYSSA A. REPSIK, Court Reporter and

18       Notary Public in and for the Commonwealth of

19       Pennsylvania.

20

21

22

23

24

25
```

JOB NO. 591519

```
 1   enough to your computer.  I'm hearing kind of
 2   like a muffled sound here a little bit.  I want
 3   to see and hear you clearly.
 4        A.    Is that better?
 5        Q.    That's better.  Thank you.  Thank
 6   you.
 7              And what are your duties as cargo
 8   operations manager?
 9        A.    As a cargo operation manager, I
10   handle the business side of Menzies related to
11   cargo operations.
12        Q.    And what does cargo operations
13   consist of?
14        A.    Consist of a -- handling the
15   operation for two customers that we have in
16   LAX, and that is the whole side of import and
17   export of cargo to the LAX airport.
18        Q.    Okay.  You mentioned two customers.
19   I want to make sure I'm -- I get it correctly.
20              You say the import and export of
21   cargo.  Is that --
22        A.    Correct.
23        Q.    And the other one is -- the second
24   one is LAX?
25        A.    Correct.
```

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

1    Q.   Okay.  What is -- can you describe
2  for me what import/export cargo entails?
3    A.   So what import cargo is, it's
4  related to the cargo that arrives to the U.S.
5  and you will have to break it down, right.
6       And when it comes -- the opposite
7  will be the import would be export it, which is
8  build up and send the cargo off overseas.
9       So when it comes in we determine
10  what would be import, and when it leaves it's
11  export.
12    Q.   Okay.  Okay.  And when you say
13  "customer," are you talking about airline
14  customers?
15    A.   Correct.  We are currently handling
16  two airline customers, and recently we acquired
17  one more airline customers that we're going to
18  start providing services to.
19       So to answer the question, yes, I'm
20  referring to our airline customers.
21    Q.   Okay.  And what are these airline
22  customers?
23    A.   So the airline customers are Qatar
24  and Air China, and very recently it's Amerijet.
25    Q.   So there's a total of three

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

```
 1          A.    By a duty manager, correct.
 2          Q.    Is there any dispatcher within the
 3   cargo operations department?
 4          A.    No.  No.  There's no dispatchers
 5   there, no.
 6          Q.    Okay.  And in -- Mr. Funes, in terms
 7   of the overall or general services that your
 8   department provides to Menzies' customers, can
 9   you describe those general services for me?
10          A.    The general service, if I can be as
11   short as possible, okay, is to accept the
12   goods -- that would be the imports -- for Qatar
13   or China or Amerijet, prepare them for the
14   flights if you assign them to the export side.
15                Or -- or the goods or the cargo that
16   comes to LAX, you receive it, you break it
17   down, and you deliver it to the customer.  That
18   is the --
19          Q.    Okay.
20          A.    Yeah.
21          Q.    I'm sorry to interrupt you.
22          A.    No.  No.
23          Q.    Go ahead.  You can -- okay.
24          A.    I'm saying, yeah, it's a very
25   simplistic way to determine the import and the
```

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

```
 1    export, but that's, in essence, what we do
 2    here.
 3         Q.    Okay.  All right.  And you're
 4    educating me, sir.
 5         A.    No.
 6         Q.    I appreciate that.  I only know how
 7    to ride airplanes, but, anyway, it's
 8    interesting to know the different roles that
 9    you guys play.
10         A.    Yeah.  Just -- yeah, it's a very
11    simplistic way to approach the import and
12    export, but that's, in essence, what we do
13    here.
14         Q.    When you say accept the goods from
15    any of the airline customers that you have.
16         A.    Correct.
17         Q.    Do you -- when does the process
18    start?  The --
19         A.    Yeah.  So --
20         Q.    Go ahead.
21         A.    Yeah.  Yeah.  Thank you.
22              So the process starts with receiving
23    the cargo in a warehouse and the cargo is
24    either screened or unscreened cargo.
25              So when you receive it and you
```

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

1    come -- the forwarders send us, the drivers, to

2    deliver the goods.  We have a front counter

3    that accept the cargo.  This is where the cargo

4    agents receive the paperwork from the drivers.

5        Q.    Yeah.

6        A.    At the same time, the cargo handlers

7    examine the cargo that they bring.  We process

8    it, we accepted it, we get it ready, and it

9    leaves.

10       Q.    Okay.

11       A.    That is it.

12       Q.    I see.  I see.

13             I suppose the drivers -- the type of

14   drivers who use the Menzies' vehicles, do they

15   basically drive to the area where the plane is

16   parked?

17       A.    Well -- yeah.  So the drivers that

18   use our Menzies vehicle they are -- the

19   paperwork that you receive from the plane that

20   is arriving you need to stamp it by the U.S.

21   Customs Office.  So my drivers bring the

22   paperwork to the U.S. Custom Office.

23             The -- our drivers don't take the

24   cargo to the plane side because that's where we

25   have the freighter department.  Our cargo is

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

```
1          A.     So two different drivers.
2          Q.     I see.  I see.  But when is the
3    initial -- the first time that any employee
4    from the cargo operations actually, physically,
5    receive the goods?  What's that process?
6          A.     So that process is checking.
7    Basically, the paperwork is being brought to
8    the office, so the agents will verify the
9    authenticity.
10               There's a checklist they follow that
11   includes them making copies of the documents
12   that they bring, make sure that it's clear
13   within the TSA regulations, and make sure the
14   paperwork is okay, it's authentic.  We process
15   it.
16               And on the other side we have the
17   drivers who process actually the cargo, the
18   shipments, the goods.  And that's when the
19   first point of contact is for anybody that
20   comes to the warehouse.
21         Q.     Okay.  So after the paperwork that
22   you describe has been completed, do those goods
23   get delivered to the warehouse?
24         A.     So after -- we need to confirm
25   whether or not the goods are screened or
```

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

1   unscreened, and that determines what's the

2   locations that we assign the cargo.

3            If the cargo is not a screen,

4   they're going to be set in a place to get a

5   screen.

6            If the cargo isn't screened, we call

7   in CCFS.  It goes to the export side where we

8   have a different set of cargo handlers build it

9   up and get it ready for the plane.

10       Q.    Okay.  Okay.  So you're describing

11  two different processes, one supposedly

12  accepting the cargo --

13       A.    That's right.

14       Q.    -- and one, of course, exporting or

15  moving the goods into the same airplane; correct?

16  correct?

17       A.    Yeah.  Correct.

18       Q.    Okay.  So these airplanes kind of

19  like -- what?  Have this -- have the purpose of

20  unloading some of the cargo and, at the same

21  time, after the unloading is completed, they'll

22  be able to load cargos in the airplane; is that

23  correct?

24       A.    Correct.  But that process that you

25  described is the passenger side when you load

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

1    freighter side.  The freighter side are the

2    guys who take the goods that we built to the

3    aircraft, to the ICC 1s 2s, 3s, and 4s, and so

4    forth.  So that's what we call the freighters.

5            But in terms of the cargo in cargo

6    business, freight and cargo is the same thing.

7        Q.    I see.  Okay.  But in terms of the

8    responsibilities of the employees within the

9    cargo department and the freighter department

10   those are different; right?

11       A.    Yes.  Absolutely.  The answer is,

12   yes, freighter and cargo are different.

13       Q.    Okay.  When you say the goods that

14   you built --

15       A.    Yeah.

16       Q.    -- what does that mean?

17       A.    It means that -- when I'm referring

18   to the export side of this business when you --

19   when you bring the shipments to us, we build

20   them to get it ready in a pallet, and that

21   pallet is what you're going to send as an

22   export.

23       Q.    I see.  You put those in a pallet or

24   you put those in a container or --

25       A.    Yeah.  No, we put that in a pallet.

DAVID FUNES                                                          JOB NO. 591519
MAY 05, 2023

1    The pallets are how we build up the export.

2    And that can be many boxes, or it can be three

3    boxes.  It all depends on size and weight.

4         Q.    I see.  I see.  Okay.  Now, you

5    mentioned building up cargo or freight.  Is

6    there such a thing as breaking down cargo or

7    freight?

8         A.    The answer is yes.

9         Q.    What is breaking down cargo or

10   freight?

11        A.    Breaking down is -- we need an item

12   for something about an export and import.

13   While we build all those boxes that you build,

14   they going to be, at one point, get broken

15   down.

16             So what you call the import is what

17   I getting delivered at the warehouse is what I

18   need to break down, and that is the import

19   side.

20             It's -- the opposite of building up

21   is breaking down.

22        Q.    Okay.  Okay.

23        A.    But I do the breakdown when the --

24   with the goods that they send me from the other

25   side.

DAVID FUNES                                                    JOB NO. 591519
MAY 05, 2023

1       Q.     I see.  I see.  Okay.

2              So there are -- okay.  So both --

3    most of your employees -- talking about the --

4    I'm talking about the cargo agents, the cargo

5    handlers.  Most of these folks work in the

6    warehouse.  Is that --

7       A.     All of them.  All of them.  No

8    more --

9       Q.     Okay.

10      A.     -- all of them work in the

11   warehouse, yes.  Yes.

12      Q.     I see.  Okay.  All right.

13             And I suppose when the goods come in

14   they're moved physically into the warehouse?

15   Somebody like a cargo handler or a cargo agent

16   inspects and determines the cargo; right?

17      A.     Correct.  Correct.

18      Q.     Okay.

19      A.     That's correct.

20      Q.     Do some agents or cargo handlers

21   take pictures or photos of the goods?

22      A.     No.  What they do is they receive

23   and they have breakdown sheets and they

24   checkmark whatever they're receiving.

25      Q.     I see.  Okay.

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

```
 1          A.      Correct.

 2          Q.      Okay.  Okay.  I see.  And you -- you

 3   mentioned that -- thanks for explaining what

 4   cargo handlers are doing.

 5                  How different are the

 6   responsibilities or duties of the cargo agents

 7   from the cargo handlers?

 8          A.      The cargo agents are apply -- the

 9   process of applying to a cargo agent position

10   is the same, and the scope of duties is

11   different because the cargo agents deal with

12   the office clerk side of this business:

13   Paperwork, photocopying, filing, fold -- it's

14   an office clerk for the warehouse.

15                  Whereas the cargo handlers they are

16   the individuals who work at the warehouse

17   moving the cargo for us on forklifts or

18   receiving it or building.

19                  So the scope of duties is different.

20          Q.      Are they the ones who build and

21   break down the freight or the cargo?

22          A.      Absolutely.  Those are -- yes.

23   Absolutely.  In the simplistic way, the side of

24   there is very physical work, moving the cargo

25   to ramp, get it ready; on the other side you
```

DAVID FUNES
MAY 05, 2023

JOB NO. 591519

1  dealing with the paperwork that requires to --

2  to file, make copies of it, and have ready --

3       Q.    Okay.

4       A.    -- in cabinets.  It's very office

5  work related.  Yeah.

6       Q.    I see.  Okay.  And the -- the cargo

7  agents that are involved in the preparation of

8  the paperwork, do they also work in the

9  warehouse?

10      A.    They don't work -- they do not work

11  in the warehouse.  They work in the office next

12  to the warehouse.

13      Q.    Okay.  There's an office next to the

14  warehouse?

15      A.    Correct.

16      Q.    Is there a separate office for the

17  export warehouse and the import warehouse?

18      A.    No.  It's the same office.

19      Q.    Okay.  Okay.  So the same office --

20  who -- who handles this office?  Who heads this

21  office?

22      A.    Who is in this office?

23      Q.    Yes.

24      A.    It's the cargo agent.

25      Q.    Other than a cargo agent.  I'm

DAVID FUNES
MAY 05, 2023

```
 1   COMMONWEALTH OF PENNSYLVANIA          )
                                           ) SS
 2   COUNTY OF ALLEGHENY                   )

 3                   CERTIFICATE

 4     I, Alyssa A. Repsik, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, DAVID FUNES, was by
     me first duly sworn to testify the truth, the
 6   whole truth, and nothing but the truth; that
     the foregoing deposition was taken at the time
 7   and place stated herein; and that the said
     deposition was recorded stenographically by me
 8   and then reduced to typewriting under my
     direction, and constitutes a true record of the
 9   testimony given by said witness.

10     I further certify that I am not a relative,
     employee or attorney of any of the parties, or
11   a relative or employee of either counsel, and
     that I am in no way interested directly or
12   indirectly in this action.

13     IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 11th
14   day of May 2023.

15

16
                 _____
17               Alyssa A.  Repsik, Notary Public
                 Court Reporter
18               Notary Public
                 Allegheny County
19               My Commission Expires March 3, 2024
                 Commission Number 129614
20

21

22

23

24

25
```

# Exhibit  8



**MENZIES AVIATION**

# JOB DESCRIPTION

## UPS- Cargo Handler Agent (North America)

**Department:** Ramp Operations-UPS
**Reports To:** Lead Ramp Agent / Shift Supervisor
**FLSA Status:** Non-Exempt (Hourly)
**Position:** Part Time (Seasonal)

### Job Purpose Summary:
Unloading and loading of luggage, freight and cargo on and off commercial aircraft, in the outbound bag room and the baggage claim area. Driving and operating small specialized commercial vehicles. Position requires: heavy lifting, pushing, pulling, bending, stretching, and frequent kneeling.

### Primary Accountabilities and Duties:

- Comfortably and continuously lift/move 70 lbs. of cargo and baggage on and off aircraft and transport it between aircraft, airport terminals and air cargo facilities.
- Frequent bending, stretching push/pulling, stacking and kneeling in small confined locations.
- Operate motorized equipment.
- Read and interpret aircraft weight and balance loading instructions, hazardous material identification labels, aircraft loading manifests, and baggage and cargo routing tags.
- Ensure the safe and secure operations, in accordance with the highest possible standards of health, safety, security and all government statutory requirements.
- Perform other duties as assigned.

### Essential Skills and Qualifications:

- Must be at least 18 years of age.
- Must pass pre-employment medical.
- Must pass Drug testing.
- Must be able to speak, read and write in English proficiently.
- Valid driver's license in good standing.
- Must be available and flexible to work variable shifts including weekends and holidays.
- Work is done primarily outdoors, must be comfortable working in all weather conditions.
- Must pass driver's test with the Department of Airports and obtain a driver's license to drive on Airport Operational Area (AOA).
- Must pass FBI background check and obtain US Customs seal.
- Prior Ramp experience preferable.
-

### Employee Acknowledgement

I, _____, acknowledge review of this job description. I realize that it is subject to change or amendment as deemed appropriate by Menzies Aviation.

I also understand that all job duties are not described above and that I will be expected to perform other related duties as directed by my supervisor and management.

Signature: _____     Date: _____

**EXCELLENCE FROM TOUCHDOWN TO TAKEOFF**